**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PALANTIR TECHNOLOGIES INC.,
Plaintiff,

v.

RADHA JAIN and JOANNA COHEN,

Defendants.

Civil Action No. 25-cv-8985

**COMPLAINT**

1. Plaintiff Palantir Technologies Inc. ("Palantir" or the "Company"), by its undersigned attorneys, hereby files this Complaint against Defendants Radha Jain ("Jain") and Joanna Cohen ("Cohen"), and in support thereof, alleges as follows:

**INTRODUCTION**

2. Palantir brings this lawsuit to protect its intellectual property and enforce its contractual rights against two former employees who used deception and stolen documents and information to create a competing copycat business.

3. Two former Palantir employees, Jain and Cohen exploited their prior access to Palantir's confidential information, proprietary methodologies, and customer relationships to the benefit of a copycat "version" of Palantir. Jain and Cohen hid their unfair competition—knowing that it directly violated their contractual obligations to Palantir. Their misconduct only recently came to light after their imitation business emerged from "stealth" mode, professing to have developed in eleven months the same product and business that took Palantir decades to develop and while Jain, its co-founder, was party to a non-competition agreement with Palantir. Palantir's subsequent forensic investigation revealed theft of confidential documents and information, which has started to unravel the scope of Defendants' misconduct.

4. Palantir has designed a market-leading platform that enables organizations to integrate artificial intelligence ("AI") into their operational workflows to increase efficiencies across their businesses. Palantir has expended billions of dollars developing proprietary technology, understanding its customers' problems, and creating valuable customer relationships to cement itself as the standard-bearer in the AI industry.

5. Jain and Cohen were far from rank-and-file employees. Jain designed and built Palantir's flagship software, and Cohen interacted directly with some of Palantir's largest and most important customers to configure specific AI software solutions to increase the efficiency of their businesses and operations.

6. As senior engineers, Jain and Cohen were entrusted with Palantir's crown jewels: its source code, internal healthcare demonstration workspace, deployed customer workflows, and proprietary customer engagement strategies. These materials are the product of billions of dollars of investment and years of research by Palantir.

7. To protect Palantir's most valuable trade secrets and confidential information and customer relationships—and in exchange for millions of dollars of compensation—Jain and Cohen agreed to abide by narrowly tailored non-competition, confidentiality, and return of property obligations.

8. Palantir had every expectation that Jain and Cohen would honor their commitments. Unfortunately, Palantir was wrong. Instead, Jain and Cohen weaponized their insider knowledge to harm Palantir by passing off Palantir's efforts as their own.

9. On November 21, 2024, Jain resigned from Palantir. A few days later, she sent her colleagues a vague email disclosing only that she was leaving to join "an AI startup," and when asked, only provided vague details about leaving for a "better opportunity." Jain did not provide

any details about what company she was joining or what her duties and responsibilities would be. She also did not update her LinkedIn profile to reflect her new employer.

10. In February 2025, Cohen followed Jain's playbook. She too resigned and kept her new employer a secret. Cohen likewise did not update her LinkedIn profile.

11. By design, Jain and Cohen purposefully hid the fact that they were secretly and unfairly competing with Palantir in brazen violation of their contractual obligations. Defendants' scheme has only recently come to light.

12. In October 2025, General Catalyst—a multi-billion-dollar venture capital firm—issued a press release announcing the launch of Percepta AI ("Percepta"), an AI integration company.

13. In that press release, General Catalyst's Chief Executive Officer, Hermant Taneja, and Percepta's Chief Executive Officer and former Palantir employee, Hirsh Jain, declared that "***[o]ver the last year, Percepta has been quietly at work***" building a direct competitor to Palantir in the AI integration industry.[1] (emphasis added).

14. That press release, announcing Percepta to the public for the very first time, revealed that Percepta is a Palantir copycat. Just like Palantir, Percepta is developing software that enables commercial and governmental organizations to integrate AI directly into their own systems and operations to transform workflows and increase efficiencies.

15. Percepta's intent to compete with Palantir has become crystal clear. In fact, during a recent interview with *Forbes*, Taneja acknowledged how "incredibly valuable" Palantir has become, and that General Catalyst (which owns Percepta) was working on creating a "version"

---

[1] Hemant Taneja and Hirsh Jain, *Unveiling Percepta*, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

of Palantir's business.[2]

16. Percepta is targeting the same global customer base in the financial services, manufacturing, and healthcare industries as Palantir, and it is using Palantir's former employees to do it. In fact, nearly half of Percepta's workforce, including its founders, such as Chief Executive Officer Hirsh Jain, Chief Technology Officer Thomas Mathew, Founding Building and Head of Health, Michael Rochlin, Cohen, and Jain, are former employees of Palantir.

17. It was only after Percepta surfaced from its self-described "stealth" mode this month that Palantir became aware that Jain and Cohen had been competing in violation of their restrictive covenant agreements. Palantir quickly launched a forensic investigation of Jain's and Cohen's activities on Palantir's devices and systems, and that investigation revealed clear and unequivocal evidence that Cohen stole highly confidential information to use at Percepta—the epitome of unfair competition and precisely what her contractual agreement prohibits.

18. The day after Cohen gave notice of her resignation from Palantir, she sent herself a Slack message attaching highly confidential documents, including a detailed healthcare revenue cycle management diagram; an internal healthcare demonstration planning framework; and a draft statement of work outlining how Palantir would deploy AIP to solve a customer's problem. Cohen then accessed and/or downloaded these documents on her personal phone. This came on the heels of her improperly accessing various marketing materials for industries she had no involvement with, violating her contract and her solemn obligations of trust as a senior Palantir employee. There was no legitimate business reason for any of Cohen's conduct.

19. In the hands of a competitor like Percepta, the highly confidential documents

---

[2] *Forbes, The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains How to Ride It*, at 6:15 (YouTube, Sept. 30, 2025), https://www.youtube.com/watch?v=hE8XOC8jWD8 (starting at 6:15).

and information Cohen misappropriated will be used to shortcut over a decade of Palantir's research into customer engagement, product development, and strategic learning, not to mention evade millions of dollars in investment costs. In so doing, Percepta would be able to replicate Palantir's most effective demonstrations, target high-value use cases, and pitch tailored solutions to clients using Palantir's own insights, thereby irreparably harming Palantir's competitive advantage and eroding its market position.

20. Jain's and Cohen's months-long charade was deliberate, coordinated, and unlawful. They lied about their plans when they resigned, Cohen stole Palantir's confidential documents and information on her way out the door, and they both hid their competitive misconduct for months. Palantir's investigation is active and ongoing, but what is clear as of now is that Jain's and Cohen's campaign of deception and unfair competition must be stopped.

21. Palantir brings this action to secure emergency injunctive relief to prevent Jain's and Cohen's infliction of further irreparable harm to Palantir's business and to immediately bring them in compliance with their lawful contracts.

## PARTIES

22. Palantir is a Delaware corporation with its principal place of business in Denver, Colorado.

23. Jain is an individual who resides in New York, New York.

24. Cohen is an individual who resides in New York, New York.

25. Palantir's investigation into the misconduct underlying this dispute is ongoing, and Palantir reserves all rights to amend the complaint to add additional defendants as the evidence provides.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs. Palantir is a citizen of Delaware and Colorado. Each of the Defendants is domiciled in New York and therefore a citizen of New York. The value of the injunctive relief sought herein, including the return and protection of highly sensitive and proprietary company documents and trade secrets, is substantial and of great value to Palantir. Palantir paid Defendants millions of dollars in compensation and equity in exchange for their covenants, and Palantir herein alleges that Jain has breached her non-competition obligations and Cohen has breached her non-competition, confidentiality, and return of property obligations. These ongoing breaches are causing irreparable harm to Palantir's business and goodwill, the value of which far exceeds $75,000.

27. This Court has personal jurisdiction over Defendants because each Defendant, by signing and accepting the terms of various binding agreements, along with accepting the significant benefits those agreements conferred, expressly agreed to this Court's exercise of jurisdiction over this action and of personal jurisdiction over them, which states "I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in New York for any lawsuit filed against me by" Palantir.[3]

28. This Court also has personal jurisdiction over Defendants because they live, work, reside, and are domiciled in New York.

29. Venue is proper in this District because each Defendant, by signing and

---

[3] *See* Radha Jain Employment Agreement at p. 14, § 2, attached hereto as Exhibit A; Joanna Cohen Employment Agreement at p. 14, § 2, attached hereto as Exhibit B.

accepting the terms of various binding agreements, along with accepting the significant benefits those agreements conferred, expressly agreed to litigate disputes in "the state and federal courts located in New York for any lawsuit filed against me by" Palantir. *Id.*

30. Venue is also proper in this District because Palantir maintains its New York office in this District and a substantial part of the events or omissions giving rise to Palantir's claims occurred here: (1) Defendants are domiciled in this District, (2) the contracts that Defendants are breaching were negotiated within this District; (3) Defendants breached their agreements while located within this District; (4) Palantir was harmed and continues to face the risk of additional immediate harm in this District as it deals with the operational and financial impact of Defendants' breaches; and (5) and Percepta's office, where Defendants are actively engaged in ongoing, willful breaches of their employment agreements with Palantir, is located in this District.

## STATEMENT OF FACTS

### A. Palantir is a Global Leader in the AI Integration Industry

31. Since its founding in 2003, Palantir has become a global leader in deploying software that enables customers to integrate AI directly into their own business operations to increase efficiencies.

32. Palantir's flagship Artificial Intelligence Platform ("AIP") provides customers with the ability to integrate their data, configure complex models, and deploy AI-powered applications securely with market-leading data governance capabilities.

33. AIP is designed to integrate directly with a customer's existing data infrastructure. It can ingest and process large volumes of the customer's data in real time, synchronize that data so that it all can be analyzed together, and generate tailored outputs that automate repetitive processes, make AI-driven recommendations, and execute specific actions

within the customer's existing workflow. This allows customers to embed AI directly into their day-to-day operations, augmenting the systems and decision-making processes they already use, rather than interacting with AI as a separate point solution.

34. AIP is a powerful platform with a proven track record in industries including:

- **Financial Services**: Financial institutions deploy AIP to assist with fraud detection, risk assessment, and compliance monitoring. For example, AIP continuously analyzes transactional data and regulatory feeds, identifies anomalies, and can recommend compliance workflows.
- **Manufacturing and Supply Chain**: Manufacturing companies benefit from AIP by monitoring and managing production and distribution in real time. For instance, if a manufacturer relies on certain raw materials to produce its product, AIP can track supply levels, forecast shortages, assess timing of reshipments, and recommend corrective action such as adjusting output or rerouting existing shipments.
- **Healthcare**: Hospitals and medical providers use AIP to automate parts of their processes for securing reimbursements from insurance companies for medical services. To illustrate, when an insurance company denies a claim, AIP can ingest the denial notice, analyze the patient's medical data and the insurer's guidelines, and generate a recommended next step for the medical provider such as drafting an appeal letter.

35. Palantir operates its business on a global scale, with six offices in North America, 14 offices in Europe & the Middle East, and four offices in Asia & Pacific. Palantir's customer base includes Fortune 500 companies located around the world.

36. By embedding AI directly into existing enterprise workflows, Palantir enables organizations around the world to transform how they operate, augmenting human decision-making with machine intelligence while maintaining full control, security, and accountability.

**B. Jain and Cohen Enjoy Access to Palantir's Most Valuable Confidential Information**

37. Jain worked for Palantir as an AI Product Engineer and was employed by Palantir from 2020 to 2025.

38. In this role, she was responsible for designing and building Palantir's source code that serves as the fundamental building blocks for its software solutions, including AIP Logic. AIP Logic is Palantir's market-leading product. It offers no-code and low-code solutions, and serves as a gateway for customers to deploy Palantir's proprietary technologies in a matter of days.

39. According to Jain, she worked "on a small team building Palantir's flagship AI application, AIP Logic,"[4] which she had led for nearly two years. Her colleagues reported that Jain had "expert level" knowledge of Palantir's products, and one of her main responsibilities was to "co-pilot[] the front-end implementation" of AIP Logic and "driv[e it] forward." According to Jain, she was responsible for leading the design, brainstorming relevant solutions, coding, and "owning the 'user story' for Logic, and using that to brainstorm with the team and prioritize features."

40. Jain worked closely with Palantir's customers, regularly attending on-the-ground "bootcamps" with Palantir's healthcare clients, including hospitals, among others. Jain had direct insight into how customers use Palantir's products, and how Palantir markets those products.

41. Joanna Cohen began her Palantir career as a Forward Deployed Engineer, a position that required both technical acumen and strong customer engagement skills, and had been

[4] Radha, Jain, https://www.radhajain.com/ (last visited October 29, 2025).

elevated over time to become a Healthcare Lead. In this role, she was responsible for interacting directly with healthcare customers to understand their unique needs and then designing and implementing AI software solutions tailored to meet those needs. In essence, she served a key function by connecting customer-specific use cases and Palantir's technical capabilities.

42. According to Cohen, she was the architect of Palantir's "Plan Acceptance Tool," a healthcare tool now used by Palantir's healthcare customers to track insurance coverage more effectively.

43. Jain and Cohen, along with the other former Palantir employees who left to join Percepta, all enjoyed access to some of Palantir's most valuable trade secrets and confidential information, including:

- **Source Code** – Both Jain and Cohen had access to Palantir's enterprise GitHub repository, which contains the core source code for its flagship software platforms. This codebase represents the foundational architecture of Palantir's products—elements that customers cannot view or modify—and is considered the Company's most sensitive intellectual property. Access to this repository is tightly controlled and tracked, requiring explicit approval due to its strategic value. Jain's role on the product development team involved directly contributing to and modifying this code, giving her deep insight into the underlying mechanics of Palantir's software and its proprietary engineering approaches.
- **Internal Workspace of Demonstrations** – Both Jain and Cohen had exposure to Palantir's internal demonstrative workspace, a gated environment used to prototype and showcase AI capabilities across industries. This workspace houses curated trial-and-error experiments, dashboards, and configurations for customer-facing

presentations. The demonstrations reflect years of learning about what offerings resonate with clients, serving as a goldmine of strategic insights into Palantir's customer relationships. Jain's and Cohen's familiarity with the environment enabled them to internalize Palantir's most effective deployment narratives and technical showcases.

- **Deployed Customer Workflows** – Jain and Cohen had access to live, customer-deployed workflows—configured dashboards, applications, and data pipelines tailored to specific customer needs. These workflows represent the final, operational layer of Palantir's software, integrating real-time data ingestion, AI processing, and actionable outputs. Accessing these deployments requires special permissions and provided visibility into how Palantir's platform was being used in practice, including the precise configurations and use cases that had proven successful. This knowledge, derived from years of customer interaction and iterative development, offered a roadmap for replicating Palantir's value propositions elsewhere.

- **Proprietary Customer Engagement Strategies** – Through their roles, Jain and Cohen also gained access to Palantir's internal strategies for customer engagement—documents and practices that guide how engineers and sales teams diagnose client needs, framed offerings, and secured buy-in. These strategies are developed through extensive experience in various sectors, such as healthcare, and were stored in restricted internal repositories. They included curated questions, diagnostic frameworks, and messaging tactics that help Palantir navigate complex stakeholder environments and accelerate adoption. This playbook of engagement

is instrumental in shaping Palantir's market success.

44. Palantir has invested billions of dollars and years of research and development to generate the confidential information to which Jain and Cohen had access.

45. Collectively, this information would give any competitor a significant head start by relieving them of the need to make a comparable initial investment in the development of such information and allow such competitor to replicate Palantir's technology, client strategies, and market positions.

**C. Palantir Takes Reasonable Precautions to Protect Its Confidential Information**

46. Palantir is highly protective of its confidential information and goes to great lengths to protect it from unauthorized use or disclosure, including requiring Palantir employees to enter into non-competition, non-solicitation, confidentiality, and return of property obligations prior to joining the company, in order to protect its trade secrets and confidential information.

47. Palantir also maintains a robust assortment of internal policies and procedures that instruct employees on appropriately using and safeguarding Palantir's trade secrets and confidential information, and which include various restrictions on employees' ability to access confidential and proprietary information. For example, Palantir maintains a policy concerning the transfer of files from Palantir's systems to personal devices, which explicitly states that employees "may NOT transfer any Palantir intellectual property" to themselves, "includ[ing] source code, presentations, videos, documents, work products, notes or photos containing Palantir data, exports from knowledge repositories" and similar materials. In addition, Palantir imposes electronic safeguards to protect and limit access to its trade secrets and confidential information, including network passwords, network monitoring, encryption, access control, and file control software.

**D. Jain and Cohen Enter Into Valid and Enforceable Restrictive Covenants**

48. In exchange for millions of dollars of compensation, Jain entered into a Proprietary Information and Inventions Assignment Agreement on or about December 6, 2019, and Cohen entered into a nearly identical Proprietary Information and Inventions Assignment Agreement on or about November 21, 2019.

49. In their PIIAs, Jain and Cohen agreed to refrain from competing with Palantir during their employment:

> 5. Non-Competition During Employment. I agree that during the course of my employment, I will not, in the same or materially similar capacity as I work for the Company, without the prior written consent of the Company, whether paid or not: (i) serve as a partner, principal, licensor, licensee, employee, consultant, officer, director, manager, agent, affiliate, representative, advisor, promoter, associate, investor, or otherwise for, (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, control, invest in, work or consult for or otherwise join, participate in or affiliate myself with, any business whose business, products or operations are in any respect competitive with the Company's and/or Group's business.

50. Jain and Cohen also agreed to refrain from competing with Palantir for 12 months following the end of their employment:

> 6.3 Non-Competition. I agree that until twelve (12) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not engage in any Prohibited Activity. For purposes of this Section 6.3, "Prohibited Activity" is an activity in which I perform the job functions that I performed during my employment with Company, directly or indirectly, in whole or part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, intern or any other similar capacity for an entity engaged in the same or similar business as the Company and/or the Group, including those engaged in the business of developing and selling analytical software, whether existing or planned.

51. In addition, Jain and Cohen agreed to refrain from soliciting any of Palantir's customers or business partners for 24 months after leaving Palantir:

> 6.1 Customer and Third Party Non-Solicitation. (a) I agree that for a period of twenty-four (24) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not

> contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's and/or the Group's business in any way. For the purposes of this Agreement, "Customer" shall mean all persons or entities that have used or inquired of the Company's and/or Group's services at any time during the two-year period preceding the termination of my employment with the Company.
>
> (b) I agree that for a period of twenty-four (24) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not solicit, encourage, or induce, or cause to be solicited, encouraged or induced, directly or indirectly, any franchisee, joint venture, supplier, vendor or contractor who conducted business with the Company and/or the Group at any time during the two-year period preceding the termination of my employment with the Company, to terminate or adversely modify any business relationship with the Company and/or the Group or not to proceed with, or enter into, any business relationship with the Company and/or the Group, nor shall I otherwise interfere with any business relationship between the Company and/or the Group and any such franchisee, joint venture, supplier, vendor or contractor.

52. Similarly, Jain and Cohen agreed to refrain from soliciting any of Palantir's employees for 24 months after leaving Palantir:

> 6.2 Employee Non-Solicitation. I agree that until twenty-four (24) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of the Company and/or the Group to leave their employment with the Company and/or the Group, nor will I contact any employee of the Company and/or the Group, or cause an employee of the Company and/or the Group to be contacted, for the purpose of leaving employment with the Company and/or the Group.

53. Jain and Cohen also agreed to refrain from using or disclosing any of Palantir's confidential information outside of their employment and to return all of Palantir's confidential information upon termination of their employment:

> 4. Proprietary Information. I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae or research activities) I develop, learn or obtain during my employment that relate to [Palantir and any of its subsidiaries] or the business or demonstrably anticipated business of [Palantir and any of its subsidiaries] or that are received by or for [Palantir and any of its subsidiaries], in confidence, constitute

> "**Proprietary Information**." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information . . .
>
> Upon termination of my employment or when requested by the Company, I will promptly return to the Company all items containing or embodying Proprietary Information…

54. Jain and Cohen acknowledged the global nature of Palantir's business, the irreparable harm that would befall Palantir if they were to breach any of their contractual obligations, and that their non-competition and non-solicitation obligations would be tolled in the event of their breach:

> 6.4 Acknowledgments and Representations. I acknowledge that the Company sells and provides its products and services worldwide and agree that the time periods, geographic regions and scope limitations referred to in Sections 6.1-6.3 above are reasonable and valid in light of the nature and extent of the business conducted by the Company, especially in light of the Company's need to protect its Proprietary Information and the international scope and nature of the Company's business. I also represent that my experience and capabilities are such that the enforcement of the foregoing covenants will not prevent me from working in my occupation, from earning a livelihood, and acknowledge that it would cause the Company serious and irreparable injury and cost if I were to use my knowledge in competition with the Company or otherwise breach the obligations contained in this Agreement. . . . In the event of my breach or violation of Sections 6.1 – 6.3, or good faith allegation by the Company of my breach of violation of this Sections 6.1 – 6.3, the relevant restricted period(s) set forth in Sections 6.1 – 6.3 shall be tolled until such breach or violation, or dispute related to an allegation by the Company that I have breached or violated Sections 6.1 – 6.3, as applicable, has been duly cured or resolved, as applicable.

55. Jain and Cohen agreed that certain obligations would continue indefinitely:

> 8. Continuing Obligations. I agree that my obligations under paragraphs 2, 3, 4, and 6 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraphs 2, 3 and 4 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

56. Jain and Cohen also agreed to a separate Arbitration Agreement with Palantir whereby the parties agreed to arbitrate all disputes between them. However, the Arbitration Agreement also makes clear that, in the event Jain or Cohen breach their restrictive covenant

agreements, Palantir may petition this Court for injunctive relief:

> D. Availability of Injunctive Relief. In addition to the right under the Rules to petition the court for provisional relief, I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this Agreement, the Proprietary Information and Invention Assignment Agreement between me and the Company, my employment Offer Letter with the Company, or any other agreement regarding trade secrets, confidential information, noncompetition, or nonsolicitation, if applicable. I understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties hereby consent to the issuance of an injunction.

57. And in the event Jain or Cohen breached their contractual obligations, they both acknowledged that Palantir would be entitled to injunctive relief, as well as its attorneys' fees, in securing such relief:

> 9. Governing Law. . . . I also understand that any breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond. I acknowledge and agree that if my Home State is New York or New Jersey, I shall indemnify the Company from any and all costs, fees, or expenses incurred by the Company (including, but not limited to, attorneys' fees) in successfully enforcing the terms of this Agreement against me (including, but not limited to, a court temporarily, partially, or fully granting any application, motion, or petition by the Company for injunctive relief) as a result of my breach or threatened breach of any provision contained herein.

**E. Jain and Cohen Leave Palantir to Secretly Build a Competing Business**

58. On November 21, 2024, Jain surprisingly resigned from Palantir.

59. Shortly thereafter, she circulated a short, cryptic farewell email to her colleagues, stating only that she was "joining the founding team of an AI startup with some ex-Palantirians." She did not identify the startup nor did she describe its business. She also provided no information concerning the work she would be performing for her new employer.

60. Following her resignation, Jain refused to sign a separation agreement which would have required her—in exchange for a severance payment—to reaffirm her non-competition, non-solicitation, confidentiality, and return of property obligations and also to represent her

compliance with those obligations.

61. Jain's last day of employment with Palantir was December 2, 2024.

62. In the months that followed her resignation, Jain did not update her LinkedIn profile to reflect her new employer, nor did she disclose any new professional affiliations.

63. On February 24, 2025, Cohen abruptly resigned from Palantir.

64. Unlike most departing employees, Cohen did not send a farewell email, make any internal announcement, or provide any information to her colleagues about her future employment.

65. Following her resignation, Cohen similarly refused to sign a separation agreement which would have required her—in exchange for a severance payment—to reaffirm her contractual obligations and represent her compliance with those obligations.

66. Cohen's last day of employment with Palantir was March 4, 2025.

67. In the months that followed her resignation, Cohen did not update her LinkedIn profile to reflect her new employer, nor did she disclose any new professional affiliations.

68. As would later become clear, Jain's and Cohen's lack of transparency concerning their future employment plans, refusal to sign standard separation agreements that would have required them to reaffirm their contractual obligations and represent that they were abiding by them, and their decision to not update their LinkedIn profiles were all part of a deliberate subterfuge to hide the fact that they were building a Palantir copycat under the cover of darkness.

**F. Percepta Emerges as a Palantir Replica**

69. In October 2025, Jain's and Cohen's competitive activities finally came to light.

70. In a LinkedIn post on October 2, 2025, Jain proclaimed "[t]oday we are

launching Percepta, and I am so excited to share what we have been working on ***since December***."[5] (emphasis added). That same day, she updated her LinkedIn profile to reveal, *for the first time*, ***that she co-founded Percepta shortly after her resignation from Palantir in December 2024***.[6]

71. Cohen similarly updated her LinkedIn profile that day to reveal, also for the first time, ***that she had been working as an Applied AI Engineer for Percepta since shortly after her resignation from Palantir in March 2025***.[7]

72. Other public statements about Percepta make clear that its investors and employees took careful steps to hide the company's activities until it emerged publicly.

73. In the October 2, 2025 press release by General Catalyst announcing its ownership stake in Percepta, Taneja and Hirsh Jain declared that "***[o]ver the last year, Percepta has been quietly at work***, creating the transformative outcomes for global Fortune 500 customers, state governments, and a big part of the US healthcare ecosystem."[8] (emphasis added).

74. One Percepta employee wrote on X that "***[w]e're finally out of stealth***." (emphasis added).[9]

75. Another co-founder wrote on X that "***[i]f I've been vague about what I'm***

---

[5] Radha Jain, LINKEDIN, https://www.linkedin.com/in/radha-jain-815047122/.

[6] *Id.*

[7] Joanna Cohen, LINKEDIN, https://www.linkedin.com/in/joannakcohen/.

[8] Hemant Taneja and Hirsh Jain, *Unveiling Percepta*, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

[9] Eugene Vinitsky (@EugeneVinitsky), X (Oct. 2, 2025, at 11:27 ET), https://x.com/EugeneVinitsky/status/1973771757371994344.

***working on, here it is!***" (emphasis added).[10]

76. And a managing director at General Catalyst wrote on LinkedIn that it was "***Great that we can finally talk about [Percepta] :)***."[11] (emphasis added).

77. Percepta's website did not go live until ***after*** General Catalyst, Jain, and Cohen announced the new business.

78. Jain's and Cohen's deception and violation of their agreements with Palantir are black and white. Since the day they walked out the door (and possibly before), both have been building a copycat in brazen violation of their contractual obligations and hiding it from Palantir and the world.

79. In the simplest terms, Percepta—like Palantir—seeks to design, develop, and deploy software that enables organizations to integrate AI directly into their workflows to increase efficiencies.

80. According to the General Catalyst press release, Percepta aims "to help enterprises in critical industries harness the frontier of AI."[12] That press release stated that "enterprises are still trying to bolt AI onto legacy infrastructure and processes," when "[t]he future is AI-native operations, where humans and intelligent systems work side by side to redesign business processes from the ground up." To address this problem, Percepta aims to deploy resources "directly within enterprises" to "orchestrate enterprise transformation" and "enable[] the

---

[10] Michael Rochlin (@marisbest2), X (Oct. 2, 2025, at 8:46 ET), https://x.com/marisbest2/status/1973912434952839532.

[11] Quentin Clark, LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:7379558658675974144/.

[12] Hemant Taneja and Hirsh Jain, *Unveiling Percepta*, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

workforce to adopt AI so teams and agents can work together."

81. Percepta's flagship product, Mosaic, appears to bear a striking resemblance to Palantir's AIP. On information and belief, both are designed to: (i) integrate directly with a customer's existing data infrastructure; (ii) ingest and process large volumes of data in real time; (iii) synchronize the data so that it all can be analyzed together; and (iv) generate tailored outputs that automate processes, make AI-driven recommendations, and execute specific actions within the customer's existing workflow. Indeed, Taneja publicly admitted that Percepta is seeking to replicate Palantir's business model. During a recent interview with Forbes shortly before launching Percepta, Taneja explained that "***one of the companies that's become incredibly valuable over the last couple years is Palantir***. This is why – because they can actually go in, take a customer as a design win and go and then say, 'We're going to come solve a lot of problems for you.' ***We're doing a version of that in healthcare at GC as well. We're doing that in other industries***."[13]

82. And when Taneja posted a description of Percepta on *X*, the first response he received from another user—who happened to previously work at Palantir—was "***[y]ou just described Palantir. They are very good***."[14] (emphasis added).

83. Percepta also targets the same customers and geographies as Palantir. The October press release stated that Percepta, like Palantir, seeks to develop and deploy "differentiated playbooks for how to execute AI transformation of healthcare, manufacturing, financial services,

[13] Forbes, *The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains How to Ride It*, at 6:15 (YouTube, Sept. 30, 2025), https://www.youtube.com/watch?v=hE8XOC8jWD8 .

[14] Hemant Taneja (@htaneja), X (Oct. 2, 2025, at 12:21 ET), https://x.com/htaneja/status/1973785447798342107.

and government."[15]

84. The press release even provided several examples of AI integration solutions that are virtually indistinguishable from the types of AI integration solutions Palantir regularly offers to its customers in the financial services, manufacturing, and healthcare industries, such as:

- "Modernizing fraud detection and customer experience in financial services, delivering significant efficiency and EBITDA uplift for banks;"
- "Optimizing supply chains and driving more optimal resource allocation in publicly traded manufacturing entities, minimizing overstocking, and improving resilience to demand fluctuations;"
- "Automating clinical workflows and improving patient engagement for healthcare customers across payers and providers."[16]

85. And just as Palantir's business has a global footprint, the press release similarly broadcasted that Percepta "expect[s] the team to become a leading transformation partner for companies and governments ***around the world***."[17] (emphasis added).

86. Lest there be any doubt that Percepta, a Palantir knock-off, constitutes a competing business, it has filled its ranks (including co-founders) with former employees of Palantir. Within months of its founding, Percepta hired at least ten former Palantir employees, many of whom had worked on Palantir's Foundry and AIP and have deep knowledge of Palantir's trade secrets and confidential information.

87. There would be little reason to so heavily concentrate hiring former Palantir employees—who now comprise nearly half of Percepta's workforce—unless Percepta planned to

---

[15] Hemant Taneja and Hirsh Jain, *Unveiling* Percepta, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

[16] *Id.*

[17] *Id.*

operate a replica business for which such employees' experience at Palantir would be valuable.

88. Given that Jain and Cohen joined Percepta shortly after their departures from Palantir, and that Percepta is operating a copycat business geared towards serving the same customers, the only conclusion is that Jain and Cohen are performing the same duties and responsibilities for Percepta that they previously performed for Palantir.

89. Indeed, Cohen posted on her LinkedIn that her duties at Percepta include being "Forward deployed," working on "AI product."[18] That is exactly what Cohen did at Palantir. *Compare* with ¶ 41. Jain, for her part, is Percepta's founder, and is and has been intimately involved in all facets of Percepta's development. Given substantial overlaps between Palantir's and Percepta's businesses, Jain is undoubtedly utilizing products and systems she helped "build" for Palantir for Percepta's benefit today.

90. And because of Jain's and Cohen's access to Palantir's trade secrets and confidential information, as well as Cohen's direct interactions with Palantir's valuable customer relationships, their breaches of their non-competition obligations are inflicting irreparable harm upon Palantir's legitimate business interests.

91. Palantir is also continuing to investigate whether these former employees violated separate post-employment contractual obligations to Palantir, and whether General Catalyst and Percepta violated Palantir's rights under the law.

**G. Palantir Quickly Investigates**

92. Soon after learning of Percepta's existence and learning that Percepta employs Jain and Cohen, Palantir quickly launched a forensic investigation into their activity on its systems and devices.

---

[18] Joanna Cohen, LINKEDIN, https://www.linkedin.com/in/joannakcohen/.

93. That investigation revealed that Cohen began viewing Palantir's highly confidential information without any legitimate business reasons in the days leading up to her resignation from Palantir. Palantir's investigation revealed an unusual pattern of activity concerning Cohen's access to the Company's Highspot repository in the days leading up to her departure. Her activity in the three-day window surrounding her notice accounted for over 50% of her entire activity over a four-month window prior to her departure. More specifically, Cohen's access spiked right after she gave notice, accessing 62 distinct items in a single day—more than she had accessed in the entire preceding four-month period—many having no connection to her work in the healthcare industry, including materials concerning Palantir's anti-money laundering, renewable energy, cyber, fleet operations, biomanufacturing, and oil and gas offerings.

94. The investigation also revealed that during the same time period preceding her resignation, Cohen accessed and reviewed information within Palantir's Github database—the central repository for Palantir's source code. Access to this repository is tightly controlled and tracked due to its strategic value. Specifically, Cohen searched for and viewed the names and contact information for contacts at Palantir's important healthcare customers. There was no legitimate business reason for Cohen to search for or view this information.

95. The investigation also revealed that on February 25, 2025, she also sent herself a message through Palantir's Slack platform attaching several highly confidential documents, which included:

- **Healthcare Revenue Cycle Management Diagram** – This detailed workflow diagram depicts key inflection points in the healthcare revenue cycle in which Palantir's AI platform could add value and provides a description of how that platform could streamline various operations.

- **Internal Healthcare Demonstration Planning Framework** – This internal framework was used to plan and prioritize demonstration content for prospective healthcare customers by aggregating insights from past deployments and customer conversations to identify high-impact use cases for showcasing Palantir's platform.
- **Draft Statement of Work** – This document outlines a proposed scope of work and a project plan for an important healthcare customer based on extensive conversations about Palantir's underutilized platform capabilities.

96. Cohen then accessed or downloaded these highly confidential documents on her personal phone.

97. Given that she gave notice of her intent to resign from Palantir the day before, there was no legitimate business reason for Cohen to have sent these documents to herself through Slack, nor for her to then access or download them on her personal phone, other than to misappropriate these highly confidential documents to exploit on behalf of Percepta.

98. And in the hands of a copycat like Percepta, these highly confidential documents could be used to shortcut years of Palantir's research into customer engagement, product development, and strategic learning, not to mention evade millions of dollars in investment costs. In so doing, Percepta would be able to replicate Palantir's most effective demonstrations, target high-value use cases, and pitch tailored solutions to clients using Palantir's own insights, thereby irreparably harming Palantir's competitive advantage and eroding its market position.

99. Palantir's investigation is ongoing, and it reserves the right to add additional claims in the future as the evidence warrants.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – Violation of Non-Competition Obligations)**
**Against Jain and Cohen**

100. Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 99 of the Complaint as if fully set forth herein.

101. Palantir is party to legally binding contracts with each of Jain and Cohen, and Palantir has performed in accordance with the contracts.

102. Jain and Cohen breached the express terms of their agreements with Palantir, including Sections 6.3 and 6.4 of the PIIA concerning their non-competition obligations.

103. Jain and Cohen breached those terms of their agreements with Palantir by performing the job functions that they performed during their employment with Palantir, directly and indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, intern, and/or another other similar capacity for Percepta, an entity engaged in the same or similar business as Palantir.

104. Jain's and Cohen's breaches have harmed Palantir.

105. Jain's and Cohen's breaches have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation and industry standing.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Violation of Confidentiality Obligations)**
**Against Cohen**

106. Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 99 of the Complaint as if fully set forth herein.

107. Palantir is party to a legally binding contract with Cohen and Palantir has performed in accordance with the contract.

108. By using Palantir's confidential information, trade secrets, and other

proprietary information in connection with her work for Percepta, Cohen has breached the express terms of her agreements with Palantir concerning confidential and proprietary information, including, specifically, Sections 2, 4, and 8 of the PIIA.

109. Cohen breached these agreements by creating and seeking to commercialize a product using Palantir's confidential information, trade secrets, and other proprietary information, including by founding, operating, owning, promoting, and otherwise providing services for the benefit of Percepta.

110. Furthermore, Cohen additionally breached her agreement with Palantir by clandestinely exfiltrating confidential information without Palantir's consent.

111. Cohen's breaches have harmed Palantir.

112. Cohen's breaches have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation and industry standing.

113. Moreover, Palantir has been irreparably harmed because Cohen, through her work for Percepta, has disseminated, and is likely to continue to disseminate, Palantir's confidential information, trade secrets, and other proprietary information to additional third parties (such as potential investors, other Percepta employees, customers, and potential customers), including those that have no privity of contract with Palantir.

**THIRD CAUSE OF ACTION**
**(Breach of Contract – Violation of Return of Property Obligations)**
**Against Cohen**

114. Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 99 of the Complaint as if fully set forth herein.

115. Palantir is party to a legally binding contract with Cohen and Palantir has performed in accordance with the contract.

116. Paragraph 4 of the PIIA states that "[u]pon termination of my employment…, I will promptly return to the Company all items containing or embodying Proprietary Information (including all copies)." ¶ 53.

117. As described above, the day before Cohen left Palantir, she exfiltrated highly confidential documents by sending them to herself through Slack. Those documents contain Proprietary Information, as defined in the PIIA.

118. Cohen failed to disclose this exfiltration to Palantir.

119. Upon her termination, Cohen failed to return these documents.

120. Cohen's breach of this obligation has harmed Palantir.

121. Cohen's breach of this obligation has irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation and industry standing.

122. Moreover, Palantir has been irreparably harmed because Cohen, through her work for Percepta, has disseminated, and is likely to continue to disseminate, Palantir's confidential information, trade secrets, and other proprietary information to additional third parties (such as potential investors, other Percepta employees, customers, and potential customers), including those that have no privity of contract with Palantir.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Palantir Technologies Inc. respectfully requests that this Court enter an Order:

A. Preliminarily and permanently enjoining Defendants from violating their contractual obligations to Palantir, including but not limited to non-competition, non-solicitation, confidentiality, and return of property obligations, tolled for the period of non-compliance as applicable;

B. Requiring Defendants to account for any and all uses of Palantir's confidential and/or proprietary information, including all use and disclosure thereof, including the entities and individuals to which any disclosures were made;

C. Requiring Defendants to return any of Palantir's confidential and/or proprietary information in their possession, custody, or control;

D. Requiring Defendants to reimburse Plaintiff its attorneys' fees incurred in connection with this action; and

E. Awarding such other and further relief as this Court deems just and proper.

Dated: October 30, 2025
New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Harris M. Mufson*

Harris M. Mufson
Ilissa Samplin
Justin M. DiGennaro
Zachary A. Schreiber

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
hmufson@gibsondunn.com
jdigennaro@gibsondunn.com
zschreiber@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213-229-7000
isamplin@gibsondunn.com

*Attorneys for Plaintiff*