**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PALANTIR TECHNOLOGIES INC.,

               Plaintiff,

     v.

RADHA JAIN and JOANNA COHEN,

           Defendants.

Civil Action No. ___25-cv-8985___

**PLAINTIFF PALANTIR'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Attorneys for Plaintiff

# Contents

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ...............................................................................5

I.      Palantir Is a Global Leader in the AI Integration Industry .............................5

II.     Jain and Cohen Enjoy Access to Palantir's Most Valuable Trade Secrets and Confidential Information.................................................................................6

III.    Jain's and Cohen's Contractual Obligations............................................8

IV.     Jain and Cohen Leave Palantir to Secretly Build a Competing Business.........................9

V.      Percepta Emerges as a Palantir Copycat ..................................................10

VI.     Palantir Quickly Investigates Jain's and Cohen's Forensic Activity ............................12

ARGUMENT ............................................................................................14

I.      The Court Should Grant a Temporary Restraining Order to Prevent Further Unlawful Conduct by Jain and Cohen. ...................................................................15

        A.      Palantir Is Likely to Succeed In Proving Jain and Cohen Breached Their Contractual Obligations ...............................................................16

                1.      Jain and Cohen Have Breached Their Non-Competition Obligations ...16

                2.      Jain's and Cohen's Non-Competition Obligations Are Valid and Enforceable ...............................................................17

                3.      Jain's and Cohen's Non-Competition Obligations Have Been Tolled So They Cannot Exploit the Secret Nature of Their Breach ...............................21

                4.      Cohen Has Breached Her Confidentiality and Return of Property Obligations ...............................................................22

II.     Absent Injunctive Relief, Palantir Will Suffer Irreparable Harm to Its Confidential Information and Valuable Customer Relationships ................................................23

III.    The Balance of Hardships and Public Interest Strongly Favor Palantir........................25

IV.     The Court Should Order Expedited Discovery in Advance of a Preliminary Injunction Hearing. .................................................................................28

CONCLUSION ..........................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*,
 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ................................................. 28, 29

*Benham Jewelry Corp. v. Aron Basha Corp.*,
 1997 WL 639037 (S.D.N.Y Oct. 14 1997) ......................................................28

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
 784 F.3d 887 (2d Cir. 2015) ...........................................................................15

*Biosynexus Inc. v. Glaxo Grp. Ltd.*,
 11 Misc.3d 1062(A), (Sup. Ct. N.Y. Cnty. 2006) ............................................23

*Chanel, Inc. v. Lin*,
 2023 WL 2574946 (S.D.N.Y. Mar. 20, 2023) ..................................................28

*Comput. Assocs. Int'l, Inc. v. Bryan*,
 784 F. Supp. 982 (E.D.N.Y. 1992) ..................................................................24

*Delta Enter. Corp. v. Cohen*,
 93 A.D.3d 411 (2012) ......................................................................................21

*DraftKings Inc. v. Hermalyn*,
 732 F. Supp. 3d 84 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024) ..................23

*Edge Grp. WAICCS LLC v. Sapir Grp. LLC*,
 705 F. Supp. 2d 304 (S.D.N.Y. 2010) ..............................................................27

*Eric Woods, LLC v. Schrade*,
 45 Misc. 3d 1206(A) (Sup. Ct., N.Y. Cnty. 2014) ............................................27

*fuboTV Inc. v. Walt Disney Co.*,
 745 F. Supp. 3d 109 (S.D.N.Y. 2024) .......................................................... 15, 26

*Gelder Med. Grp. v. Webber*,
 41 N.Y.2d 680 (1977) ......................................................................................18

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020) ....................................................15

*George & Co. LLC v. Spin Master US Holdings, Inc.*,
 2023 WL 9509031 (E.D.N.Y. Nov. 29, 2023) ..................................................18

*HMS Holdings Corp. v. Arendt*,
 18 N.Y.S.3d 579 (Sup. Ct., N.Y. Cnty. 2015) ............................................. 21, 22

*Iannucci v. Segal Co., Inc.*,
   2006 WL 8407380 (S.D.N.Y. June 27, 2006) ..................................................25

*Int'l Bus. Machines Corp. v. De Freitas Lima*,
   2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020) ................................................26

*Int'l Bus. Machines Corp. v. Visentin*,
   2011 WL 672025 (S.D.N.Y. Feb. 16, 2011) ................................................19

*Integra Optics, Inc. v. Messina*,
   52 Misc.3d 1210(A), (Sup. Ct. Albany Cnty. 2016) ..............................18, 19

*Integra Optics, Inc. v. Nash*,
   2018 WL 2244460 (N.D.N.Y. Apr. 10, 2018) ..........................................17, 19

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
   443 F. Supp. 3d 303 (E.D.N.Y. 2020) ....................................................20, 21

*JLM Couture, Inc. v. Gutman*,
   2024 WL 2053856 (S.D.N.Y. May 8, 2024) ..................................................17

*JLM Couture, Inc. v. Gutman*,
   2024 WL 892641 (S.D.N.Y. Mar. 1, 2024) ...................................................17

*JLM Couture, Inc. v. Gutman*,
   91 F.4th 91 (2d Cir. 2024) ..........................................................................17

*Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*,
   2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) .................................................24

*Marsh USA Inc. v. Karasaki*,
   2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ...............................................20

*MasterCard Int'l Inc. v. Nike, Inc.*,
   164 F. Supp. 3d 592 (S.D.N.Y. 2016) .........................................................18

*Mohawk Maint. Co. v. Kessler*,
   52 N.Y.2d 276 (1981) ..................................................................................17

*N. Atl. Instruments Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999) ..........................................................................25

*Nat'l Job Corps Ass'n v. Dep't of Lab.*,
   788 F. Supp. 3d 642 (S.D.N.Y. 2025) .........................................................15

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
   392 F.3d 520 (2d Cir. 2004) ........................................................................16

*New York Real Est. Inst., Inc. v. Edelman*,
   42 A.D.3d 321 (2007) ..................................................................................27

*PrecisionIR Inc. v. Clepper*,
   693 F. Supp. 2d 286 (S.D.N.Y. 2010) .........................................................18

*R.R. Donnelley & Sons Co. v. Marino*,
  505 F. Supp. 3d 194 (W.D.N.Y. 2020) ............................................................29

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ............................................................................23

*Repub. of Lebanon v. Sotheby's*,
  167 A.D.2d 142 (1st Dep't 1990) ....................................................................16

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*,
  190 F. Supp. 2d 577 (S.D.N.Y. 2002) ..............................................................15

*Students for Fair Admissions v. United States Mil. Acad. at W. Point*,
  709 F. Supp. 3d 118 (S.D.N.Y. 2024) ..............................................................26

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (1999) .....................................................................................24, 25

*TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*,
  2024 WL 4627452 (S.D.N.Y. Oct. 30, 2024) ...................................................26

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*,
  749 F. Supp. 473 (S.D.N.Y. 1990) ...................................................................29

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
  73 F. Supp. 3d 209 (S.D.N.Y. 2014) ................................................................28

## Other Authorities

Eugene Vinitsky (@EugeneVinitsky), X (Oct. 2, 2025),
  https://x.com/EugeneVinitsky/status/1973771757371994344 .....................10, 11

Forbes, *The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains
  How to Ride It*, (YouTube, Sept. 30, 2025),
  https://www.youtube.com/watch?v=hE8XOC8jWD8 .........................................3

Hemant Taneja (@htaneja), X (Oct. 2, 2025, at 12:21 ET),
  https://x.com/htaneja/status/1973785447798342107 ......................................11

Hemant Taneja and Hirsh Jain, Unveiling Percepta (Oct. 2, 2025),
  https://www.generalcatalyst.com/stories/unveiling-percepta ..............................3

Joanna Cohen, LINKEDIN, https://www.linkedin.com/in/joannakcohen/ ................10

Michael Rochlin (@marisbest2), X (Oct. 2, 2025),
  https://x.com/marisbest2/status/1973912434952839532 ...................................10

Quentin Clark, LINKEDIN,
  https://www.linkedin.com/feed/update/urn:li:activity:7379558658675974144/ ...................10

Radha Jain, LINKEDIN,
  https://www.linkedin.com/feed/update/urn:li:activity:7379526077620166656/ ...................10

Radha Jain, LINKEDIN, https://www.linkedin.com/in/radha-jain-815047122/ .........10

**Rules**

Fed. R. Civ. P. 30(b) ................................................................................................28

Fed. R. Civ. P. 34(b) ................................................................................................28

Fed. R. Civ. P. 65(b)(1) ............................................................................................15

# PRELIMINARY STATEMENT

Emergency relief is necessary to stop Defendants Jain's and Cohen's covert scheme to unfairly compete and clone Palantir's core offerings and business model by exploiting their prior access to Palantir's proprietary information and methodologies, technology, and customer relationships. Palantir has designed a market-leading platform that enables organizations to integrate artificial intelligence into their operational workflows to increase efficiency across their businesses. Palantir has spent billions of dollars developing proprietary technology, understanding its customers' problems, and creating valuable customer relationships to cement itself as the standard-bearer in this nascent AI industry. As senior engineers at Palantir, before they resigned, Jain and Cohen had direct access to this technology and information. To ensure the protection of this highly confidential information, Jain and Cohen agreed that they would not perform similar engineering functions for a competitor for 12 months after their employment with Palantir ended.

As it turns out, Jain and Cohen have been working together since leaving Palantir, building a copycat business and trying to avoid getting caught. Knowing their efforts directly violated multiple of their ongoing contractual obligations to Palantir—including their confidentiality, return of information, and non-competition obligations—Defendants took great pains to hide their misconduct and cover their tracks. Palantir only recently learned about Defendants' deception after their new, copycat business emerged from "stealth" mode and professed to have developed in eleven months the same product and business that took Palantir—with world-class technologies and talent at its disposal—decades to develop. Palantir's subsequent forensic investigation revealing Cohen's theft of proprietary Palantir documents and information has only begun to unravel the scope of Defendants' misconduct. Palantir urgently needs this Court's assistance now, to put a stop to Defendants' unlawful and deceptive behavior.

Jain and Cohen were far from rank-and-file Palantir employees. Jain designed and built Palantir's flagship proprietary software. Cohen, on Palantir's dime, developed relationships and goodwill with some of Palantir's largest and most important healthcare customers and tailored specific AI software solutions offered by Palantir to increase the efficiency of the customers' businesses and operations. Jain and Cohen were integrally involved in the design and development of Palantir's AI business and offerings—and, as a result, were entrusted with Palantir's crown jewels: its source code, internal demonstration workspace, deployed customer workflows, and proprietary customer engagement strategies. To protect these materials that are the product of billions of dollars of investment and years of research by Palantir—and in exchange for millions of dollars of compensation—Jain and Cohen agreed to abide by narrowly tailored non-competition, confidentiality, and return of property obligations.

In December 2024, Jain abruptly resigned from Palantir. She sent her colleagues a vague email disclosing only that she was leaving to join "an AI startup," but did not provide any details about what company she was joining or what her duties and responsibilities would be. She also did not update her LinkedIn profile and the internet was devoid of information about her new job. In March 2025, Cohen followed Jain's playbook: she resigned and kept her new employer a secret. By design, and unbeknownst to Palantir at the time, Defendants purposefully hid that they were secretly and unfairly competing with Palantir in brazen violation of their contractual obligations.

In October 2025, multi-billion dollar venture capital firm General Catalyst issued a press release announcing the launch of Percepta AI ("Percepta"), an AI integration company co-founded by Jain. In it, General Catalyst's Chief Executive Officer, Hermant Taneja, and Percepta's Chief Executive Officer and former Palantir employee, Hirsh Jain, declared that "*[o]ver the last year,*

*Percepta has been quietly at work*" building a replica of Palantir in the AI integration industry.[1] That very first public announcement of Percepta revealed it is a Palantir copycat. Just like Palantir, Percepta is developing software that enables commercial and governmental organizations to integrate AI directly into their own systems and operations to transform workflows and increase efficiencies. In fact, during a recent interview with *Forbes*, Taneja acknowledged how "incredibly valuable" Palantir has become and that General Catalyst was working on creating a "version" of Palantir's business.[2] Percepta is targeting the same global customer base in the financial services, manufacturing, and healthcare industries as Palantir, and using Palantir's former employees to do it. Nearly *half* of Percepta's workforce, including its CEO and other co-founders, are former employees of Palantir.

It was only after Percepta surfaced from its self-described "stealth" mode that Palantir became aware Jain and Cohen had been working in competitive roles in violation of their non-competition agreements. Palantir responded by rapidly launching a forensic investigation of Jain's and Cohen's activities on Palantir's devices and systems. That investigation revealed clear and unequivocal evidence that Cohen stole highly confidential Palantir information to use at Percepta—the epitome of unfair competition and a direct breach of her Palantir contract.

The day after Cohen gave notice of her resignation from Palantir, she sent herself a Slack message attaching highly confidential documents, including a detailed healthcare revenue cycle management diagram, an internal healthcare demonstration planning framework, and a draft statement of work for an important healthcare customer. Cohen then accessed or downloaded these

---

[1] Hemant Taneja and Hirsh Jain, Unveiling Percepta, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

[2] Forbes, *The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains How to Ride It*, at 6:15 (YouTube, Sept. 30, 2025), https://www.youtube.com/watch?v=hE8XOC8jWD8.

documents on her personal phone—conduct that can be explained only by a desire to have continued access to the documents after being shut off from Palantir's systems. That same day, she accessed Palantir's secure repository of confidential marketing materials 61 times—a pronounced spike as compared to her past practice—focusing on proprietary materials concerning Palantir's anti-money laundering, biomanufacturing, and oil and gas offerings. These sectors were unrelated to Cohen's work in the healthcare space at Palantir. Since she had already given notice of her intent to resign from Palantir, these materials would be of no use to Cohen unless she was planning to use the information to unfairly compete with Palantir for the benefit of herself and her new employer.

These highly confidential documents reflect the culmination of thousands of customer interactions through which Palantir developed a sophisticated understanding of what customers want and what works, and equally as important, what customers do not want and what does not work. In the hands of a copycat like Percepta, these highly confidential documents could be used to shortcut years of Palantir's research into customer engagement, product development, and strategic learning. In so doing, Percepta would be able to replicate Palantir's most effective demonstrations, target high-value use cases, and pitch tailored solutions to customers using Palantir's own insights, zeroing in on the promising ideas while avoiding the misfires, and thereby irreparably harming Palantir's competitive advantage and threatening to erode its market position.

Jain's and Cohen's months-long deception was deliberate and unlawful. They misled their former employer about their plans when they resigned, Cohen stole Palantir's confidential documents and information on her way out the door, and both hid the carbon-copy business they were knowingly and unlawfully developing together for many months. In fact, Palantir now knows that Jain considers herself a "co-founder" of Percepta.

Palantir seeks emergency injunctive relief to stop Jain's and Cohen's ongoing misconduct. Palantir is likely to succeed on its claim that Jain and Cohen breached their non-competition obligations because they are performing substantially the same job functions they performed for Palantir for Percepta—an admitted Palantir knock-off—and because their narrowly tailored non-competition obligations are plainly enforceable under New York law. Palantir is also likely to succeed on its claims that Cohen breached her confidentiality and return of property obligations because Cohen took and then exploited Palantir's highly confidential documents on behalf of Percepta. Absent emergency injunctive relief, Jain and Cohen will continue to inflict irreparable harm to Palantir's legitimate interests, including its proprietary information and customer relationships. And the balance of equities clearly favor issuing an injunction. Jain and Cohen need to be stopped in their tracks. This Court should enter a temporary restraining order and grant expedited discovery in advance of a preliminary injunction hearing.

**STATEMENT OF FACTS**[3]

## I.     Palantir Is a Global Leader in the AI Integration Industry

Founded in 2003, Palantir has become a global leader in deploying software that enables customers to integrate artificial intelligence ("AI") directly into their own business operations to increase efficiencies. Shankar Decl. ¶2. Its flagship Artificial Intelligence Platform ("AIP") provides customers with the ability to integrate their data, configure complex models, and deploy AI-powered applications securely with market-leading data governance capabilities. *Id.* ¶3. AIP is designed to integrate directly with a customer's existing data infrastructure. *Id.* ¶4. It can ingest and process large volumes of data in real time, synchronize the data so that it all can be analyzed together, and generate

---

[3] Except where otherwise noted, internal citations, quotations, and alterations in document and case quotations are omitted for clarity and convenience, and all emphases have been added.

tailored outputs that automate repetitive processes, make AI-driven recommendations, and execute specific actions within the customer's existing workflow. *Id.*

Unlike traditional software tools that can perform only a single function or operate in only a single industry, AIP is a highly configurable platform that can perform innumerable functions and operate across all industries. *Id.* ¶5. In financial services, it supports fraud detection, risk assessment, and compliance by analyzing transactional data and regulatory feeds. *Id.* In manufacturing and supply chain management, AIP monitors production and logistics, forecasts shortages, and recommends corrective actions. *Id.* And in healthcare, it automates insurance reimbursement workflows by analyzing denial notices and generating appeals based on patient data and insurer guidelines. *Id.* This versatility allows customers to embed AI directly into their day-to-day operations, augmenting the systems and decision-making processes they already use, rather than interacting with AI as a separate point solution. *Id.* ¶4.

Palantir operates on a global scale, with offices across North America, Europe, the Middle East, and the Asia-Pacific region. *Id.* ¶6. Its customer base includes Fortune 500 companies worldwide, reflecting its broad industry reach and international presence. *Id.* By embedding AI into enterprise workflows, Palantir empowers organizations around the world to transform their operations, augmenting human decision-making with machine intelligence while maintaining control, security, and accountability. *Id.* ¶7.

## II.    Jain and Cohen Enjoy Access to Palantir's Most Valuable Trade Secrets and Confidential Information

As an AI Product Engineer at Palantir, Jain played a pivotal role in designing and building the core source code for Palantir's software solutions, particularly its flagship product, AIP Logic. *Id.* ¶9. This platform enables rapid deployment of Palantir's proprietary technologies through no-code and low-code interfaces. *Id.* Jain led the development of AIP Logic for nearly two years,

contributing expert-level knowledge and overseeing front-end implementation, feature prioritization, and user experience design. *Id.* ¶¶9-11. Her responsibilities extended beyond engineering to include direct collaboration with healthcare customers during on-the-ground bootcamps, giving her deep insight into customer usage patterns and product positioning. *Id.* ¶10.

As a Healthcare Lead, Cohen interacted directly with Palantir's healthcare customers to understand their unique needs and then design and implement AI software solutions to meet those needs. Greenspan Decl. ¶6. She worked closely with Palantir's healthcare customers to tailor specific AI software solutions to their needs to increase the efficiency of their businesses and operations. *Id.* ¶4, including the development of the "Plan Acceptance Tool," which helps track insurance coverage. Her role required both technical acumen and strategic customer engagement skills, positioning her as a key contributor to Palantir's healthcare offerings and client success strategies. *Id.* ¶5.

Jain and Cohen had access to Palantir's most valuable trade secrets and confidential information, including its enterprise GitHub repository containing the foundational source code for its flagship platforms. *Id.* ¶7; Shankar Decl. ¶11. This codebase, tightly controlled and strategically vital, reflects years of engineering innovation and billions of dollars in R&D investment. Shankar Decl. ¶12. Jain and Cohen also had access to Palantir's internal demonstrative workspace, which housed curated prototypes and deployment narratives refined through extensive client interaction. *Id.* ¶11; Greenspan Decl. ¶7. Additionally, they had visibility into live customer workflows and proprietary engagement strategies, offering a comprehensive view of Palantir's operational and market tactics. Shankar Decl. ¶11; Greenspan Decl. ¶7. This information would provide any competitor with a substantial head start by relieving them of the need to make a comparable initial investment in the development of such information as well as allow such

competitor to replicate Palantir's technology, client strategies, and market positions. Shankar Decl. ¶12.

## III.    Jain's and Cohen's Contractual Obligations

To protect Palantir's most valuable trade secrets and confidential information and customer relationships—and in exchange for millions of dollars of compensation—Jain and Cohen entered into binding contracts containing narrowly tailored non-competition obligations, whereby each agreed for a period of 12 months following the end of their employment with Palantir, they would not "perform the job functions that [they] performed during [their] employment with [Palantir]…for an entity engaged in the same or similar business as [Palantir], including those engaged in the business of developing and selling analytical software." Mufson Decl. Exs. A-B ("PIIA") §6.3. They both acknowledged that Palantir "sells and provides its products and services worldwide" and agreed that the "time period[], geographic region[] and scope limitation[]" of their non-competition obligations "are reasonable and valid in light of the nature and extent of the business conducted by [Palantir], especially in light of [Palantir's] need to protect its Proprietary Information and the international scope and nature of [Palantir's] business." *Id.* §6.4. They also agreed that if they breach or violate their non-competition obligations, the duration of such obligations "shall be tolled until such breach or violation…has been duly cured or resolved." *Id.*

In addition, Jain and Cohen agreed to confidentiality obligations, promising to "hold in confidence and not disclose or…use any Proprietary Information," including "Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae, or research activities)." *Id.* §4. They also agreed that "[u]pon termination of [their] employment or when requested by the Company, [they] will

promptly return to the Company all items containing or embodying Proprietary Information (including all copies)." *Id.*[4]

Jain and Cohen acknowledged that any breach of their non-competition or confidentiality obligations "will cause irreparable harm to [Palantir] for which damages would not be an adequate remedy, and, therefore, [Palantir] will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." *Id.* §9.[5]

## IV. Jain and Cohen Leave Palantir to Secretly Build a Competing Business

On November 21, 2024, Jain abruptly resigned from Palantir, notifying colleagues shortly thereafter via a brief and cryptic farewell email that she was joining the founding team of "an AI startup" with other former Palantir employees. Shankar Decl. ¶13. She did not disclose the name of the company, its business focus, or her role there. Jain declined to sign a standard separation agreement that would have required her to reaffirm her contractual obligations—including non-competition, confidentiality, and return of property—in exchange for severance. *Id.* ¶60. Her last day at Palantir was December 2, 2024. Shankar Decl. ¶13. In the months following her departure, she did not update her LinkedIn profile or publicly disclose any new professional affiliations.

Cohen resigned from Palantir on February 24, 2025, similarly without notice or explanation. Greenspan Decl. ¶8. Unlike typical departing employees, she did not send a farewell message or inform colleagues of her future plans. She also refused to sign a separation agreement that would have reaffirmed her contractual obligations in exchange for severance. *Id.* ¶65. Cohen's last day at Palantir was March 4, 2025. *Id.* ¶66. Cohen followed Jain's playbook. She did not update her

---

[4] Jain and Cohen also agreed to 24-month non-solicitation obligations. *Id.* §§6.1-6.2.

[5] Jain's and Cohen's PIIA's are governed by New York law. *Id.* §9.

LinkedIn profile or reveal any new employment affiliations in the months following her resignation. *Id*. ¶67.

## V.    Percepta Emerges as a Palantir Copycat

In October 2025, Jain's and Cohen's competitive activities finally came to light. In a LinkedIn post on October 2, 2025, Jain proclaimed "[t]oday we are launching Percepta, and I am so excited to share what we have been working on *since December*."[6]  That same day, she updated her LinkedIn profile to reveal, for the first time, *that she co-founded Percepta shortly after her resignation from Palantir in December 2024*.[7]  Cohen similarly updated her LinkedIn profile that day to reveal, also for the first time, *that she had been working as an Applied AI Engineer for Percepta since shortly after her resignation from Palantir in March 2025*.[8]

Other public statements about Percepta make clear its investors and employees took careful steps to hide the company's activities until it emerged publicly. In the October 2 press release by General Catalyst announcing its 100% ownership stake in Percepta, Taneja and Hirsh Jain declared that "*[o]ver the last year, Percepta has been quietly at work*, creating the transformative outcomes for global Fortune 500 customers, state governments, and a big part of the US healthcare ecosystem."[9]  Other Percepta and General Catalyst employees similarly remarked on social media how Percepta was operating in secret.[10]

---

[6] Radha Jain, LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:7379526077620166656/.

[7] Radha Jain, LINKEDIN, https://www.linkedin.com/in/radha-jain-815047122/.

[8] Joanna Cohen, LINKEDIN, https://www.linkedin.com/in/joannakcohen/.

[9] *Supra* n.1.

[10] Eugene Vinitsky (@EugeneVinitsky), X (Oct. 2, 2025), https://x.com/EugeneVinitsky/status/1973771757371994344; Michael Rochlin (@marisbest2), X (Oct. 2, 2025), https://x.com/marisbest2/status/1973912434952839532; Quentin Clark, LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:7379558658675974144/.

According to the General Catalyst press release, Percepta aims "to help enterprises in critical industries harness the frontier of AI."[11] That press release stated "enterprises are still trying to bolt AI onto legacy infrastructure and processes," when "[t]he future is AI-native operations, where humans and intelligent systems work side by side to redesign business processes from the ground up." To address this problem, Percepta aims to deploy resources "directly within enterprises" to "orchestrate enterprise transformation" and "enable[] the workforce to adopt AI so teams and agents can work together." This is precisely Palantir's business.

And General Catalyst has acknowledged Percepta is seeking to replicate Palantir's business model. During a recent interview with *Forbes* shortly before launching Percepta, Taneja explained that "***one of the companies that's become incredibly valuable over the last couple years is Palantir***. This is why – because they can actually go in, take a customer as a design win and go and then say, 'We're going to come solve a lot of problems for you.' ***We're doing a version of that in healthcare at GC as well. We're doing that in other industries***."[12] And when Taneja posted a description of Percepta on *X*, the first response he received from another user—who happened to previously work at Palantir—was "***[y]ou just described Palantir. They are very good***."[13]

*See, e.g.*, https://x.com/EugeneVinitsky/status/1973771757371994344.

[11] *Supra* n.1.

[12] *Supra* n.2.

[13] Hemant Taneja (@htaneja), X (Oct. 2, 2025, at 12:21 ET), https://x.com/htaneja/status/1973785447798342107.

Percepta also targets the same customers and geographies as Palantir. The press release stated that Percepta, like Palantir, seeks to develop and deploy "differentiated playbooks for how to execute AI transformation of healthcare, manufacturing, financial services, and government."[14]

The press release provided several examples of AI integration solutions that are virtually indistinguishable from the types of AI integration solutions Palantir regularly offers to its customers in the financial services, manufacturing, and healthcare industries, such as:

- "Modernizing fraud detection and customer experience in financial services, delivering significant efficiency and EBITDA uplift for banks;"

- "Optimizing supply chains and driving more optimal resource allocation in publicly traded manufacturing entities, minimizing overstocking, and improving resilience to demand fluctuations;"

- "Automating clinical workflows and improving patient engagement for healthcare customers across payers and providers."

And just as Palantir's business has a global footprint, the press release similarly broadcasted that Percepta "expect[s] the team to become a leading transformation partner for companies and governments *around the world*."

Lest there be any doubt that Percepta constitutes a competing business, it has filled its ranks (including co-founders) with former employees of Palantir. Within months of its founding, Percepta hired at least ten former Palantir employees, many of whom had worked on Palantir's AIP and have deep knowledge of Palantir's trade secrets and confidential information. *Id.*

## VI. Palantir Quickly Investigates Jain's and Cohen's Forensic Activity

Soon after learning of Percepta's existence and that it employs Jain and Cohen, Palantir promptly launched a forensic investigation into their activity on its systems and devices. That investigation revealed Cohen began viewing Palantir's highly confidential information without any

---

[14] *Supra* n.1.

legitimate business reasons in the days leading up to her resignation from Palantir. *See* Wendt Decl. Palantir's investigation revealed an unusual pattern of activity concerning Cohen's access to the Company's Highspot repository in the days leading up to her departure. Wendt Decl. ¶14. Her activity in the three-day window surrounding her notice accounted for over 50% of her entire activity over a four-month window prior to her departure. *Id.* More specifically, Cohen's access spiked right after she gave notice, accessing 62 distinct items in a single day—more than she had accessed in the entire preceding four-month period—many having no connection to her work in the healthcare industry, including materials concerning Palantir's anti-money laundering, renewable energy, cyber, fleet operations, biomanufacturing, and oil and gas offerings. *Id.* ¶¶14-15; Greenspan Decl. ¶10.

The investigation also revealed that during the same time period preceding her resignation, Cohen ran searches in Palantir's Github database concerning a project with which she had no involvement. Wendt Decl. ¶16. Specifically, Cohen searched through the source code and related Github materials, where she viewed the names and contact information of Palantir's healthcare customers. *Id.* There was no legitimate business reason for Cohen to search for or view this information.

The investigation also revealed that on February 25, 2025, Cohen sent herself a message through Palantir's Slack platform attaching several highly confidential documents, which included:

- **Healthcare Revenue Cycle Management Diagram** – This detailed workflow diagram depicts key inflection points in the healthcare revenue cycle in which Palantir's AI platform could add value and provides a description of how that platform could streamline various operations.

- **Internal Healthcare Demonstration Planning Framework** – This internal framework was used to plan and prioritize demonstration content for prospective

healthcare customers by aggregating insights from past deployments and customer conversations to identify high-impact use cases for showcasing Palantir's platform.

- **Draft Statement of Work** – This document outlines a proposed scope of work for an important healthcare customer based on extensive conversations about Palantir's underutilized platform capabilities.

*Id.* ¶¶8-12; Greenspan Decl. ¶9. Cohen then accessed or downloaded these highly confidential documents on her personal phone. Wendt Decl. ¶10. There was no legitimate business reason for Cohen to send these documents to herself through Slack one day *after* giving notice of her intent to leave Palantir, nor for her to then access or download them on her personal phone. These are the markings of someone who wanted to make sure she had Palantir documents available to her after she was cut off from Palantir's systems.

In the hands of a copycat like Percepta, these highly confidential documents could be used to replicate Palantir's demonstrations, target high-value use cases, and pitch tailored solutions to clients, using Palantir's insights gleaned from years of work and financial investment, without having to make the same investments Palantir incurred, Greenspan Decl. ¶11, thereby irreparably harming Palantir's competitive advantage and eroding its market position. *See also* Shankar Decl. ¶12.

## ARGUMENT

A temporary restraining order is vital to prevent Jain's and Cohen's continuing violations of their non-competition obligations and Cohen's exploitation of Palantir's confidential information. Absent a temporary restraining order, Palantir will suffer irreparable harm from damage to its confidential information, as well as its valuable customer relationships. By contrast, holding Jain and Cohen to the benefit of their bargain will cause them no hardship and will further the public interest in the enforcement of contracts. The Court should grant Palantir's motion and bar Jain and Cohen from

continuing to work for Percepta in any job functions they performed at Palantir, soliciting Palantir's customers, employees, and business partners, and using or disclosing Palantir's confidential information. The Court should also authorize expedited discovery in advance of a preliminary injunction hearing.

## I.    The Court Should Grant a Temporary Restraining Order to Prevent Further Unlawful Conduct by Jain and Cohen.

A temporary restraining order "may issue [if] specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1). "[F]or purposes of granting a preliminary injunction, the status quo is not simply the status quo in the moment before relief is granted," but rather, "the last peaceable uncontested status which preceded the pending controversy." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) ("[T]he status quo in preliminary-injunction parlance is really a status quo ante. This special ante formulation of the status quo in the realm of equities ***shuts out defendants seeking shelter under a current status quo precipitated by their wrongdoing***.").

The standard for granting a temporary restraining order is the same as the standard for granting a preliminary injunction. *See, e.g.*, *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002). Such relief should be granted where the plaintiff demonstrates: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent the requested relief; and (3) the balance of hardships favors the plaintiff and the public interest would not be impaired by the requested relief. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

To obtain a temporary restraining order or preliminary injunction, a plaintiff "need not show that success is an absolute certainty" *Nat'l Job Corps Ass'n v. Dep't of Lab.*, 788 F. Supp. 3d 642, 655 (S.D.N.Y. 2025); *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024)

(holding plaintiffs "need only make a showing that the probability of…prevailing is better than fifty percent."). And where the absence of injunctive relief could "render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be accordingly reduced." *Repub. of Lebanon v. Sotheby's*, 167 A.D.2d 142, 145 (1st Dep't 1990).

## A. Palantir Is Likely to Succeed In Proving Jain and Cohen Breached Their Contractual Obligations

A breach of contract claim requires: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from that breach." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). Palantir is likely to prevail in proving its breach of contract claims against Jain and Cohen because it can satisfy each of these elements.

### 1. Jain and Cohen Have Breached Their Non-Competition Obligations

Jain and Cohen have breached their non-competition obligations by performing substantially similar job functions for Percepta—a replica of Palantir—as they performed for Palantir.

*First*, Jain and Cohen entered into binding contracts with Palantir containing narrowly tailored non-competition obligations, whereby each agreed that for a period of 12 months following the end of their employment with Palantir, they would not "perform the job functions that [they] performed during [their] employment with [Palantir]…for an entity engaged in the same or similar business as [Palantir], including those engaged in the business of developing and selling analytical software." PIIA §6.3.

*Second*, Jain and Cohen breached these obligations. There is no question Percepta is an imitator of Palantir, as both companies aim to design, develop, and deploy AI-driven software that integrates seamlessly into enterprise workflows to enhance operational efficiency. *See supra* SOF Sections I, V. Public statements from Percepta's leadership explicitly acknowledge their intent to replicate Palantir's business model, targeting the same industries (healthcare, manufacturing, financial

services, and government) and global markets. *Id.* Section V. Circumstantial evidence (which will be confirmed by expedited discovery) will show that Jain and Cohen are performing substantially similar engineering functions as they performed at Palantir—leveraging the same expertise and insights they gained at Palantir to replicate its business. Indeed, Cohen's LinkedIn now reflects that at Percepta, she is a "Forward deployed" "Applied AI Engineer"—the same role she had at Palantir.

*Third*, Jain's and Cohen's breach of their non-competition obligations have caused and will continue to cause irreparable harm to Palantir's confidential information, as well as its valuable customer relationships. *Infra* Sections III, VI.

### 2. Jain's and Cohen's Non-Competition Obligations Are Valid and Enforceable

To the extent Jain or Cohen may attempt to defend their violations of their non-competition obligations by arguing they are unenforceable, that argument fails. In New York, "agreements restricting the parties' right to compete" are "fully enforceable" if they are "reasonable." *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283-84 (1981). A restrictive covenant is reasonable if it is: (1) reasonable in time and area; (2) necessary to protect the employer's legitimate interests; (3) not harmful to the general public; and (4) not unreasonably burdensome to the employee. *See JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024). Jain's and Cohen's non-competition obligations clearly satisfy each requirement.

***Reasonable Duration***. The one-year scope of Jain's and Cohen's non-competition obligations is reasonable. Courts applying New York law routinely find one-year restrictions to be reasonable. *See e.g., Integra Optics, Inc. v. Nash*, 2018 WL 2244460, at *7 (N.D.N.Y. Apr. 10, 2018) ("[R]estrictions that are one year in duration are considered to be within prevailing notions of reasonableness."); *JLM Couture, Inc. v. Gutman*, 2024 WL 892641, at *5 (S.D.N.Y. Mar. 1, 2024) ("New York courts routinely enforce reasonable non-competes for a period of two years or shorter."). Courts also routinely uphold non-competes far longer than one year. *See, e.g., JLM Couture, Inc. v.*

*Gutman*, 2024 WL 2053856, at *14 (S.D.N.Y. May 8, 2024) (five years); *Gelder Med. Grp. v. Webber*, 41 N.Y.2d 680, 685 (1977) (same). Given Jain's and Cohen's access to some of Palantir's most valuable trade secrets and confidential information, not to mention exposure to some of Palantir's most valuable customer relationships, the 12-month duration of their non-competition obligations is patently reasonable. *See, e.g.,* Greenspan Decl. ¶7; Shankar Decl. ¶¶11-12.

***Reasonable Scope of Restricted Activities***. The scope of restricted activities contained in Jain's and Cohen's non-competition obligations is reasonable. Those non-competition obligations prohibit them only from "perform[ing] the job functions that [they] performed during [their] employment with [Palantir]" for a competitor. PIIA §6.3. They do not prohibit them from working for a competitor in ***all*** capacities. These types of narrowly tailored restrictions are enforceable because they are carefully targeted towards the protection of the employer's legitimate interests. *See, e.g.*, *PrecisionIR Inc. v. Clepper*, 693 F. Supp. 2d 286, 293–94 (S.D.N.Y. 2010) (enforcing non-competition obligation because "it merely bars [defendant] from working in roles similar to those he performed at [plaintiff]").

***Reasonable Geographic Scope***. The global geographic scope of Jain's and Cohen's non-competition obligations is reasonable. "[W]here an employer's business is conducted worldwide to a global customer base, the lack of a geographic restriction [in a restrictive covenant] is necessary." *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016); *see also George & Co. LLC v. Spin Master US Holdings, Inc.*, 2023 WL 9509031, at *13 (E.D.N.Y. Nov. 29, 2023) ("[I]t is well-established that where an otherwise valid restrictive covenant does not contain a geographic limitation, the court may…interpret the clause in conformity with the intent of the parties."). *Integra Optics, Inc. v. Messina*, 52 Misc.3d 1210(A), at *3 (Sup. Ct. Albany Cnty. 2016) (holding that "the absence of a geographical limitation" was "reasonable" given "the worldwide scope of the market").

Palantir operates on a global scale, with offices across North America, Europe, the Middle East, and the Asia-Pacific region. *See supra* SOF Section I. Its customer base includes Fortune 500 companies worldwide, reflecting its broad industry reach and international presence. *Id.* As both Jain and Cohen have acknowledged, Palantir "sells and provides its products and services worldwide" and the "geographic regions" of their non-competition obligations "are reasonable and valid in light of the nature and extent of the business conducted by [Palantir], especially in light of [Palantir's] need to protect its Proprietary Information and the international scope and nature of [Palantir's] business." PIIA §6.4. Indeed, Percepta has openly stated its intent to challenge Palantir on a global basis given the press release claims that "we expect the team to become a leading transformation partner for companies and governments ***around the world***."[15] Accordingly, the worldwide scope of Jain's and Cohen's one-year covenant is reasonable, particularly when read in conjunction with its limited one-year duration. *See Integra Optics*, 2018 WL 2244460, at *7 ("[E]ven if the geographic scope were found to be somewhat broad (due to the evidence that the vast majority of Plaintiff's current customers appear to be limited to North and South America), the restriction is tempered by the [one-year] duration of it.").

> ***Protection of Palantir's Legitimate Interests***. Jain's and Cohen's non-competition obligations are well-supported by Palantir's legitimate interests. "Trade secrets and confidential information count among employer interests courts recognized as legitimate." *Int'l Bus. Machines Corp. v. Visentin*, 2011 WL 672025, at *8 (S.D.N.Y. Feb. 16, 2011). In this case, Jain and Cohen enjoyed access to some of Palantir's most valuable trade secrets and confidential information, including its source code, internal healthcare demonstration workspace, deployed customer

---

[15] *Supra* n.1.

workflows, and proprietary customer engagement strategies. *See supra* SOF Section II. These are precisely the types of legitimate interests that justify enforcement of non-competition obligations.

In addition, New York law recognizes "an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense." *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *16 (S.D.N.Y. Oct. 31, 2008); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 337 (E.D.N.Y. 2020) (entering preliminary injunction against former employee where restrictive covenants were deemed "necessary to protect [employer's] legitimate interests in safeguarding…relationships of its clients and customers"). In this case, Jain regularly attended on-the-ground "bootcamps" with Palantir's healthcare customers, including hospitals, gaining direct insight into how customers use Palantir's products and how Palantir markets those products. *See supra* SOF Section II. And Cohen interacted directly with Palantir's healthcare customers to learn their needs and then developed and deployed AI software solutions to meet those needs, forging relationships and fostering goodwill in the process. *See id*. This type of intimate familiarity with customers—sourced, funded, and supported by Palantir—is protectible under New York law as well.

**No Harm to Public and Not Unreasonable Burdensome.** There is no harm to the public that would result from Jain's and Cohen's non-competition obligations. To the contrary, enforcing their non-competition obligations will protect the investments made by innovative businesses, especially one like Palantir that aims to support, rather than replace, the employees of its customers. Nor are Jain's and Cohen's non-competition obligations unreasonably burdensome. They are free to work for countless other companies in the AI industry, so long as they do not perform the same or substantially similar job functions as they performed for Palantir.

**3. Jain's and Cohen's Non-Competition Obligations Have Been Tolled So They Cannot Exploit the Secret Nature of Their Breach**

Jain's and Cohen's non-competition obligations will not begin to run until they cease breaching those obligations. Jain and Cohen joined Percepta and began competing with Palantir in breach of their non-competition obligations shortly after their resignations on December 2, 2024 and March 4, 2025, respectively. *See supra* SOF Section IV. By design, they purposefully hid the fact that they were secretly and unfairly competing with Palantir in brazen violation of these obligations. *See id.* But each of their agreements contain a tolling provision designed specifically to prevent a scenario in which Jain and Cohen are able to exploit the secret nature of their breach to "run-out-the-clock" on their non-competition obligations. That provision provides that in the event of a "breach or violation" of the non-competition obligations, the 12-month duration of such obligations "shall be tolled until such breach or violation…has been duly cured or resolved." PIIA §6.4. Such tolling provisions are regularly enforced in New York. *See e.g.*, *Delta Enter. Corp. v. Cohen*, 93 A.D.3d 411, 412 (2012) (enforcing tolling provision because it "appears to be the only means by which to ensure the preservation of the status quo pending a final resolution of this action"); *HMS Holdings Corp. v. Arendt,* 18 N.Y.S.3d 579 (Sup. Ct., N.Y. Cnty. 2015) (rejecting argument that tolling provision is unenforceable because it "runs counter to appellate precedent recognizing the equitable power of courts to extend the duration of a covenant even without an agreement"). To ensure Jain and Cohen are not rewarded for their dishonest and underhanded conduct, the clock on their non-competition obligations should be tolled from when they started working for Percepta.

### 4. Cohen Has Breached Her Confidentiality and Return of Property Obligations

Cohen also breached her confidentiality and return of property obligations by taking at least three of Palantir's highly confidential documents (and potentially many more) and exploiting them on behalf of Percepta.

*First*, Cohen entered into a binding contract containing confidentiality obligations, whereby she agreed to "hold in confidence and not disclose or…use any Proprietary Information," including "Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae, or research activities)." PIIA §4. She also agreed that "[u]pon termination of [her] employment or when requested by [Palantir], [she] will promptly return to [Palantir] all items containing or embodying Proprietary Information." *Id.*

*Second*, Cohen breached this obligation. The day after Cohen gave notice of her resignation from Palantir, she sent herself a Slack message attaching three highly confidential documents, including a detailed healthcare revenue cycle management diagram, an internal healthcare demonstration planning framework, and a draft statement of work for an important healthcare customer. *See supra* SOF Section VI. Cohen then accessed or downloaded these documents on her personal phone. *See id.* This came on the heels of her improperly accessing various marketing materials for industries she had no involvement with and other sensitive customer contact information. *See id.* These documents unquestionably constitute Palantir's "business" and "technical" information, and specifically, "information relating to customers," as well as "marketing and sales information, business plans or dealings, designs, formulae, [and] research activities." *See id.* There was no legitimate business reason for any of this conduct. *See id.* Rather, the only reasonable

conclusion to draw from Cohen's conduct is that she was taking deliberate steps to ensure Palantir proprietary documents would be available to her after she left the company to exploit on behalf of Percepta. *See, e.g.*, *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 117–18 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024) (granting preliminary injunction against former employee who used Slack to send himself competitively sensitive materials and then "viewed or downloaded [them] on his personal phone").

*Third*, Cohen's breach of her confidentiality and return of property obligations have caused and will continue to cause irreparable harm to the value of Palantir's confidential information and its competitive standing in the market. *See infra* Sections III, VI.

## II. Absent Injunctive Relief, Palantir Will Suffer Irreparable Harm to Its Confidential Information and Valuable Customer Relationships

Emergency equitable relief is required to prevent ongoing irreparable harm to Palantir. An injury is irreparable if it cannot be adequately redressed by money damages or if the Plaintiffs' monetary loss would be "difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). Absent a temporary restraining order, Palantir will continue suffering two principal forms of immediate and irreparable harm as a result of Jain's and Cohen's egregious breaches: (i) a substantial risk of disclosure of Palantir's confidential information to a start-up competitor seeking to replicate Palantir's business; and (ii) harm to Palantir's relationships with its clients. As Jain and Cohen expressly acknowledged in their agreements, only equitable relief is adequate to remedy the harms inflicted by violations of those agreements.

*First*, Palantir will continue suffering irreparable harm due to the substantial risk of Jain's and Cohen's continued use and disclosure of its confidential information in the absence of injunctive relief. New York courts repeatedly recognize the irreparable harm a party will suffer if its confidential information is at risk of misuse, particularly by a copycat competitor. *See Biosynexus Inc. v. Glaxo*

*Grp. Ltd.*, 11 Misc.3d 1062(A), at \*11 (Sup. Ct. N.Y. Cnty. 2006) ("Should the [confidential] information be improperly disclosed… it would be impossible to once again make it confidential."). This is because the competitive harm resulting from loss of confidential information is often difficult (if not impossible) to measure "in terms of money damages." *Comput. Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992). In this case, one of the key purposes of Jain's and Cohen's non-competition obligations is the protection of Palantir's confidential information. By requiring Defendants to wait 12 months before commencing employment with a competitor, Palantir aims to minimize the risk that their former employees will be in a position to exploit the Palantir confidential information it entrusted to them. This concern is all the more pronounced for Cohen, given she was conducting nefarious searches for customer contact information, accessing confidential information unrelated to her duties and responsibilities, and stole (and, as far as Palantir knows, remains in possession of) highly confidential documents from Palantir. *See id*.

*Second*, "[i]t is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm." *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500, at \*5 (S.D.N.Y. Jan. 27, 2025). A plaintiff who stands to lose its business relationships due to breach of restrictive covenants suffers irreparable harm because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (1999). Here, both Jain and Cohen learned confidential information about Palantir's customers and developed relationships and customer goodwill through interactions sourced, funded, and supported by Palantir. *See supra* SOF Section II. Through these interactions, they obtained unique insights into the customers, and engendered loyalty by developing Palantir AI software solutions to

meet those needs. *See id.* Percepta is targeting the same global customer base in the financial services, manufacturing, and healthcare industries as Palantir. *See supra* SOF Section V. Without Jain or Cohen, it would lack insights into customers' motivations or pre-existing relationships or loyalties which it can exploit. And if it is permitted to exploit such insights and relationships through Jain and Cohen, Palantir will surely suffer profound irreparable harm.

*Finally*, Jain and Cohen have already acknowledged that "any breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy," and that Palantir "will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." PIIA §9. New York courts have recognized "[a] movant's demonstration of irreparable harm is **strengthened significantly** where the employee has previously acknowledged—most often in an employment agreement—that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur." *Iannucci v. Segal Co., Inc.,* 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006); *see also N. Atl. Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm because the defendant "acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause irreparable injury").

Absent appropriate injunctive relief, Percepta—a Palantir copycat—will be able to access and exploit Palantir's confidential information, as well as its valuable customer relationships, for its own benefit. Monetary damages cannot adequately protect Palantir against this unfair competitive advantage.

## III. The Balance of Hardships and Public Interest Strongly Favor Palantir

The balance of hardships and public interest both strongly favor Palantir's requested relief. "[T]he balancing of the equities usually simply requires the court to look to the hardship imposed on one party outweigh[ing] the benefit to the other accruing from a grant or denial of the requested

relief." *Students for Fair Admissions v. United States Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 138 (S.D.N.Y. 2024). Put differently, when the absence of an injunction would cause significantly greater harm than its imposition, the balance of hardships weighs in favor of granting the injunction. *See FuboTV*, 745 F. Supp. 3d at 150–51.

Absent injunctive relief, Palantir faces a significant threat of irreparable harm arising from Jain, Cohen, and Percepta exploiting its confidential information, and interfering with its valuable customer relationships. *See supra* SOF Section III, VI. By contrast, the imposition of a temporary restraining order will cause no cognizable harm to Jain and Cohen. An injunction will merely stop them from unlawfully working in a competitive capacity for 12 months, which they already agreed to do when they signed their employment contracts. They would be free to work for countless other companies in the AI industry, so long as they do not perform the same or substantially similar job functions as they performed for Palantir. Any frustration of Jain's and Cohen's plans to compete with Palantir or slight inconvenience to their desired career trajectories with Percepta is far outweighed by Palantir's need to protect its legitimate business interests. *See Int'l Bus. Machines Corp. v. De Freitas Lima*, 2020 WL 5261336, at *15 (S.D.N.Y. Sept. 3, 2020) (holding plaintiff's "need to protect its legitimate business interests substantially outweigh[ed] the harm resulting to [the defendant] from [temporarily] not working for" a competitor). Indeed, in light of their decision to co-found and work for a knock-off of Palantir in clear breach of their non-competition obligations and hide it for months, the "economic costs" and other "harms" carried by injunctive relief "are largely self-inflicted." *TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*, 2024 WL 4627452, at *9 (S.D.N.Y. Oct. 30, 2024). Accordingly, "a balance of the equities tips[]in favor of" Palantir. *FuboTV*, 745 F. Supp. 3d at 153.

To the extent Jain or Cohen may argue that the balance of equities favors them because they have been working (secretly) at Percepta for months, that argument fails. Until October 2025, Percepta

was operating in "stealth" mode, concealing the nature of Jain's and Cohen's new employment and their contractual breaches. Once Palantir learned of their breaches, it quickly investigated Jain's and Cohen's misconduct and filed this action as soon as practicable. Under New York law, "[m]ere delay, without the necessary elements creating an equitable estoppel, does not preclude the grant of an injunction," particularly where, as here, "defendant[s] hid" their competition from discovery and the "status quo is the result of defendant's deception." *New York Real Est. Inst., Inc. v. Edelman*, 42 A.D.3d 321, 322 (2007); *see also Eric Woods, LLC v. Schrade*, 45 Misc. 3d 1206(A), 6 (Sup. Ct., N.Y. Cnty. 2014) (granting preliminary injunction because "defendants have not alleged or established the elements of equitable estoppel or laches," and any "delay in commencing suit does not preclude the granting of preliminary injunctive relief or tip the equities in defendants' favor under the circumstances presented herein"). Even where a party "breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement." *Edelman*, 42 A.D.3d at 322.

The public interest also weighs in favor of granting injunctive relief. An injunction would promote the public interest in protecting investments made by innovative businesses. Palantir is a pioneer and market leader in providing AI products designed to complement—but not replace—human interactions between companies and their consumers. Unlike other AI companies, Palantir protects jobs with its AI and helps employees perform better, instead of replacing them. Palantir's ability to provide these services will suffer if its confidential information and valuable customer relationships are allowed to be exploited by an imitator like Percepta.

An injunction would also promote the public interest in the enforcement of reasonable contracts. It is axiomatic that "when parties set down their agreement in a clear, complete document, their writing should…be enforced according to its terms." *Edge Grp. WAICCS LLC v. Sapir Grp. LLC*,

705 F. Supp. 2d 304, 321 (S.D.N.Y. 2010). Not only would the public suffer no harm from an injunction, but "the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014). By asking the Court to enjoin Jain and Cohen from conduct that violates their contracts, Palantir seeks only to require them to abide by the reasonable restrictions to which they already agreed in exchange for valuable consideration. Accordingly, an injunction here would advance the public interest in the promotion of investment in innovation and socially valuable technology companies like Palantir and the enforcement of reasonable contracts.

## IV. The Court Should Order Expedited Discovery in Advance of a Preliminary Injunction Hearing.

The Court should order expedited discovery in the form of the document requests, interrogatories, and document subpoenas filed contemporaneous with this memorandum in advance of the hearing on Palantir's motion for a preliminary injunction. *See* Mufson Decl. Exs. C-H. Courts have wide discretion to permit expedited discovery. *See* Fed. R. Civ. P. 30(b), 34(b); *Benham Jewelry Corp. v. Aron Basha Corp.*, 1997 WL 639037, at *20 (S.D.N.Y Oct. 14 1997). And courts frequently permit expedited discovery in advance of hearings on applications for preliminary injunctions to ensure timely determination of complex factual issues. *See Chanel, Inc. v. Lin*, 2023 WL 2574946, at *1 (S.D.N.Y. Mar. 20, 2023) (ordering a temporary restraining order and expedited discovery in advance of hearing on preliminary injunction application); *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994) ("Expedited discovery is often [made] available in cases where preliminary relief is sought").

In the Second Circuit, most courts apply a flexible "reasonableness and good cause" standard when evaluating whether a party is entitled to expedited discovery. *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 209 (W.D.N.Y. 2020). But some courts apply a four-part test requiring the movant to demonstrate: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited relief were granted. *See Advanced Portfolio Techs.*, 1994 WL 719696 at *3. Palantir is entitled to expedited discovery under either standard, and is amply justified here. *First*, Palantir faces a serious threat of irreparable harm to its confidential information and valuable confidential information as a result of Jain's and Cohen's ongoing contractual breaches. *Second*, Palantir has a high likelihood of success on the merits of its breach of contract claims based on the current record and the good chance discovery will reveal further unlawful conduct. *Third*, expedited discovery is critical to Palantir obtaining evidence regarding the full scope and nature of Jain's and Cohen's breaches of their non-competition, confidentiality, and return of property obligations, and for securing proper relief through a preliminary injunction. *And fourth*, Jain, Cohen, and their employer will suffer virtually no harm other than participating in the same discovery they would otherwise be required to participate in anyway except on a more elongated schedule. In other words, it is reasonable and there is more than good cause to order expedited discovery because "the irreparable injury that [plaintiff] potentially faces in the absence of expedited discovery is of far greater significance than any inconvenience to defendant from such expedited discovery." *See Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

## CONCLUSION

For the foregoing reasons, Palantir respectfully requests this Court enter Plaintiff's proposed order to show cause.

Dated: October 30, 2025
New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:/s/ *Harris M. Mufson*
     Harris M. Mufson
     Ilissa Samplin
     Justin M. DiGennaro
     Zachary A. Schreiber

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
hmufson@gibsondunn.com
jdigennaro@gibsondunn.com
zschreiber@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213-229-7000
isamplin@gibsondunn.com

*Attorneys for Plaintiff*

## WORD COUNT CERTIFICATION

I, Harris M. Mufson, an attorney duly admitted to practice law before this Court, hereby certify pursuant to this Court's Local Civil Rule 7.1 that this memorandum of law complies with the word limit set forth in this Court's Local Civil Rule 7.1 because it contains 8,738 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: New York, New York
October 30, 2025 *Harris M. Mufson*