**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PALANTIR TECHNOLOGIES INC.,

               Plaintiff,

    v.

HIRSH JAIN, RADHA JAIN, and JOANNA
COHEN,

               Defendants.

Civil Action No. 25-cv-08985-JPO

Hon. Paul J. Oetken

## FIRST AMENDED COMPLAINT

1.    Plaintiff Palantir Technologies Inc. ("Palantir" or "Company"), by its undersigned attorneys, hereby files this First Amended Complaint against Defendants Hirsh Jain, Radha Jain, and Joanna Cohen—employees at Percepta AI ("Percepta")—and in support thereof, alleges as follows:

## INTRODUCTION

2.    Even limited and expedited discovery has unveiled irrefutable and extensive proof of Defendants' illegal conspiracy to build a Palantir copycat company, including—in their own words—an illicit plan to "pillage the best devs at Palantir," recruit Palantir executives and senior developers, and plunder Palantir's valuable intellectual property.

3.    That conduct plainly violates the various confidentiality, noncompete, and/or non-solicitation agreements that Defendants signed as part of their employment at Palantir as well as other legal obligations owed to the Company.

4.    The original Defendants, Radha Jain and Joanna Cohen, are not the only ex-Palantirians to join Percepta—and not the only wrongdoers either.  Initial discovery revealed that Percepta's Chief Executive Officer—Hirsh Jain—is inexorably intertwined with Radha Jain and Joanna Cohen's illegal conduct.  Palantir has added Hirsh Jain to this lawsuit, and new claims

against all three Defendants.  And Palantir strongly believes additional wrongdoing has yet to be uncovered.

5.      The existing evidence in this case speaks for itself.  Documents on Defendants' devices show them unlawfully and improperly: (1) raiding Palantir's workforce, *see* Percepta's CEO stating "I'm down to pillage the best devs at Palantir" only weeks after his own departure from Palantir; (2) stealing and exploiting Palantir's confidential documents, *see* iPhone photos of information displayed on Palantir computer screens—including data far outside Joanna Cohen's daily work at Palantir; and (3) competing with Palantir to provide the same artificial intelligence ("AI") integration services to the same customers, *see* Defendants not only selling—but actually providing—services to a customer that Joanna Cohen pitched to at Palantir.

6.      In Percepta CEO's own words:

**Hirsh Jain** 11/15/2024 3:35:09 PM
Yeah I'm down to pillage the best devs at palantir when they're at their maximum richness

7.      From Percepta engineer Joanna Cohen's own phone:



8.      And from Joanna Cohen's own testimony (discussing her earlier work at Palantir for what would become Percepta's first and largest customer):

```
     Q.     Okay.  Do you have any reason
to doubt the accuracy of ████  ████████'s
statement, that you gave a, quote-unquote,
dope demo to ███████████?
     A.     I mean, I don't have a memory
of it, but I have no reason based on what
I'm seeing in front of me to doubt that.
```

9.      Defendants brazenly disregarded their contractual and legal commitments to Palantir and instead chose a path of deception and unjust competition—a path they continue trundling down to this day, and that irreparably harms Palantir and their ex-colleagues.  At Percepta, they seek to succeed not through old-fashioned ingenuity and competition, but through outright theft and deceit.  Defendants must be held accountable for their unlawful conduct.

10.     Defendants were not ordinary employees when they worked for Palantir.  Hirsh Jain was an executive and responsible for Palantir's healthcare portfolio.  Radha Jain designed and built Palantir's flagship AI software—AIP Logic.  She also interacted directly with some of Palantir's largest and most important healthcare, manufacturing, supply chain, financial services, and government customers.  So did Joanna Cohen, who worked with some of Palantir's largest and most important healthcare customers to understand the problems they faced in their businesses—and who developed AI workflows and software solutions to address the most pressing use cases and problems faced by these customers.

11.     In their respective executive and engineering roles, Defendants were entrusted with Palantir's crown jewels, including its source code, internal healthcare demonstration workspace,

deployed customer workflows, and proprietary customer engagement strategies.  These materials are the product of billions of dollars of investment and years of research by Palantir.

12.     To protect Palantir's most valuable confidential information and customer relationships—and in exchange for millions of dollars of compensation—Defendants agreed to abide by narrowly tailored non-solicitation and confidentiality obligations.  Radha Jain and Joanna Cohen also agreed to abide by narrow non-competition obligations.

13.     Palantir had every expectation that Defendants would honor their commitments, but Defendants chose to run roughshod over their contracts and legal obligations—seeking to "pillage" Palantir's workforce (including its executives and senior developers) and confidential information to build Percepta.

14.     Hirsh Jain resigned from Palantir in August 2024 to, unbeknownst to Palantir, secretly found and serve as the Chief Executive Officer of Percepta.

15.     Soon after his resignation, and in clear breach of his non-solicitation obligations, Hirsh Jain began an aggressive campaign to recruit numerous Palantir employees to leave Palantir and join Percepta, including Radha Jain and Joanna Cohen.

16.     Hirsh Jain contacted these Palantir employees to discuss joining Percepta, held countless meetings and calls during which he encouraged them to join, introduced them to numerous important stakeholders involved with Percepta, and even personally negotiated their compensation packages.

17.     Hirsh Jain also enticed Radha Jain—while she was still an employee of Palantir—to breach her own loyalty and non-solicitation obligations by participating in his scheme to raid Palantir's workforce for more employees.

18.     Regardless of the terms of his non-solicitation agreement with Palantir, Hirsh Jain,

in his own words, described his role at Percepta as involving poaching employees:

> **Hirsh Jain** 11/15/2024 3:33:58 PM
> I am, fundamentally, a recruiter

19.     While still employed by Palantir, Radha Jain wholeheartedly endorsed and celebrated Hirsh Jain's unlawful strategy to "pillage" Palantir for talent:

> **Radha Jain (Owner)** 11/15/2024 3:56:38 PM
> God thinking about poaching is so fun

20.     Hirsh Jain and Radha Jain's text messages named and compared specific Palantir employees they would solicit or had already solicited.

21.     Radha Jain's disloyalty to Palantir did not end with her support for Hirsh Jain's campaign to "pillage" and "poach" Palantir's employees.  While working on Palantir's dime, she also began working for Percepta to offer Customer A—a would-be Palantir customer—the same types of AI solutions for increasing operational efficiencies that she offered to customers while at Palantir.

22.     Days after discussing "poaching" with Hirsh Jain—and while still employed at Palantir—Radha Jain attended a three-hour meeting with more than a dozen representatives from Customer A.  She also participated in multiple strategic discussions over numerous days about how to architect AI solutions and workflows for Customer A's use cases.  Those efforts proved successful.  Customer A (which previously considered working with Palantir) was Percepta's first customer and remains its largest customer, generating millions of dollars in revenue for the company.

23.     After secretly working for Percepta for weeks while biding her time for the next tranche of her Palantir equity grant to vest, Radha Jain notified Palantir that she was resigning in December 2024.  She sent her colleagues a vague email disclosing only that she was leaving to join

"an AI startup," but did not provide any details about what company she was joining or what her duties and responsibilities would be.  She refused to sign a severance agreement that would have required her to reaffirm her non-competition, non-solicitation, and confidentiality obligations, and did not update her LinkedIn to reflect her new employer.  Instead, she continued working for Hirsh Jain and Percepta in "stealth" mode, including on the same types of AI solutions for Customer A as she offered to customers while at Palantir.

24.    Radha Jain and Hirsh Jain are described as Percepta's co-founders.

25.    Hirsh Jain and Radha Jain then continued their plan to "pillage" Palantir by setting their sights on Joanna Cohen.  As with Radha Jain, Hirsh Jain repeatedly met with Joanna Cohen, introduced her to numerous stakeholders involved with Percepta, and negotiated her compensation package.

26.    In March 2025, Joanna Cohen followed the budding playbook.  She too resigned and kept her new employer a secret.  She likewise refused to sign a severance agreement and did not update her LinkedIn profile.  And she too would join Percepta in "stealth" mode, performing the same job functions for Percepta that she had performed for Palantir.

27.    After more than a year in "stealth" mode, in October 2025, General Catalyst finally issued a press release announcing the launch of Percepta.  There, Hirsh Jain and General Catalyst's Chief Executive Officer, Hemant Taneja, declared that "[o]ver the last year, Percepta has been quietly at work."[1]  That press release—which revealed Percepta to the public for the very first time— also demonstrated that Percepta is unquestionably a Palantir copycat, aiming to design, develop, and deploy software that enables customers to integrate AI into their own existing workflows to increase

---

[1]    Hemant   Taneja   and   Hirsh   Jain,   *Unveiling*   Percepta,   (Oct.   2,   2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

operational efficiencies, focusing on all of the use cases that Palantir offers its customers. It also revealed that Percepta's workforce is disproportionately populated by former Palantir employees, including an outright majority of its founding team.

28.     It was only after Percepta surfaced from its self-described "stealth" mode that Palantir became aware that Radha Jain and Joanna Cohen had been competing in violation of their restrictive covenant agreements. Palantir then quickly launched a forensic investigation of Defendants' activities on Palantir's devices and systems. That investigation revealed clear and unequivocal evidence that Joanna Cohen had stolen highly confidential documents from Palantir to use at Percepta—the epitome of unfair competition and a violation of her confidentiality obligations to Palantir.

29.     The day after Joanna Cohen gave notice of her resignation from Palantir, she sent herself a Slack message attaching highly confidential documents, including a detailed healthcare revenue cycle management diagram, an internal healthcare demonstration planning framework, a draft statement of work for an important healthcare customer, and an AI use case tracker for another important healthcare customer. She then downloaded these documents onto her personal phone. Thereafter, she deleted the documents from her Palantir laptop in an effort to cover her tracks. All of this misconduct came on the heels of Joanna Cohen improperly accessing dozens of confidential marketing materials for industries with which she had no involvement and other sensitive customer contact information.

30.     Through expedited discovery in this case, Palantir has learned that Joanna Cohen's efforts to exfiltrate Palantir's confidential information were far more extensive than it was able to uncover through an audit of its own systems. In an obvious effort to evade Palantir's data security systems, after accepting an offer to join Percepta, Joanna Cohen used her personal phone to take

dozens of photographs of her Palantir computer monitor while it displayed highly confidential documents and information regarding Palantir's product capabilities, use cases, design concepts, and sales strategies for specific projects and workflows.  She saved these photographs on her personal phone and kept them while working for Percepta.

31.    There was no legitimate business reason for Joanna Cohen to take any of these highly confidential documents.

32.    None of the documents she took copies or photographs of had any relation to her efforts to transition her duties and responsibilities at Palantir upon leaving the company.

33.    In the hands of a competitor like Percepta, these highly confidential documents could be used to shortcut years of Palantir's research into product development, customer engagement, solutions to high-value customer problems, and strategic learning, not to mention evade millions of dollars in investment.  In so doing, Percepta would be able to replicate Palantir's most effective customer demonstrations, target high-value use cases, and pitch-tailored solutions to customers using Palantir's own insights, thereby irreparably harming Palantir's competitive advantage and eroding its market position.

34.    Defendants' year-long charade was deliberate, coordinated, and unlawful.  Hirsh Jain and Radha Jain built Percepta's nascent workforce by targeting Palantir employees; Joanna Cohen stole Palantir's confidential documents on her way out the door; and they all concealed their competitive misconduct for nearly a year.

35.    Palantir brings this action to secure emergency injunctive relief to prevent Defendants' infliction of further irreparable harm to Palantir's business and to immediately bring Defendants into compliance with their lawful contracts and with other legal obligations to Palantir.

## PARTIES

36.    Palantir is a Delaware corporation with its principal place of business in Denver, Colorado.

37.    Hirsh Jain is an individual who resides in New York, New York.

38.    Radha Jain is an individual who resides in New York, New York.

39.    Joanna Cohen is an individual who resides in New York, New York.

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Palantir and Defendants are citizens of different U.S. states and the amount in controversy exceeds $75,000, excluding interest and costs.  Palantir is a citizen of Delaware and Colorado.  Each of the Defendants is domiciled in New York, and therefore a citizen of New York. The value of the injunctive relief sought herein, including the return and protection of highly confidential documents, is substantial and of great value to Palantir.  Palantir paid Defendants millions of dollars in compensation and equity in exchange for their covenants, while Hirsh Jain has (at minimum) breached his non-solicitation obligations, Radha Jain has (at minimum) breached her non-competition and non-solicitation obligations, and Joanna Cohen has (at minimum) breached her non-competition, confidentiality, and return of property obligations.  These ongoing breaches are causing irreparable harm to Palantir's business and goodwill, the value of which far exceeds $75,000.

41.    This Court has personal jurisdiction over Defendants because each Defendant, by signing and accepting the terms of various binding agreements, along with accepting the significant benefits those agreements conferred, expressly agreed to this Court's exercise of jurisdiction over this action and of personal jurisdiction over them.

42.    This Court also has personal jurisdiction over Defendants because they live, work, and reside in New York.

43.    Venue is proper in this District because each Defendant, by signing and accepting the terms of various binding agreements, along with accepting the significant benefits those agreements conferred, expressly agreed to this Court's exercise of jurisdiction over this action and of personal jurisdiction over them.

44.    Venue is also proper in this District because Palantir maintains its New York office in this District and: (1) Defendants reside in this District, (2) the contracts that Defendants are breaching were negotiated within this District; (3) Defendants breached their agreements and other legal obligations to Palantir while located within this District; (4) Palantir was irreparably harmed and continues to face the risk of additional irreparable immediate harm in this District by virtue of Defendants' breaches; and (5) Percepta's office, where Defendants are actively engaged in ongoing, willful breaches of their employment agreements with and other legal obligations to Palantir, is located in this District.

## STATEMENT OF FACTS

**A.    Palantir Is a Global Leader in the AI Integration Industry.**

45.    Since its founding in 2003, Palantir has become a global leader in designing, developing, and deploying software that enables customers in the healthcare, manufacturing supply chain, financial services, and government industries (among others) to integrate AI into their own existing workflows to increase operational efficiencies.  Palantir offers a myriad of solutions to the most important use cases in specific industries, most of which are developed and architected by Palantir, deployed to the customer, and re-iterated into its core Foundry platform to be repeatable for other customers in the industry.

46.    Palantir's Artificial Intelligence Platform ("AIP") provides customers with the ability to standardize their data, build complex models, and deploy AI-powered applications securely within their existing systems and operations.

47. AIP is designed to integrate directly within a customer's existing data infrastructure and enterprise software. It can ingest and process large volumes of data in real time, synchronize the data so that it all can be analyzed together, and generate tailored outputs that automate processes, make recommendations, and execute specific actions within the customer's existing workflow. This allows customers to embed AI directly into their day-to-day operations, augmenting the systems and decision-making processes they already use, rather than interacting with AI as a separate or external tool.

48. Unlike traditional software tools that can perform only a single function or operate in only a single industry, AIP is a highly configurable workflow platform that can perform innumerable functions and operate across most industries, including:

- **Healthcare**: Palantir enables hospitals and medical providers to use AIP to automate clinical workflows. For example, AIP can be used to process and analyze medical information in real time, enhance early detection of sepsis, and provide recommended care plans. AIP can also be used to facilitate patient engagement through automated texting and the scheduling of appointments.

- **Manufacturing and Supply Chain**: Palantir aids manufacturing companies to benefit from AIP by monitoring and managing production and distribution in real time. For instance, if a manufacturer relies on certain raw materials to produce its product, AIP can track supply levels, forecast shortages, assess timing of reshipments, and recommend corrective action such as adjusting output or rerouting existing shipments. In other words, Palantir aids

these companies in simultaneously avoiding stockouts and overstocks.

- **Financial Services**: Palantir assists financial institutions deploy AIP to assist with fraud detection, risk assessment, and compliance monitoring. For example, Palantir deploys workflows in AIP to continuously analyze transactional data and regulatory feeds, identify anomalies, generate reports, and recommend compliance workflows based on its analysis.

- **Government**: Palantir helps governmental entities apply AIP to a wide range of functionalities to enhance their operational efficiencies. For instance, governmental entities use AIP to analyze applications and other types of submissions from the public, streamlining processing in relation to approvals or other recommended next steps.

49. Palantir operates its business on a global scale, with six offices in North America, 14 offices in Europe & the Middle East, and four offices in Asia & Pacific. Palantir's customer base includes Fortune 500 companies located around the world.

50. By architecting solutions that embed AI directly into existing enterprise workflows—through Palantir's Foundry and/or AIP platform or through a customer's own data infrastructure—Palantir enables organizations around the world to transform how they operate, augmenting human decision-making with machine intelligence while maintaining full control, security, and accountability.

**B. Defendants Enjoy Access to Palantir's Most Valuable Confidential Information.**

51.    Hirsh Jain worked for Palantir as a Deployment Strategist in Palantir's U.S. Government business and was the portfolio lead of Palantir's U.S. government health business.

52.    In this role, Hirsh Jain had oversight, strategy, and execution responsibilities across the entirety of Palantir's U.S. government health business, including work with the Center for Disease Control and Department of Health and Human Services, inclusive of all organizations within those agencies (such as the National Institute of Health).  His responsibilities included engaging on Palantir's broader government growth strategy (inclusive of the health business), government affairs approaches, and driving execution efforts for all U.S. government health projects.  He managed nearly a dozen direct reports, set compensation for 28 other employees, contributed to compensation review of over 100 employees, was the hiring manager for Forward Deployed Engineers at Palantir for three years, and helped to drive Palantir's retention strategies relating to its most promising personnel.

53.    Throughout his time with Palantir, many of Hirsh Jain's direct reports were senior employees or leaders within Palantir's U.S. government business.  This included individuals who were leaders of specific deployments within Palantir's health and civilian government business.  His direct reports were also people leads, reflecting his leadership responsibilities over other leaders in Palantir's U.S. government business.  In addition, Hirsh Jain's compensation review/manager responsibilities provided him with unique insight into his colleagues' pay and promotional prospects.  He also had visibility into Palantir's retention efforts, inclusive of different levers and macro retention strategies.

54.    Radha Jain began her Palantir career as a Forward Deployed Engineer, a position that required both technical acumen and strong customer engagement skills.  While in this role, Radha Jain regularly interacted with Palantir customers in the healthcare, manufacturing supply chain,

financial services, and government industries to understand the problems affecting their businesses and to develop software solutions for those problems.

55.    Radha Jain was subsequently elevated to an AI Product Engineer.  In this role, she was responsible for designing and building Palantir's source code that serves as the fundamental building blocks for all of its software solutions, including AIP Logic, which is Palantir's market-leading product.  It offers no-code and low-code solutions and serves as a gateway for customers to deploy Palantir's proprietary technologies in a matter of days.

56.    In her own words, Radha Jain worked "on a small team building Palantir's flagship AI application, AIP Logic."  And she was "one of 4 developers of AIP Logic, a no-code IDE for deploying production-ready LLM functions . . . [u]sed by over 25,000 people within 6 months, to author over 300,000 functions in production at ~150 customers."

57.    Her colleagues reported that Radha Jain had "expert level" knowledge of Palantir's products and one of her main responsibilities was "co-piloting the front-end implementation" of AIP Logic.  According to Radha Jain, she was responsible for leading the design, brainstorming relevant solutions, coding, and "owning the 'user story' for Logic, and using that to brainstorm with the team and prioritize features."

58.    Radha Jain also continued to work closely with Palantir's customers, regularly attending on-the-ground "bootcamps" with Palantir's healthcare customers, including hospitals, among others.  Through these efforts, Radha Jain secured direct insight into the problems customers face, how customers use Palantir's products and AI to solve those problems, and how Palantir markets and drives adoption of those products.

59.    Joanna Cohen also began her Palantir career as a Forward Deployed Engineer and was subsequently elevated over time to become a Healthcare Lead.  In this role, she was responsible

for interacting directly with healthcare customers to understand the problems they faced in their businesses and to then design and implement AI software solutions and workflows tailored to meet those needs. She served a key function by bridging the gap between customer-specific use cases and Palantir's technical capabilities, and eventually was responsible for the execution of the technical deliverables for numerous healthcare customers.

60.     According to Joanna Cohen, she was the architect of Palantir's "Plan Acceptance Tool," a healthcare tool now used by Palantir's healthcare customers to track insurance coverage more effectively.

61.     In October 2024, while at Palantir, Joanna Cohen participated in a pitch to Customer A—a prospective healthcare customer of Palantir. As part of that pitch, Joanna Cohen prepared a demonstration of how Palantir's AI platform could help solve some of the problems Customer A was facing.

62.     While working for Palantir, Defendants all enjoyed access to some of Palantir's most valuable confidential information, including:

- **Source Code** – Defendants had access to Palantir's enterprise GitHub repository, which contains the core source code for its flagship software platforms. This codebase represents the foundational architecture of Palantir's products—elements that customers cannot view or modify—and is considered the Company's most sensitive intellectual property. Access to this repository is tightly controlled and tracked, requiring explicit approval due to its strategic value. Radha Jain's role on the product development team involved directly contributing to and modifying

this code, giving her deep insight into the underlying mechanics of Palantir's software and its proprietary engineering approaches.

- **Internal Workspace of Demonstrations** – Defendants had exposure to Palantir's internal demo workspace, a gated environment used to prototype and showcase AI capabilities across industries. This workspace housed curated trial-and-error experiments, dashboards, and configurations that were not shared externally, but informed customer-facing presentations and Palantir's product road map. The demonstrations reflected years of learning about what resonated with clients and what did not, serving as a goldmine of strategic insights. Defendants' familiarity with the environment enabled them to internalize Palantir's most effective deployment narratives and technical showcases.

- **Deployed Customer Workflows** – Defendants had access to live, customer-deployed workflows—custom-built dashboards, algorithmic solutions, and data pipelines tailored to specific customer needs. These workflows represented the final, operational layer of Palantir's software, integrating real-time data ingestion, AI processing, and actionable outputs. Accessing these deployments required special permissions and provided visibility into how Palantir's platform was being used in practice, including the precise configurations and use cases that had proven successful. This knowledge, derived from years of customer interaction and iterative

development, offered a roadmap for replicating Palantir's value propositions elsewhere.

- **Proprietary Customer Engagement Strategies** – Through their roles, Defendants also gained access to Palantir's internal strategies for customer engagement—documents and practices that guided how engineers and sales teams diagnosed customer needs, framed offerings, and secured buy-in both for Palantir's products and for its services. These strategies were developed through extensive experience in sectors like healthcare and were stored in restricted internal repositories. They included curated questions, diagnostic frameworks, and messaging tactics that helped Palantir navigate complex stakeholder environments and accelerate adoption. This playbook of engagement was instrumental in shaping Palantir's market success and a key resource for Defendants given their regular dealings with prospective and existing customers.

63. Palantir invested billions of dollars and years of research and development to generate the confidential Palantir information to which Defendants had access.

64. Collectively, this information would give any competitor a significant head start by relieving them of the need to make a comparable initial investment in the development of such information as well as allow such competitor to replicate Palantir's technology, AI solutions, client strategies, and market positions.

**C. Palantir Takes Reasonable Precautions to Protect Its Confidential Information.**

65. Palantir is highly protective of its confidential information and goes to great lengths

to protect it from unauthorized acquisition, use, or disclosure.

66.    Palantir requires its employees to enter into non-competition, non-solicitation, confidentiality, and return of property obligations to protect its confidential information.

67.    Palantir also maintains robust internal policies and procedures that instruct employees on appropriately using and safeguarding Palantir's confidential information, and which include various restrictions on employees' ability to access confidential Palantir information.  For example, Palantir maintains a policy concerning the transfer of files from Palantir's systems to personal devices, which explicitly states that employees "may NOT transfer any Palantir intellectual property" to themselves, which "includes source code, presentations, videos, documents, work products, notes or photographs containing Palantir data, exports from knowledge repositories," and similar materials.

68.    In addition, Palantir imposes electronic safeguards to protect and limit access to its confidential information, including network passwords, network monitoring, encryption, access control, and file control software.

**D.  Defendants Enter Into Valid and Enforceable Restrictive Covenants.**

69.    In exchange for millions of dollars of compensation, Defendants entered into substantially similar Proprietary Information and Inventions Assignment Agreements ("PIIA"), attached as Exhibits A-C.

70.    In these PIIAs, Defendants agreed to refrain from competing with Palantir during their employment:

> 5. <u>Non-Competition During Employment</u>. I agree that during the course of my employment, I will not, in the same or materially similar capacity as I work for the Company, without the prior written consent of the Company, whether paid or not: (i) serve as a partner, principal, licensor, licensee, employee, consultant, officer, director, manager, agent, affiliate, representative, advisor, promoter, associate, investor, or otherwise for, (ii) directly or indirectly, own,

purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, control, invest in, work or consult for or otherwise join, participate in or affiliate myself with, any business whose business, products or operations are in any respect competitive with the Company's and/or Group's business.

71.     Radha Jain and Joanna Cohen also agreed to refrain from competing with Palantir

for 12 months following the end of their employment:

> 6.3 <u>Non-Competition</u>. I agree that until twelve (12) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not engage in any Prohibited Activity. For purposes of this Section 6.3, "Prohibited Activity" is an activity in which I perform the job functions that I performed during my employment with Company, directly or indirectly, in whole or part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, intern or any other similar capacity for an entity engaged in the same or similar business as the Company and/or the Group, including those engaged in the business of developing and selling analytical software, whether existing or planned.

72.     In addition, Defendants agreed to refrain from soliciting any of Palantir's customers

or business partners for 24 months (Radha Jain and Joanna Cohen) or 12 months (Hirsh Jain) after

leaving Palantir:

> 6.1 <u>Customer and Third Party Non-Solicitation</u>. (a) I agree that for a period of [twenty-four (24) / twelve (12)] months immediately following the termination of my [employment / relationship] with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging [the Company's and/or the Group's / the Company's] business in any way. For the purposes of this Agreement, "Customer" shall mean all persons or entities that have used or inquired of [the Company's and/or Group's / the Company's] services at any time during the two-year period preceding the termination of my employment with the Company.

(b) I agree that for a period of [twenty-four (24) / twelve (12)] months immediately following the termination of my [employment / relationship] with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not solicit, encourage, or induce, or cause to be solicited, encouraged or induced, directly or indirectly, any franchisee, joint venture, supplier, vendor or contractor who conducted business with [the Company and/or the Group / the Company] at any time during the two-year period preceding the termination of my employment with the Company, to terminate or adversely modify any business relationship with [the Company and/or the Group / the Company] or not to proceed with, or enter into, any business relationship with [the Company and/or the Group / the Company], nor shall I otherwise interfere with any business relationship between [the Company and/or the Group / the Company] and any such franchisee, joint venture, supplier, vendor or contractor.

73.     Similarly, Defendants agreed to refrain from soliciting any of Palantir's employees for 24 months (Radha Jain and Joanna Cohen) or 12 months (Hirsh Jain) after leaving Palantir:

6.2 <u>Employee Non-Solicitation</u>. I agree that until [twenty-four (24) / twelve (12) months] months immediately following the termination of my [employment / relationship] with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of [the Company and/or the Group / the Company] to leave their employment with [the Company and/or the Group / the Company], nor will I contact any employee of [the Company and/or the Group / the Company], or cause an employee of [the Company and/or the Group / the Company] to be contacted, for the purpose of leaving employment with [the Company and/or the Group / the Company].

74.     Defendants also agreed to refrain from using or disclosing any of Palantir's confidential information outside of their employment and to return all of Palantir's confidential information upon termination of their employment:

4. [<u>Proprietary Information</u>]. I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees [price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae or

research activities]²) I develop, learn or obtain during [the term of] my employment that relate to [the Company and/or the Group / Company], or the business or demonstrably anticipated business of [the Company and/or the Group / Company] or that are received by or for [the Company and/or the Group / Company] in confidence, constitute "**Proprietary Information**." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information . . .

Upon termination of my employment [or when requested by the Company],³ I will promptly return to the Company all items containing or embodying Proprietary Information…

75.     Both Radha Jain and Joanna Cohen acknowledged the global nature of Palantir's

business, the irreparable harm that would befall Palantir if they were to breach any of their

contractual obligations, and that their non-competition and non-solicitation obligations would be

tolled in the event of their breach:

6.4 <u>Acknowledgments and Representations</u>. I acknowledge that the Company sells and provides its products and services worldwide and agree that the time periods, geographic regions and scope limitations referred to in Sections 6.1-6.3 above are reasonable and valid in light of the nature and extent of the business conducted by the Company, especially in light of the Company's need to protect its Proprietary Information and the international scope and nature of the Company's business. I also represent that my experience and capabilities are such that the enforcement of the foregoing covenants will not prevent me from working in my occupation, from earning a livelihood, and acknowledge that it would cause the Company serious and irreparable injury and cost if I were to use my knowledge in competition with the Company or otherwise breach the obligations contained in this Agreement. . . . In the event of my breach or violation of Sections 6.1 – 6.3, or good faith allegation by the Company of my breach or violation of this Sections 6.1 – 6.3, the relevant restricted period(s) set forth in Sections 6.1 – 6.3 shall be tolled until such breach or violation, or dispute related to an allegation by the Company that I have breached or violated Sections 6.1 – 6.3, as applicable, has been duly cured or resolved, as applicable.

---

² This language appears in Radha Jain and Joanna Cohen's PIIAs with Palantir, but does not appear in Hirsh Jain's PIIA with Palantir.
³ *See supra* note 2.

76.     Hirsh Jain similarly acknowledged the global nature of Palantir's business, the harm to the Company's value and goodwill that would befall Palantir if he were to breach any of his contractual obligations, and that his non-solicitation obligations would be tolled in the event of breach:

> 6.1(c) I acknowledge that I will derive significant value from the Company's agreement to provide me with the Proprietary Information of the Company to enable me to optimize the performance of my duties to the Company. I further acknowledge that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to disclose nor to use the Company's Proprietary Information other than for the Company's exclusive benefit and my obligations not to solicit contained in Sections 6.1-6.2 herein, is necessary to protect the Company's Proprietary Information and, consequently, to preserve the value and goodwill of the Company. I also acknowledge the time, geographic and scope limitations of my obligations under subsections 6.1 (a)-(b) above are fair and reasonable in all respects, especially in light of the Company's need to protect its Proprietary Information and the international scope and nature of the Company's business. In the event of my breach or violation of this Section 6.1, or good faith allegation by the Company of my breach or violation of this Section 6.1, the restricted periods set forth in this Section 6.1 shall be tolled until such breach or violation, or dispute related to an allegation by the Company that I have breached or violated this Section 6.1, has been duly cured or resolved, as applicable.

77.     Defendants' agreements with Palantir also makes clear that, in the event Defendants breach their employment agreements, Palantir may petition this Court for injunctive relief:

> D. <u>Availability of Injunctive Relief</u>. In addition to the right under the Rules to petition the court for provisional relief, I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this Agreement, the Proprietary Information and Invention Assignment Agreement between me and the Company, my employment Offer Letter with the Company, or any other agreement regarding trade secrets, confidential information, noncompetition, or nonsolicitation, if applicable. I understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties

hereby consent to the issuance of an injunction.

78.     Defendants acknowledged that in the event of a breach, Palantir would be entitled to injunctive relief, as well as its attorneys' fees, in securing such relief:

> 9. <u>Governing Law</u>.  . . . I also understand that any breach of this Agreement will cause irreparable harm to [the] Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.  I acknowledge and agree that if my Home State is New York or New Jersey, I shall indemnify the Company from any and all costs, fees, or expenses incurred by the Company (including, but not limited to, attorneys' fees) in successfully enforcing the terms of this Agreement against me (including, but not limited to, a court temporarily, partially, or fully granting any application, motion, or petition by the Company for injunctive relief) as a result of my breach or threatened breach of any provision contained herein.

**E.  Hirsh Jain Resigns from Palantir to Secretly Start His Palantir Copycat—Percepta.**

79.     Hirsh Jain resigned from Palantir on July 17, 2024.

80.     His last day of employment with Palantir was on August 2, 2024.

81.     Immediately after resigning from Palantir, Hirsh Jain began working with General Catalyst to secretly create Percepta.

82.     In the simplest terms, Percepta—like Palantir—seeks to design, develop, and deploy software that enables organizations to integrate AI directly into their own existing workflows to increase operational efficiencies.

83.     Percepta's goal is to help customers perform comprehensive transformation with AI by bringing them strategic guidance, forward-deployed engineering, and access to AI products.

84.     In practice, this entails: (i) understanding how organizations operate and diagnosing where AI can transform certain fundamental workflows in the business; (ii) embedding engineers onsite with the customer to develop a plan for how to apply AI solutions for the customer; (iii) using forward-deployed engineers with a sophisticated understanding of AI solutions to develop a

comprehensive AI platform for the customer; and (iv) implementing those solutions to allow businesses to run more efficiently.

85.    Percepta's "Applied AI Engineers"—like Palantir's Forward Deployed Engineers—embed directly with customers on developing applied AI workflows, driving strategy for product development and helping build technology playbooks for each industry.

86.    Percepta also targets the same customers as Palantir, seeking to develop and deploy differentiated but repeatable playbooks for how to execute AI transformation in the healthcare, manufacturing supply chain, financial services, and government industries:

- **Healthcare** – Percepta endeavors to automate clinical workflows, improve patient engagement, facilitate care administration, and enhance data quality for healthcare customers.

- **Manufacturing Supply Chain** – Percepta seeks to optimize supply chains and drive more optimal resource allocation in publicly traded manufacturing entities, minimizing overstock, and improving resilience to demand fluctuations.

- **Financial Services** – Percepta aims to modernize fraud detection and customer experience in financial services.

- **Government** – Percepta works to help governments streamline licensing and permitting processes with AI to deliver faster, more efficient services.

87.    And just as Palantir's business has a global footprint, Percepta already has customers in Europe and hopes to become a leading transformation partner for companies and governments around the world.

88.     General Catalyst's Chief Executive Officer—Hemant Taneja—publicly admitted that Percepta is seeking to replicate Palantir's business model.  During a recent interview with Forbes shortly before launching Percepta, Hemant Taneja explained that "***one of the companies that's become incredibly valuable over the last couple years is Palantir***.  This is why – because they can actually go in, take a customer as a design win and go and then say, 'We're going to come solve a lot of problems for you.'  ***We're doing a version of that in healthcare at GC as well. We're doing that in other industries***."[4]

89.     Lest there be any doubt that Percepta constitutes a Palantir copycat, Percepta actively sought to "pillage" and poach developers specifically from Palantir.  It has filled its ranks (including a majority of its co-founders) with former employees of Palantir.  Percepta has hired at least 10 former Palantir employees, many of whom had worked on Palantir's flagship products and have deep knowledge of Palantir's confidential information.

90.     There would be little reason to so heavily concentrate on hiring former Palantir employees—who now comprise a significant percentage of Percepta's workforce—unless Percepta planned to operate a competing business for which such employees' experience at Palantir would be extremely valuable.

**F.  Hirsh Jain Recruits Radha Jain to Join Percepta.**

91.     After departing Palantir, Hirsh Jain was well aware of his non-solicitation obligations to Palantir.  He discussed those obligations with others at General Catalyst, including its in-house counsel.

92.     Less than one month after his employment with Palantir ended, Hirsh Jain began

---

[4] Forbes, *The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains How to Ride It*, at 6:15 (YouTube, Sept. 30, 2025), https://www.youtube.com/watch?v=hE8XOC8jWD8.

recruiting Radha Jain—then a Palantir employee—to join him at Percepta.

93.     In an August 26, 2024 text message to Radha Jain, Hirsh Jain asked to meet so he could introduce her to various stakeholders at General Catalyst:

> **Hirsh Jain** 8/26/2024 5:17:43 PM
> Hello my friend. I hear through the rumor mill there may be new adventures coming... can we catch up / can I also introduce you to my future colleague at GC (and also my college roommate who I adore) Tyler?

94.     Hirsh Jain followed up again on October 17, 2024, texting Radha Jain to ask if she was available to meet for coffee.

95.     On October 24, 2024, Hirsh Jain texted Radha Jain yet again, begging to meet:

> **Hirsh Jain** 10/24/2024 7:52:51 PM
> I am determined to make this happen
>
> **Hirsh Jain** 10/24/2024 7:52:57 PM
> if it must be the following week I will oblige but we need to do it
>
> **Hirsh Jain** 10/24/2024 7:53:07 PM
> I could do 11/4 or 11/5
>
> **Hirsh Jain** 10/24/2024 7:53:30 PM
> if we must zoom, we must, but it would b nice to see you irl

96.     Radha Jain knew Hirsh Jain wanted to recruit her to join Percepta.  In text messages with another colleague at the time, they discussed how Hirsh Jain "NEEDS to hire" her at his new company.  But Radha Jain told her colleague that she was not interested in leaving Palantir at that time:

> **Radha Jain (Owner)** 10/24/2024 9:46:29 PM
> I actually decided I'm going to stay for the foreseeable I think

97.     This all changed when Radha Jain finally met with Hirsh Jain on November 4,

2024, to discuss joining Percepta.

98.    During the meeting, Hirsh Jain explained Percepta's business and recruited Radha Jain to leave Palantir and join Percepta.

99.    The day after the meeting, on November 5, 2024, Hirsh Jain reaffirmed his recruitment of Radha Jain, texting her:

> ██████    **Hirsh Jain**  11/5/2024 9:21:26 PM
> fwiw I found our convo very energizing and was reminded of how much I'd love to come to work every day and see you (and loved seeing you at palantir, even in passing!)
>
> ██████    **Hirsh Jain**  11/5/2024 9:21:46 PM
> I say that both bc I want you to consider working w me, but also bc I am def riding the excitement high off of seeing you!

100.    On November 6, 2024, Hirsh Jain texted Radha Jain additional information about the type of equity compensation she could expect to receive at Percepta, as well as information about Percepta's relationship with General Catalyst.

101.    On November 12, 2024, Hirsh Jain and Radha Jain met again.  They also exchanged text messages later that day concerning Radha Jain meeting other founders of Percepta and various stakeholders at General Catalyst.

102.    As part of his campaign to recruit Radha Jain to Percepta, Hirsh Jain introduced Radha Jain to numerous individuals at General Catalyst and Percepta, including:

- **Quentin Clark** – Managing Director at General Catalyst

- **Jeanette zu Furstenberg** – Managing Director at General Catalyst

- **Pranav Singnhvi** – Managing Director at General Catalyst

- **Katie Keller** – Member of Investment Team at General Catalyst

- **Candace Richardson** – Member of Investment Team at General Catalyst

- **Gaby Giglio** – Chief Human Resources Officer and Executive Talent at General Catalyst

- **Thomas Mathew** – Co-Founder and Chief Technology Officer at Percepta and former Palantir employee

- **Michael Rochlin** – Co-Founder and Builder at Percepta and former Palantir employee

- **Athul Jacob** – Co-Founder and Chief AI Officer at Percepta

- **Costis Daskalakis** – Co-Founder and Chief Scientist at Percepta

103.    Hirsh Jain repeatedly referred to Radha Jain as ***leading*** development for Palantir's flagship AI product, AIP Logic, when introducing her to his colleagues.

104.    On November 14, 2024, Hirsh Jain and Radha Jain exchanged text messages about the logistics of Radha Jain officially joining Percepta:



105.    The two agreed that Radha Jain should not formally resign from Palantir until she vested in her next tranche of Palantir equity:



106.    After many discussions with Hirsh Jain, Radha Jain decided she was ready to accept his offer to join Percepta.  And once she made that decision, she immediately began to violate her duty of loyalty and non-solicitation obligations to Palantir.

## G. Hirsh Jain Entices Radha Jain to Breach Her Duty of Loyalty and Non-Solicitation Obligations to Palantir by Recruiting Her Colleagues to Join Percepta.

107.    Radha Jain was well-aware of her contractual duty of loyalty and non-solicitation obligations to Palantir.  She even discussed her non-solicitation obligations with Hirsh Jain.

108.    But on November 15, 2024, Hirsh Jain and Radha Jain hatched a scheme to poach the best AI engineers at Palantir to join Percepta to build their Palantir imitator.  Radha Jain started by referencing one of her favorite colleagues at Palantir, who she would soon be telling she was leaving the Company.  Without hesitation, Hirsh Jain encouraged Radha Jain to solicit this colleague to join Percepta:



109.    Radha Jain then explained that the "the real star combo" is this one employee and another employee at Palantir who "are best friends outside" of work.  She even discussed the levers to pull to recruit these employees: "[He] likes head pats and money."  She said Percepta could pursue both employees and Hirsh Jain agreed:



110.    Radha Jain added:



111.    Hirsh Jain and Radha Jain then formulated their strategy to raid Palantir's workforce to populate the ranks of their nascent copycat business:



112.    Radha Jain then sent Hirsh Jain the LinkedIn profile of another Palantir employee. Hirsh Jain responded that "we could 100% poach" that Palantir employee and commended Radha

Jain for "such a good idea."  Hirsh Jain then immediately solicited that Palantir employee with Radha Jain's encouragement:



113.    Radha Jain proposed an approach for luring this Palantir employee to Percepta—which Hirsh Jain endorsed:

114.    This was not pure talk.  Hirsh Jain then suggested yet another former Palantir employee, who they could try to poach to join Percepta.

115.    Though Radha Jain was less than impressed with this employee, Percepta nevertheless recruited her and currently employs her:

> ████████████    **Radha Jain (Owner)** 11/15/2024 3:49:29 PM
> I worked with her when she was baby fresh
>
> ████████████    **Radha Jain (Owner)** 11/15/2024 3:49:57 PM
> She was fine/good then not hugely impressive but im sure she's grown

116.    Hirsh Jain and Radha Jain then proposed at least three other Palantir employees who they could try to poach, and gleefully discussed their solicitation efforts.

117.    It was apparently of no moment to Radha Jain that she remained an employee of Palantir and owed the Company a duty of loyalty.  She was excited by, and invested in efforts to, solicit Palantir employees to leave Palantir for Percepta:

> ████████████    **Radha Jain (Owner)** 11/15/2024 3:56:25 PM
> Kkkkk I need to go do meetings for my real job

> ████████████    **Radha Jain (Owner)** 11/15/2024 3:56:38 PM
> God thinking about poaching is so fun

118.    Hirsh Jain shared in that excitement, explaining why he enjoyed poaching Radha Jain from Palantir and why he was excited about the prospect of poaching other Palantir employees as well:

> ████████████    **Hirsh Jain** 11/15/2024 3:57:07 PM
> You understand why I saw you and immediately went into sell mode
>
> ████████████    **Hirsh Jain** 11/15/2024 3:57:18 PM
> The idea of working w your fav ppl outside the context of palantir is
>
> ████████████    **Hirsh Jain** 11/15/2024 3:57:26 PM
> Electric

119.    Radha Jain responded by saying that she intended to use the same confidential

recruiting strategies she learned while employed by Palantir *against* Palantir—to encourage Palantir employees to leave for Percepta:



120.    On November 19, 2025, Radha Jain executed her offer letter and accompanying employment agreements with General Catalyst to join the founding team of Percepta. But she remained a Palantir employee.

### H.  Hirsh Jain Entices Radha Jain to Breach Her Duty of Loyalty to Palantir by Soliciting and Servicing Customer A on Behalf of Percepta.

121.    Radha Jain's disloyalty to Palantir extended to customer solicitation as well.

122.    On November 13, 2024, Hirsh Jain and Radha Jain (while still employed at Palantir), along with several other founders of Percepta, participated in a three-hour meeting with more than a dozen representatives of Customer A (including several senior executives)—a then prospective healthcare customer of Percepta and Palantir—to discuss how Percepta could deploy AI into Customer A's existing workflows to enhance operational efficiencies. Hirsh Jain introduced Radha Jain as a member of Percepta's team.

123.    During the meeting, Radha Jain exchanged numerous text messages with Hirsh Jain and the other founders of Percepta concerning strategy for Percepta to meet Customer A's needs. The group also engaged in note taking of the meeting. Radha Jain actively participated in these discussions, explaining that she had developed similar AI solutions for Palantir that the group was

discussing developing for Customer A.

124.    The next day, November 14, 2024, representatives from Customer A shared three confidential AI strategy documents relating to the topics discussed during the meeting with Hirsh Jain, Radha Jain, and the Percepta founding team.

125.    Later that day, Hirsh Jain forwarded an email he sent to General Catalyst providing updates on Percepta's strategy vis-à-vis Customer A to Radha Jain and other Percepta founders. That email summarized the meeting with Customer A, explained the economics of a potential engagement, discussed Percepta's burgeoning workforce (of mostly former Palantir employees), mentioned some legal questions, and summarized proposed next steps.

126.    Hirsh Jain also texted Radha Jain and the Percepta founding team about further strategizing in relation to meeting Customer A's AI integration needs:



> **Hirsh Jain** 11/14/2024 3:52:53 PM
> You guys want to get together early next week & start mapping out some stuff re: ▮▮▮▮ Think we should try to enumerate our rough mapping of target workflows, data needs, priorities. Athul maybe you could come down from Boston and we could all get some IRL time?

127.    The work Radha Jain did for Percepta was not a general sales pitch.  She met with Percepta's Chief AI Officer for a "deep dive" to discuss "workflow specifics" for Customer A.

128.    During her employment with Palantir, Radha Jain's work for Percepta was not limited to Customer A.  She also participated alongside Hirsh Jain, other founders of Percepta, and General Catalyst stakeholders in planning regular calls and roundtables with senior technology leaders from other prospective healthcare customers.

129.    On November 15, 2024, Radha Jain offered substantive comments on a slide deck shared by Katie Keller—Member of the Investment Team at General Catalyst—concerning Percepta with the other founding members of that Palantir imitator.

130.    She also exchanged text messages with the founding team of Percepta concerning

a draft communication to a senior executive at Customer A following up on the meeting that took place a week earlier.  Again, Radha Jain offered her feedback on the draft communication.

131.    On November 19, 2024, Hirsh Jain, Radha Jain (prior to giving notice at Palantir), and the rest of the Percepta team held an hours-long meeting at General Catalyst's offices during which they continued to refine their strategy for solving Customer A's problems with AI solutions.

132.    Customer A agreed to a six-figure agreement with Percepta shortly thereafter.

133.    On November 26, 2024, Radha Jain exchanged further emails with the founding team at Percepta concerning its business, product, and recruitment strategy.

134.    During that conversation, Hirsh Jain expressed frustration that he had to converse with his soon-to-be colleagues through their personal accounts because they were all still employed elsewhere.

## I.    Radha Jain Resigns from Palantir Without Disclosing Percepta's Business or Her Anticipated Role.

135.    On November 27, 2024, Hirsh Jain and Radha Jain exchanged text messages about how to frame her resignation from Palantir without creating suspicion.  Specifically, Radha Jain raised concerns about disclosing to her colleagues that she would be joining an AI startup with ex Palantirians.

136.    Hirsh Jain, however, was not concerned in the slightest.  Despite chasing Radha Jain for months to convince her to join Percepta, introducing her to various stakeholders at General Catalyst and Percepta, and personally negotiating her Percepta compensation package, Hirsh Jain apparently believed he had somehow evaded his non-solicitation obligations to Palantir because he did not "solicit" (a word he placed in quotation marks) Radha Jain.

137.    On November 27, 2024, Radha Jain finally resigned from Palantir.

138.    That day, she circulated a short, cryptic farewell email to her colleagues, stating

only that she was "joining the founding team of an AI startup with some ex-Palantirians." She did not identify the startup nor did she describe its business. She also provided no information concerning the work she would be performing for her new employer.

139.    Following her resignation, Radha Jain refused to sign a separation agreement which would have required her—in exchange for severance—to reaffirm her non-competition, non-solicitation, confidentiality, and return of property obligations and represent her compliance with those obligations.

140.    Radha Jain's last day of employment with Palantir was December 2, 2024.

141.    On December 9, 2024, Radha Jain officially started working at Percepta.

142.    In the months that followed her resignation, Radha Jain did not update her LinkedIn profile to reflect her new employer, nor did she disclose any new professional affiliations. Similarly, she did not update her professional webpage (https://www.radhajain.com/).

143.    Instead, she hid the fact that she was performing precisely the same work for Percepta that she had performed for Palantir: interacting directly with customers to understand the problems facing their businesses and developing specific AI software solutions and workflows to address those problems.

144.    As she summarized to Hirsh Jain in a proposed introductory email for General Catalyst and Percepta personnel, Radha Jain wanted to be described as a member of Percepta's "Founding Team" with an expansive role leveraging her Palantir "experience and expertise."

**J.    Hirsh Jain and Radha Jain Continue to Breach their Non-Solicitation Obligations to Palantir by Recruiting Joanna Cohen and Other Palantir Employees to Join Percepta.**

145.    On October 28, 2024, Hirsh Jain sent an email to various stakeholders at General Catalyst identifying Percepta's recruitment candidates, including several individuals employed by Palantir. One of those individuals was Joanna Cohen. Hemant Taneja and Jeannette zu

Furstenberg supported these recruitment efforts, proclaiming "Great stuff!" and "Awesome!  Great progress."

146.    On November 5, 2024, Hirsh Jain met with Joanna Cohen at General Catalyst's offices and recruited her to join Percepta.

147.    Over the coming months, Hirsh Jain introduced Joanna Cohen to numerous individuals at General Catalyst and Percepta to discuss the prospect of her joining Percepta.

148.    On November 18, 2024, Hirsh Jain provided another update to various General Catalyst stakeholders, including Hemant Taneja, Quentin Clark, and Jeannette zu Furstenberg, concerning Percepta's recruitment efforts.

149.    On December 8, 2024, Alexandre Momeni—a member of the Investment Team at General Catalyst—asked Hirsh Jain for recommendations of Palantir employees to poach.  Hirsh Jain was more than happy to oblige, listing several employees then still at Palantir.

150.    On January 29, 2025, Hirsh Jain called Joanna Cohen again to recruit her to join Percepta.

151.    On January 29, 2025, Hirsh Jain enlisted Radha Jain to assist in his recruitment of Joanna Cohen:



152.    The next day, on January 30, 2025, Radha Jain spoke with Joanna Cohen and recruited her to leave Palantir and join Percepta.

153.    That same day, Hirsh Jain provided an update to various General Catalyst stakeholders, including Hemant Taneja and Quentin Clark, concerning the recruitment of Joanna Cohen.  Hemant Taneja strongly endorsed the pursuit.

154.    The day after that, on January 31, 2025, Radha Jain called Joanna Cohen's supervisor at Palantir as a "reference" for Joanna Cohen.  Joanna Cohen never told her supervisor that she was applying for a position at Percepta, nor did she ask if she could use her as a "reference."

155.    On February 4, 2025, Radha Jain and Joanna Cohen met in person at Customer A's offices.

156.    Joanna Cohen was well-aware that Percepta and Palantir's customer base

overlapped because, among other things, she participated in a pitch to Customer A as a Palantir employee.  As part of that pitch, Joanna Cohen prepared several demonstrations of Palantir's AI software capabilities.

157.    Radha Jain also continued to recruit Joanna Cohen to join Percepta during this meeting and at a lunch afterwards.

158.    Hirsh Jain texted Joanna Cohen the next day, on February 5, 2025, pressing her to join Percepta as quickly as possible:



159.    A few days later, on February 8, 2024, Hirsh Jain and Radha Jain exchanged text messages concerning a list of prospective recruits, including Joanna Cohen and another Palantir employee, Bryan McLellan.  Hirsh Jain and Radha Jain strategized about recruiting them to join Percepta.

160.    Hirsh Jain also shared a text message he exchanged with one of the Palantir employees Radha Jain had identified as a recruitment target back in November and who he immediately texted to solicit to join Percepta.  That text message referenced an earlier conversation Radha Jain had with this Palantir employee during which she also attempted to recruit him to join Percepta.

161.    From February 9, 2025 through February 17, 2025, Hirsh Jain and Joanna Cohen exchanged numerous emails negotiating her prospective compensation at Percepta.

162.    On February 21, 2025, Joanna Cohen signed her offer letter and other employment

agreements with General Catalyst.

163.    That same day, Hirsh Jain enlisted Radha Jain to assist in his recruitment of yet another Palantir employee, Bryan McLellan:



164.    Hirsh Jain and Radha Jain's recruitment efforts were successful.  Bryan McLellan now works at Percepta.

165.    On February 24, 2025, Joanna Cohen resigned from Palantir.

166.    Unlike most departing employees, Joanna Cohen did not send a farewell email, make any internal announcement, or provide any information to her colleagues about her future employment.

167.    Following her resignation, Joanna Cohen similarly refused to sign a separation agreement which would have required her—in exchange for severance—to reaffirm her contractual obligations and represent her compliance with those obligations.

168.    On March 4, 2025, Bryan McLellan resigned from Palantir, telling Radha Jain that he followed her instruction to not disclose that he was joining Percepta, which Radha Jain supported:

> **Bryan McLellan** 3/12/2025 8:22:19 PM
> Telling ▇▇ went pretty well. I started off saying I signed somewhere and he was super bummed but understood. He really wanted to know who I'm joining but I just told him I didn't wanna say and he accepted it.
>
> **Radha Jain (Owner)** 3/12/2025 10:36:16 PM
> Loved "Telling ▇▇ went pretty well. I started off saying I signed somewhere and he was super bummed but understood. He really wanted to know who I'm joining but I just told him I didn't wanna say and he accepted it."

169.    Joanna Cohen's last day of employment with Palantir was also March 4, 2025.

170.    Joanna Cohen officially started her employment with Percepta on March 17, 2025.

171.    In the months that followed her resignation from Palantir, Joanna Cohen did not update her LinkedIn profile to reflect her new employer, nor did she disclose any new professional affiliations.

172.    Like Radha Jain, Joanna Cohen hid the fact that she was performing precisely the same work for Percepta she had performed for Palantir: interacting directly with customers to understand the problems facing their businesses and developing AI software solutions to address those problems.

173.    As would later become clear, Radha Jain's and Joanna Cohen's lack of transparency concerning their future employment plans, refusal to sign standard separation agreements that would have required them to reaffirm their contractual obligations and represent that they were abiding by them, and decision to not update their LinkedIn profiles were all part of a deliberate subterfuge to hide the fact that they were building a competitor under the cover of darkness.

**K. Percepta Finally Emerges from "Stealth."**

174.    In October 2025, Defendants' anticompetitive activities finally came to light.

175.    In a LinkedIn post on October 2, 2025, Radha Jain proclaimed "[t]oday we are

launching Percepta, and I am so excited to share what we have been working on *since December*."[5] (emphasis added).  That same day, she updated her LinkedIn profile to reveal, *for the first time*, *that she co-founded Percepta shortly after her resignation from Palantir in December 2024*.[6]

176.   Joanna Cohen similarly updated her LinkedIn profile that day to reveal, also for the first time, *that she had been working as an Applied AI Engineer for Percepta since shortly after her resignation from Palantir in March 2025*.[7]

177.   Other public statements about Percepta make clear that its investors and employees took careful steps to hide the company's activities until it emerged publicly.

178.   In the October 2, 2025 press release by General Catalyst announcing its ownership stake in Percepta, Hemant Taneja and Hirsh Jain declared that "*[o]ver the last year, Percepta has been quietly at work*, creating the transformative outcomes for global Fortune 500 customers, state governments, and a big part of the US healthcare ecosystem."[8] (emphasis added).

179.   One Percepta employee wrote on X that "*[w]e're finally out of stealth*." (emphasis added).[9]

180.   Another co-founder wrote on X that "*[i]f I've been vague about what I'm working on, here it is!*" (emphasis added).[10]

---

[5]                              Radha                    Jain,                              LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:7379526077620166656/

[6] Radha Jain, LINKEDIN, https://www.linkedin.com/in/radha-jain-815047122/.

[7] Joanna Cohen, LINKEDIN, https://www.linkedin.com/in/joannakJoanna Cohen/.

[8] Hemant Taneja and Hirsh Jain, *Unveiling* Percepta, (Oct. 2, 2025), https://www.generalcatalyst.com/stories/unveiling-percepta.

[9] Eugene Vinitsky (@EugeneVinitsky), X (Oct. 2, 2025, at 11:27 ET), https://x.com/EugeneVinitsky/status/1973771757371994344.

[10] Michael Rochlin (@marisbest2), X (Oct. 2, 2025, at 8:46 ET), https://x.com/marisbest2/status/1973912434952839532.

181.    And a managing director at General Catalyst wrote on LinkedIn that it was "***Great that we can finally talk about [Percepta] :)***."[11]  (emphasis added).

182.    And Percepta's website did not go live until ***after*** General Catalyst, Radha Jain, and Joanna Cohen announced the new business.

**L. Palantir Discovers Joanna Cohen's Theft of Confidential Documents.**

183.    Soon after learning of Percepta's existence and that it employs the Defendants, Palantir quickly launched a forensic investigation into Defendants' activity on Palantir's systems and devices.

184.    The investigation revealed that Joanna Cohen began viewing Palantir's highly confidential information without any legitimate business reasons in the days leading up to her resignation from Palantir.

185.    Specifically, Palantir's investigation revealed an unusual pattern of activity concerning Joanna Cohen's access to the Company's Highspot repository in the days leading up to her departure.  Her activity in the three-day window surrounding her notice accounted for over 50% of her entire activity over a four-month window prior to her departure.  In fact, Joanna Cohen's access spiked right after she gave notice, accessing 62 distinct items in a single day— more than she had accessed in the entire preceding four-month period—many having no connection to her work in the healthcare industry, including materials concerning Palantir's anti-money laundering, renewable energy, cyber, fleet operations, biomanufacturing, and oil and gas offerings.

186.    The investigation also revealed that during the same time preceding her resignation,

---

[11]                    Quentin                    Clark,                    LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:7379558658675974144/.

Joanna Cohen accessed and reviewed information within Palantir's Github database—the central repository for Palantir's source code. Access to this repository is controlled and tracked due to its strategic value. Joanna Cohen searched for and viewed the names and contact information for contacts at Palantir's important healthcare customers. There was no legitimate business reason for Joanna Cohen to search for or view this information.

187. The investigation also uncovered that on February 25, 2025, Joanna Cohen sent herself a message through Palantir's Slack platform attaching several highly confidential documents, which included:

- **Healthcare Revenue Cycle Management Diagram** – This detailed workflow diagram depicts key inflection points in the healthcare revenue cycle in which Palantir's AI platform could add value and provides a description of how that platform could streamline various operations.

- **Internal Healthcare Demonstration Planning Framework** – This internal framework was used to plan and prioritize demonstration content for prospective healthcare customers by aggregating insights from past deployments and customer conversations to identify high-impact use cases for showcasing Palantir's platform.

- **Draft Statement of Work** – This document outlines a proposed scope of work for an important healthcare customer based on extensive conversations about Palantir's underutilized platform capabilities.

- **AI Use Case Tracker** – This Excel spreadsheet contained over 20

AI use cases for an important healthcare customer, with matrices and scoring evaluations of the costs and benefits of each use case.

188.    Joanna Cohen then downloaded these highly confidential documents on her personal phone.

189.    Through expedited discovery, Palantir has learned that on the same day Joanna Cohen downloaded highly confidential Palantir documents to her personal phone, she also used that personal phone to take photographs of many other highly confidential Palantir documents. Those documents include:

- A slide showing how Palantir's healthcare AI tools work from end to end and reflecting Palantir's use cases.

- Slides showing how Palantir connects data, models, and workflows inside a customer's systems.

- Slides showing how Palantir's systems automate billing, coding, and call center operations, and how AI is deployed.

- Slides showing how Palantir designed, tested, and tuned a complex model for a specific healthcare customer.

- Slides showing which major clients Palantir works with, what problems Palantir solves for them, and how Palantir's tools fit together.

- Dozens of confidential sales materials, technical diagrams, and use case descriptions across healthcare, finance, energy, and government.

190.    Since she gave notice of her intent to resign from Palantir the day before, there was

no legitimate business reason for Joanna Cohen to take photographs of Palantir's confidential information, to have sent documents to herself through Slack, or to then download them on her personal phone—other than to secretively misappropriate these highly confidential documents to exploit, on behalf of Percepta.

191.    And in the hands of a competitor like Percepta, these highly confidential documents could be used to shortcut years of Palantir's research into customer engagement, product development, and strategic learning, not to mention evade millions of dollars in investment costs. In so doing, Percepta would be able to replicate Palantir's most effective demonstrations, target high-value use cases, and pitch tailored solutions to clients using Palantir's own insights, thereby irreparably harming Palantir's competitive advantage and eroding its market position.

192.    Palantir's investigation about the full scope of Defendants' unlawful conduct is active and ongoing—including whether General Catalyst and Percepta violated Palantir's rights under the law.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Violation of Non-Competition Obligations)
#### Against Radha Jain and Joanna Cohen

193.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

194.    Palantir entered into legally binding contracts (the PIIAs) with each of Radha Jain and Joanna Cohen, and Palantir fully performed its duties under both contracts.

195.    Radha Jain and Joanna Cohen breached the express terms of their agreements with Palantir, including, specifically, Section 6.3 of their PIIAs.

196.    Radha Jain and Joanna Cohen breached their non-competition obligations to Palantir by performing the job functions they performed during their employment with Palantir, directly and indirectly, as an employee, employer, owner, operator, manager, advisor, consultant,

agent, partner, director, stockholder, officer, intern and/or another other similar capacity for Percepta, an entity engaged in the same or similar business as Palantir.

197.    Radha Jain's and Joanna Cohen's breaches of their non-competition obligations have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Violation of Employee Non-Solicitation Obligations)**
**Against Hirsh Jain and Radha Jain**

198.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

199.    Palantir entered into legally binding contracts (the PIIAs) with each of Hirsh Jain and Radha Jain, and Palantir has fully performed its duties under both contracts.

200.    Hirsh Jain and Radha Jain breached the express terms of their agreements with Palantir, including, specifically, Section 6.2 of the PIIA.

201.    Hirsh Jain and Radha Jain breached their non-solicitation obligations to Palantir by directly and indirectly soliciting and recruiting (and attempting to solicit and recruit) multiple Palantir employees to leave Palantir and join Percepta.

202.    Hirsh Jain's and Radha Jain's breaches of their non-solicitation obligations have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

**THIRD CAUSE OF ACTION**
**(Tortious Interference with Contract)**
**Against Hirsh Jain**

203.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

204.    Palantir entered into a legally binding contract with Radha Jain, her PIIA, and has

47

fully performed its duties under that contract.

205.    Hirsh Jain was aware of Radha Jain's PIIA or at least the substance thereof, including but not limited to Section 4 (Proprietary Information), Section 5 (Non-Competition During Employment), and Section 6.2 (Employee Non-Solicitation) because he was subject to the same provisions in his own PIIA and because he discussed these provisions with Radha Jain.

206.    Radha Jain breached the express terms of her agreement with Palantir, including, specifically, Section 4, Section 5, and Section 6.2 of the PIIA.

207.    Radha Jain breached her confidentiality obligations to Palantir by using and disclosing confidential information concerning multiple Palantir employees in an effort to solicit and recruit (and attempt to solicit and recruit) such employees to leave Palantir and join Percepta.

208.    Hirsh Jain directed, instructed, encouraged, facilitated, and/or otherwise caused Radha Jain to use and disclose confidential information concerning multiple Palantir employees in an effort to solicit and recruit (and attempt to solicit and recruit) such employees to leave Palantir and join Percepta.

209.    Hirsh Jain lacked any lawful justification for directing, instructing, encouraging, facilitating, and/or otherwise causing Radha Jain to use and disclose confidential information concerning multiple Palantir employees in an effort to solicit and recruit (and attempt to solicit and recruit) such employees to leave Palantir and join Percepta.

210.    Radha Jain breached her contractual obligations to Palantir by directly and indirectly soliciting and recruiting (and attempting to solicit and recruit) multiple Palantir employees to leave Palantir and join Percepta while she was an employee of Palantir and after she joined Percepta.

211.    Hirsh Jain directed, instructed, encouraged, facilitated, and/or otherwise caused

Radha Jain to directly and indirectly solicit and recruit (and attempt to solicit and recruit) multiple Palantir employees to leave Palantir and join Percepta while she was an employee of Palantir and after she joined Percepta.

212.    Hirsh Jain lacked any lawful justification for directing, instructing, encouraging, facilitating, and/or otherwise causing Radha Jain to directly and indirectly solicit and recruit (and attempt to solicit and recruit) multiple Palantir employees to leave Palantir and join Percepta while she was an employee of Palantir and after she joined Percepta.

213.    Radha Jain breached her contractual obligations to Palantir by directly and indirectly soliciting and doing business with Customer A while she was an employee of Palantir.

214.    Hirsh Jain directed, instructed, encouraged, facilitated, and/or otherwise caused Radha Jain to directly and indirectly solicit and do business with Customer A while she was an employee of Palantir.

215.    Hirsh Jain lacked any lawful justification for directing, instructing, encouraging, facilitating, and/or otherwise causing Radha Jain to directly and indirectly solicit and do business with Customer A while she was an employee of Palantir.

216.    Hirsh Jain's tortious interference with Radha Jain's contractual obligations have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract – Violation of Customer Non-Solicitation Obligations)**
**Against Joanna Cohen**

217.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

218.    Palantir entered into a legally binding contract with Joanna Cohen, her PIIA, and has fully performed its duties under that contract.

219.    Joanna Cohen breached the express terms of her agreement with Palantir, including, specifically, Section 6.1 of the PIIA.

220.    Joanna Cohen breached her non-solicitation obligations to Palantir by directly and indirectly soliciting and doing business with Customer A, a customer for which she pitched while employed by Palantir.

221.    Joanna Cohen's breaches of her non-solicitation obligations have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

### FIFTH CAUSE OF ACTION
#### (Breach of Contract – Violation of Confidentiality Obligations)
**Against Joanna Cohen**

222.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

223.    Palantir entered into a legally binding contract with Joanna Cohen, her PIIA, and Palantir has fully performed its duties under that contract.

224.    Joanna Cohen breached the express terms of her agreement with Palantir, including, specifically, Section 4 of the PIIA.

225.    Joanna Cohen breached her confidentiality obligations to Palantir by exfiltrating confidential Palantir information and documents from the company without Palantir's consent.

226.    On information and belief, Joanna Cohen breached her confidentiality obligations to Palantir by using and/or disclosing Palantir's confidential information in connection with her work for Percepta.

227.    Joanna Cohen's breaches of her confidentiality obligations have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

## SIXTH CAUSE OF ACTION
### (Breach of Contract – Violation of Return of Property Obligations)
### Against Joanna Cohen

228.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 192 of the First Amended Complaint as if fully set forth herein.

229.    Palantir entered into a legally binding contract with Joanna Cohen, her PIIA, and has fully performed its duties under that contract.

230.    Joanna Cohen breached the express terms of her agreement with Palantir, including, specifically, Section 4 of the PIIA.

231.    Joanna Cohen breached her return of property obligations to Palantir by exfiltrating Palantir property from the company without Palantir's consent and failing to return such property upon the termination of her employment.

232.    Joanna Cohen's breaches of her return of property obligations to Palantir have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, and damaging Palantir's reputation, goodwill, and industry standing.

## PRAYER FOR RELIEF

WHEREFORE, Palantir respectfully requests that this Court enter an Order:

A.    Enjoining Defendants from violating their contractual obligations to Palantir, including but not limited to non-competition, non-solicitation, confidentiality, and return of property obligations, tolled for the period of non-compliance as applicable;

B.    Enjoining Radha Jain and Joanna Cohen from working for Percepta and/or General Catalyst for 12 months from the Stipulated Temporary Restraining Order;

C.    Enjoining Hirsh Jain from working for Percepta and/or General Catalyst for 12

51

months from the Preliminary Injunction Order;

D.     Enjoining Hirsh Jain and Radha Jain from participating, whether directly or indirectly, in any recruitment, interview, or hiring roles or responsibilities at Percepta and/or General Catalyst for 24 months from the Preliminary Injunction Order;

E.     Enjoining Hirsh Jain from directing, instructing, encouraging, facilitating, and/or otherwise causing any Palantir employee to breach or violate their contractual obligations to Palantir.

F.     Requiring Defendants to account for any and all uses of Palantir's confidential and/or proprietary information, including all use and disclosure thereof, including the entities and individuals to which any disclosures were made, and including any of Palantir's confidential and/or proprietary information which may exist in Percepta and/or General Catalyst's possession, custody, or control;

G.     Requiring Defendants to return any of Palantir's confidential and/or proprietary information in their possession, custody, or control;

H.     Requiring Defendants to reimburse Palantir for its attorneys' fees incurred in connection with this action; and

I.     Awarding such other and further relief as this Court deems just and proper.

Dated: December 11, 2025
   New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: */s/ Harris M. Mufson*
  Harris M. Mufson
  Ilissa Samplin
  Justin M. DiGennaro
  Zachary A. Schreiber

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
hmufson@gibsondunn.com
jdigennaro@gibsondunn.com
zschreiber@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213-229-7000
isamplin@gibsondunn.com


*Attorneys for Plaintiff*