**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PALANTIR TECHNOLOGIES INC.,

                    Plaintiff,

    v.

HIRSH JAIN, RADHA JAIN, and JOANNA
COHEN

                    Defendants.

Civil Action No. 25-cv-08985-JPO

Hon. J. Paul Oetken

## PLAINTIFF PALANTIR TECHNOLOGIES INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Attorneys for Plaintiff

# Table of Contents

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS........................................................................................... 4

    I.    Palantir Is a Global Leader in the AI Integration Industry.................................. 4

    II.   Defendants Enjoy Access to Palantir's Most Valuable Confidential Information. ................. 5

    III.  Defendants' Contractual Obligations. ................................................................ 8

    IV.  Hirsh Resigns from Palantir to Secretly Start His Palantir Copycat Company. ............... 10

    V.   Hirsh Recruits Radha to Percepta. ................................................................... 13

    VI.  Hirsh Entices Radha to Breach Her Duty of Loyalty and Non-Solicitation Obligations to Palantir by Recruiting Her Colleagues to Join Percepta................................... 15

    VII. Hirsh Entices Radha to Breach Her Duty of Loyalty to Palantir by Soliciting and Servicing ▅▅▅▅ on Behalf of Percepta......................................................... 17

    VIII.Radha Resigns from Palantir Without Disclosing Percepta's Business, Her Anticipated Role, or the Work She Had Already Done for the Copycat Company.............................. 18

    IX.  Hirsh and Radha Recruit Joanna and Other Palantir Employees to Percepta In Violation of their Non-Solicitation Obligations to Palantir. ................................................ 19

    X.   Joanna Steals Palantir's Highly Confidential Documents. ................................. 21

ARGUMENT ............................................................................................................ 23

    I.    The Court Should Grant a Preliminary Injunction to Prevent Further Unlawful Conduct by Defendants. .................................................................................................. 23

    II.   Palantir Is Likely to Succeed In Proving Defendants Breached Their Contracts. ............ 24

        A.   Radha and Joanna Breached their Non-Competition Obligations. .................................. 24

        B.   Defendants Breached Their Non-Solicitation Obligations. .......................................... 28

           1.   Hirsh and Radha Breached their Employee Non-Solicitation Obligations.............. 28

           2.   Joanna Breached Her Customer Non-Solicitation Obligations. .............................. 29

        C.   Joanna Breached Her Confidentiality and Return-of-Property Obligations. ................ 30

III. Palantir Is Likely to Succeed In Proving Hirsh Tortiously Interfered with Radha's Contract with Palantir. ................................................................................................... 32

IV. Absent Injunctive Relief, Palantir Will Suffer Irreparable Harm to Its Confidential Information and Valuable Customer Relationships. ........................................................ 33

V. The Balance of Hardships and Public Interest Strongly Favor Palantir. ........................... 35

VI. The Court Has Substantial Discretion to Impose Extracontractual Relief Based Upon Defendants' Egregious Misconduct. ................................................................................. 38

CONCLUSION ................................................................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015)....................................................................................24

*Biosynexus Inc. v. Glaxo Grp. Ltd.*,
   11 Misc.3d 1062(A), (Sup. Ct., N.Y. Cnty. 2006)..................................................34

*Capstone Logistics Holdings, Inc. v. Navarrete*,
   2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ..........................................................29

*Capstone Logistics Holdings, Inc. v. Navarrete*,
   2020 WL 3429775 (S.D.N.Y. June 23, 2020) .....................................................32, 33

*Coastal Distribution, LLC v. Town of Babylon*,
   216 F. App'x 97 (2d Cir. 2007) ...............................................................................34

*Devos, Ltd. v. Rec.*,
   2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) .........................................................26

*DoubleClick v. Henderson*,
   1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997) ......................................................38

*DraftKings Inc. v. Hermalyn*,
   732 F. Supp. 3d 84 (D. Mass. 2024) ..................................................................31, 32

*Edge Grp. WAICCS LLC v. Sapir Grp. LLC*,
   705 F. Supp. 2d 304 (S.D.N.Y. 2010).....................................................................37

*Eric Woods, LLC v. Schrade*,
   45 Misc. 3d 1206(A) (Sup. Ct., N.Y. Cnty. 2014)..................................................37

*fuboTV Inc. v. Walt Disney Co.*,
   745 F. Supp. 3d 109 (S.D.N.Y. 2024)......................................................................36

*Iannucci v. Segal Co., Inc.*,
   2006 WL 8407380 (S.D.N.Y. June 27, 2006) .........................................................34

*Int'l Bus. Machines Corp. v. De Freitas Lima*,
   2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020)......................................................25, 36

*Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*,
   2006 WL 1638537 (M.D. Tenn. June 6, 2006).....................................................29, 30

*Integra Optics, Inc. v. Nash*,
   2018 WL 2244460 (N.D.N.Y. Apr. 10, 2018) .........................................................25

*JLM Couture, Inc. v. Gutman*,
   91 F.4th 91 (2d Cir. 2024) .......................................................................................25

*Locke v. Tom James Co.*,
    2013 WL 1340841 (S.D.N.Y. Mar. 25, 2013) ..............................................................30, 31

*MasterCard Int'l Inc. v. Nike, Inc.*,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016)..............................................................................25

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)..............................................................................35

*Mohawk Maint. Co. v. Kessler*,
    52 N.Y.2d 276 (1981) ......................................................................................................25

*Monovis, Inc. v. Aquino*,
    905 F. Supp. 1205 (W.D.N.Y. 1994) ..............................................................................38

*Nat'l Job Corps Ass'n v. Dep't of Lab.*,
    788 F. Supp. 3d 642 (S.D.N.Y. 2025)..............................................................................24

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004)........................................................................................24, 28

*Natsource LLC v. Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)..........................................................................35, 36

*New York Real Est. Inst., Inc. v. Edelman*,
    42 A.D.3d 321 (2007) ......................................................................................................37

*Perella Weinberg Partners LLC v. Kramer*,
    230 A.D.3d 451 (2024)..................................................................................................28, 29

*Renaissance Nutrition, Inc. v. Jarrett*,
    2012 WL 42171 (W.D.N.Y. Jan. 9, 2012).................................................................26, 27, 28

*Spinal Dimensions v. Chepenuk*,
    16 Misc. 3d 1121(A), (Sup. Ct., N.Y. Cnty. 2007)........................................................39, 40

*Springs Mills, Inc. v. Ultracashmere House, Ltd.*,
    724 F.2d 352 (2d Cir. 1983)............................................................................................38

*Students for Fair Admissions v. United States Mil. Acad. at W. Point*,
    709 F. Supp. 3d 118 (S.D.N.Y. 2024)..............................................................................36

*TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*,
    2024 WL 4627452 (S.D.N.Y. Oct. 30, 2024) ..................................................................37

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
    73 F. Supp. 3d 209 (S.D.N.Y. 2014)................................................................................38

## PRELIMINARY STATEMENT

Injunctive relief is necessary to stop Defendants' ongoing campaign of unfair competition, unlawful employee raiding, customer poaching, and misappropriation of Palantir Technologies Inc. ("Palantir" or "Company")'s confidential and sensitive information.  For more than a year, Defendants operated in secrecy to build Percepta AI ("Percepta")—a Palantir replica—by exploiting Palantir's proprietary technology, confidential strategies, and customer relationships in violation of their legal obligations to Palantir.  Their conduct was deliberate, coordinated, and unlawful—and it continues to inflict irreparable harm on Palantir's competitive advantage, goodwill, and industry standing.

Defendant Hirsh Jain ("Hirsh") was a senior executive responsible for Palantir's U.S. government health portfolio, with oversight of strategy, execution, and retention efforts across critical deployments.  Defendant Radha Jain ("Radha") was one of only four developers of Palantir's flagship AI product, AIP Logic.  During and after her time as a Forward Deployed Engineer, Radha regularly engaged with healthcare, manufacturing supply chain, financial services, and government customers to receive feedback on the product and refine it to suit customer needs.  Defendant Joanna Cohen ("Joanna") served as a Healthcare Lead, architecting bespoke AI workflows for Palantir's most important healthcare customers.

Each Defendant enjoyed access to Palantir's crown jewels—source code, internal demonstration workspaces, deployed customer workflows, and proprietary engagement strategies— and deep insight into Palantir's customer relationships.  Yet Defendants abused the trust Palantir placed in them and violated their contractual obligations to the Company to build a copycat operation.  Their goal?  Unlawfully usurping Palantir's hard-earned market position, workforce, customers, and opportunities to line their own pockets at their ex-employer and ex-coworkers' expense.

Hirsh's knowing violation of his non-solicitation obligation began almost immediately after he resigned from Palantir in August 2024.  Within weeks, Hirsh convinced Radha to leave Palantir, meet

1

with Percepta stakeholders, and personally negotiated her pay.  After Radha agreed to join Percepta—but while still a Palantir employee—Hirsh tortiously interfered with her contractual obligations to Palantir.  He enticed her to violate her duty of loyalty to Palantir and disclose confidential information about her colleagues to "pillage the best devs at Palantir" by identifying specific engineers, strategizing recruitment tactics, and celebrating successful poaching.  Hirsh persuaded Radha to compete with Palantir to make Percepta millions of dollars by pitching a valuable prospective healthcare customer while she was still employed by Palantir.  Specifically, Radha attended a 3-hour November 2024 meeting with ███████—a prospective Palantir customer—and actively strategized AI solutions with Percepta's founding team, leveraging her Palantir experience to secure Percepta's first and largest customer.

After collecting her latest tranche of equity and resigning from Palantir without naming her new employer, Radha and Hirsh turned their sights on Joanna, Bryan McLellan, and other Palantir employees.  In further breach of their non-solicitation obligations to Palantir, Hirsh and Radha repeatedly met with these Palantir employees, introduced them to Percepta stakeholders, and negotiated their compensation—swelling Percepta's senior ranks with Palantir talent.  Joanna similarly resigned from Palantir in secret, deliberately obfuscating her future plans.

After nearly a year in "stealth" mode, Percepta emerged with a press release in October 2025, trumpeting a business model and ambitions eerily identical to Palantir's: embedding AI into enterprise workflows, securely and quickly, for healthcare, manufacturing, financial services, and government customers to increase operational efficiencies.[1]  Upon learning of Percepta, Palantir quickly launched

---

[1] These representations continue.  Just yesterday, in a public comment on this lawsuit, General Catalyst and Percepta described their employees' work as "innovating with applied AI." https://www.cnbc.com/2025/12/11/palantir-sues-former-employees-says-percepta-tried-to-pillage-devs.html.  Palantir describes its business in almost identical terms. https://investors.palantir.com/news-details/2024/Proxet-Announces-Strategic-Partnership-With-

a forensic investigation. It discovered that the day after giving notice, Joanna sent herself highly sensitive documents belonging to Palantir—including a healthcare revenue cycle management diagram; internal demonstration frameworks; draft statement of work; and an AI use case tracker—and downloaded them to her personal phone. This occurred once Joanna decided to join Palantir—after which she accessed highly confidential marketing and customer information that fell well outside her responsibilities at Palantir. Expedited discovery has revealed Joanna also contemporaneously photographed dozens of confidential Palantir materials displayed on her computer screen—including technical diagrams, customer strategies, and proprietary workflows—to help Percepta shortcut years of research and investment at Palantir's expense. She hid all of this during her exit.

This is not a case about lawful competition. Palantir welcomes fair and honest competition, and supports its leavers in their post-Palantir pursuits. Percepta's creation and development has been far from lawful or fair. Percepta is built on contractual violations, tortious conduct, and deceit—and absent injunctive relief, Defendants' misconduct will continue unabated. The Court should enter a preliminary injunction because Palantir is likely to succeed on each of its claims:

- **Non-Competition**: Radha and Joanna breached their non-competition obligations because they are performing substantially the same job functions they performed at Palantir for Percepta.

- **Employee Non-Solicitation:** Hirsh and Radha breached their employee non-solicitation obligations by recruiting and hiring a number of Palantir employees, arranging meetings with them to discuss joining Percepta, introducing them to Percepta stakeholders, and negotiating their compensation packages.

---

Palantir-Technologies-Inc-/ ("Applied AI: We develop custom AI applications and solutions based on your specific needs using Palantir Foundry and Palantir Artificial Intelligence Platform").

- **Tortious Interference:** Hirsh tortiously interfered with Palantir's contract with Radha because he enticed her to breach several contractual obligations while she was still employed by Palantir. He encouraged her to: (1) disclose confidential information about her Palantir colleagues for purposes of Percepta's recruitment scheme, and (2) actively compete with Palantir (her then-employer) for a healthcare customer.

- **Customer Non-Solicitation:** Joanna breached her customer non-solicitation obligations because she indisputably pitched AI solutions to a healthcare customer while at Palantir, and now provides similar solutions to that same customer at Percepta.

- **Confidentiality/Return of Property:** Joanna breached her confidentiality and return of property obligations because she took and exploited Palantir's highly confidential documents on behalf of Percepta.

Absent injunctive relief, Defendants will continue to run roughshod over their legal obligations—and to inflict irreparable harm on Palantir's legitimate interests, including its confidential information and customer relationships. This is precisely the type of dire, unlawful situation that preliminary injunctive relief is meant to remedy. Palantir urges this Court to enter such relief.

## STATEMENT OF FACTS[2]

### I.    Palantir Is a Global Leader in the AI Integration Industry.

Founded in 2003, Palantir has become a global leader in deploying software that enables customers to integrate AI directly into their own business operations to increase efficiencies. ECF 9 ("Shankar Decl.") ¶2. Its flagship Artificial Intelligence Platform ("AIP") provides customers with the ability to integrate their data, configure complex models, and deploy AI-powered applications securely with market-leading data governance capabilities. *Id.* ¶3. AIP is designed to integrate directly with a

---

[2] Except where otherwise noted, internal citations, quotations, and alterations in document and case quotations are omitted for clarity, and all emphases have been added.

customer's existing data infrastructure. *Id.* ¶4. It can ingest and process large volumes of data in real time, synchronize the data so that it all can be analyzed together, and generate tailored outputs that automate repetitive processes, make AI-driven recommendations, and execute specific actions within the customer's existing workflow. *Id.*

Unlike traditional software tools that can perform only a single function or operate in only a single industry, AIP is a highly configurable platform that can perform innumerable functions and operate across most industries. *Id.* ¶5. In healthcare, AIP processes and analyzes medical information in real time, enhances early detection of sepsis, and provides recommended care plans. Ex.90[3] ("Shankar Tr.") 41:4-19. In manufacturing supply chain management, AIP monitors production and logistics, forecasts shortages, and recommends corrective actions. Shankar Decl. ¶5. In financial services, AIP supports fraud detection, risk assessment, and compliance by analyzing transactional data and regulatory feeds. *Id.* And in government, AIP analyzes applications and other public submissions, streamlining processing in relation to approvals or other recommended next steps. Ex.86 ("Radha Tr.") 98:20-99:3. This versatility allows customers to embed AI directly into their day-to-day operations, augmenting the decision-making processes they already use. Shankar Decl. ¶4.

Palantir operates on a global scale, with offices across North America, Europe, the Middle East, and the Asia-Pacific region. *Id.* ¶6. Its customer base includes Fortune 500 companies worldwide, reflecting its broad industry reach and international presence. *Id.*

## II.    Defendants Enjoy Access to Palantir's Most Valuable Confidential Information.

In their respective roles, Defendants had access to Palantir's most valuable confidential information, including its foundational source code for its flagship platforms. Radha Tr. 48:7-8;74:3-8;Shankar Decl. ¶11;ECF 11 ("Greenspan Decl.") ¶7;Parikh Decl. ¶9. Defendants also had

---

[3] "Ex.__" refers to exhibits attached to the accompanying Declaration of Harris Mufson.

access to Palantir's internal demonstrative workspace, which housed curative prototypes and deployment narratives refined through extensive customer interaction. Shankar Decl. ¶11;Greenspan Decl. ¶7;Parikh Decl. ¶9. Additionally, they had visibility into live customer workflows and proprietary engagement strategies, offering a comprehensive view of Palantir's operational and market tactics. Radha Tr. 47:16-48:3;Shankar Decl. ¶11;Greenspan Decl. ¶7;Parikh Decl. ¶9. This information would provide any competitor with a substantial head start by relieving them of the need to make a comparable initial investment in the development of such information as well as allowing such competitor to replicate Palantir's technology, customer strategies, and market positions. Shankar Decl. ¶12.

Additionally, during his seven years at Palantir, Hirsh served as a Deployment Strategist and portfolio lead for Palantir's U.S. government health business, where he oversaw confidential strategy and execution across all health-related projects, including engagements with the CDC, HHS, and NIH. Parikh Decl. ¶¶ 4-8. His responsibilities spanned government growth initiatives, affairs strategy, and operational delivery. *Id*. He managed nearly a dozen direct reports and influenced compensation decisions for more than 100 employees. *Id*. He acted as hiring manager for Forward Deployed Engineers for three years, and also shaped retention strategies for Palantir's most critical personnel. *Id*.

At the start of her 5 years at Palantir, Radha began at Palantir as a Forward Deployed Engineer, working directly with customers across healthcare, manufacturing supply chain, financial services, and government, developing a deep understanding of customers' businesses and confidential information that enabled her to strategize and develop AI solutions for complex business problems. Exs.97-98;Radha Tr. 50:10-23;54:16-20;55:2-11;57:23-59:7;65:6-14;66:5-21;78:3-14;81:18-82:13;91:7-20;97:6-16;99:19-24;100:10-12;101:13-22;132:6-13. She was later

promoted to AI Product Engineer, where she helped design and build Palantir's flagship product, AIP Logic—a no-code platform enabling rapid deployment of Palantir's proprietary technologies. Ex.91;Radha Tr. 74:3-8;117:23-118:2;171:15-21;120:9-25. As one of only four core developers of AIP Logic, Radha led design, coding, and feature prioritization, giving her expert-level knowledge of Palantir's products. Ex.91;Radha Tr. 67:20-68:5;92:12-22;115:20-116:8. She also maintained close customer engagement, attending on-site boot camps with healthcare and automotive customers to refine solutions and gain insight into product use and needs, potential new features, and marketing strategies. Shankar Decl. ¶10;Radha Tr. 69:16-70:3;74:25-75:11;75:22-25;131:19-132:5. In the healthcare space, Radha worked closely with hospitals and other customers to help deploy AIP Logic, including for "handling claims and billing, through to identifying cases of sepsis and being able to monitor clinical conditions." Shankar Tr. 41:4-19;Radha Tr. 74:25-75:11;75:22-25. In the self-assessment Radha completed during her final year of employment with Palantir, she explained that she was responsible for "[d]riving forward AIP logic - particularly focusing on the 'practical' aspect of finding pain points and smoothing down workflows." Ex.91. In accomplishing this goal, she was "leading design," "taking a step back to spot the larger issues," and "brainstorming relevant solutions." *Id.* She also "played a [product-manager]-esque role in owning the 'user story' for Logic, and using that to brainstorm with the team and prioritize features." *Id.*

During her nearly 5 years at Palantir, Joanna played a central role in developing and deploying Palantir's healthcare solutions for customers. She began as a Forward Deployed Engineer, both technical and customer-facing, eventually focusing exclusively on healthcare customers as a Healthcare Lead responsible for major accounts. Ex.87 ("Joanna Tr. ") 30:22-31:2;51:6-52:3;54:5-56:4. She served as the primary point of contact for customers,

communicating with engineers and c-suite executives alike, while translating user needs into workflow and technical requirements. Exs.92-93. Joanna worked with customers to design and implement AI workflows, navigate complex systems, and deliver solutions that transform clinical and operational processes. Exs.5,94. She made key technical contributions to Palantir's offerings, including building the Plan Acceptance Tool, improving patient status coding, repairing pipelines, and designing AI enabled workflows tailored to customer needs. Exs.94-96;Joanna Tr. 66:4-67:22;64:12-24. She created AI-driven tools and automation to reduce administrative burdens, improve efficiency, and enhance patient and staff experiences. Exs.5-6. And she focused on building integrated workflows across core systems, developing predictive algorithms, and automating documentation to optimize engagement and streamline operations. Exs.94;89 ("Jungck Tr. ") 39:1-22. Joanna also supported outreach and business development efforts to numerous prospective healthcare customers. Ex.94. For example, in mid-2023, Joanna created a custom demonstration about Palantir's capabilities for a then prospective customer, ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████—and engaged in some follow-up work in October 2024. Exs.36-38.

## III. Defendants' Contractual Obligations.

To protect Palantir's most valuable confidential information, customer relationships, and business, and in exchange for millions of dollars of compensation, Defendants agreed to narrowly tailored obligations:

- **Non-Competition During Employment:** Defendants agreed to not work on behalf of "any business whose business, products or operations are in any respect competitive with [Palantir's] business" while employed by Palantir. ECF 33-1;33-2;33-3 ("PIIA") §5.

- **Non-Competition:** Radha and Joanna agreed that for 12 months after leaving Palantir, they would not "perform the job functions that [they] performed during [their] employment with [Palantir]…for an entity engaged in the same or similar business as [Palantir]."  PIIA §6.3.

- **Employee Non-Solicitation:** Defendants agreed that for 12 (Hirsh) or 24 (Radha/Joanna) months after leaving Palantir, they would not "directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of [Palantir] to leave their employment with [Palantir]" or "contact any employee of [Palantir], or cause an employee of [Palantir] to be contacted, for the purpose of leaving employment with [Palantir]."  PIIA §6.2.

- **Customer Non-Solicitation:** Defendants agreed that for 12 (Hirsh) or 24 (Radha/Joanna) months after leaving Palantir, they would not "contact, or cause to be contacted, directly or indirectly…any Customer for the purposes of conducting business that is competitive or similar to that of [Palantir]."  PIIA §6.1.

- **Confidentiality:** Defendants agreed to "hold in confidence and not disclose or…use any Proprietary Information," including "business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae, or research activities)."  PIIA §4.

- **Return of Property:** Defendants agreed that they would "promptly return…all items containing or embodying Proprietary Information."  PIIA §4.

Defendants also agreed that if they breach any of these obligations, the duration of the breached obligation "shall be tolled until such breach or violation…has been duly cured or

resolved."  PIIA §6.4 (Radha and Joanna);§6.1(c) (Hirsh).  Finally, Defendants agreed that any breach of these obligations "will cause irreparable harm to [Palantir] for which damages would not be an adequate remedy," thereby entitling Palantir "to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond."  PIIA §9.

## IV.    Hirsh Resigns from Palantir to Secretly Start His Palantir Copycat Company.

Shortly after leaving Palantir in August 2024, Hirsh founded Percepta alongside General Catalyst.  Ex.7;Radha Tr. 192:4-17.  Percepta, like Palantir, aims to assist customers to enhance their operational efficiency through use of AI technology.  Radha Tr. 23:7-13;24:2-15.  From inception, Percepta was modeled on Palantir's business—although this was unbeknownst to Palantir until recently, because Percepta did not emerge from "stealth" mode until October 2025, Ex.78.  General Catalyst celebrated the fact that Percepta was modeled on Palantir: during a recent interview with *Forbes* shortly before launching Percepta, General Catalyst CEO Hemant Taneja explained that "one of the companies that's become incredibly valuable over the last couple years is Palantir.  This is why—because they can actually go in, take a customer as a design win and go and then say, *'We're going to come solve a lot of problems for you.'  We're doing a version of that in healthcare at GC as well. We're doing that in other industries*."[4]



---

[4] *Forbes*, The AI Wave is Coming. General Catalyst CEO Hemant Taneja Explains How to Ride It, at 6:15 (YouTube, Sept. 30, 2025), https://www.youtube.com/watch?v=hE8XOC8jWD8.

████████████████████████████████████████

Exs.78-82.

These are the same capabilities Palantir provides: enhancing operational efficiency, embedding AI into mission-critical workflows, assisting with improving data-driven decision making through the use of AI, and delivering scalable enterprise automations.  Jungck Tr. 110:11-14;111:18-22;112:6-9;112:20-23;128:5-129:1.

Percepta mirrors Palantir in the types of problems both companies try to solve too:

| Problem | Palantir | Percepta |
|---|---|---|
| **Improving Operational Efficiencies** | Palantir "assist[s] its customers with enhancing their operational efficiency through the use of AI." Jungck Tr. 110:11-14. | ████████████████ |
| **Embedding AI into Enterprise Workflows** | Palantir "help[s] its clients design, develop, and deploy AI-driven software into enterprise workflows." Jungck Tr. 112:6-9. | ████████████████ |
| **Deployment of Workflows at Speed** | Palantir offers a "collection of starter packs, templates, and other installable workflow primitives, which allow builders to start building right away, and then customize."[5] | Percepta "deploy[s] production-grade, industry-specific AI workflows in minutes instead of months.  Our platform eliminates the prototype-to-production gap that stalls enterprise AI."[6] |
| **Healthcare** | Palantir works with healthcare customers to facilitate care administration, including "handling claims and billing, through to identifying cases of sepsis and being able to monitor clinical conditions." Shankar Tr. 41:4-19.[7] | ████████████████ |
| **Manufacturing Supply Chain** | Palantir works with customers to assist in managing supply chain optimization in various sectors. Radha Tr. 56:19-57:20.[8] | ████████████████ |

---

[5] https://www.palantir.com/platforms/aip/.

[6] https://percepta.ai/.

[7] https://www.palantir.com/offerings/palantir-for-hospitals/.

[8] https://www.palantir.com/offerings/supply-chain/.

| Financial Services | Palantir works with financial services customers to utilize AI to assist in automating anti-money laundering efforts. Jungck Tr. 175:8-24;Radha Tr. 112:17-113:5.[9] | ████████████████████████ ████████████████████ ████████████████████ ████████████ |
| --- | --- | --- |
| Governments | Palantir works with customers in government to utilize AI in a variety of manners. For example, Palantir works with the State Department to utilize AI to assist in review of visa applications and residency permits. Radha Tr. 98:20-99-3. | Percepta works with customers in government, like the State of Maryland, to utilize AI to "improve permitted and licensing timelines."[10] |

Percepta is actively targeting Palantir's major healthcare customers. *Compare* Jungck Tr. 168:4-7 (discussing customers ███████████ and ████████████████), *with* Exs.79 (Percepta is in "advanced conversations" with ███████████████), 81 (██████████████ in Percepta's "commercial pipeline"). And Percepta is working on the same problems for healthcare customers. *Compare* Jungck Tr. 253:2-255:12 (describing Palantir's work with ████████ relating to patient engagement), *with* Ex.103 (describing Joanna's work at Percepta for ████████ relating to patient engagement ████████████████"). Indeed, Percepta has conceded that disclosure of its "sensitive, non-public information regarding client pitches and strategy" to Palantir "would risk concrete commercial and privacy harms," which would only be the case if they were competitors. Ex.85.

Furthermore, just as Palantir's business has a global footprint, Percepta has repeatedly represented that it ███████████████████████████████████████████ ███████████████████████████████████████████

---

[9] https://www.palantir.com/offerings/financial-services/
[10]    https://governor.maryland.gov/news/press/pages/maryland-governor-wes-moore-announces-landmark-ai-partnership-to-transform-state-service-delivery.aspx.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████

Percepta has also filled its ranks with former Palantir employees, including its co-founders and at least ten employees within months of launch, many of whom worked on AIP and have deep knowledge of Palantir's trade secrets and confidential workflows.  Mathew Tr. 53:5-8.  As Palantir's corporate representative put it, Percepta has "all the tools and all the Lego blocks to build the same foundation" as Palantir.  Jungck Tr. 158:1-12.  And now Percepta is using Palantir's former employees to do exactly what Palantir does: help businesses use artificial intelligence tools to improve outcomes, increase efficiencies, and generate more revenue.  *Compare id.* 110:11-14;111:18-22;112:6-9;112:20-23;128:5-129:1, *with* Mathew Tr. 124:12-125:15;251:2-17.

Defendants have self-servingly attempted to distinguish Percepta by labeling it a "consultancy" business.  Radha Tr. 145:11-12;Joanna Tr. 214:14.  But the evidence shows Percepta is actively building an AI platform, Mosaic, which it intends to commercialize.  Exs.79,83;Radha Tr. 136:7-17;Mathew Tr. 109:6-25.  Until then, █████████████████████████

███████████████████████████████████

████████████████████  That is exactly what Palantir does in a typical sale.  And while Palantir often bundles its consulting services with its software products, it also has "consulting agreements," where the customer does not purchase Palantir's products.  Jungck Tr. 56:7-13;102:10-16.

**V.    Hirsh Recruits Radha to Percepta.**

Hirsh knew he and other Palantir employees were contractually prohibited from soliciting their former colleagues.  Radha Tr. 231:22-232:8;Mathew Tr. 320:8-321:22.  But Hirsh decided it

was more important to hire some of Palantir's star employees to build his new company than adhere to his contract. Almost immediately, Hirsh embarked on a knowing and deliberate campaign to recruit Palantir's star engineers to form Percepta. He started with Radha—his friend. Radha Tr. 190:19-191:17.

Between August and November 2024, Hirsh aggressively recruited Radha. He started by repeatedly texting her to set a meeting where he could introduce her to his "future colleague at GC." Exs.7-8. Radha was originally hesitant, explaining to a Palantir colleague that "I actually decided I'm going to stay for the foreseeable I think." Ex.9. That all changed on November 4, 2024, when the two met for a private meeting during which Hirsh sold Radha on joining Percepta. Ex.10. Following that meeting, Hirsh continued his full-court press to induce Radha to join him at Percepta:

> "fwiw I found our convo very energizing and was reminded of how much I'd love to come to work every day and see you (and loved see you at Palantir, even in passing!). I say that both bc **I want you to consider working w me**, but also bc I am def riding the excitement high off of seeing you!" Ex.11.

Astonishingly, when confronted with this text at her deposition, ***Radha refused to acknowledge the plain meaning of the text—that Hirsh was recruiting her to work with him at General Catalyst.*** Radha Tr. 215:2-11. A few days after this text, Radha told Hirsh that she "need[s] a little more clarity on the [General Catalyst] deal mechanics," asking "how does the money / equity work?" Ex.12. Hirsh was more than happy to elaborate on precisely how Radha would be compensated if she joined Percepta. *Id.* Hirsh also began to introduce Radha to numerous stakeholders involved with Percepta, describing her as "an amazing software engineer / PM that currently leads the development of Palantir's flagship AI product (AIP Logic)." Ex.13;Radha Tr. 156:2-4;226:10-24. At the same time, he continued to negotiate Radha's compensation package

with her in the hopes of reaching an agreement. Radha Tr. 237:17-238:20. As Radha became more persuaded by Hirsh's recruitment efforts, they began to discuss the logistics of Radha's departure from Palantir, including "mechanics, start date, etc." Ex.15. They both agreed that Radha should defer her resignation to ensure that she vested in her next tranche of Palantir equity, valued at several hundred thousand dollars. *Id.*;Radha Tr. 231:11-21. After many discussions with Hirsh, Radha decided she was ready to accept his offer to join Percepta. Exs.17,84. And once she made that decision, she immediately began to violate her duty of loyalty and non-solicitation obligations to Palantir—including at the behest of Hirsh.

## VI.    Hirsh Entices Radha to Breach Her Duty of Loyalty and Non-Solicitation Obligations to Palantir by Recruiting Her Colleagues to Join Percepta.

Like Hirsh, Radha was fully aware of her contractual non-solicitation obligations to Palantir. Radha Tr. 44:8-10. She specifically discussed those obligations with Hirsh. *Id.* 231:22-232:8. But both flagrantly ran roughshod over their contractual obligations, immediately formulating a strategy to raid Palantir's workforce to populate the ranks of their nascent copycat.

During a text exchange on November 15, 2024 (*while Radha was employed by Palantir*), Hirsh and Radha hatched a scheme to poach the best AI engineers at Palantir to join Percepta to build their Palantir imitator. Radha started by referencing one of her favorite colleagues at Palantir, who she would soon be telling she was leaving the Company. Without hesitation, Hirsh immediately suggested that she should "hire him." Ex.1. Radha then explained that "the real star combo" is this one employee and another employee and that "if *we* get one *we* get both." *Id.* Hirsh agreed, proclaiming: "*I am, fundamentally, a recruiter*." *Id.* Radha then offered some additional potential poaching options, disclosing that she "made friends with a lot of the pipeline builder guys who are also excellent and grind." *Id.* It was at this point that Hirsh and Radha formulated their strategy to raid Palantir's workforce to populate the ranks of their nascent copycat business:

Radha: I def think that there is a world where we can get some stellar eng talent

Hirsh: Yeah **I'm down to pillage the best devs at Palantir** when they're at their maximum richness.  *Id*.

They continued "brainstorming names of people" from Palantir to solicit to Percepta. Radha Tr. 246:2-6;247:21-248:5.  Radha sent the LinkedIn profile of another Palantir employee and Hirsh responded that "we could 100% poach" that employee, commending Radha for "such a good idea." Ex.1.  Hirsh then immediately solicited that Palantir employee, saying "I just texted him"—a solicitation which Radha endorsed, proclaiming "*oh fuck yes*."  *Id*.  The two then strategized about how to lure this employee away from Palantir to Percepta, with Radha sharing confidential information that "Palantir is making him feel special [right now] so we just gotta make him feel more special."  *Id*.  Hirsh agreed, saying "w[e] can do that [in] a lot of diff ways."  *Id*. Hirsh and Radha then proposed at least four other Palantir employees who they could try to poach to join Percepta, including one of whom is currently a Percepta employee.  *Id*.

It was apparently of no moment to Radha that she remained an employee of Palantir and owed the Company a duty of loyalty.  She was excited by, and invested in efforts to, solicit Palantir employees to leave Palantir for Percepta:

KKKKK I need to go do meetings for my real job

**God thinking about poaching is so fun**

*Id*.  Hirsh shared in that excitement, explaining "you understand why I saw you and immediately went into sell mode."  *Id*.  Radha responded by saying that she intended to use the same confidential recruiting strategies she learned while employed by Palantir *against* Palantir, encouraging Palantir employees to leave for Percepta.  *Id*.;Radha Tr. 102:25-103:7.  On November 19, 2025, Radha

executed her offer letter and accompanying employment agreements with General Catalyst to join the founding team of Percepta. Ex.17. But she remained a Palantir employee.

## VII. Hirsh Entices Radha to Breach Her Duty of Loyalty to Palantir by Soliciting and Servicing ▇▇▇▇ on Behalf of Percepta.

In addition to flagrantly violating his non-solicitation obligations, Hirsh also encouraged and induced Radha to redirect her loyalties to Percepta's business *while she remained on Palantir's payroll*.

On November 13, 2024, Hirsh and Radha decided that Radha should join a three-hour call with a potential customer of both Palantir and Percepta—▇▇▇▇—occurring later that day. Ex.22. During that call (which occurred during normal business hours and was attended by ▇▇▇▇ most senior executives), Hirsh, Radha, and the other founding members of Percepta exchanged numerous messages diagnosing ▇▇▇▇ problems and strategizing about AI solutions Percepta could offer. Ex.24. Radha texted the Percepta team that she was frustrated that ▇▇▇▇ did not ▇▇▇▇ *Id*. She also offered her thoughts on the challenges ▇▇▇▇ was facing in its business: ▇▇▇▇ ▇▇▇▇ Ex.22. And critically, she offered thoughts on how Percepta could solve that problem, writing "*I built a demo for something very similar*" while at Palantir. *Id*. According to Radha, ▇▇▇▇ ▇▇▇▇" Ex.24. And she explained that ▇▇▇▇ ▇▇▇▇ *Id*.

Following the call, Hirsh and Radha exchanged emails with ▇▇▇▇ and even received confidential documents concerning its business and AI strategy. Exs.23,25-28,30. Hirsh sent the Percepta founding team a text message after the call, asking to "get together early next week &

start mapping out some stuff re: ████████?" Ex.30.  He suggested that "we should try to enumerate our rough mapping of target workflows, data needs, [and] priorities." *Id*. The Percepta founding team subsequently held that meeting and continued their discussion of the problems facing ████████ business and the potential AI solutions Percepta could offer.  Mathew Tr. 83:6-24;317:24-318:12;Exs.16,29,31.  Radha also collaborated with the founding team on their communications with ████████, offering feedback on messaging. Ex.34.

Radha's efforts to land a new healthcare customer for Percepta while employed by Palantir was not an isolated incident. During her final weeks with Palantir, Radha shifted her loyalties to Percepta—collaborating with Hirsh and Percepta's founders on outreach to other healthcare prospects. Exs.32-33.  She also collaborated with her soon-to-be colleagues on a slide-deck presentation shared by General Catalyst, offering substantive feedback concerning its implications for Percepta's business by explaining that ████████████████████ and that it was ████████████████████ Ex.18. The Percepta founding team continued their discussions regarding its business, product, and recruitment strategy. Exs.19-20,25.  Hirsh was fully aware that Radha was performing work for Percepta while still employed by Palantir, complaining about the annoyance of working clandestinely: "*[c]an you guys start already so I can just send you shit on your GC emails / slack*." Ex.20.

## VIII.  Radha Resigns from Palantir Without Disclosing Percepta's Business, Her Anticipated Role, or the Work She Had Already Done for the Copycat Company.

On November 27, 2024, Hirsh and Radha exchanged text messages about how to frame her resignation from Palantir. Ex.39.  Radha raised concerns about disclosing to her colleagues that she would be joining an AI startup with former colleagues, asking him "you don't think the ex Palantirians will be sus[picous]." *Id*.  Hirsh apparently was not concerned, believing he had

somehow evaded his non-solicitation obligations to Palantir, claiming "It's not Sus[picious] you're an at will employee…I just am not allowed to have 'solicited' you." *Id.*

Later that day, after spending weeks already assisting Percepta attract a competitive healthcare customer to build its business, Radha finally resigned from Palantir. She sent a cryptic farewell email stating only that she was "joining the founding team of an AI startup with some ex-Palantirians," without naming the company or describing her role. Ex.40. She refused to sign a separation agreement reaffirming her contractual obligations and officially left Palantir on December 2, 2024. Exs.21,41. She formally began at Percepta on December 9, signing an agreement containing substantially similar restrictive covenants as her PIIA. Exs.4,17;Radha Tr. 364:2-365:8.

She then hid the fact that she was performing precisely the same work for Percepta that she had performed for Palantir: interacting directly with customers to understand the problems facing their businesses and developing specific AI software solutions and workflows to address those problems. Radha Tr. 139:10-140:6;144:24-145:10;Mathew Tr. 144:22-145:16;191:18-21. Radha is a member of Percepta's "Founding Team" with an expansive role leveraging her Palantir "experience and expertise." Ex.39. She oversees the same type of AI engineering and customer-integration work she performed at Palantir. Radha Tr. 297:16-22. She "lead[s] the engagement with ███████," *id.* 139:13-14, writes code, *id.* 140:5-12, and "liaise[s] with our customer[s]…about plans" on AI workflows, *id.* 378:18-25—work which closely resembles the solutions she built using Palantir's confidential know-how. Exs.91,97,98.

## IX.    Hirsh and Radha Recruit Joanna and Other Palantir Employees to Percepta In Violation of their Non-Solicitation Obligations to Palantir.

Radha and Hirsh continued their plan to "pillage" Palantir by setting their sights on Joanna and other Palantir employees. Exs.2,14,42,60,75-77. Hirsh met Joanna at General Catalyst's

office on November 5, 2024, and introduced her to Percepta and General Catalyst personnel throughout November to January. Joanna Tr. 133:4-15;Exs.44-7,50-53,63,80,96. By late January, he intensified his recruitment efforts and enlisted Radha to assist. Exs.43,49-49,54-57,62. On January 30, Radha and Joanna met, after which Radha called Joanna's Palantir supervisor for a "reference." Radha Tr. 351:21-352:4;357:11-358:16;Joanna Tr. 175:13-176:25;Ex.59. Radha met with Joanna again on February 4 at ████████ offices—the prospective customer Joanna had pitched for Palantir only a few months earlier—where Radha continued pushing her toward joining Percepta. Ex.58.

On February 5, 2025, Hirsh texted Joanna "[i]f we were to move forward would you be comfy w close to ASAP." Ex.62. Hirsh negotiated and made Joanna an offer to join Percepta in February 2025. Joanna Tr. 178:17-19;Exs.61,64-69. Joanna signed on February 21—agreeing to substantially similar restrictive covenants as in her PIIA—and resigned from Palantir on February 24 without disclosing the work she would be doing. Exs.70-73. She also refused to reaffirm her contractual obligations to Palantir, rejected Palantir's severance offer, and formally began at Percepta on March 17. Exs.70-74.

In her role at Percepta, just as at Palantir, Joanna embeds with customers to design and implement AI workflows, navigate complex systems, and deliver solutions that transform clinical and operational processes. Ex.99. She builds AI driven tools and automation to reduce administrative burdens, improve efficiency, and enhance patient and staff experiences. *Id*. And she works with executives and operational leaders to identify constraints, translate domain knowledge into high impact applications, and ensure data quality for accurate, timely outputs. *Id*. And she spends all her time working with ████████. Joanna Tr. 258:12-5.

**X.      Joanna Steals Palantir's Highly Confidential Documents.**

As soon as Palantir learned that Percepta existed and had hired former Palantir employees, it launched a forensic investigation to determine whether any confidential information had been compromised.  ECF 10 ("Wendt Decl.") ¶¶8-16.  That investigation revealed a highly suspicious pattern of activity and exfiltration by Joanna.

Immediately after Joanna received her offer from Hirsh to join Percepta, she began digging through Palantir's GitHub repositories.  *Id*. ¶16.  These repositories contain Palantir's proprietary source code, as well as sensitive engineering assets, internal logic, and customer-specific contact and workflow information.  *Id*.

On February 24—the same day she tendered her resignation—Joanna sent herself multiple confidential Palantir documents through Slack—including:

- a revenue-cycle workflow for a major healthcare customer,

- an internal demo-planning framework based on insights from prior deployments,

- a draft statement of work reflecting Palantir's capabilities, and

- an AI use-case tracker with 30 confidential evaluated use cases of an important healthcare customer.

*Id*. ¶12;Greenspan Decl. ¶9;Ex.101;Jungck Decl. ¶¶4-8.  Joanna downloaded these documents to her personal iPhone and then deleted them from her laptop.  Exs.101-102.  The next day, Joanna went on a shopping spree in Highspot (Palantir's repository of confidential marketing content, workflow diagrams, and sales intelligence), viewing 61 documents—more than she had viewed in the preceding fourth months combined.  Wendt Decl. ¶¶14-15.  These included documents for industries in which she never worked, including anti-money laundering, energy, and manufacturing.  Greenspan Decl. ¶10.

Expedited discovery has revealed that Joanna continued her looting on the eve of her departure.  On her way out, Joanna took dozens of photos of these Highspot materials and other

Palantir work product, capturing her laptop screen using her personal iPhone. Joanna Tr. 261:7-262:4. These were not electronic downloads, but instead blurry screenshots taken with an iPhone —a blatant effort designed to evade Palantir's exfiltration safeguards. The images she took included:

- Descriptions of Palantir offerings and workflow designs. *Id.* 280:8-18.

- Staffing solutions for hospital systems, including scheduling and resource models. *Id.* 286:19-288:20.

- Customer specific use case information. *Id.* 291:18-24;303:12-304:10.

- A Member360 diagram showing provider and payer views used in Palantir's design work. *Id.* 294:12-295:25.

- Presentations and diagrams for active and prospective customer engagements. *Id.* 299:24-301:10;305:5-13.

- An internal diagram showing an overview of a revenue cycle management process. *Id.* 308:6-22.

- A sales document used to explain Palantir's use cases, approaches, value theses, and case studies. *Id.* 318:13-320:11.

- Multiple confidential customer presentations containing Palantir crafted solutions. *Id.* 322:23-323:1.

When asked under oath about why she took photographs of Palantir's confidential information and retained it long after she left Palantir, Joanna asserted these photos were somehow part of transitioning her work to Palantir colleagues—even though she could not cite a single instance in which she had taken photographs of her computer screen before and could not articulate how any of the photographs were related to anything she was actually transitioning. Joanna Tr. 262:5-17;262:18-15;271:16-272:11;276:2-24;287:7-15.

Joanna's failure to provide any cogent explanation for her violation of Palantir's policies and her contractual obligations is not surprising since the truth is obvious. Ex.3. Once she decided to leave for Percepta, she raided Palantir's systems for confidential information and took photos of dozens of highly sensitive documents—not to help Palantir—but to benefit Percepta with inside

knowledge of Palantir's use cases, presentations, and sales materials. These materials allow Percepta to replicate Palantir's demonstrations, identify high-value use cases, and pitch tailored solutions using Palantir's internal playbooks instead of building their own. Greenspan Decl. ¶11;Shankar Decl. ¶12. They also reveal Palantir's tried-and-tested solutions to core customer problems and the ways Palantir solves those problems for its customers. Jungck Tr. 240:25-241:9;244:2-245:19. For example, one slide showed how Palantir designed a complex model for a specific healthcare customer, reflecting the results of Palantir's real world use cases. Jungck Tr. 263:10-21. In Percepta's hands, these highly confidential documents will give Percepta a significant "head start...in the development of" Percepta's copycat "technology, client strategies, and market positions." Shankar Decl. ¶12;Greenspan Decl. ¶11.

## ARGUMENT

A preliminary injunction is necessary to prevent Defendants' continuing violations of their contractual and legal obligations to Palantir. The evidence of Defendants' ongoing misconduct and blatant disregard for those obligations is abundant—as is the evidence that Palantir will suffer irreparable harm to its competitive advantage, causing loss of opportunity and damage to its reputation, goodwill, and industry standing in the absence of a preliminary injunction. By contrast, imposing a preliminary injunction on Defendants will cause them minimal hardship and will further public interest in the enforcement and protection of contracts and the law. The Court should grant Palantir's motion and, among other things, bar Defendants from continuing to work for Percepta, soliciting Palantir's customers or employees, or using or disclosing Palantir's confidential information.

## I.    The Court Should Grant a Preliminary Injunction to Prevent Further Unlawful Conduct by Defendants.

A preliminary injunction should be granted where the plaintiff demonstrates: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent the requested relief; and (3) that

the balance of hardships favors the plaintiff and the public interest would not be impaired by the requested relief. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). To obtain a preliminary injunction, a plaintiff "need not show that success is an absolute certainty." *Nat'l Job Corps Ass'n v. Dep't of Lab.*, 788 F. Supp. 3d 642, 655 (S.D.N.Y. 2025). In this case, Palantir clearly satisfies all three elements and a preliminary injunction is more than justified.

## II. Palantir Is Likely to Succeed In Proving Defendants Breached Their Contracts.

A breach of contract claim requires: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from that breach." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). Palantir is likely to prevail on its breach of contract claims against Defendants because it can easily satisfy each of these elements for each contract clause at issue.

### A. Radha and Joanna Breached their Non-Competition Obligations.

Defendants breached their non-competition obligations to Palantir by working for Percepta—a Palantir copycat company—and performing substantially similar job functions as they performed for Palantir.

**(1) Existence of Contract.** Defendants agreed that for 12 months following their employment, they would not "perform the job functions [they] performed during [their] employment with [Palantir] … for an entity engaged in the same or similar business as [Palantir]." PIIA §6.3

In New York, "agreements restricting the parties' right to compete" are "fully enforceable" if they are "reasonable." *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283-84 (1981). A restrictive covenant is reasonable when it is: (i) limited in time and scope; (ii) protects the employer's legitimate interests; (iii) does not harm the public; and (iv) does not impose undue hardship on the employee. *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024). Defendants' covenants satisfy each requirement—and Palantir is thus able to prove the existence of valid and enforceable contractual non-competition obligations for both Defendants.

24

<u>Reasonable time and scope</u>.  Defendants' one-year non-competition periods are well within the limits routinely upheld by New York courts.  *Integra Optics, Inc. v. Nash*, 2018 WL 2244460, at 7 (N.D.N.Y. Apr. 10, 2018) (one-year restrictions are "within prevailing notions of reasonableness");*JLM Couture, Inc. v. Gutman*, 2024 WL 892641, at *5 (S.D.N.Y. Mar. 1, 2024) (upholding two-year restriction).  Courts also routinely uphold covenants without geographic limits where, as here, an employer's business is worldwide.  *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016); *Int'l Bus. Machines Corp. v. De Freitas Lima*, 2020 WL 5261336, at *10 (S.D.N.Y. Sept. 3, 2020).  Defendants expressly acknowledged that Palantir "sells and provides its products and services worldwide" and that the geographic scope of their non-competition obligations is "reasonable and valid in light of the nature and extent of the business." PIIA §6.4.  Percepta likewise sells products and services worldwide and markets itself as a global transformation partner for companies and governments around the world.  Facts §I.

<u>Protection of legitimate interests</u>.  Defendants' non-competition obligations are well-supported by Palantir's legitimate interests.  The protection of confidential information is a legitimate interest.  *Devos, Ltd. v. Rec.*, 2015 WL 9593616, at *12 (E.D.N.Y. Dec. 24, 2015).  Defendants had access to Palantir's most valuable confidential information, including its source code, internal demonstration workspace, deployed customer workflows, and proprietary customer engagement strategies.  Facts §II.

In addition, employers also have legitimate interests in protecting customer relationships developed by an employee at an employer's expense.  *Renaissance Nutrition, Inc. v. Jarrett*, 2012 WL 42171, at *3 (W.D.N.Y. Jan. 9, 2012).  Defendants directly interacted with Palantir's customers, including healthcare customers, acquiring a deep understanding of their business challenges while being entrusted with their confidential information.  Fact§II.

No harm to public or undue burden.  As discussed in detail *post*, there is no harm to the public that would result from Defendants' non-competition obligations nor are the non-competition obligations unreasonably burdensome on Defendants.  *See* Argument §V.

**(2) Breach of Contract.**  Defendants breached these non-competition obligations.  Percepta is engaged in the same or similar business as Palantir.  Both companies aim to design, develop, and deploy AI-driven software that integrates seamlessly into enterprise workflows to enhance operational efficiency.  Facts §§I;IV.  In practice, this entails: (i) understanding how organizations operate and diagnosing where AI can transform certain fundamental workflows in the business; (ii) embedding engineers onsite with the customer to develop a plan for how to apply AI solutions for the customer; (iii) using forward-deployed engineers with a sophisticated understanding of AI to develop comprehensive AI solutions and workflows for the customer; and (iv) implementing those solutions to allow businesses to run more efficiently.  *Id.*  That is certainly not true of every AI company, or every company applying AI.  But it is true for both Percepta and Palantir.  It is apparent even at the preliminary injunction stage, where much about Percepta's operations remains undiscovered and obscured.

Both companies aim to solve similar problems for customers around the world in the healthcare, manufacturing supply chain, financial services, and government industries, by integrating AI into similar workflows to accomplish similar solutions:

- **Healthcare**: Facilitating care administration and enhancing clinical decision-making.

- **Manufacturing Supply Chain**: Managing supply chain optimization and improving supply chain resilience.

- **Financial Services**: Embedding automated transaction monitoring to enhance identification of financial crimes.

- **Government**: Expediting processing of applications and permits.

*Id.* Lest there be any doubt that Percepta is a Palantir copycat, it has filled its ranks (including a majority of its co-founders) with at least 10 former Palantir employees, many of whom had worked on Palantir's flagship products and have deep knowledge of Palantir's confidential information. *Id.* There would be little reason to so heavily concentrate on hiring former Palantir employees—who now comprise a significant percentage of Percepta's workforce—unless Percepta planned to operate a competing business for which such employees' experience at Palantir would be extremely valuable.

Furthermore, Defendants are performing substantially similar job functions for Percepta as they performed for Palantir. As a Forward Deployed Engineer for Palantir, Radha engaged directly with healthcare customers to understand their business problems and design AI solutions. Facts §§II. And as an AI Product Engineer for Palantir, she designed and built AIP Logic, leading design brainstorming, coding, and prioritization of features, as well as attending on-the-ground bootcamps with healthcare customers (including hospitals) to drive adoption and tailor workflows. *Id.* As a Founding Team Member at Percepta, she similarly designs and implements AI workflows for healthcare customers, including ▮▮▮▮▮▮▮, participating in strategic meetings, product development, and otherwise leveraging her Palantir experience to architect solutions. Facts §VII.

Joanna similarly engaged directly with healthcare customers to understand their business problems and design AI solutions as a Forward Deployed Engineer for Palantir. Facts §II. And as an Applied AI Engineer at Percepta, she is again embedding with healthcare customers to design and implement AI workflows. Facts §IX. Indeed, Joanna pitched ▮▮▮▮▮▮ on AI solutions at Palantir and now works with ▮▮▮▮▮▮ on AI solutions at Percepta. *Id.*

(3) **Damages**. Defendants' breaches of their non-competition obligations have caused and will continue to cause irreparable harm to Palantir's confidential information and valuable customer relationships. *See* Argument §IV.

### B.    Defendants Breached Their Non-Solicitation Obligations.

#### 1.    Hirsh and Radha Breached their Employee Non-Solicitation Obligations.

Evaluating the same three elements, Defendants breached their employee non-solicitation obligations by directly and indirectly recruiting multiple Palantir employees to leave Palantir and join Percepta. *Nat'l Market Share, Inc.*, 392 F.3d at 525.

**(1) Existence of Contract.**  Defendants agreed that for 12 months (Hirsh) or 24 months (Radha) following the end of their employment, they would not "directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of the Company to leave their employment with the Company." PIIA §6.2.  These restrictions offer legitimate means of safeguarding Palantir's investment in its workforce by preventing targeted raiding of talent with access to Palantir's confidential information and valuable customer relationships. *Perella Weinberg Partners LLC v. Kramer*, 230 A.D.3d 451, 452 (2024).

**(2) Breach of Contract.**  Defendants blatantly breached their employee non-solicitation obligations by recruiting Palantir employees to depart for Percepta.  Immediately after leaving Palantir, Hirsh persistently pursued Radha—who explicitly stated she was not interested in leaving Palantir—through repeated texts, meetings, and promises of equity, ultimately convincing her to join Percepta after negotiating her compensation package.  Facts §V.  Hirsh went further by introducing Radha to numerous Percepta stakeholders and General Catalyst executives, reinforcing her integration into the Palantir copycat's founding team.  *Id*.  Radha celebrated "poaching" as "so fun" and actively collaborated with Hirsh to identify top Palantir engineers, sharing names and LinkedIn profiles, discussing recruitment strategies, and even proposing tailored inducements to lure specific employees.  Facts §VI.  Together, they successfully solicited Joanna through in-person meetings, calls, and introductions to Percepta stakeholders, with Hirsh

negotiating her compensation and Radha reinforcing the pitch.  Facts §IX.  Their coordinated efforts extended to other Palantir employees as well, including Bryan McLellan, demonstrating a deliberate, sustained scheme to undermine Palantir's workforce in direct violation of both Defendants' contractual non-solicitation obligations.  *Id.*  All of this conduct is textbook "solicitation."  *Capstone Logistics Holdings, Inc. v. Navarrete*, 2018 WL 6786338, at *28 (S.D.N.Y. Oct. 25, 2018) (holding that asking a recruit to join an employer and introducing them to a colleague constitutes solicitation); *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 2006 WL 1638537, at *23 (M.D. Tenn. June 6, 2006) ("[T]he acts of interviewing, negotiating with, persuading or making a job offer to a current ISMG employee to come work for Citadel would constitute 'solicitation' under the ordinary meaning of the term."); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 287–88, 292 (5th Cir. 2007) ("[A]cts of introducing Navigant employees to competitors' representatives...rose to the level of solicitation").

(3) **Damages.**  Defendants' breaches of their non-solicitation obligations have caused and will continue to cause irreparable harm to Palantir's confidential information and valuable customer relationships.  *See* Argument §IV.

### 2.   Joanna Breached Her Customer Non-Solicitation Obligations.

Joanna breached her customer non-solicitation obligations by communicating with ████████ on behalf of Percepta in a way that directly competed with Palantir's business.

(1) **Existence of Contract.**  Joanna agreed that for 24 months following the end of her employment, she would not "contact…any Customer for the purposes of conducting business that is competitive or similar to that of [Palantir]."  PIIA §6.1(a).  A "Customer" is defined as any entity that "inquired of" Palantir's services at any time within the last two years.  *Id.*  This restriction offers a legitimate means of protecting customer relationships and goodwill developed

by Joanna with customers (including but not limited to ███████) at Palantir's expense. *Locke v. Tom James Co.*, 2013 WL 1340841, at *8 (S.D.N.Y. Mar. 25, 2013).

**(2) Breach of Contract.** Joanna breached her customer non-solicitation obligations by working with ███████ while at Percepta, even though she pitched ███████ multiple times to work with Palantir shortly before her departure from the Company. Facts §II. She even prepared a demonstration of Palantir's AI capabilities in an effort to show how Palantir could design and implement AI software into ███████ workflows. *Id.* At Percepta, Joanna works closely with ███████ to understand the problems confronting its business and to design and deploy AI solutions. *Id.* In essence, she is now providing precisely the same services to ███████ for Percepta that she pitched to provide to ███████ while at Palantir. *Id.* This constitutes a breach of her obligation not to "conduct[] business" with ███████ "that is competitive or similar to" Palantir. PIIA §6.1(a). *Locke*, 2013 WL 1340841, at *8.

**(3) Damages.** Joanna's breach of her non-solicitation obligations have caused and will continue to cause irreparable harm to Palantir's confidential information and valuable customer relationships. *See* Argument §IV.

### C.    Joanna Breached Her Confidentiality and Return-of-Property Obligations.

Joanna also breached her confidentiality and return-of-property obligations by stealing dozens of confidential Palantir documents.

**(1) Existence of Contract.** Joanna agreed to "hold in confidence and not disclose or…use any Proprietary Information," including "business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae, or research activities)." PIIA §4. She further agreed that she would "promptly return…all items containing or embodying Proprietary Information." *Id.*

**(2) Breach of Contract.**  Joanna blatantly breached her confidentiality and return-of-property obligations by engaging in a deliberate and covert scheme to misappropriate Palantir's highly confidential materials in the days surrounding her resignation.  Facts §X.  Immediately after giving notice, she accessed an unusually large volume of sensitive repositories, including Palantir's Highspot and GitHub databases, far beyond what her role required.  *Id*.  She then sent herself a Slack message attaching multiple confidential documents and downloaded them onto her personal phone.  *Id*.  To further evade detection, Joanna deleted these files from her laptop and used her personal phone to take dozens of photographs of her computer screen displaying proprietary diagrams, workflows, and technical content.  *Id*.  These actions were calculated to circumvent Palantir's security protocols and ensure she retained valuable information for use at Percepta.  *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 117-18 (D. Mass. 2024) (granting preliminary injunction against employee who used Slack to send himself confidential documents).

The documents Joanna exfiltrated included a healthcare revenue cycle management diagram, an internal demonstration planning framework, a draft statement of work for a major healthcare customer, and an AI use case tracker.  *Id*.  She also photographed slides showing Palantir's end-to-end healthcare AI workflows, model design strategies, and confidential sales materials across multiple industries.  *Id*.  These materials represent years of research and millions of dollars in investment, providing insight into Palantir's most effective deployment strategies, technical architecture, and customer engagement playbooks.  *Id*.  In the hands of a competitor like Percepta, they would allow rapid replication of Palantir's solutions, shortcutting product development, targeting high-value use cases, and eroding Palantir's competitive advantage.  *Id*.

**(3) Damages.** Joanna's breach of her confidentiality and return-of-property obligations have caused and will continue to cause irreparable harm to Palantir's confidential information. *See* Argument §IV.

### III. Palantir Is Likely to Succeed In Proving Hirsh Tortiously Interfered with Radha's Contract with Palantir.

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Capstone Logistics Holdings, Inc. v. Navarrete*, 2020 WL 3429775, at *8 (S.D.N.Y. June 23, 2020). Palantir is likely to prevail on its tortious interference claim against Hirsh because it can easily satisfy each of these elements.

*First*, Radha agreed in her PIIA: (i) to "hold in confidence and not disclose or…use any Proprietary Information," including all "information relating to…employees"; (ii) to not work on behalf of "any business whose business, products or operations are in any respect competitive with [Palantir's] business" while employed by Palantir; and (iii) to not "directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of the Company to leave their employment with the Company." PIIA §§4,5,6.2.

*Second*, Hirsh knew about Radha's PIIA or at least the substance of her restrictions because he was subject to the same restrictions in his own PIIA and because he discussed these **exact** provisions with Radha. Facts §§III;VI-VII. He knew the legal risks and made a calculated judgment to take them anyway.

*Third*, Hirsh intentionally procured Radha's breach of these contractual obligations—and she did in fact breach them. Hirsh encouraged Radha—while she was an employee of Palantir—

to leverage Palantir's confidential information about her colleagues as well as Palantir's confidential recruitment strategies. *Id.*. Radha's actions violated Section 4 of the PIIA. Hirsh prompted her to identify and solicit Palantir employees and share insider details about their skills, preferences, and susceptibility to poaching. *Id.* In so doing, both Defendants violated Section 6.2 of the PIIA. Hirsh also directed and facilitated Radha's participation in strategic discussions and customer meetings for Percepta—while she remained on Palantir's payroll—ensuring that her breaches played a central role in Percepta's launch even before she became an employee. *Id.* Radha's actions here violated Section 5 of the PIIA.

*Fourth*, Hirsh's tortious interference with Radha's contractual obligations to Palantir have caused and will continue to cause irreparable harm to Palantir's confidential information and valuable customer relationships. *See* Argument §IV.

## IV.    Absent Injunctive Relief, Palantir Will Suffer Irreparable Harm to Its Confidential Information and Valuable Customer Relationships.

Palantir will suffer clear and irreparable harm if the Court does not enjoin Defendants' unlawful misconduct. An injury is irreparable if it cannot be adequately redressed by money damages or if monetary loss would be "difficult to establish and measure." *Coastal Distribution, LLC v. Town of Babylon*, 216 F. App'x 97, 100 (2d Cir. 2007). Absent a preliminary injunction, Palantir will continue suffering two principal forms of immediate and irreparable harm as a result of Defendants' egregious breaches: (i) a substantial risk of disclosure of Palantir's confidential information to a competitor seeking to replicate Palantir's business from documents or employees freshly removed from the Company; and (ii) harm to Palantir's valuable relationships with its customers. That is why Defendants each expressly acknowledged in their PIIAs that harm from a breach would be irreparable, and that only equitable relief is adequate to remedy the harms inflicted by violations of those agreements or related legal rights.

Defendants have already acknowledged that "any breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy," and that Palantir "will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond." PIIA §9.  New York courts have recognized "[a] movant's demonstration of irreparable harm is ***strengthened significantly*** where the employee has previously acknowledged—most often in an employment agreement—that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur." *Iannucci v. Segal Co., Inc.*, 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006).

In addition, Palantir will continue suffering irreparable harm due to the substantial risk of Defendants' continued use and disclosure of its confidential information in the absence of injunctive relief.  Parties suffer irreparable harm if their confidential information is at risk of misuse, particularly by a copycat competitor.  *Biosynexus Inc. v. Glaxo Grp. Ltd.,* 11 Misc.3d 1062(A), at *11 (Sup. Ct., N.Y. Cnty. 2006) ("Should the [confidential] information be improperly disclosed…it would be impossible to once again make it confidential.").  In this case, one of the key purposes of Defendants' contractual obligations is the protection of Palantir's confidential information.  By requiring Radha and Joanna to wait 12 months before commencing employment with a competitor; Hirsh and Radha to wait 12 months or 24 months before soliciting Palantir's customers or employees; and Joanna to refrain from using or disclosing its confidential information, Palantir aims to minimize the risk that their former employees will be in a position to exploit the confidential information Palantir entrusted to them.  This concern is particularly pronounced given that Joanna stole dozens of confidential documents from Palantir to use for Percepta's benefit.  Facts §X.

Furthermore, "[i]t is well established in the Second Circuit that the loss of client relationships and customer goodwill that results from the breach of a [restrictive covenant] generally constitutes

irreparable harm." *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018); *see also Ticor Title Ins. Co. v. Kenneth Cohen*, 173 F.3d 63, 69 (2d. Cir. 1999).

Here, Defendants learned confidential information about Palantir's customers and developed customer relationships and goodwill through interactions sourced, funded, and supported by Palantir. Facts §II. Through these interactions, they obtained unique insights into Palantir's customers, and were entrusted with their confidential information in order to develop AI software solutions to meet their needs. *Id.* Given that Percepta is targeting the same global customer base in the healthcare, manufacturing supply chain, financial services, and government industries, Defendants' insights into customers' motivations and pre-existing relationships and loyalties would be readily exploitable to the detriment of Palantir. *Id.*

And the loss of employees can constitute irreparable harm since their departure may cause the employer to lose clients who follow the employees because of relationships developed with them at the employer's expense. *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). Here, Hirsh and Radha executed a months-long campaign to poach as much Palantir talent as they could, resulting in a Percepta workforce that is disproportionately populated by former Palantir employees— including an outright majority of Percepta's founding team. Facts §§IV-VI. Given the deep relationships these Palantir employees formed with Palantir's customers by learning about the problems they experienced in their businesses and developing solutions, Palantir faces serious risk that these customers will follow the employees to Percepta. *Natsource*, 151 F. Supp. 2d at 469.

## V.      The Balance of Hardships and Public Interest Strongly Favor Palantir.

The balance of hardships and public interest both strongly favor Palantir's requested relief. "[T]he balancing of the equities usually simply requires the court to look to the hardship imposed on one party outweigh[ing] the benefit to the other accruing from a grant or denial of the requested relief." *Students for Fair Admissions v. United States Mil. Acad. at W. Point*, 709 F. Supp. 3d 118,

138 (S.D.N.Y. 2024).  Put differently, when the absence of an injunction would cause greater harm than its imposition, the balance of hardships weighs in favor of granting the injunction.  *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 150-51 (S.D.N.Y. 2024).

Absent injunctive relief, Palantir faces a significant threat of irreparable harm arising from Defendants exploiting its confidential information, poaching its employees, and interfering with its valuable customer relationships.  *See* Argument §§II-III.  By contrast, imposing a preliminary injunction will cause minimal (and frankly justifiable) harm to the Defendants.  As they have repeatedly demonstrated a blatant (and at times, joyful) disregard for their contractual and legal obligations to Palantir, a preliminary injunction will merely stop them from unfairly competing against their former employer.  For example, the Defendants would be free to work for countless other companies in the AI industry, so long as they do not perform the same or substantially similar job functions as they performed for Palantir; solicit Palantir's employees and customers; or use its confidential information.  Any frustration of the Defendants' plans to unfairly compete with Palantir or the slight inconvenience to their desired career trajectories with Percepta is far outweighed by Palantir's need to protect its legitimate business interests.  *See Int'l Bus. Machines Corp.*, 2020 WL 5261336, at *15 (holding plaintiff's "need to protect its legitimate business interests substantially outweigh[ed] the harm resulting to [the defendant] from [temporarily] not working for" a competitor).  Indeed, given their decision to found a Palantir copycat based almost entirely off flagrant and celebrated contractual and legal violations, the "economic costs" and other "harms" carried by injunctive relief "are largely self-inflicted." *TushBaby, Inc. v. Jinjang Kangbersi Trade Co.*, 2024 WL 4627452, at *9 (S.D.N.Y. Oct. 30, 2024).

To the extent Defendants may argue that the balance of equities favors them because they have been working (secretly) at Percepta for months, that argument fails.  Under New York law, "[m]ere

delay, without the necessary elements creating an equitable estoppel, does not preclude the grant of an injunction," particularly where, as here, "defendant[s] hid" their misconduct and the "status quo is the result of defendant's deception." *New York Real Est. Inst., Inc. v. Edelman*, 42 A.D.3d 321, 322 (2007); *Eric Woods, LLC v. Schrade*, 45 Misc. 3d 1206(A), 6 (Sup. Ct., N.Y. Cnty. 2014) (granting preliminary injunction because any "delay in commencing suit does not preclude the granting of preliminary injunctive relief or tip the equities in defendants' favor under the circumstances presented herein"). Even where a party "breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement." *Edelman*, 42 A.D.3d at 322. Indeed, the PIIA expressly provides for tolling. Facts §III.

The public interest also weighs in favor of granting injunctive relief. An injunction would promote the public interests of: (i) encouraging parties to abide by reasonable contracts; and (ii) protecting such contracts from tortious interference. It is axiomatic that "when parties set down their agreement in a clear, complete document, their writing should…be enforced according to its terms." *Edge Grp. WAICCS LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 321 (S.D.N.Y. 2010). Not only would the public suffer no harm from an injunction, but "the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014). The same is true with respect to discouraging third parties from tortiously interfering with such agreements. By asking the Court to enjoin Defendants from further unfair competition, Palantir seeks only to require them to abide by the reasonable restrictions to which they already agreed—in exchange for valuable consideration—as well as other legal obligations they owe to the Company to ensure it secures the benefit of its bargain with other employees as well.

**VI.    The Court Has Substantial Discretion to Impose Extracontractual Relief Based Upon Defendants' Egregious Misconduct.**

This Court should enjoin Hirsh for 12 months from competing against Palantir based upon the egregiousness of his tortious interference with Radha's contractual obligations and his own breaches of his employee non-solicitation obligations.  That knowing and calculated conduct irredeemably taints his role at Percepta—a copycat business he built (and leads) almost entirely through unlawful conduct and unfair competition.

Courts have "a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983).  As a result, New York courts regularly issue non-competition injunctions for serious and/or repeated violations of restrictive covenants—even when there is no contractual non-competition agreement in place.  *See, e.g.*, *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1235-36 (W.D.N.Y. 1994) (imposing extracontractual noncompete based upon defendant's egregious breaches of other legal obligations owed to former employer); *DoubleClick v. Henderson*, 1997 WL 731413, at *6 (N.Y. Sup. Ct. Nov. 7, 1997) (concluding "defendants' cavalier attitude toward their duties to their former employer" warranted enjoining them from working for "any employer that competes with" the plaintiff).  Such relief is warranted "even in the absence of an express restrictive covenant against post-employment competition."  *Spinal Dimensions v. Chepenuk*, 16 Misc. 3d 1121(A), at *6-7 (Sup. Ct., N.Y. Cnty. 2007).

For example, in *Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs. Inc.*, a group of employees resigned to join a competitor.  2019 WL 2536104 (Del. Ch. June 20, 2019) at *1.  Notwithstanding their non-solicitation obligations, the employees "engaged in a full-court press to solicit" their former employer's personnel and customers.  *Id.*  The court found that "rather

38

than respecting those covenants, [the new employer] induced [others] to leave" and that it "expected that [new hires] would bring other…personnel with" them. *Id*. at *1,3.

Given the magnitude of the tortious interference, the court crafted extracontractual relief to remedy the new employer's misconduct, which the court found had "tainted" its "ability to compete" fairly. *Id*. at *22. The court prohibited the new employer from doing business with the former employer's customers—even those that had already moved their business—because permitting the new employer "to retain the fruits of that misconduct would compound its breach and the harm." *Id*. at *23. The court reasoned that a less severe remedy would be "difficult to monitor and enforce," especially since the new employer and its new hires had "demonstrated their willingness and ability to engage in secretive and underhanded behavior in violation of contractual obligations." *Id*. at *22. The extracontractual injunction was also essential to give the former employer the "benefit of its bargain," otherwise the existing contractual restrictions "would be rendered practical nullities." *Id.* at *23.

As in *Mountain West*, Percepta had "little chance" of succeeding absent Hirsh's tortious interference with Radha's contractual obligations to Palantir and violations of his own non-solicitation agreement, particularly without his "ability to use former [Palantir] employees to attract" the same customers. *Id*. at *24. Hirsh encouraged Radha—while she was an employee of Palantir—to leverage Palantir's confidential information about her colleagues as well as Palantir's confidential recruitment strategies, prompting her to identify and solicit Palantir employees and share insider details about their skills, preferences, and susceptibility to poaching. Facts §§V;VI;IX. He also directed and facilitated Radha's participation in strategic discussions and customer meetings for Percepta—while she remained on Palantir's payroll—ensuring that her breaches played a central role in Percepta's launch even before she became an employee by

39

securing Percepta's first and largest customer.  Facts §VII.  Given the egregiousness of this misconduct—coupled with the fact that Hirsh built his Palantir imitator almost entirely through unlawful and unfair competition—this Court should enjoin Hirsh from working for Percepta because he cannot be trusted to honor his other obligations if permitted to continue to work there.

### CONCLUSION

For the foregoing reasons, Palantir respectfully requests that this Court enter the proposed preliminary injunction order submitted herewith.

Dated: December 12, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: _/s/ Harris M. Mufson_

Harris M. Mufson
Ilissa Samplin
Justin M. DiGennaro
Zachary A. Schreiber

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212-351-4000
hmufson@gibsondunn.com
jdigennaro@gibsondunn.com
zschreiber@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213-229-7000
isamplin@gibsondunn.com

_Attorneys for Palantir Technologies, Inc._

## <u>WORD COUNT CERTIFICATION</u>

I, Harris M. Mufson, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word limit set forth in the Court's December 10, 2025 Order because it contains no more than 11,489 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: December 12, 2025                    By:  <u>*/s/ Harris M. Mufson*</u>

                                                          Harris M. Mufson