# Exhibit 88

## Redacted

with all prospective members of the founding team?

A. That's right.

Q. Who are the members of the founding team?

A. Me, Radha, Hirsch, Michael, Minalto (ph.)

Q. So other than those individuals, did General Catalyst play a role in anybody else's hire at Percepta?

A. No.

Q. And why was General Catalyst -- what was the purpose of General Catalyst's meeting with the members of the founding team?

A. It was both a combination of -- it was generally just to tell us about the company and get us excited about it, and -- and also to, I'm sure in some ways evaluate us because they are our investor.

Q. And you're aware that Mr. Jain kept Mr. Taneja updated on Percepta's -- the status of Percepta's hiring of various employees?

Q. What work is Percepta doing for [REDACTED]?

A. For [REDACTED], again, very similar. We are onboarded onto -- onto their infrastructure and environments and we are [REDACTED]

Q. Is that work ongoing?

A. Very similar thing, where we finish the pilot and we are in active negotiation for an enterprise deal.

Q. What work is -- has Palantir done for [REDACTED]?

A. You mean Percepta?

Q. I'm sorry, Percepta. Thank you. Yes.

A. We are helping them with [REDACTED]

[redacted] and we essentially help them do that faster with AI.

Q. And is that work ongoing?

A. Same thing, where we finish the pilot and we're in active enterprise negotiation.

Q. And any negotiation about other projects to work with them on?

A. Expansion of this project.

Q. And what work has Percepta done with Summa?

A. We haven't started at Summa yet. We just closed on the hospital this month, but -- yeah, we -- we own the entire hospital and so I think we're going to have to scope out some -- scope out

them kind of [REDACTED]

Q. Anything else?

A. No.

Q. And what work has Percepta done for [REDACTED]?

A. Umm... we have basically done two different workflows. One of them is [REDACTED]

And then we also did a pretty small workflow [REDACTED]

Q. And have you been in

ATTORNEYS' EYES ONLY - THOMAS MATHEW

Q. They might prove to be useful to what end?

A. Might prove to be useful for businesses in decision-making.

Q. You continue in that bullet saying you "launched our core product called Mosaic." What is Mosaic?

A. Mosaic -- and we talk about this later in this document, but Mosaic is [redacted]

ATTORNEYS' EYES ONLY - THOMAS MATHEW



in that do incredible work, and we kind of bucket that under the transformative technology in this statement.

But one of the things we also realize is that those portfolio companies are not actually being used at the enterprise at the level that one would expect. And what was missing was a team of engineers who could kind of act as consultants for those enterprises and help bring in those portfolio companies, or that transformative technology, and embed it within the workflows at those enterprises.

And we believe that whole -- that whole process basically takes the incredible innovation that's happening in the Valley and bringing it into enterprises that we work with that catalyzes, you know, progress towards a prosperous future.

Q. Let me ask you about the long-term thesis there.

A. Sure.

[redacted] [redacted].

Q. Is Radha Jain in charge of any part of that process?

A. She works -- she's -- she interviews candidates and so she's part of that process.

Q. Does she own any part of that process?

A. Not fully. [redacted]

Q. What are Radha's duties and responsibilities at Percepta?

A. She -- she basically is -- on our very customer-facing team that

essentially works directly with the customer's leadership to come up what with the AI native version of their business looks like five to ten years from now and essentially does a lot of the project management around okay, here is where your business is going to look like five years from now, here is like what some of your priorities are this year.

Let us do some project management of the in-house engineers that we have that will help you build this, plus let's also kind of scope out which portfolio companies might be relevant for you as part of that journey.

Q. Does she work with a particular customer or customers?

A. Yes, she works at [redacted].

Q. Any other customers?

A. No, not as a -- not in a primary kind of functional -- function.

Q. As a secondary function does she work with other customers?

A. Yeah, I think like right before

ATTORNEYS' EYES ONLY - THOMAS MATHEW

A. Not really, no.

Q. How do you know it exists?

A. Umm, I knew that it was one of the documents that we collected for counsel.

Q. Okay. Does this -- I don't believe it's dated, so do you have a sense of when this was prepared?

A. Umm, I don't, but it would have been sometime this year.

Q. Okay. And do you know who prepared it?

A. I don't know the specific person, but I would be again very surprised if it wasn't Radha.

Q. If it wasn't Radha?

A. Yeah, Radha basically headed the [REDACTED] deployment and came up with a lot of the -- the strategy for what we were doing there.

Q. Okay. And so what is this document?

A. Give me a second to kind of review it.

A. I don't really recall.

Q. Do you have a practice of taking notes at meetings?

A. Umm... generally we all often just kind of have a conversation about -- especially in those early days I think we were just mostly just in conversations about meetings over text because we didn't have any text setup, like we didn't have our own accounts on Google or anything to actually take notes in.

Q. Well, you could take notes on a notepad. You could take notes all sorts of different ways. I'm just asking whether you have a practice of taking notes at meetings.

A. Me personally?

Q. Yes.

A. Oh... not usually, no.

Q. Does Mr. Jain have a practice of taking notes at meetings?

A. Not that I'm aware of.

Q. Do you recall what Mr. Jain represented to [REDACTED] about Ms. Jain's

status vis-à-vis Percepta?

A. No, I don't recall the specifics. I remember vaguely that, you know, he was planning on having a conversation to [REDACTED], or at least a leader at [REDACTED] about some -- some employees that are not yet in -- not yet in Percepta. [REDACTED] was very aware about the fact that Percepta was a early-stage company and we were starting to hire people.

Q. Were you aware -- I asked you this earlier but I want to make sure I understand your testimony.

Are you aware that Palantir had -- did anyone at [REDACTED] ever tell you that Palantir had had prior discussions with [REDACTED] about being a potential client?

A. No.

Q. And were you ever aware that Palantir had discussions with [REDACTED] about [REDACTED] being a potential client.

A. No, I learned that today when

ATTORNEYS' EYES ONLY - THOMAS MATHEW

it just didn't seem relevant at -- relevant all to me.

Q. Have you seen Ms. Jain's employment contract?

A. No, I haven't seen it in person, no.

Q. And so at the time that Ms. Jain attended that [REDACTED] call in November, you weren't aware of what her contractual restrictions were; right?

A. No, just aware of what general contractual restrictions around these kind of things are.

Q. And what are the general contractual restrictions that you're aware of?

A. Things like non-soliciting and noncompetes.

Q. When you were working with Mr. Jain to recruit employees to join Percepta --

A. Yep.

Q. -- and you had the conversation that you testified about earlier, about

guardrails concerning recruiting Palantir employees, did you ever seek legal counsel about your or Mr. Jain's contractual obligations.

A. Seek legal counsel... umm --

Q. Yes, ask for legal advice from a lawyer.

A. We --

MR. FELDMAN: You can answer the question yes or no. Just don't reveal the substance of any lawyer communications.

A. Yes.

Q. I don't want to know the substance. Which lawyer did you speak with? What's the name of the lawyer?

A. Our lawyers, I believe Dan Reilly.

Q. Dan Reilly, the general counsel at Catalyst?

A. Yeah.

Q. When did that conversation take place?

A. I don't recall.