# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., <br>                                           Plaintiff, <br>     v. <br><br> HIRSH JAIN, RADHA JAIN, and JOANNA COHEN, <br><br>                                          Defendants. | Case No. 25-cv-08985-JPO |

## **DECLARATION OF RADHA JAIN**

I, Radha Jain, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Radha Jain, and I am a Co-founder at Percepta and a Defendant in this action. I submit this declaration in support of Defendants' Opposition to Plaintiff's Renewed Application for a Preliminary Injunction. I have personal knowledge of the matters set forth herein, based on my personal experience, and, if called to testify as a witness, I could and would testify competently thereto.

2. I have known that I have wanted to pursue a career in technology for years. In 2019, I graduated from Stanford University with a degree in computer science and economics.

3. Shortly after graduating, I obtained my first full-time role in my chosen field—as a forward deployed engineer at Palantir Technologies, Inc. ("Palantir"). A few weeks before I started, I was presented with a copy of Palantir's Proprietary Information and Inventions Agreement ("PIIA") alongside my offer letter and told I had to sign it before I could begin my employment. I was 22 years old, with no prior full-time employment and I understood this to be standard. It never occurred to me that I could try to push back or negotiate any of the terms that were placed in front of me, and no one at Palantir informed me that I could do so or that I could

hire legal counsel to help me review the document. Even had someone said that to me, I would not have had the money to hire counsel. As a result, I did not review the PIIA closely prior to signing it. I was wholly unaware that it contained any non-competition restrictions on my employment when and if I ultimately moved on from Palantir. My understanding is that Palantir requires all incoming employees to sign a PIIA.

4. I began working at Palantir in January 2020. Very early on I spent 3 months working on a project for ████████████████████████████████████████████████████████████████████████████████. I do not remember any meaningful details from this work and have not thought about it in years. I have not had contact with this client since I left the project.

5. After this brief engagement, I began working ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

6. A little over a year and a half into my time at Palantir, I transitioned to a new role as a sales engineer ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,

7. For the entire time that I worked within Palantir's ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

8. In late 2022, I changed roles within Palantir again to an internal engineering team, hoping to get more technical. Ankit Shankar led this team, known as the ████████ Since I had no previous professional software engineering experience, for the first 6 months I worked on a starter project ████████████████████████████████. During this time, I did not interact with any customers.

9. ████████████████████████████████████████████████████████████ ████████████████████████ AIP Logic. I returned from my honeymoon as this work was underway, and asked Ankit if I could join this team. ████████████████████ ████████████████████████████████████████████████████████████ ██ My position was a junior front-end engineer. ████████████████████████ ████████████████████████████████████████ In my role on AIP Logic, I reported to Ankit Shankar who led the team.

10. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████████████████████████████
████

11. As a "front-end" engineer, I focused on ████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████

12. ████████████████████████████████
████████ and any suggestion otherwise is simply inaccurate. ████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████

13. ██████████████████████████████
███████████████████████████████████
████████████

███████. That is false. █████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████

14. As 2024 progressed, I grew dissatisfied at Palantir. I was eager to do more than ██████████████████ and wanted a role that would offer new challenges. I was excited by the promise of LLMs, and wanted to understand whether the technological gains would actually be transformative. On AIP Logic, I felt abstracted from that work, like I was "stuck behind the product," and unable to see what was working and what was mere hype. ████████████████████████████████████████

████████ I was more interested in what raising the ceiling could look like for the most ambitious companies. I discussed these frustrations and my desire for additional growth opportunities with Ankit during our periodic meetings but was mostly met with indifference.

15. Initially, I thought my next move after Palantir would be to start a company of my own. I was in the early stages of brainstorming possibilities along these lines when, in the fall of 2024, Hirsh Jain reached out to me to meet for coffee.

16. Hirsh and I are friends. Though we never worked together directly, we first crossed paths at Palantir when I was working ▮▮▮▮ and he was working in the same department. We kept in touch even after I moved on internally and he left Palantir altogether.

17. I met Hirsh for coffee on November 5, 2024. Going in, I had no expectations or agenda for our conversation other than anticipating catching up with a friend and former colleague. In the course of our conversation, I asked him what he was working on. At the time, Percepta was just an idea—it didn't have a name, any customers, or even a clear concept of what it would offer—but I was intrigued by what he told me about it. Specifically, Hirsh mentioned that General Catalyst had just purchased a hospital in Ohio called Summa Health, ▮▮▮▮

▮▮▮▮

▮▮▮▮. I was impressed and fascinated by the boldness of the bet and the impact it could have in evolving healthcare. I had never heard of a venture firm taking on a risk like that before, and wanted to learn more.

18. Over the course of 2024, I went back and forth on whether I should leave Palantir. I was working on Palantir's AI product during a time of strong company performance, but craved greater ownership and impact in my work. At various points I convinced myself to stay, including in communications with ▮▮▮▮ where I indicated I had decided to stay. Ultimately, however, my dissatisfaction persisted.

19. When I got coffee with Hirsh, everything he told me aligned with what I was already looking for in a new opportunity. In its motion, Palantir expresses incredulity at the notion that Hirsh did not recruit or solicit me to join Percepta. But the simple truth is that *I* was the one pushing to learn more about the company and a potential role there. At both our initial coffee chat and in subsequent communications, I asked Hirsh for more details on the company, its relationship

to General Catalyst, and other details because it was so novel and I was so curious to learn more. I also was the one who asked to speak to other people at General Catalyst about Percepta. Hirsh didn't have to sell me on Percepta because it was what I was already looking for. And for much the same reasons, I did not have to be enticed away from Palantir because I was already on my way out the door.

20. Following my initial coffee with Hirsh, I met with several other individuals at Percepta and General Catalyst to learn more about the company. During this time, Percepta had scheduled an introductory meeting with ▮▮▮▮ its first customer, to learn more about ▮▮▮▮ business model and ▮▮▮▮. I was unfamiliar with the field and asked Hirsh if I could observe the meeting to better understand the business context and people I might work with. I sat in on the meeting on November 13, 2024, but I did not speak at or otherwise participate. The meeting consisted of ▮▮▮▮ team describing its business to Percepta. I thought the meeting was interesting and it excited me. I sent a few texts to Hirsh during the meeting with some of my immediate reactions to ▮▮▮▮ presentation, but I did not engage in any substantive work, and the reactions I shared via text were not passed along to ▮▮▮▮ during the meeting.

21. Throughout this period, I was incredibly excited about the possibility of joining Percepta. The company at the time was very much a blank slate, and it was exhilarating to think about building something entirely new from the ground up. That was the spirit in which Hirsh and I discussed a number of our professional acquaintances from Palantir in a text exchange from mid-November 2024: as talented individuals who, should they be looking for new opportunities, would be great to work with on our new venture.

22. Palantir makes much of this exchange in its motion, claiming that in it Hirsh and I "hatched a scheme to poach the best AI engineers at Palantir" and launched a "strategy to raid Palantir's workforce." Though I regret some of the facetious wording of our texts, I completely reject Palantir's characterization of our conversation. My conversation with Hirsh reflected our wishful thinking about individuals we would have liked to work with again—as anyone building a company might—but there was never any "scheme" or "strategy to raid" Palantir. The fact that the individuals we discussed were then working at Palantir was incidental, and simply a consequence of the fact that most of my professional network at the time consisted of current and former Palantir employees.

23. In reality, despite discussing several individuals with Hirsh, I did not reach out to or contact any of them to get them to come work at Percepta. That has been true throughout my time at Percepta. I have never conducted outreach to any current Palantir employees for the purpose of enticing them to work at Percepta, and I have never been the first point of contact of any current Palantir employee with our company. While I spoke to Joanna Cohen and Bryan McClellan before they joined Percepta, those conversations took place after they had already begun the process of exploring potential roles with Percepta. I did not believe that merely speaking with Joanna or Bryan to answer their questions about Percepta and assess whether I thought they would be a good fit at the company constituted "solicitation," or that I would be in violation of my PIIA for doing so.

24. I understand that Hirsh contacted just one of the individuals he and I had texted about, and I later had a conversation with that person. We did not offer that individual a job at Percepta—and he ended up leaving Palantir anyway for another job.

25. Palantir also alleges that I made use of its "confidential recruiting strategies" against it. I have no idea what "confidential recruiting strategies" Palantir is referring to, as I am unaware of any and certainly have not made use of any such strategies in my involvement in hiring for Percepta. ███████████████████████████████████████████

26. I formally gave notice of my resignation from Palantir to Ankit on November 21, 2024. A few days later, on November 27, I sent an email to approximately 100 people at Palantir notifying them of my resignation and sharing that I would be joining an AI startup with a number of former Palantir employees. This email was just one example of my sharing with my Palantir colleagues where I would be going and what I would be doing—at least to the extent I knew at the time. Over calls, I told my teammates ███████ and ███████ that I had an offer in hand from General Catalyst and detailed everything I knew about the opportunity at the time. I also had a farewell lunch with five other members of my AIP Logic team, in which I provided further detail on my new role. On my last day at Palantir, I spoke with Ankit via phone, during which I told him about Percepta's connections to General Catalyst and to Hirsh and the work it would be doing using advanced modeling and reinforcement learning. Shortly thereafter, Ankit sent me links to courses on these topics, so that I could better prepare myself for my new job.

27. Before I left Palantir, the company presented me with a voluntary severance agreement to sign. ████████████████████████████████████████████ I understood from having spoken with others who had left the company that many departing employees choose not to sign the severance agreement, particularly if they leave to pursue entrepreneurial endeavors. I did not consider Palantir's proposed exchange to be worthwhile, and declined to sign.

9

28.     My last day at Palantir was December 5, 2024. I started at Percepta a few days later, on December 9.

29.     Even after leaving Palantir, I kept in touch with a number of the individuals I worked with, including Ankit, and was open and forthcoming about my work at Percepta in those discussions. While I was unable to make public statements about Percepta before General Catalyst could fully inform its LPs, I did not keep Percepta a secret in my personal interactions with my former colleagues from Palantir—nor did I see any need to, because I didn't think there was anything wrong with my having left Palantir for this new role.

30.     Several months after I resigned, in May 2024, I met with Ankit again, this time in San Francisco. I caught him up on what I had been doing at Percepta, including work with ▮▮▮▮ our approach using ▮▮▮▮▮▮ and our efforts to grow the team. He asked me who else from Palantir had joined us, and I told him. No one from Palantir ever said anything to me about my contractual obligations to the company or suggested that I might be in violation of them.

31.     My day-to-day work at Percepta is radically different from my work at Palantir—that is a major reason why I pursued this new role in the first place.

32.     At Palantir I was a junior front-end engineer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At Percepta, I lead the engagement with ▮▮▮▮, managing a team of 8 engineers to build bespoke software solutions to help ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To achieve these outcomes, our team uses reinforcement learning and advanced modeling—▮▮▮▮▮▮ ▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

10

33. Moreover, my AIP Logic experience would be of little value at Percepta. AIP Logic is composed of hundreds of thousands of lines of code; it would be absurd to suggest I remember specific implementation details. More importantly, the features AIP Logic offers—██████████████████████████████████████████████—are well-understood industry concepts available through commodity software from dozens of startups, including the ones we use. AIP Logic's unique value lies in its integration with the rest of Foundry's platform and its no-code interface, neither of which are relevant to Percepta's work. We do not have a Foundry-like platform and instead write bespoke solutions directly in code for each client's specific needs.

34. Some of our recent projects for ██████ include using reinforcement learning █████████████████████████████████████, developing modeling to █████████████████████████████, and leveraging AI to ████████████ █████████████████████████. None of my team's current work for ██████ involves ████████████████████████████████████████████████████ ████████████████████████████.

35. In addition to coordinating with my internal team, I meet regularly with ██████ leadership team to update on progress and to help them strategize how best to use AI and other technologies in their business. While these conversations can (and often do) concern the bespoke solutions our team is building for ██████ they can also range farther afield and touch on broader business and strategic issues. ████████████████████████████████████████ ████████████████████████████.

36. Prior to going on leave, I was also in the process of launching Percepta's engagement with Summa Health. ████████████████████████████████

█████████████████████████████████████████
█████████████████.

37.     As a co-founder of Percepta, I also have a host of new responsibilities that are not connected to any particular customer engagement, including hiring for and overseeing our team of embedded project managers. I also meet regularly with my co-founders to discuss the strategic direction of the company.

38.     There are also a number of activities and job functions that I do not perform at Percepta. I do not spend any meaningful amount of time writing code, for example; my sole code-writing experience was relatively early on in my tenure, when I briefly performed some coding in ████████████████████████████████████████████████. Nor do I run or oversee Mosaic, a ████████████████████████████████████ that Percepta uses in some of its customer engagements. Mosaic is instead run by Thomas Mathew, Percepta's Chief Technology Officer.

39.     Palantir's claim that Percepta is a "copycat" is incorrect. Percepta takes a totally different approach to integrating AI for its customers, starting with the fact that we do not offer a platform comparable to Palantir's Foundry or AIP Logic, and our services go well beyond the white glove configuration that Palantir provides. Percepta creates bespoke solutions, building off of pre-existing AI technologies, ████████████████████████████████████ ██████████████. We are able to work on top of Palantir's platforms for any customer that already has those data integration platforms in place. Because of the differences between the two companies, the most charitable explanation I can offer for this lawsuit is that Palantir genuinely misunderstands what Percepta actually does.

40. When I left Palantir, I did not take any Palantir documents or other materials, including any confidential materials, and I have no such documents or materials in my possession. Nor have I ever made use of any of the company's confidential information for any purpose—including in my new role at Percepta.

41. Though I believe they are entirely without merit, Palantir's claims against me have been incredibly damaging.

42. I first learned of this lawsuit not from counsel, but from an alert from the news website Axios. I was completely blindsided and shocked. The various news alerts announcing the suit presented a false narrative that was both humiliating and alarming, immediately triggering concern among my friends and professional network.

43. The filing of this lawsuit has also had an immediate and profound impact on my family. They were shocked and surprised to learn of the allegations against me, and they have struggled to understand how my efforts to pursue a new opportunity at a young company could result in my being sued by my former employer. The news has been deeply distressing to them and has amplified the anxiety I have felt about my professional future.

44. I never contemplated, and genuinely do not believe, that anything I did in connection with leaving Palantir or joining Percepta violated my PIIA or any other agreement with Palantir. When I signed the PIIA at age 22, I did not understand it to contain any non-competition restrictions that could prevent me from working in the field of applied AI if I left the company. After I left Palantir, I remained in touch with former colleagues, including my former manager, and candidly discussed my work at Percepta. No one at Palantir ever warned me that I was violating any obligations or suggested that I was doing anything improper.

45. Shortly after this case commenced, I agreed to enter into a stipulated temporary restraining order, pursuant to which I have not engaged in any work at or with Percepta or General Catalyst since November 3, 2025.

46. This has not been a welcome vacation or respite in any respect. I have been cut off from doing work that I love, for clients that I care deeply about on projects with the potential for significant positive impact. I have felt isolated from my chosen field and professional community. The aggressiveness of Palantir's counsel and their distortion of events has been painful to witness. I find it deeply troubling that my former employer did not even attempt to contact Percepta to learn more before filing the suit.

47. If granted, Palantir's proposed preliminary injunction would have significant negative impacts on my professional trajectory and on Percepta itself. If I were sidelined for the better part of a year, the harm to my career would be devastating. My professional trajectory over the past several years has involved a progression from coding to leadership of cross-functional teams delivering bespoke AI solutions. In a rapidly evolving area like applied AI, a year on the sidelines would mean missing major inflection points in technology and practice, which would set back my ability to be a strategic AI partner for clients.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 12, 2026
New York, New York

Radha Jain