**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC., <br>            Plaintiff, <br>  v. <br> HIRSH JAIN, RADHA JAIN, and JOANNA COHEN, <br>            Defendants. | Case No. 25-cv-08985-JPO |

### DECLARATION OF HIRSH JAIN

I, Hirsh Jain, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Hirsh Jain, and I am the Chief Executive Officer of Percepta. I submit this declaration in support of Defendants' Opposition to Plaintiff's Renewed Application for a Preliminary Injunction. I have personal knowledge of the matters set forth herein, based on my personal experience, and, if called to testify as a witness, I could and would testify competently thereto.

2. I graduated from Harvard in 2017, with an undergraduate degree in mathematics and computer science. While at Harvard, I completed internships at the trading firm Jane Street, Google, the Department of Defense, and Palantir. As a senior, I also co-founded a company named Reverie Labs, a startup that used artificial intelligence and computational methods to improve the design of new pharmaceutical drugs and identify promising drug candidates. Reverie Labs received outside venture capital funding (including from General Catalyst) and was later acquired by the autonomous lab company Gingko Bioworks.

3. Later in 2017, I joined Palantir as a forward deployed engineer—███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

4. At the time I joined Palantir, I signed a copy of their Proprietary Information and Inventions Agreement ("PIIA"). I understood that I had to do so as a standard condition of my employment, and that everyone at Palantir signs some version of that contract. I did not review the PIIA with a lawyer or attempt to negotiate any of its terms, and I did not know that doing so was even an option.

5. I went on to hold various roles ████████ over the ensuing years, and ultimately was named Head of Healthcare and Civilian and a senior vice president in 2022.

6. All of my experience at Palantir was with ████████████████████ ████████████████████████████████████ To the contrary, to the best of my current recollection, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

7. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

8. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

9. In 2024, I began thinking about leaving Palantir and exploring opportunities outside of the company.

10. In or around early June 2024, I began to speak with assorted investors at General Catalyst, including the CEO Hemant Taneja, about possible opportunities within his firm and its various portfolio companies. I was introduced to Hemant by a close friend who is an investor at General Catalyst. In the course of those conversations, I learned that General Catalyst was in the process of creating and standing up an "AI Transformation Company," or "AITCo," along the lines of a similar "Healthcare Transformation Company" it had established earlier.

11. Based on my discussions, I understood that General Catalyst intended its new AITCo to offer comprehensive AI transformation services ████████████████████████ ████████████████████████████████. There are a number of companies—including GC portfolio companies—that offer discrete AI solutions or other technologies to enterprise clients. But what was missing was an entity that could help clients stitch all those various tools together to develop a comprehensive AI solution to meet the clients' particular needs. Enter AITCo—which would provide this service through a mix of strategic consulting and engineering, so the solutions achieved were ultimately tailored to each customer's bespoke needs and coding environment.

12. I was intrigued by what I learned about General Catalyst's plans for AITCo. Since my earlier experience at Reverie Labs, I had always wanted to try my hand at building another company from its early stages, and was excited to learn more about a possible opportunity to do so. General Catalyst's idea for AITCo was particularly compelling to me because it represented a

3

new model for approaching AI transformation and development that was made possible by the relationships General Catalyst had and the investments it had already made into the project. In particular, no other company I am aware has been able to bring together all of the incredible AI technologies that exist to enterprise and do it to scale. I have always been motivated by the opportunity to bridge the gap between frontier technologies and industries or communities I care about, and this seemed like a genuinely unique opportunity to do so. This partnership-first and consulting-first approach to AI transformation also marked a departure from the work I had been doing at Palantir, which further excited me. I was introduced to others at General Catalyst so we could discuss further.

13. Over the course of June and early July 2024, I spoke to Hemant and others at General Catalyst about their plans for AITCo and how I might fit within it. I learned that General Catalyst had hired Athul Paul Jacob as Chief AI Officer and Constantinos Daskalakis as Chief Scientist (neither a former Palantir employee) to incubate its ideas and help bring the AITCo company to life. Over time, it became apparent that the new venture would pursue opportunities in ▮▮▮▮▮▮▮▮▮▮ in the first instance. This was exciting to me. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it resonated with my prior experience at Reverie Labs and my personal history—my mother is a physician.

14. In July 2024, I accepted an offer from General Catalyst to become Chief Executive Officer of the as-yet unnamed (and unformed) AITCo and to help lead efforts to make General Catalyst's plans a reality. (We wouldn't formally incorporate the new company until much later, in mid-December.)

4

15. On or around the week of July 15, 2024, I told S████████████ ████████ my direct supervisor, that I was resigning from Palantir to become the CEO of a new company initiative within General Catalyst. My last day at Palantir was August 2, 2024.

16. I did not take any of Palantir's confidential materials or information with me upon leaving the company, and I do not have any such documents or materials in my current possession. Since leaving, I have not made use of Palantir's confidential information at Percepta or anywhere else, for any reason.

17. Around the time of my departure from Palantir, I told numerous colleagues at Palantir that I was leaving to join General Catalyst to help launch its new AI startup, and specifically that we would be working on ████████████████████. I also told several colleagues about the company's connection to General Catalyst.

18. Overall, I would estimate that I have informed over 250 people at Palantir of my plans and current work since I left the company. Many of my former colleagues at Palantir have subsequently reached out to me for jobs, for advice, and simply to find out what I have been doing since leaving—and I have told them. I had a wide network at Palantir given my tenure there, and have had nothing to hide about where I was going or what I would be doing in my new role. As is common with startups, the specifics of what our company does have evolved over time, but I have always been completely forthcoming about the details.

19. I believed I was leaving Palantir on good terms. I received many messages of support from various executives at the company when I announced my departure. Multiple Palantir executives, senior vice presidents, and engineering leaders reached out to me to congratulate me on taking my next step. I met with many of them over the coming weeks and months and spoke openly about the work I was doing.

20.     Just four days after I left, on August 6, 2024, Shyam Sankar, Palantir's Chief Technology Officer, sent an email connecting me with investors at the venture capital firm A*, who were interested in learning more about the work I would be doing. A true and correct copy of that exchange is attached hereto as **Exhibit 225**. (This was not a one-time event. In January 2025, Shyam connected me with investors at the venture capital firm XYZ. (A true and correct copy of that email exchange is attached hereto as **Exhibit 226**.)

21.     I began working at AITCo—which, after cycling through several different naming iterations, eventually became Percepta—on September 16, 2024. About two months later, we hired Thomas Mathew as Chief Technology Officer and Co-Founder. Tom, Athul, Constantinos, and I set to work brainstorming what the new company would be. We were truly working with a blank slate.

22.     At the time, I felt there would be ample opportunities for us to collaborate with Palantir and to leverage its Foundry platform for the work we were hoping to achieve. At no point—then or now—did I believe we were building a Palantir competitor or "copycat." We have not built a rival product to Palantir's Foundry or AIP Logic. To the contrary, I believed (and still believe) that we could be symbiotic, and regularly discussed possibilities along these lines internally. Percepta's purpose is to facilitate its clients' introduction to the ecosystem of AI products available on the market—from the smallest to the largest—and Palantir's Foundry and AIP Logic products could easily be part of that offering.

23.     Palantir itself reached out to me to explore a potential partnership a few months after I left. Specifically, in late 2024, Eric Menser, who worked at Palantir in the Office of the CEO and was an enterprise lead for startups, emailed me to ask if he could learn more about our work at Percepta (which was then going by the name Renaissance) and hear our thoughts on how

Palantir might engage or partner with startups like ours. A true and correct copy of this email exchange is attached as **Exhibit 227**. I continued to communicate with Eric throughout January and February of 2025, including by introducing him to other members of Percepta's founding team and describing our work in the healthcare space to him. True and correct copies of my email communications with Eric from Palantir are attached hereto as **Exhibits 228 through 230**.

24. I also do not view Percepta as directly competing for Palantir's customers or targeting those customers specifically in any way. Percepta focuses its business development efforts on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. A good example is our engagement with ▓▓▓▓▓▓ a value-based healthcare provider that officially became our first enterprise client when we entered into an agreement with them in late December 2024. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which makes it a good fit for Percepta's value proposition and transformation model. GC has also introduced me to large companies in the healthcare space with whom it has significant long-standing relationships, like ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, though Percepta has no active engagements with either.

25. I understand that Palantir is alleging that I have improperly "solicited" three of its former employees who now work at Percepta: Radha Jain, Joanna Cohen, and Bryan McClellan. I dispute that claim.

26. Radha and I are friends. We met while we were both working at Palantir several years ago, and we agreed to keep in touch after I left the company. In early November 2024, I met her for coffee. I did not go into this interaction intending to recruit or hire Radha, or even with any expectation that she was looking for a job with me. At the time, I was under the impression that she was thinking of leaving Palantir to start her own company, and so I offered to introduce

7

her to the individuals I was working on at General Catalyst who might be able eventually to help her with her business ideas. In the course of catching up, Radha asked me what I was working on. I told her about my work and General Catalyst's approach to AI transformation. I mentioned that General Catalyst was pursuing interesting opportunities in healthcare, including via its purchase of an Ohio hospital, Summa Health. She seemed interested, and asked me for more information and to be connected with others at General Catalyst from whom she could learn more. At her request, I answered her questions and made those introductions.

27. Over the course of the next several weeks, Radha and I continued to discuss her interest in Percepta. She called me to say she wanted to join us, I was glad to learn of her enthusiasm. Radha is a talented individual and a good friend, and I was excited to have her as a co-founder.

28. Palantir points to a text exchange between Radha and I in late November 2024, in which we discussed various individuals we knew from Palantir, to claim that I engaged in a scheme to "poach" or "pillage" its employees. That is, simply put, ridiculous. Palantir is a $440 billion company that employs thousands of engineers. Percepta is a small start-up with a fundamentally different offering. At the time this lawsuit was first filed, we employed approximately 25 people. Today, we have grown to 35. As I discuss below, only three of these people came directly to us from Palantir. We have no plans to somehow take Palantir down by "stealing" its people (or its customers or anything else).

29. In our texts, Radha and I mentioned the names of talented individuals we knew from our respective time at Palantir who we would enjoy working with again. Of the several individuals we discussed, I reached out to just one, via text, to ask if we might catch up. That outreach went nowhere. It took over three months to actually schedule that catch-up conversation.

We never made that individual an offer to join us at Percepta, and he left Palantir anyway to pursue another opportunity.

30. As for Joanna Cohen, I did not know her from my time at Palantir. I was introduced to Joanna in the fall of 2024 by another individual, ▆▆▆▆▆▆▆▆▆▆, who also worked at Palantir (and still does). ▆▆▆▆ had been in periodic touch with me to learn about General Catalyst and potential opportunities for funding or employment. At our meeting, I told both ▆▆▆▆ and Joanna about Percepta, but I spent more time speaking to them about the company that I had heard they were interested in starting, potential collaboration opportunities, and offers to meet other investors. We ultimately ended up deciding not to work together in that conversation.

31. I did not hear from Joanna again until approximately two months later. She reached out to me directly and on her own to reiterate her interest in Percepta and to ask if the company was hiring. After a short delay, I reached back out to her. As it happens, we were beginning to think about expanding the team, so I answered her questions about Percepta and introduced her to others at the company so she could learn more and my colleagues could mutually assess whether she was a good fit. She eventually came to meet others on the team, but I was not in town at the time. When we decided to hire her, the decision ultimately fell with Tom as our CTO and I handled the logistics.

32. Like Joanna, I did not know Bryan McClellan when I was at Palantir. Nor was I the one who made initial contact with him. Bryan came onto Percepta's radar in early 2025 via Tom Mathew, with whom he had previously worked. Tom facilitated Bryan's introductions with individuals at Percepta (including me) and General Catalyst and ran his hiring process. I met with Bryan once prior to his hiring.

33. Radha, Joanna and Bryan are the only three individuals that Percepta has hired directly from Palantir. In its papers, Palantir makes much of the fact that other Percepta employees previously worked there. While that is true, the relevant individuals all worked at other technology companies or startups for periods of months or years in between. We have not hired these individuals because they previously worked at Palantir or in an effort to obtain any of Palantir's confidential information or expertise. Frankly, familiarity with Palantir's confidential information—and even with its source code—is of no use to us, because our business is so different. In any event, the fact that many of our employees worked at Palantir at some point in their careers does not strike me as unusual. The New York developer community is small, and Palantir employees and alumni make up a significant portion of it. Given the length of my tenure at Palantir and my visibility there—to say nothing of my openness about my current work—it is also unremarkable that other alumni of the company have reached out or expressed interest in coming to work at Percepta.

34. I was stunned when I learned that Palantir had filed its initial lawsuit against Radha and Joanna. Prior to its lawsuit, Palantir had not reached out to me or Percepta about its allegations, or to learn about Percepta's business. Had they done so, I believe we could have assuaged their claimed concerns and made clear that we were not using Palantir's confidential information in our operations or seeking to poach its employees. I worked at Palantir for seven years, was thankful for the opportunities I had there, and thought I had left the company on good terms. Palantir's decision to go straight to litigation, without even contacting me, is both regrettable and troubling.

35. Palantir's lawsuit has been disruptive to Percepta. We have done our best to operate business as usual during this time, and our employees know how baseless Palantir's allegations

are. Nonetheless, we have had to contend with increased scrutiny from the press and within the industry, as well as expend considerable time, effort, and resources on this litigation.

36. Percepta will also be impacted if Palantir is granted the relief it is requesting going forward. Specifically, sidelining me, Radha and Joanna will significantly affect Percepta's ability to deliver on the services it is already under contract to provide, including on our engagement with one of our largest enterprise customers. (We have already had to adjust our operations to account for the fact that Radha and Joanna are out on garden leave, to say nothing of losing Radha's input on our co-founders' strategic decision-making for the firm.) And preventing Radha and I from participating in any hiring for our 35-person company would impact Percepta's overall ability to effectively vet and hire candidates.

37. On a personal level, not being able to work at Percepta during the pendency of this lawsuit or for the period of time that Palantir has demanded would be devastating. I have poured so much of myself into this company. I believe our approach to AI transformation and our offering of strategic insight coupled with technological development and the use of pre-existing AI technologies makes us unique in the market, and certainly distinct from Palantir. This field is my passion, and I genuinely do not know what I would do professionally if I was prohibited from working in it.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 12, 2026
San Francisco, California

_____
Hirsh Jain