**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PALANTIR TECHNOLOGIES INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>HIRSH JAIN, RADHA JAIN, and JOANNA COHEN,<br><br>                    Defendants. | Case No. 1:25-cv-08985-JPO<br><br>Hon. J. Paul Oetken |

## DEFENDANTS' OPPOSITION TO PALANTIR TECHNOLOGIES INC.'S RENEWED APPLICATION FOR A PRELIMINARY INJUNCTION

## CONTENTS

Page

I.   PRELIMINARY STATEMENT ................................................................1

II.  FACTUAL BACKGROUND .................................................................4
     A.   Palantir Requires Overbroad Restrictive Covenants..................................4
     B.   General Catalyst Creates Percepta. ...................................................5
     C.   Radha Jain Decides To Join Percepta. ................................................7
     D.   Percepta Is an AI-Consulting and Engineering Company—It Does No
          Data Analytics or Software Sales. ....................................................9
     E.   In March 2025 Joanna Cohen Joins Percepta. .......................................11
     F.   Nearly a Year after Radha's Departure and Eight Months After Joanna's,
          Palantir Files this Case. ...............................................................14

III. LEGAL STANDARD ........................................................................15

IV.  ARGUMENT ..................................................................................16
     A.   Palantir Cannot Show Irreparable Harm Absent an Injunction. ...................16
          1.   Palantir Has Shown No Harm to Its Relationship with Its
               Customers. ........................................................................17
          2.   Palantir Has Made No Showing Regarding Imminent Disclosure or
               Use of Any Confidential Information. .......................................20
          3.   Absent Evidence of Imminent Harm, Palantir Cannot Rely on the
               PIIA. ...............................................................................22
     B.   Palantir Has Not Shown It is Likely to Succeed on the Merits. ..................24
          1.   Palantir's Non-Compete Claims Are Unlikely to Succeed.....................24
          2.   Palantir's Solicitation Claims Are Unlikely to Succeed. .....................35
          3.   Palantir's Confidentiality and Return of Property Claims Against
               Joanna are Moot. ..............................................................39
          4.   The Tortious Interference Claim Against Hirsh is Unlikely to
               Succeed. ..........................................................................40
     C.   The Balance of Equities Weigh in Favor of Hirsh, Radha, and Joanna—
          Young Professionals Who Are Fairly Applying Their Skills in a Rapidly
          Evolving Sector.........................................................................41
     D.   Palantir's Requested "Extracontractual" Relief Is Legally Unsupported
          and Should Be Denied. ...............................................................43

V.   CONCLUSION................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Accenture LLP v. Trautman*,
No. 21-CV-2409 (LJL), 2021 WL 6619331 (S.D.N.Y. June 8, 2021) ...................................29

*All Am. Adjusters, Inc. v. Acceleration Nat. Ins.*,
No. 96-CV-9344 (MBM), 1997 WL 732445 (S.D.N.Y. Nov. 25, 1997) .........................40, 41

*Am. Airlines, Inc. v. Imhof*,
620 F. Supp. 2d 574 (S.D.N.Y. 2009).....................................................................................44

*Am. Fed. Grp., Ltd. v. Rothenberg*,
136 F.3d 897 (2d Cir. 1998)...................................................................................................43

*Am. Inst. of Chemical Eng'rs v. Reber-Friel Co.*,
682 F.2d 382 (2d Cir. 1982)...................................................................................................42

*Ardis Health, LLC v. Nankivell*,
No. 11-CV-5013 (NRB), 2011 WL 4965172 (S.D.N.Y. Oct. 19, 2011) ...............................23

*Bajan Grp., Inc. v. Consumers Interstate Corp.*,
958 N.Y.S.2d 59 (Sup. Ct. 2010)...........................................................................................36

*Baker's Aid v. Hussmann Foodservice Co.*,
830 F.2d 13 (2d Cir. 1987).....................................................................................................23

*Barchha v. TapImmune, Inc.*,
No. 12-CV-8530 (PKC), 2013 WL 120639 (S.D.N.Y. Jan. 7, 2013)......................................44

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ..................................................................................................... *passim*

*Bijan Designer for Men, Inc. v. Katzman*,
No. 96-CV-7345 (BSJ), 1997 WL 65717 (S.D.N.Y. Feb. 7, 1997) .......................................37

*Brown & Brown, Inc. v. Johnson*,
980 N.Y.S.2d 631 (4th Dep't 2014).......................................................................................31

*Buckingham Corp. v. Karp*,
762 F.2d 257 (2d Cir. 1985)...................................................................................................16

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
601 F.2d 48 (2d Cir. 1979).....................................................................................................15

*Catalogue Serv. of Westchester, Inc. v. Henry*,
    107 484 N.Y.S.2d 615 (2d Dep't 1985)................................................................29

*Cenveo Corp. v. Diversapack LLC*,
    No. 09-CV-7544 (SAS), 2009 WL 3169484 (S.D.N.Y. Oct. 1, 2009)....................36

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011)................................................................................44

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
    369 N.E.2d 4 (N.Y. 1977)...............................................................................28, 43

*Consol. Brands, Inc. v. Mondi*,
    638 F. Supp. 152 (E.D.N.Y. 1986) ......................................................................43

*Conte v. Emmons*,
    895 F.3d 168 (2d Cir. 2018).................................................................................41

*Crippen v. United Petroleum Feedstocks, Inc.*,
    666 N.Y.S.2d 156 (1st Dep't 1997) .....................................................................31

*Crye Precision LLC v. Duro Textiles, LLC*,
    No. 15-CV-1681 (DLC), 2016 WL 1629343 (S.D.N.Y. Apr. 22, 2016), *aff'd*,
    689 F. App'x 104 (2d Cir. 2017) ........................................................................28

*DS Parent, Inc. v. Teich*,
    No. 5:13-CV-1489 (LEK) (DEP), 2014 WL 546358 (N.D.N.Y. Feb 10, 2014) ..............28, 29

*E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*,
    828 F.Supp.2d 526 (E.D.N.Y. 2011) ..................................................................40

*EarthWeb Inc. v. Schlack*,
    71 F. Supp. 2d 299 (S.D.N.Y. 1999).............................................................31, 44

*Equibal, Inc. v. 365 Sun LLC*,
    No. 21-CV-6254 (VB), 2024 WL 1526178 (S.D.N.Y. Apr. 9, 2024) ...................22

*Fareportal, Inc. v. Jason Ware, and Travana, Inc.*,
    No. 653995/16, 2018 WL 4031630 (N.Y. Sup. Ct. Aug. 23, 2018).......................33

*Fid. Info. Servs., Inc. v. Katz*,
    No. 109-CV-766 (LEK) (DRH), 2009 WL 10721269 (N.D.N.Y. Aug. 4, 2009)........18, 19, 21

*Flatiron Health, Inc. v. Carson*,
    No. 19-CV-8999 (VM), 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020)
    ................................................................................................................27, 30, 33

*Forschner Group v. Arrow Trading Co.*,
   124 F.3d 402 (2d Cir. 1997).................................................................................44

*FTI Consulting, Inc. v. Graves*,
   2007 WL 2192200, No. 05-CV-6719 (NRB), (S.D.N.Y. July 31, 2007) ..............................36

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)..................................................................................16

*H. Meer Dental Supply Co. v. Commisso*,
   702 N.Y.S.2d 463 (App. Div. 2000) ......................................................................28

*Heartland Sec. Corp. v. Gerstenblatt*,
   No. 99-CV-3694 (WHP), 2000 WL 303274 (S.D.N.Y. Mar. 22, 2000) ..............................30

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
   No. 1:21-CV-38 (MKV), 2021 WL 535485 (S.D.N.Y. Feb. 12, 2021) ..............................23

*Iannucci v. Segal Co.*,
   No. 06-CV-4720 (PKL), 2006 WL 8407380 (S.D.N.Y. June 27, 2006) .........................22, 23

*Impax Media Inc. v. Ne. Advert. Corp.*,
   No. 17-CV-8272, 2018 WL 358284 (S.D.N.Y. Jan. 10, 2018) ..............................18

*Int'l Bus. Machs. Corp. v. Visentin*,
   No. 11-CV-399 (LAP), 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437
   F. App'x 53 (2d Cir. 2011) ...............................................................29, 30, 31

*Investor Access Corp. v. Doremus & Co.*,
   588 N.Y.S.2d 842 (1st Dep't 1992) ......................................................................38

*Janus et Cie v. Kahnke*,
   No. 12-CV-7201 (WHP), 2013 WL 5405543 (S.D.N.Y. Aug. 29, 2013) ..............................44

*King Spider LLC v. Panda (Hong Kong) Tech. Co.*,
   No. 24-CV-2668, 2025 WL 89123 (S.D.N.Y. Jan. 14, 2025) ..............................16

*Locke v. Tom James Co.*,
   No. 11-CV-2961 (GBD), 2013 WL 1340841 (S.D.N.Y. Mar. 25, 2013)..............................39

*Med. Soc'y of State of N.Y. v. Toia*,
   560 F.2d 535 (2d Cir. 1977)..................................................................................15

*Mercer Health & Benefits LLC v. DiGregorio*,
   307 F. Supp. 3d 326 (S.D.N.Y. 2018)..................................................................38

*Metito (Overseas) Ltd. v. Gen. Elec. Co.*,
   No. 05-CV-09478 (GEL), 2009 WL 399221 (S.D.N.Y. Feb. 18, 2009) .........................16, 37

*Moore v. Consol. Edison Co. of N.Y.*,
409 F.3d 506 (2d Cir. 2005)................................................................15

*Natsource LLC v. Paribello*,
151 F. Supp. 2d 465 (S.D.N.Y. 2001).................................................20

*New Hope Fam. Servs. v. Poole*,
966 F.3d 145 (2d Cir. 2020)................................................................16

*P.C. v. Skavina*,
780 N.Y.S.2d 675 (3d Dep't 2004).....................................................30

*Permanens Cap. L.P. v. Bruce*,
No. 21-CV-10525 (JSR) (RWL), 2022 WL 3442270 (S.D.N.Y. July 22, 2022) ...................31

*Permanens Cap., L.P. v. Bruce*,
No. 21-CV-10525 (JSR) (RWL), 2022 WL 4298731 (S.D.N.Y. Sept. 19, 2022)................................................................36, 38

*Poller v. BioScrip, Inc.*,
974 F.Supp.2d 204 (2013) (Oetken, J.).................................................24

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
813 F. Supp. 2d 489 (S.D.N.Y. 2011)..............................................29, 34, 35

*QBE Ams., Inc. v. Allen*,
No. 22-CV-756 (JSR), 2022 2022 WL 889838 (S.D.N.Y. Mar. 24, 2022)..........................36

*Reed Elsevier Inc. v. Transunion Holding Co.*,
No. 13-CV-8739 PKC, 2014 WL 97317 (S.D.N.Y. Jan. 9, 2014).........................21

*Rodriguez ex rel. Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999)................................................................16

*Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*,
780 N.Y.S.2d 675 (3d Dep't 2004).....................................................30

*Shepard Indus., Inc. v. 135 E. 57th St., LLC*,
No. 97-CV-8447 (DAB), 1999 WL 728641 (S.D.N.Y. Sept. 17, 1999) ................19

*Silipos, Inc. v. Bickel*,
No. 1:06-CV-2205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006).........................27

*Slomin's Inc. v. Gray*,
575 N.Y.S.2d 545 (2d Dep't 1991).....................................................38

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ........................................................15, 41

*Superb Motors Inc. v. Deo*,
No. 2:23-CV-6188, 2023 WL 5952145 (OEM) (ST), (E.D.N.Y. Aug. 25,
2023) ....................................................................................................................19

*TomGal LLC v. Castano*,
No. 22-CV-9516 (JGK), 2022 WL 17822717 (S.D.N.Y. Dec. 19, 2022)
..................................................................................................................19, 22, 41

*University Sports Publ'ns Co. v. Arena Media Networks, LLC*,
No. 109436/06, 2007 WL 7130745 (N.Y. Sup. Ct. Feb. 9, 2007).........................33

*Veramark Techs. v. Bouk*,
10 F. Supp. 3d 395 (W.D.N.Y. 2014) ......................................................31, 33, 42

*Vortexa Inc. v. Cacioppo*,
No. 1:24-CV-02065 (JLR), 2024 WL 2979313 (S.D.N.Y. June 12, 2024).....................18, 21

# I.   PRELIMINARY STATEMENT[1]

Palantir—a software development behemoth with a market capitalization of over $400B—has brought this case to muscle-out a 35-person New York-based AI startup, not to protect any legitimate interest.  To do so, it seeks to use sweepingly overbroad restrictive covenants, which it forces each of its thousands of employees to sign, to sideline three young professionals at the start of their careers.  Palantir does so even though the record shows Percepta does not have a competitive AI platform to Palantir's and, in fact, was a prospective partner that Palantir itself approached just last year.  Indeed, weeks of expedited discovery confirmed that Percepta is not a Palantir "replica."  It is an AI-focused consultancy and implementation firm that embeds engineers inside a customer's environment to stitch together open-source and third-party AI tools—it does not sell a data analytics product, platform, data repository, or ontology.  In truth, Palantir is looking to scare others away from leaving and to destroy Percepta before it can grow further, with collateral damage squarely visited on the individual defendants Radha Jain, Joanna Cohen, and Hirsh Jain.  There is no emergency here, and Palantir does not come close to demonstrating its entitlement to the relief it seeks, which would affirmatively alter, not preserve, the status quo.  The Court should deny the application in its entirety for any or all of the following independently sufficient reasons.

***First***, and perhaps most crucially, Palantir has failed to show that it will suffer any harm—much less imminent, irreparable harm—absent injunctive relief.  New York law holds that irreparable harm is the decisive prerequisite for the issuance of a preliminary injunction.  Here, the record is clear that none exists: indeed, Palantir's own corporate representative testified that Palantir is simply "***exploring***" whether Percepta "***could someday harm us***," even as he

---

[1] Unless otherwise noted, emphases are added, and internal citations and quotations are omitted.

freely admitted that "***it's difficult to say in what ways it would***." Ex. 200 ("Palantir Dep.") 158:25–159:19; 138:20–139:13; 164:5–9; *see also id.* 163:1–4 ("Q. Are you aware of any Palantir customer that has terminated its contract with Palantir because of Percepta's launch? A. ***In the literal specific, I'm not aware, no***.").

Although these corporate admissions are fatal, Palantir persists, claiming a "substantial risk" that its confidential information will be disclosed to "a competitor seeking to replicate Palantir's business." Dkt. 44 ("Mot.") at 33. That contention fails for a straightforward reason: this is not a trade-secrets case, and the "inevitable disclosure" doctrine—the source of the "substantial risk" standard Palantir tries to import—does not apply (and is not satisfied in any event). Tellingly, Palantir's First Amended Complaint omits the dozen "trade secrets" references that appeared in its original Complaint. Equally as important, Palantir does not identify what confidential information it alleges is "at risk" with any particularity, much less attach any to its application for the Court's independent evaluation. This is not surprising given that the record reflects ***zero evidence that any of Palantir's confidential information has or will be used*** by any of Hirsh, Radha, or Joanna following their departures from Palantir—much less in their new roles at Percepta. To the contrary, comprehensive searches at Percepta turned up ***no*** Palantir materials, and the evidence shows that the "blurry screenshots" on Joanna's phone—which the unrebutted evidence shows were taken in good faith to help Joanna wrap up her work at Palantir and then never again revisited—would be useless to Percepta and are by now stale regardless.

Given its failure to establish the single most important requirement to obtain a preliminary injunction, the Court can and should deny Palantir's application on that basis alone.

***Second***, Palantir's application additionally fails because it cannot show that it is likely to prevail on the merits of its claims, each of which turns on post-employment restrictive covenants

that are facially overbroad and unenforceable. Hirsh, Radha, and Joanna each signed a version of Palantir's Proprietary Information and Inventions Agreement (the "PIIA") as a condition of employment with Palantir, with Radha and Joanna's agreements containing a non-compete provision so broad that—if enforced according to Palantir's interpretation—it would prevent them from working for any company that uses AI to help customers or clients to solve problems anywhere in the world for 12 months. Palantir is effectively claiming as its competitive moat the business of assisting customers with "enhance[ing] their operational efficiency through use of AI technology." Mot. at 10. This describes virtually every AI company in the world (and plenty of non-AI companies as well), and demonstrates that Palantir's interpretation of its noncompete is meant to stifle competition, not protect its confidential information or customer relationships.

Palantir's other claims of breach are unlikely to succeed for analogous reasons. Its customer and employee non-solicitation claims are predicated on overbroad and unenforceable restrictions in the PIIA, and, as detailed below, also lack necessary factual support. For example, Palantir claims that the PIIA prohibits Joanna from working with a customer at Percepta that not only never previously engaged Palantir, but in fact rejected Palantir's ██████████ well before commencing work with Percepta. Palantir's claims of "poaching" are similarly fatally undercut by the fact that the three individuals who left it for Percepta have all testified that they were not "solicited" and were in fact already exploring opportunities elsewhere. Likewise, Palantir's confidential information and return of property claims are now moot, and, in any event, have failed to give rise to any actionable damages.

*Finally*, the equities do not favor Palantir. Palantir has ignored settled New York precedent and leveraged its unequal bargaining power to compel prospective employees to accept overbroad restraints that suppress competition and employee mobility. Enforcing

Palantir's covenants as it urges would chill legitimate market competition, block service-only firms that neither build nor sell a software platform, and devastatingly sideline young professionals from participating in one of the economy's largest and fastest-growing fields, where being benched for a year would have tangible consequences. Palantir cannot cite any serious countervailing equity because, beyond its speculative assertions and general claims, it has not shown (nor could it) that any of Hirsh, Radha, or Joanna has or imminently plans to disclose any Palantir confidential information, or otherwise will cause disruption to Palantir's business.

For all of these reasons, and those detailed below, Palantir's application should be denied.

## II.    FACTUAL BACKGROUND

### A.    Palantir Requires Overbroad Restrictive Covenants.

According to its SEC filings, Palantir, a company worth over $440 billion with over 4,400 full-time employees, "build[s] software"—specifically, four main operating systems, named Palantir Gotham, Palantir Foundry, Palantir Apollo, and Palantir AIP—"that empower[] organizations to effectively integrate their data, decisions and operations at scale." Ex. 202 at 4–5.[2] Palantir says it generates "substantially all of our revenue from customers purchasing our platforms and products," largely through "the sale of subscriptions to access [these] software platforms." *Id.* at 19, 71.

As a precondition of employment, Palantir requires employees to sign a PIIA. RJ Decl. ¶ 3; Cohen Decl. ¶ 3; HJ Decl. ¶ 4; Palantir Dep. 45:7–13. The PIIAs contain broad restrictive covenants that purport to limit employees' activities for 12-24 months after they leave Palantir. As relates to solicitation, the PIIAs attempt to constrain former employees' ability to contact

---

[2] "Ex. _" (starting at 200 *et. seq.*) refers to exhibits attached to the accompanying Declarations of Steven N. Feldman ("Feldman Decl."), Hirsh Jain ("HJ Decl.") and Joanna Cohen ("Cohen Decl.").

Palantir's current or potential customers, or its employees. Specifically, the PIIAs provide that the former employee "shall not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purpose of conducting business that is competitive or similar to that of [Palantir] . . . ." Dkt. 33-1 § 6.1(a) (Hirsh's PIIA); Dkt. 33-2 § 6.1(a) (Radha's PIIA); Dkt. 33-3 § 6.1(a) (Joanna's PIIA). "Customer" is defined to include "all persons or entities that have used or inquired of [Palantir's] services at any time" during the two years preceding the employee's departure—irrespective of whether that employee ever worked with that customer. *Id.* The language regarding employee non-solicitation is similarly expansive, prohibiting each of Radha, Joanna and Hirsh from "directly or indirectly" "solicit[ing], or recruit[ing], or attempt[ing] to solicit, or recruit, any employee of [Palantir] to leave their employment," and from "contacting" any employee of Palantir or "causing" an employee of Palantir to be contacted, "for the purpose of leaving employment with" it. *Id.* at § 6.2.

Radha and Joanna's PIIAs (but not Hirsh's) contain an additional restriction: an overbroad non-competition clause that prohibits each from "perform[ing] the job functions that [she] performed during [her] employment with [Palantir] . . . for an entity engaged in the same or similar business as the Company and/or [any of its subsidiaries worldwide], including those engaged in the business of selling analytical software, whether existing or planned" for a period of one year. Dkts. 33-2, 33-3 § 6.3. In its papers, Palantir contends that "the same or similar business" is, variously, "innovating with applied AI" and "embedding AI into enterprise workflows . . . to increase operational efficiencies." Mot. at 2.

### B. General Catalyst Creates Percepta.

Percepta is an AI-focused consultancy and implementation company created and indirectly owned by the venture capital firm General Catalyst ("GC"). *See* Ex. 79 at 562. The

genesis of Percepta was GC's desire to create a company that could help other companies think through and execute "███████████████████" within their organizations, including by employing AI products offered by GC's existing portfolio companies.  Ex. 79 at 563 ("████████ ██████████████████████████████████████████████████████████ ███████████████████████"); *id.* at 556–57.  At a high level, Percepta's mission translates into a two-part approach: pair strategy (i.e., consultation) with hands-on engineering, and do it inside the customer's codebase and infrastructure, with bespoke software solutions— not software products sold off the shelf.  Ex. 203 ("Mathew Dep.") 217:16–21 ("We are not trying to be another data platform."); *id.* 229:11–14 ("We work directly within a customer's code bases and develop custom code and custom bespoke applications for them."); *see also* Ex. 204 ("RJ Dep.") 27:13–20; 144:5–145:21.

To launch the initiative, GC leaned heavily on its prior experience developing its Health Assurance Transformation Company (known as "HATCo"), and hired Athul Paul Jacob as Chief AI Officer and Constantinos Daskalakis as Chief Scientist (neither a former Palantir employee) to incubate its ideas and help bring the company to life.  HJ Decl. ¶ 13.  Later, due to the allure of building a company designed to act as a consultancy and implement the technology from GC's portfolio companies to create custom solutions for customers, Defendant Hirsh Jain joined Percepta as Chief Executive Officer.  *Id.* ¶¶ 10–12, 14.

Hirsh graduated from Harvard University in 2017, and after founding a biotechnology research company that specialized in the use of artificial intelligence to identify new drug candidates, joined Palantir.  *Id.* ¶¶ 2–3.  There, Hirsh worked ████████████████████ ████████████████  *Id.* ¶ 6.  His engineering work ████████████████████████ ██████████████████████████████████████████████████████.  *Id.* ¶ 7.

In 2024, Hirsh began seeking opportunities outside of the company. HJ Decl. ¶ 9. From June to July 2024, he had a series of discussions with GC executives about the firm's plans for its still-unnamed AI transformation company—what would eventually become Percepta. *Id.* ¶¶ 10–13. Through these discussions, Hirsh learned that GC intended to launch Percepta to provide transformation services by connecting and leveraging the various discrete solutions ███████████████████████████████████████████████████████████ ██████████. *Id.*

Hirsh resigned from Palantir in mid-July 2024. *Id.* ¶ 15. He was transparent with his Palantir colleagues that he was leaving to work for an AI startup affiliated with GC. *Id.* ¶¶ 15, 17–18. Hirsh left Palantir on good terms. Indeed, on August 6, 2024, Shyam Sankar, Palantir's Chief Technology Officer, emailed Hirsh to introduce him to investors at venture fund A* and stated: "As you build the future, I wanted to connect you with my favorite VCs at A* who are interested in learning more about what you are working on." *Id.* ¶ 20; Ex. 225; Ex. 226 (Sankar connecting Hirsh with investors at venture firm XYZ in January 2025).

Through a mutual friend, Hirsh was introduced to Thomas Mathew in November 2024. Mathew Dep. 22:18–23:20. At that time, Mr. Mathew had departed a different AI company and was considering starting his own company. *Id.* 23:18–24:11. He decided to join Percepta as a Co-Founder and Chief Technology Officer because he "didn't want to start a product company," and liked "the ambition that [GC] had for creating a totally net new type of company" that was not "generic B2B SaaS [Software as a Service]." *Id.* 29:15–30:5.

### C. Radha Jain Decides To Join Percepta.

Radha joined Palantir in January 2020, after graduating from college in 2019. Declaration of Radha Jain ("RJ Decl.") ¶¶ 2, 4. She started as a Forward Deployed Engineer, where her core work ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████. RJ Dep. 56:5–58:5.

In July 2021, Radha transitioned into a new role as an Engineering Lead, ████████

████████████████████████████████████████████████████ *Id.* 58:6–59:11.

████████████████████████████████████████████████████████████

*Id.*; *see also id.* 95:5–99:5.

Radha's final role at Palantir was as an AI Product Engineer. ██████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████ *Id.* 67:20–68:25; *see also* Palantir Dep. 84:1–16 (█████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ RJ Dep. 69:16–70:12;

70:21–23.  By mid-2024, feeling disenchanted and looking for opportunities to do more, she was

considering leaving Palantir to start her own company.  RJ Decl. ¶¶ 14–15.

In November 2024, Hirsh and Radha met up.  RJ Dep. 132:21–133:6.  The pair are

friends (*id.* 191:12–17), and a few weeks earlier Hirsh offered to introduce her to "his future

colleague at GC" so she could explore possible funding for her new venture.  *Id.* 192:4–193:25

(referencing Ex. 7) ("Q. Mr. Jain writes you … 'Hello, my friend, I hear through the rumor mill

that there may be new adventures coming.' Do you know what he was referring to? A. Yes, I

was thinking of starting a company.").  While they caught up, Radha asked what Hirsh was

working on, and he told her what he was doing for GC, including that GC had just bought a

hospital in Ohio called Summa Health ████████████████████████ RJ Dep.

205:24–207:3.  Radha was intrigued, and asked to speak to someone at GC.  *Id.* 206:25–207:3.

       Throughout November, Radha explored joining Percepta.  *Id.* 229:9–230:15; 234:2–14.

On November 13, she observed an early meeting with ████████, which would later

become Percepta's first client, to understand "were [she] to join Percepta, what [its] potential

first customer would look like."  *Id.* 306:10–307:8.  She did not participate substantively in the

meeting, which focused primarily on ██████ describing itself to Percepta.  *Id.* 307:18–308:2

("Q. Did you say anything during that call? A. No."); RJ Decl. ¶ 20.

       On November 19, Radha signed her offer with GC.  When she joined Percepta in

December 2024, the company had a general mandate from GC, but little else.  It had no name

and no website.  RJ Dep. 360:21–365:8; *id.* 329:21–330:9.  It had no offices, and it had none of

its own payroll or HR services.  *Id.* 350:3–16; Mathew Dep. 48:25–50:22.  When Radha left

Palantir, she sent a widely circulated farewell email, saying all she knew: that she would "be

staying in New York, joining the founding team of an AI startup with some ex-Palantirians."  Ex.

40; *see also* Ex. 206 ("Shankar Dep.") 161:10–164:23 (████████████████████████

████████████████████); Ex. 207.  Contrary to Palantir's allegations that Percepta

was working in a nefarious "stealth" mode, its founding team was not hiding their new mission,

there was simply limited information to share.  *See* Ex. 39 at 523 ("I have no reason to hide

[Percepta] . . . I'm excited about it . . . I've been telling whoever asks me[.]"); RJ Dep. 360:21–

365:8 ("I think it's absolute nonsense to say that this was private in any way.").

    **D.**    **Percepta Is an AI-Consulting and Engineering Company—It Does No Data
Analytics or Software Sales.**

       Core to Percepta's mission is its belief that pre-existing AI start-ups, including those

within GC's portfolio, are underutilized.  *See* Mathew Dep. 114:7–115:15 ("[T]here's a ton of

startups in the Valley that are creating incredible technology. They're at the frontier of what's happening in AI … [but] those portfolio companies are not actually being used at the enterprise at the level that one would expect.").  Percepta aims to bridge this gap and be at the cross-section of AI consulting and implementation.  Consequently, Percepta's engineering mandate is not to replace a customer's "data stack" with Percepta software products, but to stitch together both open-source and third-party AI tools— █████████████████████████████████

███████████████████████████████████████████████████

*See* Ex. 81 at -576; Mathew Dep. 172:6–174:6 (█████████████████████████████

████████████████████████████████████████████████

████████); 109:6–114:3 (████████████); *id.* at 226:9–16; *see also* RJ Dep. 27:13–20; 144:5–145:21.  These engagements create a "█████████████," where ███████████████

██████████████████████████████ Ex. 79 at 563 ("████████

████████████████████████████████████████████████

████████████████████████████████████"); *see also* Mathew Dep. 178:2–180:18; RJ Dep. 143:17–144:4 (████████████████████████

████████████████████).

Very simply put, Percepta integrates outside solutions and writes the last-mile software to make them work together in the customer's workflow.  Mathew Dep. 68:16–69:9. ████████

████████████████████████████████, reinforcing its consultancy engineering model. *Id.* 214:6–23 (Percepta "████████████████████████████████

████████).  This is further reflected by Percepta's compensation structure: ███████████

██████████████████████.  Ex. 79 at 560.

Because Percepta works within a customer's preexisting codebase to integrate third-party AI offerings, its engineers necessarily build on top of data integration platforms offered by companies like Snowflake, Databricks, and even Palantir. Mathew Dep. 65:7–14 ("We're not proposing [our clients] get rid of Databricks or Snowflake and we wouldn't propose anyone gets rid of Palantir. We would just work directly on top of it."); RJ Dep. 21:25–22:7 ("Many of our customers have, for example, Snowflake or one of the actual competitors to Palantir, and we will work on top of whatever data integration platform they already have."); *id.* 27:9–23.

To date, none of Percepta's clients has used Palantir's software. But as Percepta's CTO testified, Percepta "would have been happy to leverage [Palantir's] functionality … and actually drive money to Palantir by building on top of it." Mathew Dep. 68:16–70:17; *see also* RJ Dep. 19:18–21:24 ("We could work with a customer who [] already has Palantir, we could work on top of that . . . because we're not offering the same thing."). In fact, after Palantir's then-Enterprise Lead for Startups reached out to Percepta in January 2025, Percepta spoke with and considered partnering with Palantir. *See* Mathew Dep. 68:16–75:5 (describing various communications between Percepta and Palantir's Enterprise Lead for Startups); *see also* HJ Decl. ¶¶ 22–23.

### E.     In March 2025 Joanna Cohen Joins Percepta.

In August 2020, after graduating from MIT, Joanna joined Palantir as a Forward Deployed Engineer. Ex. 201 ("Cohen Dep.") 29:19–21; 30:10–16; 30:18–21. ███████████

████████████████████████████████████████████████████

███████████████  *Id.* 31:16–24; 49:8–14. In November 2021, she progressed to

Technical Lead, ███████████████████████████████████████████

████████████████████████████████████████. *Id.* 37:15–39:21;

42:9–19.

From February 2023 through March 2025, when she left Palantir, Joanna worked as an Enterprise Lead and Healthcare Lead, ██████████████████████████████████. Cohen Dep. 50:18–54:4. ████████████████████████████████████ ██████████████████. *Id.* ████████████████████████████████████ ██████████████████████████. *Id.*

By late 2024, after several years at Palantir, Joanna felt she had "been doing the same thing for a bit" and asked her manager about other internal roles. *Id.* 108:5–112:13. She also began looking externally. A mutual friend and Palantir colleague introduced her to Hirsh; the three met for coffee in November 2024. *Id.* 113:8–23. Hirsh then introduced Joanna to Thomas Mathew. Mathew Dep. 304:16–18; Cohen Dep. 121:6–10; Ex. 47. She was not hired at Percepta until February 2025, with Mr. Mathew as her hiring manager. Mathew Dep. 275:25–276:14. By then, Percepta had begun work with its first customer and was seeking a junior engineer. RJ Dep. 347:19–348:2. Joanna resigned from Palantir on February 24 and worked through March 4 to ensure a smooth handoff, including two days at the start of her honeymoon. Cohen Dep. 252:8–254:6.

On February 25, as she wrapped up her work, Joanna took a series of iPhone photos of high-level materials—such as ██████████████████ and draft diagrams—solely to help her complete tasks during her offboarding and while in transit, using her iPhone as an "extra screen." Cohen Dep. 271:16–273:14. She did so to facilitate her transition, not to misappropriate information. Cohen Decl. ¶¶ 21-23. Palantir has not attached any of these images to its motion; had it done so, the Court would see that much of the content is public-facing material drawn from Palantir's own website. Cohen Decl. ¶ 22. The photos were part of a rushed, good-faith transition after she gave notice. Cohen Dep. 261:7–265:21; 271:16–273:14. She did not share

the images, she never used them at Percepta, and—following her honeymoon (which started on March 2)—she forgot they existed. *See* Cohen Dep. 273:15–21; *id.* 267:20–269:21; Cohen Decl. ¶¶ 23, 29. Following discovery, there is zero evidence to suggest otherwise.

Consistent with her efforts to transition her duties and her team, Joanna also Slacked herself three of the documents she photographed.[3] She used her Slack as a running to-do list, sending herself documents that she needed to read or reference. Cohen Dep. 296:8–297:3; 324:11–18. Joanna did not retain these documents: not one was found on her device following a forensic image and search. *See* Feldman Decl. ¶ 13. Because Palantir did not immediately backfill Joanna's position, she spent her final days helping her team identify new leads aligned with their interests. Cohen Dep. 331:18–335:12. To that end, she reviewed Highspot materials across multiple industries and made placement recommendations for the employees she managed. *Id.*; *see also* Ex. 209 ("Greenspan Dep.") 119:22–126:15 (referencing Ex. 74); 155:8–159:9.

Throughout her final days at Palantir, Joanna worked hard to leave her team and her projects in a "good space." Cohen Dep. 334:15–335:12; Cohen Decl. ¶¶ 16–19. Joanna was transparent, telling colleagues she was leaving "for a startup" with some "ex-Palantir people." Cohen Dep. 236:2–241:16 (describing who she spoke to and what she disclosed about her departure from Palantir). Palantir itself expressed no contemporaneous concern with Joanna's activities—███████████████████████████████████████████████████████████.

---

[3] Palantir's renewed motion asserts that Joanna downloaded four documents—including an "████████████████████"—whereas its original submission described three. *See* Dkt. 10 (Wendt Decl.). This eleventh-hour addition warrants skepticism as to the document's purported confidentiality, particularly considering Ms. Wendt's testimony that the original three documents were the only ones "████████████████████" Ex. 208 ("Wendt Dep.") 91:7–10. As with the screenshots, Palantir has attached none of these materials and has not provided the "████████████████████" to Defendants or their counsel.

██████████████████████████████████████████

██ .  Wendt Dep. 33:4–35:12; *see also* Greenspan Dep. 149:5–25 (███████████████

██████████████████████████████████████████

██████ ).

Joanna has not looked at any of the screenshots on her phone since leaving Palantir, let alone used any of the information from them while performing her new, engineering-focused role at Percepta.  Cohen Decl. ¶¶ 23, 29.

### F.    Nearly a Year after Radha's Departure and Eight Months After Joanna's, Palantir Files this Case.

On October 30, 2025—about a month after Percepta's official public launch; nearly a year after Radha notified Palantir that she was leaving to "join[] the founding team of an AI startup with some ex-Palantirians" (Ex. 40); and eight months after Joanna openly left to do the same—Palantir filed suit against Radha and Joanna, alleging an intricate scheme to surreptitiously create a Palantir "copycat."  *See* Dkt. 1.  Palantir did so without warning or notice, and without any attempt to learn more about Percepta's business or either Radha or Joanna's roles within Percepta before filing suit.  HJ Decl. ¶ 34; RJ Decl. ¶¶ 42–44, 46; Cohen Decl. ¶ 30.

After Palantir filed its initial complaint and motion, Radha and Joanna stipulated to a temporary restraining order that delivered the interim relief Palantir requested—without admitting any wrongdoing and to allow for the expedited discovery that would reveal that Palantir's motion lacks any legal basis.  Dkt. 22.  Specifically, Radha and Joanna agreed to promptly forensically image the devices in their possession that they used to perform any Palantir work; to return any Palantir materials and then delete them post-imaging; and to refrain from using or disclosing Palantir information, if any, in their possession.  *Id.*  They further agreed to "garden leave" pending resolution of Palantir's motion.  *Id.*

On December 11, Palantir filed a First Amended Complaint, adding claims against Hirsh and seeking "extracontractual relief" that would prohibit him from operating as Percepta's CEO for one year, notwithstanding that he is not subject to a non-compete.  Tellingly, although the Defendants' PIIAs require confidential arbitration of "any and all controversies, claims, or disputes," other than for injunctive relief (*see* Dkts. 33-1, 33-2, 33-3), Palantir has not brought any claims in arbitration.

Following entry of the stipulated temporary restraining order, the parties engaged in extensive, expedited discovery.  This included the production of documents from Radha and Joanna's respective imaged devices, seven depositions—including of Palantir and Percepta—and document productions from Percepta and GC pursuant to third-party subpoenas.  Nothing in discovery demonstrated or even suggested that Hirsh, Radha, Joanna, or anyone else at Percepta has ever used Palantir's information, confidential or otherwise.

## III.  LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted."  *Med. Soc'y of State of N.Y. v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977). "[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 (2d Cir. 1979).

Accordingly, a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).  This requires a movant to establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) both serious questions on the merits and a balance of hardships decidedly favoring the movant; and (3) that a preliminary injunction is in the public interest.  *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102,

106 (2d Cir. 2025) (summary order).  In assessing whether the movant has met this heavy burden, the Court "is *not* required to accept [the movant's] allegations as true or draw all reasonable inferences in their favor."  *King Spider LLC v. Panda (Hong Kong) Tech. Co.*, 2025 WL 89123, at *1 (S.D.N.Y. Jan. 14, 2025) (citing *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020)).  Palantir cannot demonstrate even one of these elements, let alone all of them.

## IV. ARGUMENT

### A. Palantir Cannot Show Irreparable Harm Absent an Injunction.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999); *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) ("The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction.").  To meet its burden, Palantir "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

Here, Palantir argues that there is "(i) a substantial risk of disclosure of Palantir's confidential information to a competitor seeking to replicate Palantir's business from documents or employees freshly removed from the Company; and (ii) harm to Palantir's valuable relationships with its customers."  Mot. at 33.[4]  Yet, as set forth below, beyond making these

---

[4] Palantir's "substantial risk" argument is merely the "judicially disfavored" "inevitable disclosure" doctrine in disguise.  That doctrine arises in trade-secret cases and, only in narrow circumstances, permits a substitute for proof of actual disclosure where the nature of the new role makes disclosure "inevitable."  *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 2009 WL 399221, at

conclusory assertions, Palantir has made **absolutely zero** showing that it stands to suffer imminent, concrete harm absent the issuance of injunctive relief. On this basis alone, its motion must be denied.

> **1.    Palantir Has Shown No Harm to Its Relationship with Its Customers.**

Palantir's claim that it will suffer irreparable harm absent injunctive relief because of the "harm to Palantir's valuable relationships with its customers" collapses under basic scrutiny. Indeed, Palantir has not identified **even one customer** that it has lost (or stands to lose) because of Defendants' conduct or Percepta's launch. Palantir Dep. 163:1–4 ("Q. Are you aware of any Palantir customer that has terminated its contract with Palantir because of Percepta's launch? **A. In the literal specific, I'm not aware, no.**").

By Palantir's own account, the one customer it suggests it may have "lost"—███████—███████████████████████████████████████████████████████████████████████████. Palantir has offered no evidence to support its claim that this was a head-to-head battle, or that it "lost" this business because of Percepta. *See id.* 178:12–20 ("Q. Do you know or are you assuming that ████████ did not sign a contract with Palantir because of Percepta? A. I -- I think with any decision, there's a million reasons. And that very well could be a strong one. But I -- we wouldn't know unless they told us. Q. So you don't know, correct? A. Correct.").[5] Palantir's reliance on ████████ as a means of showing irreparable harm therefore fails because "it speaks only to the likelihood that [Palantir] cannot secure new business, not the likelihood that it will

---

*11 (S.D.N.Y. Feb. 18, 2009). This is not a trade-secret case, and the Court should reject Palantir's attempt to import that doctrine and evade its attendant burdens.

[5] Percepta did not even exist as a formal entity when Palantir was supposedly pitching it. Palantir Dep. 141:20–142:24 ████████████████████████████████████████████ ███████████████████████████████████████████.

lose an existing customer." *Vortexa Inc. v. Cacioppo*, 2024 WL 2979313, at \*15 (S.D.N.Y. June 12, 2024).

Palantir also grasps at straws when it argues that "Percepta is actively targeting Palantir's major healthcare customers." Mot. at 12 (identifying ████████████ and ██████ ████████████ ). This too ignores reality: discovery revealed that Percepta has not done **any** work with either ████████████ or ████████████ . RJ Dep. 218:21–223:17 (noting that conversations with ████████████ "could be due diligencing the quality of the General Catalyst startups that [Percepta] would inevitably be working with."); Mathew Dep. 189:10–190:2 ("Q. 'Blues Association,' what is that? A. I actually don't know. I never heard of it."); HJ Decl. ¶ 24.

In the absence of showing that it has lost or imminently stands to lose a current customer, Palantir speculates that because Percepta is "targeting the same global customer base" as Palantir, the confidential customer information that Defendants allegedly learned while employed there "would be readily exploitable." Mot. at 35. This is not imminent, irreparable harm: it is a speculative hypothetical that Defendants could, at some unknown future date, "exploit" non-specific "confidential information" they learned about some unspecified number of unidentified Palantir customers. It is well-established that "speculation as to future losses lacks the imminence necessary for the drastic relief" Palantir seeks. *Fid. Info. Servs., Inc. v. Katz*, 2009 WL 10721269, at \*3 (N.D.N.Y. Aug. 4, 2009) ("While Plaintiff contends that Defendants have threatened three of its most important business relationships . . . Plaintiff has not shown that Defendants' actions have, in fact, caused these relationships to suffer or that Plaintiff faces imminent loss of these customers' business"); *see also Impax Media Inc. v. Ne. Advert. Corp.*, 2018 WL 358284, at \*6 (S.D.N.Y. Jan. 10, 2018) (denying preliminary injunction where plaintiff

failed to establish risk of imminent loss of customers or goodwill); *Shepard Indus., Inc. v. 135 E. 57th St., LLC*, 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999) (denying preliminary injunction due to conclusory allegations of harm to plaintiff's goodwill or reputation); *Superb Motors Inc. v. Deo*, 2023 WL 5952145, at *4 (E.D.N.Y. Aug. 25, 2023) (no irreparable harm where customer solicitation allegations were premised on a "highly attenuated chain of possibilities").

Palantir's own public filings from 2025 likewise demonstrate that far from suffering customer and revenue losses, its customer base, total contract values, and revenue are growing. Palantir Dep. 154:18–155:25 (referencing Exs. 211–213). Palantir's customer count was up 39% year-over-year in the first quarter of 2025, 43% in the second quarter, and 45% in the third quarter. *Id.* 148:6–153:4 (referencing Exs. 211–213). For the fourth quarter of 2025, Palantir projected acceleration—not decline—in revenue of approximately $1.327–$1.331 billion. *Id.* 155:15–18. Thus, far from showing customer loss, market decline, or reputational harm, Palantir's public filings show expanded customer adoption, ***notwithstanding Percepta's operations during this same period***.

Palantir's application is based solely on conjecture about what might happen in the future, not imminent, irreparable harm. This Court consequently should decline to issue emergency relief. *TomGal LLC v. Castano*, 2022 WL 17822717, at *5 (S.D.N.Y. Dec. 19, 2022) (no irreparable harm where plaintiffs claimed a loss could occur but lacked actual evidence of client loss or diminished goodwill); *Katz*, 2009 WL 10721269, at *3 (where employer did not

allege current decline in market share, speculation as to future losses "lack[ed] the imminence necessary for the drastic relief sought").[6]

### 2. Palantir Has Made No Showing Regarding Imminent Disclosure or Use of Any Confidential Information.

Additionally, Palantir has not—because it cannot—offer any evidence that any of the Defendants (or nonparties Percepta or GC) has ever used or is about to use any Palantir confidential information. Instead, it infers use based on its incorrect and misinformed assumptions about Percepta.

*First*, although Palantir makes much of the "blurry" screenshots that Joanna inadvertently retained on her phone following her departure from Palantir and the four documents she sent to her work phone from Slack, Palantir has again made no showing of their past or imminent use. Searches of Percepta and General Catalyst's files confirmed that they do not contain these materials—or any other Palantir information.[7] Ex. 214 at 7; Ex. 215 at 6. And in fact, these high-level documents would be of *no use* to Percepta. Some of the documents reference ███████ ███████████. *E.g.*, Palantir Dep. 180:19–181:3, 181:22–184:19, 244:5–13. Percepta does not do ██████████████. Mathew Dep. 250:9–251:17; RJ Dep. 373:7–374:3. Another handful are about ████████ which is █████████████████████████████████

---

[6] Plaintiff's irreparable-harm theory is distinguishable from *Natsource*, which turned on the "unique relationship" formed between a broker and his customers. *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). In the context of restrictive covenants, New York courts have treated "employees who work as brokers, traders, or salespersons" as sui generis based on "the unique relationships with the customers with whom they deal." *Reed Elsevier Inc. v. Transunion Holding Co.*, 2014 WL 97317, at *11 (S.D.N.Y. Jan. 9, 2014) (citing cases). Palantir has made no showing that Defendants' roles at Palantir were analogous to that of a commodities broker, or that their success at Palantir depended on their abilities to cultivate unique, extraordinary relationships with clients. *See Natsource*, 151 F. Supp. 2d at 473.

[7] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████. Wendt Dep. 58:7-16.

███████████████████████ Palantir Dep. 253:2–12.  Percepta does not offer this workflow.
Cohen Decl. ¶ 23.

The other images contain high-level materials, public-facing "use-case" outlines, "battle cards," and draft sales or marketing diagrams.  *E.g.*, Palantir Dep. 248:1–249:13, 256:8-259:8, 259:9-260:19; Cohen Decl. ¶ 22.  Given that one of Percepta's unique and foundational premises is that it works for customers with whom GC has a relationship (Mathew Dep. 159:13–160:17), Percepta has no use for these "confidential sales materials" and "customer engagement playbooks" (Mot. at 31).  In any event, courts regularly find these sorts of materials are not confidential.  *See Vortexa*, 2024 WL 2979313, at *9–11 (finding "battle card" and "use-case" documents were not confidential and collecting cases).  This is particularly true here, given that these documents are many months old and now likely stale.  *E.g.*, Palantir Dep. 180:23–181:21; 190:4–24; 199:24–200:4; 247:11–14; 256:23–257:7; 260:2–7; 262:3–13.

Palantir's deficient showing of irreparable harm is further underscored by its significant delay in filing this action.  *Katz*, 2009 WL 10721269, at *4.  Palantir's delay is evident both with respect to the documents Joanna sent to her "iPhone and then deleted" (Mot. at 21) and its general awareness of Percepta as an "AI startup" staffed by former Palantir employees (*id.* at 18).

During discovery, Palantir admitted that, in February 2025, at the time Joanna downloaded the Slack documents ██████████████████████████████████████████ ████████████████████████ Wendt Dep. 33:4–35:12; *see also* Mot. at 21.  If these documents are as sensitive as Palantir now claims, ████████████████████████████████████ ███████████████████████████████████████ Likewise, discovery confirmed that high-ranking employees at Palantir were aware of Percepta's activities in late 2024 and throughout

2025; Hirsh, Radha and Joanna each told Palantir personnel about their activities.  HJ Decl.
¶¶ 15, 17–19; RJ Decl. ¶¶ 26, 29–30, 44; Cohen Decl. ¶¶ 10–11, 14.  ***Yet no one at Palantir
raised non-competition concerns.***

Palantir will no doubt argue that it needed additional ██████" before determining
whether Joanna's was "██████████████████ Wendt Dep. 35:5–12.  Or that it did not
know the full scope of Percepta's operations until the company fully emerged from so-called
"stealth mode" in early October 2025.  Mot. at 2.  These arguments fall flat: "the length of delay
is measured from the time the plaintiff originally learned of the alleged violation or is put on
notice thereof, not when the irreparable injury allegedly begins."  *Equibal, Inc. v. 365 Sun LLC*,
2024 WL 1526178, at \*9 (S.D.N.Y. Apr. 9, 2024); *see also TomGal*, 2022 WL 17822717, at \*5
(plaintiffs' belief that litigation would not have been "'an efficient use of [their] resources,' upon
first learning of the defendants' alleged misbehavior" "significantly weakens any perception that
the plaintiffs had suffered an irreparable harm sufficient to support a preliminary injunction.").

**3.    Absent Evidence of Imminent Harm, Palantir Cannot Rely on the
PIIA.**

Attempting to resurrect its failed showing of irreparable harm, Palantir relies on the
PIIAs, which contain boilerplate language that "any breach of this Agreement will cause
irreparable harm to the Company for which damages would not be an adequate remedy."  Mot. at
33–34.  Citing one decision, Palantir argues that New York courts recognize that a showing of
irreparable harm is "strengthened significantly" where an employee "has previously
acknowledged . . . that his or her own breach of a restrictive covenant entitles the employer to
injunctive relief because of the irreparable injury the movant would incur."  Mot. at 34 (citing
*Iannucci v. Segal Co.*, 2006 WL 8407380 (S.D.N.Y. June 27, 2006)).

But these types of contractual provisions cannot be used as a substitute for actual irreparable harm, where, as here, a party has made no showing of irreparable harm that might be "strengthened" by pointing to the language of its contract. *See Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *8 (S.D.N.Y. Feb. 12, 2021) ("Parties may not contractually circumvent an independent judicial determination of irreparable harm.").

In stark contrast to the instant case, in *Iannucci*, the plaintiff presented concrete evidence of imminent solicitation of its "longstanding" clients by a former employee: both "before and after" the employee's termination, the plaintiff "began to receive termination notices from several of its clients," and two requested a waiver of the employee's restrictive covenant so that he "could perform services for them." *Iannucci*, 2006 WL 8407380, at *2. Palantir has shown nothing comparable. It instead speculates that, because Defendants were generally exposed to Palantir's business-development efforts, Palantir's "insights into customers' motivations and pre-existing relationships and loyalties **would be** readily exploitable" by Defendants to Palantir's detriment. Mot. at 35.

As discussed, Palantir has failed to identify even a single current customer who has contemplated—let alone threatened—to terminate its contract with Palantir in favor of Percepta, just as it has failed to identify any impending "exploitation" of these so-called customer insights by Defendants. Because Palantir has made no such showing of irreparable harm in the first instance, the language in its employment agreements is irrelevant. *Ardis Health, LLC v.*

*Nankivell*, 2011 WL 4965172, at *3 (S.D.N.Y. Oct. 19, 2011) ("A conclusory contract provision alone cannot establish irreparable harm.").

For all these reasons, Palantir has failed to make the mandatory showing of irreparable harm justifying the issuance of a preliminary injunction. The Court need go no further: Palantir's application for a preliminary injunction can and should be denied on this basis alone.

## B.     Palantir Has Not Shown It is Likely to Succeed on the Merits.

Even if the Court were to reach the likelihood of success on the merits prong, Palantir's application still fails because the success of its claims depends upon it showing the enforceability of its plainly unenforceable PIIA.[8]

In New York, powerful public policy considerations generally advise against sanctioning the loss of a person's livelihood. *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204 (2013) (Oetken, J.) Thus, a party seeking to enforce a restrictive covenant must show it is (1) no greater than necessary to protect the employer's legitimate interest; (2) reasonable in duration and geographic area; *and* (3) not unreasonably burdensome on the employee. *See id.* (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999)).

### 1.     Palantir's Non-Compete Claims Are Unlikely to Succeed.

#### a.     The non-compete is unenforceable because it is facially vague and overbroad.

Palantir's non-compete prohibits Radha and Joanna, for a period of 12 months, from "***directly or indirectly***" performing services for any "entity engaged in the same ***or similar*** business as [Palantir] and/or [***any of its subsidiaries worldwide***], including those engaged in the

---

[8] To the extent Palantir relies on its (deficient) showing of irreparable harm to satisfy the damages showing for its likelihood of success on the merits on its underlying claims, its claims also fail for the reasons set out in Section IV.A., *supra*.

business of developing and selling analytical software, ***whether existing or planned***." Dkt. 33-2, 33-3 at § 6.3. This sweeping prohibition is unenforceable and far greater than necessary to protect Palantir's stated interests.

   ***First***, by tying the non-compete to any entity engaged in a "similar" business as Palantir, the covenant is hopelessly vague, conceivably reaching any company that touches data analytics, data platforms, AI model building, or related software or consulting—even if the prospective employer's business, products, markets, or customers differ materially from Palantir's (as is the case here). The lack of any clear criteria by which "similarity" may be assessed is especially troubling given the sweeping way Palantir defines its business. *See* Palantir Dep. 73:11–16 (describing Palantir: "It's … a software company. We sell software. It's a consulting company. We do services for our customers. It's an analytics and AI company. We build models. I … think it can be all three and even depends, per customer, exactly how it's applied."). Palantir's motion defines its business around outcomes like "enhancing operational efficiency, embedding AI into mission-critical workflows, assisting with improving data-driven decision making through the use of AI, and delivering scalable enterprise automations." Mot. at 11; *see also* Palantir Dep. 107:15–18 ("Q. Under Palantir's own framing, AI companies that … operationalize AI in enterprise workflows fall within Palantir's competitive set, correct? A. I'd say so generally, yes."). Those are not Palantir-specific functions; they are the generic objectives of enterprise AI itself and describe virtually ***any company*** that seeks to implement AI into business.

   This is underscored by market evidence showing that organizations across industries now describe their offerings as reflecting AI's ubiquitous role in "enhancing efficiencies," "data-

driven decision making," and "scalable enterprise automations."[9]  Mot. at 11.  Fortune-500

adoption of "AI" language surged from 2022 to 2024, illustrating that these descriptors have

become table-stakes, not differentiators.[10]  Even companies historically known for tax software

or e-signatures now centrally tout "AI platforms" to automate workflows and decisions.[11]

Palantir's non-compete clause functions as an industry-wide dragnet that would capture almost

any enterprise deploying AI to improve operations and decision-making, potentially prohibiting

Radha and Joanna from working for companies as diverse as Box and NVIDIA.[12]  *See also*

Palantir Dep. 47:17–49:21 ███████████████████).

---

[9] *E.g.*, **CrowdStrike**, 2025 Form 10-K:
https://www.sec.gov/Archives/edgar/data/1535527/000153552725000009/crwd-20250131.htm
("Charlotte AI transforms hours of routine investigation into minutes, addressing critical skills
gaps and *enhancing operational efficiency*."); **ABB Group**: https://new.abb.com/industrial-
software/industrial-digital-transformation/playbook ("To ensure your digital transition progresses
smoothly, ABB has built a Digital Transformation toolbox *to drive and manage the process at
enterprise scale*."); **Schneider Electric**: https://www.se.com/ww/en/about-
us/newsroom/news/press-releases/schneider-electric-debuts-one-digital-grid-platform-to-help-
utilities-modernize-and-address-energy-costs-691af6851937b58c890951a3 (announcing an AI-
platform that "streamlines operator *workflows and decision-making*, helping utilities respond
more quickly and effectively.").

[10] Arize, "The Rise of Generative AI in SEC Filings,"
https://arize.com/wpcontent/uploads/2024/07/The-Rise-of-Generative-AI-In-SEC-Filings-Arize-
AI-Report-2024.pdf ("Over half (64.6%) of Fortune 500 companies mention AI in their most
recent annual report."); QuantumBlack AI by McKinsey, "Exploring opportunities in the
generative AI value chain," April 26, 2023,
https://www.mckinsey.com/capabilities/quantumblack/our-insights/exploring-opportunities-in-
the-generative-ai-value-chain (recognizing the diverse companies associated with "AI," ranging
from manufacturers of semiconductor devices to consulting firms).

[11] **Intuit**: https://investors.intuit.com/sec-filings/all-sec-filings/content/0000896878-25-
000035/intu-20250731.htm ("Our strategy is to be an AI-driven expert platform by connecting
customers to a virtual team of AI agents and AI-enabled human tax and financial experts.");
**Docusign**: https://www.sec.gov/Archives/edgar/data/1261333/000126133325000024/docu-
20250131.htm ("Docusign's IAM platform automates agreement workflows, uncovers actionable
insights, and leverages AI capabilities.").

[12] **NVIDIA**: "Nvidia is the Engine of AI," https://www.nvidia.com/en-us/about-nvidia/#nvidia-
is-the-engine-of-ai; **Box**: ("AI-powered document processing and metadata extraction.")
https://www.sec.gov/Archives/edgar/data/1372612/000095017025036261/box-20250131.htm.

Such a broad, amorphous provision does not withstand scrutiny under New York law. The decision in *Flatiron Health, Inc. v. Carson*, 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020), is particularly instructive. There, the court evaluated a non-compete close to Palantir's that restricted employees from working "directly or indirectly" for "any business" that was "similar to" the plaintiff's, including any "competing business," which the plaintiff defined as "providing software products, data analysis, data, clinical trial research services, analytics and electronic medical record systems to hospitals, physicians, community practices, health care centers, and pharmaceutical companies in the oncology industry." *Id.* at *19. The court found the terms of this non-compete overbroad, and highlighted the use of the term "similar to," finding it to be "impermissibly vague," noting that the clause "contains no criteria to provide notice of which similarities are and are not relevant," and thus "operates as a broad and amorphous restraint." *Id.* at *20–21. So too here. Indeed, the vagueness of its clause allows Palantir to enforce it at its whim, capturing any business "similar" to it, without providing "a list of clear and specific criteria by which similarity may be assessed." *Id.* at *24.

By attempting to sweep in every company seeking to "deploy AI-driven software . . . into enterprise workflows to enhance operational efficiency" (Mot. at 26), Palantir collapses any meaningful market boundaries. Its non-compete is plainly unenforceable. *See Flatiron*, 2020 WL 1320867 at *20; *see also Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006) (holding that a non-compete was overbroad insofar as it prevented an employee from working for any firm engaged in "the Business of the Company, expansively defined" such that the employee would "be barred from the entire industry"); *see also Crye Precision LLC v. Duro Textiles, LLC*, 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016) (holding that non-compete was "impermissibly vague and overbroad" where it prohibited the licensee from making

"similar" products but offered "no criteria to provide notice of what [the licensor] considers to be similar"), *aff'd*, 689 F. App'x 104 (2d Cir. 2017); *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 369 N.E.2d 4, 6 (N.Y. 1977) (non-compete that prevented employees from working for any firm that sold goods "similar" to those sold by the company did "no more than baldly restrain competition").

**Second**, Palantir has failed to establish that the non-compete is narrowly tailored to protect specific customer relationships or truly confidential technical knowledge. New York law holds that a party seeking injunctive relief must identify **with specificity** the protectable interests at issue. *See H. Meer Dental Supply Co. v. Commisso*, 702 N.Y.S.2d 463, 465 (App. Div. 2000) (denying preliminary injunction where plaintiff failed to identify the "specific data" constituting a protectable interest); *DS Parent, Inc. v. Teich*, 2014 WL 546358, at *7 (N.D.N.Y. Feb. 10, 2014) (denying a motion for preliminary injunction in part because of lack of specificity of protectable interest). Palantir has failed to meet this burden, repeatedly describing its "confidential information" at a high level (e.g., Palantir's "source code, internal demonstration workspaces, deployed customer workflows, and proprietary engagement strategies," as well as "deep insight into Palantir's customer relationships," Mot. at 1, 25) and, tellingly, declining to attach any of the purportedly confidential documents for the Court's review.

Indeed, as discussed above, Palantir has failed to substantiate its assertions that much of the purportedly "confidential" information to which Radha and Joanna had access while at Palantir is protectable **at all**. Much of what Palantir claims to be confidential information (such as "customer workflows" and "proprietary customer engagement strategies") is either largely publicly available (*see* Cohen Decl. ¶ 22), or—at most—akin to marketing and sales strategies, which courts have held are not protectable as trade secrets. *Accenture LLP v. Trautman*, 2021

WL 6619331, at *9 (S.D.N.Y. June 8, 2021) ("'marketing strategies,' or 'mere knowledge of the intricacies of a business' do not rise to the level of a trade secret"); *Int'l Bus. Machs. Corp. v. Visentin*, 2011 WL 672025, at *15 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011) (same).[13]

So too with respect to any customer information to which Radha or Joanna had "access" while at Palantir. *See Catalogue Serv. of Westchester, Inc. v. Henry*, 107 484 N.Y.S.2d 615, 616 (2d Dep't 1985) ("It is basic law . . . that remembered information as to specific needs and business habits of particular clients is not confidential.")); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 510 (S.D.N.Y. 2011) ("[F]ormer employees can use their recollection of information about customers, and such recollected information is not considered confidential for purposes of enforcing restrictive employment covenants."). For customer relationships to be protectable, the employee must have had a long-standing client relationship, and her services must have been "a significant part of the total transaction." *BDO Seidman*, 93 N.Y.2d at 391–92. Here, Palantir presented no facts showing that either Radha or Joanna had longstanding client relationships that they acquired at Palantir and that are somehow threatened by their decision to move on to Percepta—let alone that their services were a significant part of the "total transaction." *DS Parent*, 2014 WL 546358, at *10 ("Plaintiffs have not shown that [defendant's] customer relationships constitute a protectible interest" where they "do not specify what made these relationships unique or valuable.").

For these reasons, Palantir is unlikely to be able to demonstrate the existence of an enforceable contract, let alone a breach of that contract.

---

[13] Defendants' historical "access" to Palantir's "source code" is also of no moment given that Percepta has not developed any competing software product or platform. *See* Section B.1.b.

**b.    The Court should strike the non-compete.**

Because Palantir's non-compete is unenforceable as written, the Court should exercise its discretion to strike it.  Blue-penciling is only appropriate if ***Palantir*** demonstrates "an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct."  *Visentin*, 2011 WL 672025, at *24; *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 780 N.Y.S.2d 675 (3d Dep't 2004) (striking restrictive covenant where "[p]laintiff has not demonstrated, or even argued, an absence of anticompetitive misconduct on its part").  Here, Palantir has not even acknowledged the overbreadth of its non-compete, let alone made the requisite showing that it operated in good faith while systematically imposing it on thousands of employees.  *Heartland Sec. Corp. v. Gerstenblatt*, 2000 WL 303274, at *10 (S.D.N.Y. Mar. 22, 2000) (declining to blue-pencil where, *inter alia*, plaintiff "failed to demonstrate that it did not overreach or use dominant bargaining power in reaching the agreements with defendants").

Once again, *Flatiron* is instructive.  There, as discussed above, the court declined to blue-pencil a facially broad non-compete, emphasizing that the covenant was a condition of the employee's initial employment, imposed across the board on "all employees," and its overbreadth was "obvious," undermining any claim of good faith.  *Flatiron*, 2020 WL 1320867, at *24 ("No drafter could reasonably overlook that the language of the 'similar to' prong is impermissibly vague and overbroad.").  The same is true here, where Palantir uses its disproportionate bargaining power to impose its obviously overbroad non-compete—containing the same ambiguous "similar to" language as the non-compete in *Flatiron*—on every employee as a condition of employment, irrespective of role.  Palantir Dep. 45:7-13.

Public policy considerations also weigh in favor of striking Palantir's non-compete.  As the *Flatiron* court noted, partial enforcement should not reward overreaching or allow employers to rely on courts to rewrite plainly invalid restraints after the fact.  *Flatiron*, 2020 WL 1320867,

at *23 ("If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too."). Other courts agree. *See Permanens Cap., L.P. v. Bruce*, 2022 WL 4298731, at *1 (S.D.N.Y. Sept. 19, 2022) (declining to "narrow" restrictive covenants "by striking some of their language" and collecting cases); *Veramark Techs. v. Bouk*, 10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014) ("A court should not attempt to partially enforce a non-compete provision where its infirmities are so numerous that the court would be required to rewrite the entire provision."); *EarthWeb Inc. v. Schlack*, 71 F. Supp. 2d 299, 313 (S.D.N.Y. 1999) (declining to blue-pencil after finding that the "employment agreement as a whole overreaches"); *see also Crippen v. United Petroleum Feedstocks, Inc.*, 666 N.Y.S.2d 156 (1st Dep't 1997) (noting covenant was "unreasonably broad on its face," and declining to blue-pencil the agreement where defendant could have drafted it more narrowly "from the start").[14]

But even if the Court were inclined to blue-pencil Palantir's non-compete (it should not), the only narrowing that would avoid a wholesale rewrite would pare it to the single clause with any objective criterion: the prohibition on former employees working for companies "engaged in the business of developing and selling analytical software." Assuming, *arguendo*, that such a pared-down version of the non-compete is enforceable, it plainly would not apply here because the record is clear that—unlike Palantir—***Percepta is not in the business of developing and***

---

[14] The PIIA's inclusion of statements that it may be narrowed if found to be overbroad (PIIA § 6.4), does not render it partially enforceable. *Visentin*, 2011 WL 672025, at *7 n.4. To the contrary, such language is evidence that Palantir "imposed the covenant in bad faith, knowing full well that it was overbroad." *Brown & Brown, Inc. v. Johnson*, 980 N.Y.S.2d 631 (4th Dep't 2014) (reversed on other grounds) (quoting *BDO Seidman*, 93 N.Y.2d at 395) (construing restrictive covenant that included similar "narrowing" provision and finding that its presence was evidence of employer's bad faith).

*selling analytical software*.[15] Percepta has not developed, and thus does not sell, a commercial software product or platform. Mathew Dep. 226:17–231:14; RJ Dep. 19:12–21:9. It offers neither a data repository nor a data integration platform. RJ Dep. 144:11–145:6 ("Percepta does not do data work."). It does not offer data "ontology." *Id.* 174:10–25; 177:16–22 ("Q. [Has] Percepta had any discussions about plans to help clients create an ontology? A. That is not Percepta's business. That is not what we do."). In fact, Percepta would readily build on top of Palantir's software, which would drive licenses and revenue to Palantir—i.e., a complementary, not competitive, posture. Mathew Dep. 31:7–19; 69:2–3 ("We are not a product company. We will work on top of … the customer environment to build [AI] functionalities into their existing systems."); RJ Dep. 21:17–24; *see also* Mathew Dep 68:16–75:5 (describing communications between Percepta and Palantir's Enterprise Lead for Startups); Hirsh Decl. ¶¶ 22–23.

Indeed, discovery in this case made clear that Palantir mistakenly believes that Percepta's "Mosaic" is a reproduction of Palantir's "AIP." *See* Palantir Dep. at 86:16–89:11 ("Q. Is it Palantir's position that Percepta has built an equivalent platform to AIP? A. Yes. Or to parts of it."). But Mosaic is not AIP: ███████████████████████████████████ ████████████████████████████████████████████████ Mathew Dep. 226:9-16; *see also id.* 109:6–114:3; 135:17–136:25; 112:8–19; *see also* RJ Dep. at 134:17–20;

---

[15] If there is any party being "self-serving" in its self-description, it is Palantir. Its statements confirm that it is a data software and analytics company. To the extent it does any "consulting," it does so regarding its own platforms. *See* Palantir Dep. 73:8–23; 287:9–12 ("Q. Does Palantir have any customers that aren't using one of its software products? A. In the, like, software value delivery space, not that -- not to my knowledge."); *id.* 275:22–276:15; Ex. 202 (Palantir 2024 10-K) (describing Palantir's business as "build[ing] software that empowers organizations to effectively integrate their data, decisions, and operations at scale" and discussing Palantir's "four principal software platforms."); Ex. 219 (Palantir's LinkedIn page, listing Palantir's industry as "software development"); Ex. 220 ("Palantir invents, builds, and deploys software solutions that empower organizations to integrate their data, decisions, and operations to scale.").

██████████). Mosaic is the way in which Percepta captures what it hopes will be its "████████

████████" across its use of these various AI companies, not, as Palantir asserts a

commercialized AI platform. Mathew Dep. at 109:6-25; 257:13–258:3; 216:17–221:8 (Percepta

is not building a "core AI platform"); *id.* 226:9–16.

Thus, even were this Court to rescue Palantir's unenforceable non-compete, neither

Radha nor Joanna would be in violation of it.

**c.** **Palantir's non-compete poses an undue hardship on Radha and Joanna, who would fall into a reasonable safe harbor provision if one existed.**

Even though the Court need go no further, *BDO Seidman*, 712 N.E.2d at 1223 ("A

violation of any prong renders the covenant [not to compete] invalid,"), the non-compete also is

unenforceable because it imposes an undue hardship on Radha and Joanna.

New York law "does not favor terms in an employment agreement that seek to prevent an

employee from pursuing his or her chosen vocation after termination of employment,"

*Veramark*, 10 F. Supp. 3d at 406. Yet this is precisely what Palantir aims to do: prevent Radha

and Joanna from working at any company that has a business "similar to" it for an entire year,

essentially rendering them unemployed, a result that is strongly discouraged. *See, e.g.*,

*Fareportal, Inc. v. Jason Ware, and Travana, Inc.*, 2018 WL 4031630, at *8 (N.Y. Sup. Ct. Aug.

23, 2018); *Flatiron*, 2020 WL 1320867, at *22; *Pure Power*, 813 F. Supp. 2d at 507 (finding

overbroad non-compete provision to be "unreasonably burdensome to [d]efendants because its

enforcement is likely to result in the loss of [employees'] ability to earn a living"); *University

Sports Publ'ns Co. v. Arena Media Networks, LLC*, 2007 WL 7130745 (N.Y. Sup. Ct. Feb. 9,

2007) (unreasonably broad non-competes "impermissibly prevent employees from pursuing their

chosen careers and impose an unfair burden").

33

Palantir asserts that Radha and Joanna are "free to work for countless other [unnamed] companies in the AI industry" so long as they "do not perform the same or substantially similar job functions as they performed for Palantir." Mot. at 35. But this is not what the PIIA "safe harbor" says: it merely acknowledges that employment with an "analytical software company" might be permissible if they avoid "the same functions" worked while at Palantir. Dkt. 33-2, 33-3 at § 6.3. This purported safe harbor also is illusory in practice because it covers work performed "directly or indirectly" and "in whole or part," covering even tangential duties, collaborative contributions, or partial overlap with prior responsibilities, leaving little room for role differentiation in the industry. Dkt. 33-2, 33-3 at § 6.3.

In actuality, neither Radha nor Joanna performs the same functions at Percepta as she performed at Palantir. Before leaving Palantir, Radha was a ███ front-end engineer ███



████████████████████████████ Now, at Percepta, Radha is not a day-to-day coder. She instead oversees an eight-person team, spending her time in leadership meetings, and serving as the primary liaison who drives vision and execution for one of Percepta's ███████ clients. RJ Dep. 139:10–140:12; 378:9–379:3; RJ Decl. ¶¶ 31–38.

Likewise, at Palantir, Joanna's work involved ████████████████████ ████████████. Cohen Dep. 31:16–24; 49:8–14. She focused primarily on ████████ ████████████████████████ *Id.* 37:15–39:21; 42:9–19; 50:18–54:4. By contrast, at Percepta she operates as a hands-on engineer, writing code within customers' environments, without people-management responsibilities. *Id.* 102:12–103:15; Mathew Dep. 147:2–14; Cohen Decl. ¶¶ 27–28.

Thus, if there was a properly tailored safe harbor provision within Palantir's overbroad non-compete, Radha and Joanna would comfortably fall within it. The fact that there is not further underscores the provision's unenforceability. *Pure Power*, 813 F. Supp. 2d at 507 (noting undue hardship created based on non-compete that was "ambiguous and overly broad").

For each of these reasons, Palantir is unlikely to be able to demonstrate a breach of the non-compete.

### 2. Palantir's Solicitation Claims Are Unlikely to Succeed.

#### a. Palantir's employee non-solicitation claim lacks merit.

Palantir's employee non-solicitation claim against Hirsh and Radha—for Hirsh's alleged solicitation of Radha, and their joint alleged solicitation of Joanna and a third employee, Bryan McClellan—is similarly unlikely to succeed. Palantir claims that Hirsh and Radha engaged in "textbook solicitation" by participating in interviews or meeting for coffee, making introductions to others at Percepta or General Catalyst, and discussing possible compensation, among other activities. In doing so, Palantir relies on (mostly out-of-jurisdiction) cases involving campaigns of coordinated corporate raiding that are factually inapposite.

Tellingly, Palantir ignores the Southern District authority concluding that the PIIA's proposed employee non-solicitation provision is unenforceable, either as a matter of law or as applied. To begin, courts in this district routinely decline to uphold employee non-solicitation provisions that purport to "apply to every person employed by [a company] or an affiliate of [a company], without regard to what type of role the employee holds, what type of skills they possess, or their value." *Permanens Cap. L.P. v. Bruce*, 2022 WL 3442270, at *9 (S.D.N.Y. July 22, 2022), *report and recommendation adopted*, 2022 WL 4298731 (S.D.N.Y. Sept. 19, 2022) (holding a non-solicitation provision substantially similar to the PIIA was unenforceable). Here, Palantir has not demonstrated it made any special investment in Radha, Joanna or Bryan

McClellan that would warrant upholding of the PIIA's non-solicitation provision, nor has it explained how their continued employment at Palantir was an "asset" requiring special protection when each was an at-will employee. *QBE Ams., Inc. v. Allen*, 2022 WL 889838, at *11 (S.D.N.Y. Mar. 24, 2022); Dkts. 33-1, 33-2, 33-3 § 7.

Further, there can be no "solicitation" when the allegedly solicited employees instigated their own departures. *See, e.g.*, *Cenveo Corp. v. Diversapack LLC*, 2009 WL 3169484, at *8 (S.D.N.Y. Oct. 1, 2009) (no likelihood of success on merits where "any evidence directly linking the employee's departure to some conduct by defendants" was "[n]oticeably absent"); *FTI Consulting, Inc. v. Graves*, 2007 WL 2192200, at *8 (S.D.N.Y. July 31, 2007) (finding no breach of a non-solicitation covenant where the only evidence was that the defendant and other former employees left plaintiff "in temporal proximity" and that they were well-acquainted); *see also Bajan Grp., Inc. v. Consumers Interstate Corp.*, 958 N.Y.S.2d 59, at *6 (Sup. Ct. 2010) ("[T]he plain meaning of the term 'solicit' connotes the act of requesting or seeking a particular object or end. Thus, in order for the non-solicitation clause to be violated, it must be shown that [plaintiff] initiated contact with [the customer] . . . .").

Only three former Palantir employees went directly from Palantir to Percepta: Radha, Joanna, and Bryan McClellan. And each has provided sworn testimony that they were already looking to leave Palantir, and that they pursued opportunities at Percepta and/or made the first contact. *See, e.g.*, RJ Dep. 207:4–7 (Q. So Mr. Jain didn't say anything about wanting to hire any people to help in this endeavor. A. I asked him."), 156:5–7 ("Q. Did Hirsh recruit you to come to Percepta? A. No."), 233:10–12 ("Q. Did Mr. Jain ever ask you to join Renaissance/Percepta? A. No."); RJ Decl. ¶ 19; Cohen Dep. 178:4-8 ("He [Hirsh] didn't solicit me . . . She [Radha] did not solicit me."), 179:4–7 ("I informed ██████████ Joanna's

supervisor] verbally of the fact that I was the one initiating conversations relating to what Radha was doing."); Cohen Decl. ¶ 12; Declaration of Bryan McClellan ¶ 6.   In light of this evidence, Palantir's claim fails.  *Metito*, 2009 WL 399221, at *9 ("[R]egardless of who approached who first . . . [plaintiff's employee] was not inducible because [plaintiff's employee] already desired to leave [plaintiff's employ].").

Palantir attempts to distract from these facts by devoting much of its brief to a November 2024 text exchange between Radha and Hirsh that Palantir says evinces a "scheme" of coordinated "poaching."  However, Palantir fails to acknowledge that ***none*** of the individuals named in that exchange left Palantir to join Percepta.  Indeed, all but one were never even contacted; the one exception was never offered a job at Percepta and decided to leave Palantir anyway.  HJ Decl. ¶¶ 28–29; RJ Decl. ¶¶ 22–24.  Palantir identifies no authority stating that merely thinking about alleged solicitation—or even of "poaching"—constitutes a breach.

### b.     Palantir's customer solicitation claim is facially deficient.

Palantir next alleges that Joanna breached Section 6.1(a) of the PIIA by "communicating with" ███████ while at Percepta in a manner that competed with Palantir's business.  Mot. at 29.  Palantir cannot show that it is likely to prevail on this claim either.

***First***, the PIIA's customer non-solicitation provision purports to prohibit Joanna from "conducting business that is competitive or similar to that of [Palantir]" with ███████  But, as discussed above, Palantir's notion of what is "competitive or similar" is fatally overbroad, *see supra* Section B.1.a. and, in any event, Percepta's work with ███████ is not "competitive or similar" to Palantir's offering.  RJ Decl. ¶¶ 34–35 (describing Percepta's work for ███████).

***Second***, Palantir cannot show that it has a legitimate interest in precluding its former employees from working with customers that independently seek out Percepta's services.  *See, e.g.*, *Bijan Designer for Men, Inc. v. Katzman*, 1997 WL 65717, at *6 n.9 (S.D.N.Y. Feb. 7,

1997) (injunctive relief preventing employee from doing business with customers even if customers sought employee's services without solicitation "would operate in a harsh and oppressive manner"); *Investor Access Corp. v. Doremus & Co.*, 588 N.Y.S.2d 842 (1st Dep't 1992) (not enforcing non-solicitation covenant where plaintiff's customer sought out former employee and its account to former employee); *Slomin's Inc. v. Gray*, 575 N.Y.S.2d 545 (2d Dep't 1991) (trial court was "correct in denying plaintiff's request" to enjoin defendant "from servicing former ... customers who voluntarily switch[ed] [companies]). Here, GC has a longstanding relationship with ███████████████████████████████ ███████████—a connection that far predates Joanna's employment at Percepta.

And ***third***, Palantir's customer non-solicitation prohibition reaches too far in its attempt to include any entity which merely "inquired of" Palantir's services, as opposed to those who actually engaged Palantir to perform work. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 350 (S.D.N.Y. 2018) (deeming a non-solicitation covenant overbroad because it applied to merely potential clients).[16]

But even if the PIIA's customer non-solicitation provision was enforceable as written (it is not), Palantir is nevertheless unlikely to be able to demonstrate a breach of its terms. It is undisputed that ████████ was never an actual Palantir customer. And Palantir's own evidence shows that ████████ did not "inquire of" Palantir's services, and is thus not properly considered a "Customer" even under the overly broad definition in the PIIA. *See, e.g.*, Ex. 36 (████████ ███████████████████████████████████████████████████); Ex. 37 (████████

---

[16] The Court should decline to blue-pencil the non-solicitation provision for the same reasons discussed above. *See Permanens*, 2022 WL 4298731, at *1. Palantir has been on notice at least since the 1999 *BDO Seidman* decision that its customer non-solicitation provision, which sweeps in any company that "inquired of" Palantir's services, is facially overbroad.

██████████████████████████████████████████████████████
██████ ); *see also* Cohen Dep. 192:15–21 (████████████████████████ ).

Palantir's allegations also suffer from a causation problem.  Palantir alleges that Joanna gave ████████ a ████████ (of what, the record evidence is silent) in early 2023, and that others within the company had limited "████████████" interactions (seemingly devoid of any specific project pitch or scope of work) with ████████ in October 2024.  (Joanna, for her part, testified that her only interaction with ████████ in October 2024 was to speak to a then-████████ employee about coming to work for Palantir.  *See* Cohen Dep. 184:3–7, 191:13–19.)  Palantir acknowledges that ████████ was pursuing opportunities to work with ***Percepta*** in November 2024, and that ████████'s signed engagement with ***Percepta*** began in December 2024.  Joanna did not even leave Palantir until ***March 2025***.  Consequently, Palantir cannot show that it somehow lost the prospective ████████ account to Percepta due to anything Joanna did, ***as she was not even working at Percepta at the time***.

Palantir's sole cited authority in support of its customer non-solicitation claim, *Locke v. Tom James Co.*, 2013 WL 1340841 (S.D.N.Y. Mar. 25, 2013), does not save it.  In that case, the former employee against whom the non-solicitation covenant was to be enforced set up a rival enterprise and actively induced 16 of his former employer's actual customers to move their business.  That is a far cry from the conduct at issue here, where Palantir seeks to preclude Joanna from working with a company that it never successfully engaged, and who decided independent of anything Joanna did to partner with Percepta.

### 3. Palantir's Confidentiality and Return of Property Claims Against Joanna are Moot.

Palantir's allegations against Joanna for breach of confidentiality and return of property obligations are heavy on inflammatory rhetoric but devoid of relevant evidence.  Tellingly,

Palantir does not seriously engage with Joanna's unrebutted testimony that she accessed the materials in question as part of legitimate transition activities or that their content is not nearly as sensitive as Palantir suggests, and instead summarily concludes that the materials "[i]n the hands of a competitor like Percepta," would damage Palantir's business and its confidential information. Mot. at 31. But therein lies the rub. As discussed above, there is *zero* evidence that the materials in question ever ended up in "the hands of . . . Percepta" or anywhere else. They are not even in Joanna's hands anymore, given her prompt deletion of the files at issue following the parties' entry into the stipulated TRO. Cohen Decl. ¶ 21.

### 4. The Tortious Interference Claim Against Hirsh is Unlikely to Succeed.

Palantir's claim for tortious interference against Hirsh requires it to establish "(1) the existence of a valid contract between [it] and a third party; (2) [Hirsh's] knowledge of that contract; (3) [his] intentional procuring of the breach; and (4) damages." *All Am. Adjusters, Inc. v. Acceleration Nat. Ins.*, 1997 WL 732445, at *9 (S.D.N.Y. Nov. 25, 1997). Palantir has not demonstrated that it will be able to satisfy these elements.

*First*, to the extent Palantir is unlikely to show Radha breached any of her alleged obligations, its tortious interference claim against Hirsh necessarily fails. *E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 541 (E.D.N.Y. 2011) (denying motion for preliminary injunction based on tortious interference claim where evidence did not support a finding of breach of underlying contract). Palantir has not provided any authority for its apparent contention that Radha's knowledge of the identities of her former coworkers is "confidential information" that falls within the scope of the PIIA's confidentiality provision. And for the reasons set out in Sections B.1. and B.2., above, Palantir is similarly unlikely to show that Radha violated any non-compete or non-solicitation obligations.

40

Palantir is likewise unlikely to be able to demonstrate another required element of its tortious interference claim: that Hirsh was aware of the Radha's obligations under her PIIA, much less that he knowingly and intentionally interfered with them. *Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018) ("New York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract."); *see also All Am. Adjusters*, 1997 WL 732445, at \*9 (dismissing tortious interference claim where plaintiff had insufficient evidence of defendant's awareness of employment contract or intentional inducement of breach). Radha and Hirsh's PIIA's differ in several respects, including because Hirsh's does not contain a non-competition provision. *Compare* Dkt. 33-1 *with* 33-2. And Palantir offers no evidence that Hirsh was aware of the details of Radha's obligations, as opposed to his own. To the contrary, Radha affirmed to GC that she was not in violation of any agreements with Palantir when she signed her offer letter, and was herself unaware of any noncompetition obligations she may have had. Ex. 17 at 2; RJ Dep. 42:23–43:8.

### C. The Balance of Equities Weigh in Favor of Hirsh, Radha, and Joanna—Young Professionals Who Are Fairly Applying Their Skills in a Rapidly Evolving Sector.

Because Palantir has failed to demonstrate either irreparable harm or a likelihood of success, the Court need not consider the balance of equities. *St. Joseph's*, 131 F.4th at 108. However, this factor also weighs decidedly in Defendants' favor.

*First*, Palantir has not shown that it will be irreparably harmed absent an injunction, and it is free to pursue any damages for alleged past breaches of contract in an arbitral forum. *See TomGal*, 2022 WL 17822717, at \*6 (finding that a preliminary injunction would "serve no purpose other than to punish the defendants for their alleged misbehavior."). As set forth above, Palantir has, at most, articulated only a speculative, unsubstantiated fear that it might lose some

future customer and/or that Radha or Joanna might disclose some unspecified confidential information to which they once had access.[17]  Palantir's over-broad agreement is therefore not necessary to protect either Palantir's confidential information or its customer relationships.

*Second*, the public interest would be disserved by issuing the injunction sought by Palantir.  Enforcing Palantir's covenants as it urges—sweeping in any business seeking to increase operational efficiencies with AI—would chill legitimate market entry, block service-only firms that neither build nor sell a software platform, and needlessly sideline young professionals from participating in one of the economy's most dynamic fields.  Public interest favors competition, innovation, and talent development.  It is not served by converting Palantir's expansive competitive framing into a de facto sector-wide non-compete.  This is especially so given that Percepta's model actually drives business to AI start-ups, helping to bring that technology to established industries.  *See* Mathew Dep. 114:7–115:22; 68:16–69:21; *see also* Ex. 80 (discussing AI companies Percepta has brought to its clients).

Indeed, restrictive covenants in the employment context run counter to the free flow of competition and are heavily disfavored as a matter of public policy, particularly where they threaten an individual's ability to earn a living.  *Am. Inst. of Chemical Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982); *Veramark*, 10 F. Supp. 3d at 403 ("broad restriction on [defendant's] ability to earn a living" was not "necessary to protect" former employer's "customer relationships").  The Court should reject Palantir's attempt to stretch its covenants beyond protecting legitimate interests and into restraining ordinary, beneficial competition,

---

[17] Radha's non-compete expired during the course of this lawsuit and Joanna's non-compete is essentially three-quarters complete.  Yet, to date, Palantir has not identified a single piece of evidence demonstrating that either has disclosed or is on the verge of disclosing Palantir's confidential information, including anything purportedly contained in their memory.

particularly given its unsubstantiated and speculative claims of harm. *Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 158 (E.D.N.Y. 1986) (balance of hardships weighed against inhibiting "free trade and the potential for competition.").

**Finally**, Palantir should not be rewarded for exploiting its unequal bargaining power to force prospective employees (many directly out of college) to enter into anti-competitive agreements, prohibiting them from working "directly or indirectly" for "the same or similar business" as Palantir or any of its subsidiaries worldwide, and similarly prohibiting "direct or indirect" solicitation of customers—defined to include any entity that merely "inquired of" Palantir's services—for a period of two years. Such practices are inherently repugnant considering New York's longstanding policy disfavoring agreements that "prevent an employee from pursuing a similar vocation after termination of employment." *Columbia Ribbon*, 42 N.Y.2d at 499.

### D.    Palantir's Requested "Extracontractual" Relief Is Legally Unsupported and Should Be Denied.

Even though Hirsh's agreement with Palantir did not include a non-compete, Palantir asks the Court to impose one, framing it as "extracontractual" equitable relief. This request is entirely unsupported by legal authority and should be denied.

**First**, New York has a strong public policy against implying post-employment covenants. The New York Court of Appeals has "put it flatly" that "'anticompetitive covenants covering the postemployment period will not be implied.'" *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 909 (2d Cir. 1998)); *see also Janus et Cie v. Kahnke*, 2013 WL 5405543, at *3 (S.D.N.Y. Aug. 29, 2013) (refusing to impose an "unbargained-for restrictive covenant" because it would go against "well entrenched state public policy considerations disfavor[ing] such agreements"); *Am.*

*Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 582 (S.D.N.Y. 2009) (noting that New York has "strong public policy against" implied-in-fact restrictive covenants).

Palantir's reliance on caselaw involving egregious trade secret theft is inapposite. There are no trade secret claims here, and "in cases that do not involve the actual theft of trade secrets, the court is essentially asked to bind the employee to an implied-in-fact restrictive covenant based on a finding of inevitable disclosure [which] runs counter to New York's strong public policy against such agreements and circumvents the strict judicial scrutiny they have traditionally required." *EarthWeb*, 71 F. Supp. 2d at 310.

**Second**, the Second Circuit has held that injunctive relief must be "narrowly tailored to fit specific legal violations," and implying a sweeping non-compete that was never agreed to where no irreparable harm has even been shown, is far from "narrowly tailored." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011); *see also Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation.").

Because Palantir seeks a broad, post-employment restraint that Hirsh never agreed to— and that would have expired prior to this litigation even if he had—its demand for extraordinary, extracontractual relief should be denied.[18]

---

[18] Palantir's demand overreaches generally. For example, Palantir asks that any restrictions run from entry of an injunction, even as the parties' stipulated any prohibitions would run from entry of the TRO. Dkt. 22 ¶ 2. Other aspects of Palantir's demand essentially seek final relief, even though such a request is improper—and an attempt to avoid the PIIA arbitration procedures. *Barchha v. TapImmune, Inc*., 2013 WL 120639, at *2 (S.D.N.Y. Jan. 7, 2013) (A preliminary injunction "is not an adjudication on the merits, and it should not grant relief properly awarded in a final judgment.'").

## V. CONCLUSION

For the reasons stated above, Radha, Joanna and Hirsh respectfully urge that the Court

deny Palantir's application for a preliminary injunction.

Dated: January 12, 2026                          LATHAM & WATKINS LLP


By: _____

Steven N. Feldman
Sarah Burack
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Facsimile: (212) 751-4864
steve.feldman@lw.com
sarah.burack@lw.com

Marja-Liisa Overbeck (*pro hac vice*)
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
mari.overbeck@lw.com

Jordan Hughes (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
jordan.hughes@lw.com

*Attorneys for Hirsh Jain, Radha Jain,*
 *and Joanna Cohen*

## WORD COUNT CERTIFICATION

I, Steven N. Feldman, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word limit set forth in the Court's January 5, 2026 Order because it contains no more than 13,990 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: January 12, 2026                              By: _____
                                                              Steven N. Feldman