# Exhibit 204
# (Corrected)

# Redacted

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

PALANTIR TECHNOLOGIES, INC.,

          Plaintiff,

   vs.                              Case No.

                                    1:25-cv-08985-JPO

RADHA JAIN AND JOANNA COHEN,

          Defendants.

--------------------------------x


  HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

     VIDEOTAPED DEPOSITION OF RADHA JAIN

            New York, New York

         Friday, November 21, 2025

               9:08 a.m.


Reported by:

Jennifer Ocampo-Guzman, CRR, CLR

Page 2

November 21, 2025

9:08 a.m.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Videotaped Deposition of RADHA JAIN, held at the offices of Gibson Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York, pursuant to notice, before Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

GIBSON, DUNN & CRUTCHER, LLP

Attorneys for the Plaintiff

200 Park Avenue, 47th Floor

New York, New York 10166

BY:   HARRIS MUFSON, ESQ.

JUSTIN M. DiGENNARO, ESQ.

LATHAM & WATKINS, LLP

Attorneys for the Defendants

1271 Avenue of the Americas, suite 4300

New York, New York 10020

BY:   STEVEN FELDMAN, ESQ.

JORDAN HUGHES, ESQ.

SARAH BURACK, ESQ.

ALSO PRESENT:

JOE RAGUSO, Videographer

ALLISON CHEUNG, ESQ. (Palantir), via Zoom

Page 19

JAIN-HIGHLY CONFIDENTIAL-AEO

on my radar.  So I'll let you imagine.

Q.  In terms of your parents, what did you talk to your parents about?

A.  Well, my mom fainted when she heard the news.

Q.  I'm very sorry.

A.  So my dad called me and he was, like, you know, I read it, and there's nothing there.  So that's what we talked about.

Q.  Do you think there's nothing there?

A.  Yes, I do.

Q.  Why?

A.  Because I don't believe Percepta completes with Palantir.  I believe this is a misunderstanding.

Q.  Why doesn't Percepta compete with Palantir?

MR. FELDMAN:  Object to the extent it calls for a legal conclusion, but, otherwise, you can answer.

Q.  You just said you don't believe it, so tell me why.

A.  I believe the approach that

Page 20

JAIN-HIGHLY CONFIDENTIAL-AEO

Percepta is taking is in many ways the opposite of what Palantir does.

Q.    What does that mean?

A.    Palantir offers a data platform called Foundry.  Everything that they do is within that platform.  It is their IP, right?  They are simply giving that platform -- selling that platform to consumers who can buy it, with or without services.

We don't have a platform.  We are not selling anything directly to consumers to buy.  We are a consulting firm.  Everything that we make is our customer's IP.

Q.    So you're perspective is because Percepta doesn't have a platform, there is no competition between the --

A.    Percepta is not --

Q.    Excuse me, let me just finish my question.

Your perspective is because Percepta doesn't have a platform at present, that it is not in competition with Palantir; is that right?

MR. FELDMAN:    Objection, misstates

Page 21

JAIN-HIGHLY CONFIDENTIAL-AEO

the testimony.

A.   No, I said Percepta is not selling a product, we are selling services.

Q.   Doesn't Palantir sell services?

A.   Palantir offers, offers white glove configuration of their product.  But you don't need that white glove configuration, you can just buy the product.

Q.   So could a client use your -- use Percepta's consulting services, as you say, in lieu of Palantir's product?

MR. FELDMAN:  Objection, vague.

Q.   Is it possible?

A.   No.  We offer fundamentally different things.

Q.   What is fundamentally different?

A.   Palantir is offering a data platform.  We could work with a customer who you already has Palantir, we could work on top of that --

Q.   Could you work --

A.   -- because we're not offering the same thing.

Q.   Could you work with a customer that

JAIN-HIGHLY CONFIDENTIAL-AEO
doesn't have Palantir's platform?

A.    Yes.    Many of our customers have,
for example, Snowflake or one of the actual
competitors to Palantir, and we will work on
top of whatever data integration platform
they already have.

Q.    You would agree with me that
Percepta aims to design, develop, and deploy
AI-driven software that integrates into
enterprise workflows to enhance customers'
operational efficiency?

MR. FELDMAN:  Objection, vague
compound.

A.    Can I see the document that you're
reading from?

Q.    No. You can answer the question,
though.

Do you want me to repeat it?

A.    Yes, please.

Q.    Okay.

You would agree with me that
Percepta aims to design, develop and deploy
AI-driven software that integrates into
enterprise workflows to enhance customers'

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Yes or no?   It's a yes-or-no question.

A.    I can't answer that yes or no.

Q.    Okay.

A.    Most of them have --

Q.    It's okay.   You can't answer that question yes or no, that's fine.

What does it mean for Percepta to provide services on top of Palantir's platform?

A.    Palantir offers Foundry, their data integration platform.   Percepta offers AI services which could be anything from simple calling LLMs to advanced modeling and reinforcement learning.   All of that can sit on top of whatever data foundation our customer already has, which could be Palantir, it could be Snowflake, it could be Databricks, it could be whatever that is.

Q.    And Percepta has no plans to creates create its own data platform?

A.    No.

Q.    Does Palantir provide services on top of its own platform to clients?

Page 42

JAIN-HIGHLY CONFIDENTIAL-AEO
paying you, you had to work for the company
and not for a competitor; is that right?

MR. FELDMAN:  Objection, vague.

MR. MUFSON:  You can answer.

A.    Sure.

Q.    And did you comply with this
provision during your employment with
Palantir?

A.    I believe so, but it is a legal
question.

Q.    Is it possible that you didn't?

A.    There are a lot of words and
provisions in here.

Q.    Well, let me -- besides this, so
let me just ask you a separate question,
then.

Do you believe that you engaged in
any competitive conduct during your
employment with Palantir while you were
employed there?

A.    No, I don't.

Q.    Did you understand that, aside from
agreeing to not compete with Palantir while
you were employed there, you also agreed to a

Page 43

JAIN-HIGHLY CONFIDENTIAL-AEO noncompetition provision that applied after your employment with Palantir ended?

MR. FELDMAN:  Objection, vague, and calls for a legal conclusion.

MR. MUFSON:  You can answer.

A.  I did not recall that at all, no.

Q.  Do you know now that you have a posttermination noncompete?

A.  I found out about it from the newspaper, yes.

Q.  So you didn't know at all, you had no idea that you had this noncompetition obligation.

A.  I had no idea.

Q.  When you left, when you were speaking with Percepta or considering moving over to Percepta, did you think back, to go back and look at your contractual obligations?

A.  No.

Q.  Did anyone at Percepta or General Catalyst ever ask you about your contractual obligations?

A.  No.

Page 56

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.   And does this accurately state your employment and educational history?

A.   I believe so, yeah.

Q.   Now, your LinkedIn account lists your position at Palantir as a "Forward Deployed Engineer, federal Health," between January 2020 and July 2021.  Do you see that?

A.   Yes.

Q.   And can you describe your duties and responsibilities in that role.

A.   Yes.  I -- I'm trying to remember.

Q.   Are you struggling -- is there a reason you're struggling to remember what your job duties were?

A.   It was five years ago, four years ago.

Q.   Okay.



Page 57

JAIN-HIGHLY CONFIDENTIAL-AEO



Q. Did you do anything else in terms of your general duties and responsibilities as a forward-deployed engineer during that

Page 58

JAIN-HIGHLY CONFIDENTIAL-AEO

time period?

A.    Attending the customer meetings, ramping up new joiners.  That's what I recall.

Q.    In terms of your role as engineering lead between July 2021 and September 2022, was that a promotion to that role?

A.    It was a different role.  This was on the growth team.

Q.    Okay, so tell me about your duties and responsibilities in that role.

Q.    So you were interacting directly with the Federal Government?

Q.    Have you described everything you

Page 59

JAIN-HIGHLY CONFIDENTIAL-AEO
recall with respect to your duties and
responsibilities in the engineering lead
role?

A.    Yes.   I was building demos and --
to help those clients imagine how they would
use, use Palantir, use Foundry.

Q.    What kind of demos?

A.    I configured Foundry so it made
fake data, made fake dashboards so that they
could see how they could use Foundry.

Q.    And why do clients use Foundry?

MR. FELDMAN:   Objection, lacks
foundation.

A.    Each client has different reasons.

Q.    So the clients that you were --
well, generally, what are the general reasons
clients would use Foundry?

A.    Primarily because their data
environment is fragmented across a dozen
different systems, and they don't have a
single source of truth to understand
everything that is going on in their
enterprise, in their department, whatever
those things are.   So they use it to bring

Page 60

JAIN-HIGHLY CONFIDENTIAL-AEO
together all of their data into
human-readable context, such as a person, a
law firm, a room, so that they can see it and
understand it.

Q.   And so once a client uses
Foundry --

A.   Uh-huh.

Q.   -- how else does Palantir help them
increase their operational efficiencies or
their business generally?

MR. FELDMAN:  Objection, lacks
foundation and vague.

A.   It depends on the client.

Q.   To your knowledge, I mean, you have
general knowledge of Palantir's business; is
that right?

A.   Sure.

Q.   I mean, you worked there for, what,
four years, around that?  Okay, and you
testified earlier that you were, you were
responsible for developing the code for AIP;
is that right?

MR. FELDMAN:  Objection, misstates
the testimony.

Page 67

JAIN-HIGHLY CONFIDENTIAL-AEO

THE WITNESS:  May I get some more water?

MR. MUFSON:  Absolutely.

MR. FELDMAN:  If you want, we can take a five-minute break.  It's been a little more than an hour.

MR. MUFSON:  That's fine.  We can take five minutes.

THE VIDEOGRAPHER:  Off the record. The time is 10:14 a.m.

(A brief recess was taken.)

THE VIDEOGRAPHER:  Back on the record.  The time is 10:27 a.m.

Q.   Ms. Jain, I just want to follow up on the last colloquy that we had.  Your position as an AI product engineer --

A.   Uh-huh.

Q.   -- if you could just describe your duties and responsibilities, what were you

Page 68

JAIN-HIGHLY CONFIDENTIAL-AEO

doing on a day-to-day basis as -- in that role?

Q.    And what were you building in terms of your duties and responsibilities within

Page 69

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Anything else in terms of your duties and responsibilities in your role that you want to share in your role as an AI product engineer?  Did you do anything else?

A.    I met once every three months, maybe four months with some of the internal teams that were using the product, where they shared what were the paper cuts, what was -- where they had to do twelve clicks instead of what could be two, and to figure out, A, should we put a button elsewhere.

Q.    Anything else that was part of your duties and responsibilities?

A.    That was the vast majority.

Q.    Did you meet with any customers in your role as an AI product engineer?

A.    I recall being on one meeting for -- I believe it was that automotive client where they had some issues because the function was taking a really long time to run, so we talked about different ways they could split up the function technically to make it run faster.  And I think I may have attended two boot camps, both of which I

JAIN-HIGHLY CONFIDENTIAL-AEO

think I left after the first hour because there were too many folks in the room.

Q.   What are boot camps?

A.   Boot camps is a new sales methodology that Palantir came up with where instead of producing demos for potential customers, they bring the customer into the room and you spend a day working alongside Palantir engineers, and the customer will make their -- make a little application to see the power of Foundry.

Q.   And is the information shared during those boot camps confidential?

A.   I don't know.

Q.   Does Palantir make it public to your knowledge?

A.   Public to the public?

Q.   To the outside world, yes.

A.   No.

But I do believe that often they are working on demo data and notional information.

Q.   Other than what you've described in terms of your duties and responsibilities,

JAIN-HIGHLY CONFIDENTIAL-AEO

compile it.  We were now just moving it to something that they wouldn't need the BCG contract for.

Q.   The next, the fourth bullet says, "Flipped skeptical stakeholders' opinion of Protect, by focusing relentlessly on user experience and getting the platform to a place where stakeholders could engage north of ontology & see value."  Do you see that?

A.   Uh-huh.

Q.   What does that mean?

A.   That means that Foundry is an analytical platform.  In order to use it, our customers, the U.S. Government employees, had to log in to Foundry and to open the dashboard and use it, which they weren't doing because they were -- they found it too complex to have to click around to all of these different data concepts and try and figure out what it meant, versus BCG would put a piece of paper in front of them explaining in two sentences what something meant.

So my job here was to try and clean

Page 96

JAIN-HIGHLY CONFIDENTIAL-AEO

up their data foundation, clean up the ontology such that it was easier for the customer to come onto the platform and see the information that they were looking for.

Q.    So how did you flip this -- which skeptical stakeholders were you referring to?

A.    I don't know exactly who I was referring to.  I can't remember.

Q.    If you look down on that same page, the second-to-last bullet on the bottom, you described -- it starts, "Lead echo team for Sales enablement."  Do you see that?

A.    Uh-huh.

Q.    And you refer there to "high-value customers."  Do you see that?

A.    Yep.

Q.    Who are you referring to?

A.    The departments I mentioned earlier, NOAA, Department of State.  Yeah, I can't remember exactly who else.

Q.    So in addition to what you testified to earlier about helping the government, I think you said understand where its products were located or where PPE, you

Page 97

JAIN-HIGHLY CONFIDENTIAL-AEO

were talking about where certain information was visible; is that what you testified to?

A.    Yes, that's a different piece of work.

Q.    Okay.  What was the work you were doing for these high value customers, NOAA, the Department of State?

A.    This was sales work.  These were potential accounts.  Customers is the wrong word here.  It should be potential high value potential customers.

Q.    And so what were you pitching them on?

A.    We were trying to communicate the value of Foundry.

Q.    And what is the value of Foundry?

A.    It's a data platform, bring together your data into one place so that you can see what's happening.

Q.    For what purpose would clients, such as NOAA and the Department of State, use Foundry?

A.    If I recall correctly, they would use -- it could be of interest to NOAA to

Page 98

JAIN-HIGHLY CONFIDENTIAL-AEO

help them understand how many people were located in an area at the time of an emergency, so a natural event, and how they could evacuate them.

Although -- no, sorry.  NOAA, NOAA doesn't do the evacuations, but NOAA, I believe if I recall correctly, sends the notifications to people's phones.  And so you need to know when is it too late to send a notification, like when would that just cause more panic versus if I have a day in advance, then sending a notification would be possible.

It really was not clear what we, Palantir, could do for them, that is not really a Foundry-shaped workflow, but, yeah, we -- they have data, we figured that there might be something interesting there.

Q.   And what about the Department of State?

A.   I believe it was helping with Visa reviews, the reviews -- reviewing someone's application for a Visa, and flagging if there was anything that should mean that they

Page 99

JAIN-HIGHLY CONFIDENTIAL-AEO

should spend more time in an interview with someone.

I don't recall exactly.  It was a demo we built for them.

Q.    Your bullet here refers to seven of our accounts.  What were the seven?

A.    I told you I don't really -- TSA, it looks like, was one of them.  I don't remember the others.  Other federal departments.

Q.    If you flip over to the next page, the second bullet on the top says, "USG civil Pod."

A.    Uh-huh.

Q.    Do you see that?

(Discussion off the record.)

A.    Yes, I see it.

Q.    What did you mean by "oversee our capture efforts across all 8 accounts"?

A.    So this is what we just talked about of helping our salespeople.

Q.    Helping your salespeople do what?

A.    Sell.

Q.    Sell what?

JAIN-HIGHLY CONFIDENTIAL-AEO

industry, yes or no?

A.    Sure.

Q.    Is that a yes?

A.    Yes.

Q.    At Palantir you worked -- again, during the four years that you were there approximately, you also worked with customers in the manufacturing supply chain industry, correct?

MR. FELDMAN:  Objection, vague.

██ ██ █ ████ ███ ██ ███ █ ████

██ ███ ████ █ ████

Q.    You're a cofounder of Percepta?

A.    Yes.

Q.    When did the idea for Percepta first come about?

MR. FELDMAN:  Lacks foundation.

A.    It's vague.  It's evolving.  We are a new startup.

Q.    When was the first time you were aware of what, of what the potential for Percepta was?

MR. FELDMAN:  Objection, vague.

A.    What does that mean?

Page 133

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Well, how did you first hear about this opportunity?

MR. FELDMAN:  Objection, vague.

A.    I got coffee with Hirsh, and I asked him what he was working on.

Q.    What is Percepta's business?

A.    Percepta --

MR. FELDMAN:  I would just say vague.

Go ahead.

A.    Percepta is a tech consulting company that works with customers to do bespoke software development.

Q.    What sort of software?

A.    Any that needs doing.

Q.    And does Percepta use artificial intelligence in connection with its business in any way?

A.    Again, I don't understand what you mean by "use," but we specialize in providing services that leverage artificial intelligence.

Q.    And has Percepta created any product or platform?

Page 134

JAIN-HIGHLY CONFIDENTIAL-AEO

A.    What do you define as product or platform?  That is just the output of coding.

Q.    Well, you spent a lot of time testifying about Palantir's products --

A.    Yes.

Q.    -- right?

So I'm asking, you use some definition of product.  What was your definition of product?

A.    That is my definition of product.

Q.    What is that?

A.    It is the output of code, compilable code.

Q.    Okay, using that definition --

A.    Okay.

Q.    -- does Percepta -- has Percepta created any product?

A.    Percepta has a product called Mosaic, ███ ██ █████ █ ████████

██ ████ ████ ████ ████ █ ████ █

██ █████

██ ██ ██ ██ █ █████ █ ██████ █

██ █████ █ ████ ██ ██ ████ ██

██ █████ █████ ██ █ ██ ████ █ ████

Page 135

JAIN-HIGHLY CONFIDENTIAL-AEO

, like, startup company's output.

Q.    And so the software -- so there is some software that Percepta has developed, yes or no?

MR. FELDMAN:  No. Objection.

You can answer.

Q.    Well, either it did, it has or it

Page 136

JAIN-HIGHLY CONFIDENTIAL-AEO

hasn't?

A.   I can't answer that with a yes or no.

Q.   So then try to answer without a yes or no?

Does that make sense?

Q.   When you say a --

A.   So we --

Q.   Go ahead, please.

Page 139

JAIN-HIGHLY CONFIDENTIAL-AEO

CTO, say they've got a CTO.  We are essentially -- serve as a technical team that they can rely on to help them think about where do they go for the next five years.

MR. FELDMAN:  We're going to designate all of this testimony as AEO. I just want to put it out there so I don't forget at the end.

Q.   And what are you doing specifically at Percepta, your duties and responsibilities?

A.   So I lead the engagement with ▮▮▮▮▮▮▮▮.  I function as a consultant.  I have a team of eight people from the Percepta tech side.  I spend most of my days in meetings with ▮▮▮▮▮▮▮ leadership, and talking about their ideas, and talking about what does the vision look like for their business.  I review -- the PMs on my team, I review their plans.  I've written documents about what, you know, what they're thinking about for each of the features.  I shout out with stakeholders.  Yeah.

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Have you worked with any other customers at Percepta?

A.    Primarily with ▬▬▬▬▬.    I think the week before this started, started talking to Summa, which is our hospital that GC bought.

Q.    How do you spell Summa?

A.    S-U-M-M-A.

Q.    What does that stand for?

A.    I don't know.

Q.    Do you know where is Summa located?

A.    In Ohio.

Q.    Do you have any -- is Summa an

Page 143

JAIN-HIGHLY CONFIDENTIAL-AEO

in perpetuity, to work with, meaning --

MR. MUFSON:  Strike that.

Q.    Is Percepta's business -- will it --

MR. MUFSON:  Strike that.

Q.    Well, you're a cofounder, so what do you think the future of the business is?

MR. FELDMAN:  Asked and answered.

A.    The Percepta business model fits into General Catalyst's idea of a flywheel. General Catalyst has portfolio companies. Percepta partners with those portfolio companies to help bring their solutions to customers.  Those customers may be a portfolio company.  They may be an asset. They may be someone that has a special relationship with General Catalyst, whoever

Page 144

JAIN-HIGHLY CONFIDENTIAL-AEO

it may be. ███ ███ █████ █ ██ ███████

█ ██ ██ █████ ███ ██ █████

Does that make sense?

█ ██ ██ ██ ██ ██████ ██ █

█████ █████ ██ █████

█ ██ █ █████ ████ ███ █ ███ ████

█ ██ ██ ██ ██ ███ ██

█████ ████

██ ██ ██

Q.    If ██████ -- could ███████ use Palantir's products or services?

A.    They don't need to.  They have a very strong data foundation.  So I -- like anyone could use Palantir.  So I don't know -- if you're saying that would they have a strong need for it?  Then, no.

Q.    Why don't they have a strong need for it?

A.    Because they have a very well architected and strong data foundation.

Q.    So what do they need your services for?

A.    For AI.

MR. FELDMAN:  Objection, lacks

Page 145

JAIN-HIGHLY CONFIDENTIAL-AEO
foundation.

A.    For doing AI and other technical services.  Like we mentioned, we are not a data company.  We -- Percepta does not do data work.

Q.    When you say, "for doing AI and other technical services," I just want to break that down.  So what do you mean for doing AI, what does that mean?

A.    As mentioned, so Percepta is a consultancy.  We work with our clients to help them modernize, to help them think about how do they future-proof and build a future system.

And that can mean, hey, how do you integrate AI into what you are doing.  It can mean how do you integrate these reinforcement learning models, these decisionmaking models into what you are doing.  It can mean a host of things.

Q.    Okay.  When you say you said, "for doing AI and other technical services" --

A.    Yes.

Q.    -- what are the other technical

Page 156

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Did Hirsh recruit you to come to Percepta?

A.    No.

Q.    Katie Keller, who is Katie Keller?

A.    She was in my sorority at Stanford, and she now works for GC.

Q.    Who is Candace Richardson?

A.    She is the partner that does healthcare things, I believe. █ ███ █ ███████ ███ █ ██ ████████ █ █████████ She just has a good healthcare background.

Page 174

JAIN-HIGHLY CONFIDENTIAL-AEO

A.   Just applied AI, how are people trying to use AI.

Q.   When you say, "people," you mean customers?

A.   Enterprises, yes.

Q.   Are you familiar with the term "ontology"?

A.   I am.

Q.   What is an ontology?

A.   An ontology is a human-readable organization of data is how I would describe it.  You will find many descriptions, many different definitions.

Q.   When you would use that term, what did you mean it to mean?

A.   Exactly what I just said.

Q.   Okay.  Is Percepta building an ontology?

A.   No.

Page 177

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Okay.  Does Percepta -- has Percepta had any discussions about plans to help clients create an ontology?

MR. FELDMAN:  Objection, vague, and lacks foundation.

A.    That is not Percepta's business. That is not what we do.

Q.    But is it something that Percepta has discussed about what it may do?

MR. FELDMAN:  Objection, asked and

Page 191

JAIN-HIGHLY CONFIDENTIAL-AEO
mutual friends, yeah.

Q.    When you say, "at work," you meant at Palantir?

A.    Yes.

Q.    Do you know when Mr. Jain left Palantir?

A.    I couldn't give you an exact time. Sometime in 2024.

Q.    Before you?

A.    Yes.

Q.    So Mr. Jain contacted you in August of '24 to speak to you; is that right?

A.    That's right.

Q.    And he wanted to catch up; is that fair to say?

A.    Yeah, we were friends.

Q.    And did you end up meeting with Mr. Jain at or around that time?

A.    I don't remember exactly when I met with Mr. Jain, no.

MR. MUFSON:  Mark as Exhibit 10 an exchange Bates stamped 403.

(Exhibit 10, Document dated 8/26/24, Bates No. RJ_JC_00000403,

Page 192

JAIN-HIGHLY CONFIDENTIAL-AEO

marked for identification, this date.)

THE WITNESS:  Thank you.

Q.   Ms. Jain, is this an exchange that you had with Hirsh Jain on August 26, 2024?

A.   Yes, it looks like it.

Q.   And is this a text exchange that you had with him?

A.   Yes, I imagine so.

Q.   Mr. Jain writes you at 5:17, "Hello, my friend, I hear through the rumor mill that there may be new adventures coming."

Do you know what he was referring to?

A.   Yes, I was thinking of starting a company.

Q.   You were thinking of starting a company?

A.   Yes.

Q.   What kind of company were you thinking of starting up?

A.   It was a vague idea.

Q.   What was the vague idea?

A.   It was more of like a concept than

Page 193

JAIN-HIGHLY CONFIDENTIAL-AEO
it was a reality.

Q.   What was the concept?

A.   I don't even actually remember.

Q.   And how did Mr. Jain know about you potentially wanting to start a company?

A.   I don't know.

Q.   Did you ask him?

A.   It doesn't look like it, no.

Q.   Well, whether in this exchange or based on your recollection, do you remember asking him?

A.   No, I don't think we spoke at this point.

Q.   And Mr. Jain, so he contacted you and you talked about getting coffee, then you end by saying, "Perfect."  Is that right?

A.   Yes.  I don't think we did get coffee then, I don't know.  I don't know what happened after that, but, yeah.

Q.   Okay.  Now, Mr. Jain, in his first reach-out to you, says, "Can I also introduce you to my future colleague at GC?"

Do you see that?

A.   I do.

Page 205

JAIN-HIGHLY CONFIDENTIAL-AEO

right?

MR. FELDMAN:  Lacks foundation.

A.   I don't know what -- I don't know what Hirsh's setup was at this specific time.

Q.   No, no, I'm not talking about what his specific setup was at this time.  I'm talking about the reality of the situation, that it turned out that ███ ██████████ was -- what he said was accurate at this time, that looking back, that Mr. Jain had, in fact, been working on a healthcare AI company and that he needed to hire you; isn't that right?

MR. FELDMAN:  Objection, calls for speculation and lacks foundation.

A.   It's pure speculation.  ████ █ ████████ ██████ ███████ It is a joke.  ███ is joking.  Like, I cannot tell you what was -- what ████ knew or what he did not know.  I cannot tell you what Hirsh was doing or was not doing.

I can tell you how my conversation with Hirsh went.

Q.   Okay, why don't you tell me with -- how your conversation with Hirsh went.

Page 206

JAIN-HIGHLY CONFIDENTIAL-AEO

A.   It basically went, hey, how are you?  What are you doing these days?  He gave me the spiel, and I was, like, wait, that's really interesting.

Q.   What's the spiel?

A.   At the time the spiel was -- he started off by describing how his mom is a doctor and how she -- and gets very frustrated at having to treat patients potentially in a fee-for-service way, right?  You treat each new thing, but you aren't able to actually help them with their long-term health.

And then was talking -- and then we were sort of talking about General Catalyst and all the health plays that they have in the space and -- including the hospital that they just bought.  That was the thing that I was, like, whoa, that's really cool.

Q.   And what was the purpose of that discussion?

A.   We were catching up.  He told me what he was working on.  I said, that's really interesting.  Can I talk to any of the

JAIN-HIGHLY CONFIDENTIAL-AEO

General Catalyst people about it?  And he was, like, yes, I will put you in touch.

Q.  So Mr. Jain didn't say anything about wanting to hire any people to help in this endeavor.

A.  I asked him.

Q.  When did you meet with Mr. Jain?

A.  I don't know the exact date.

Q.  You had set up the meeting on November 4th.  Was that the time that you had that meeting?

A.  I don't know.

Q.  Do you have any notes or documents concerning that meeting?

A.  No. We had coffee.

Q.  Where did you meet?

A.  I don't remember exactly.  I don't remember.

Q.  You have a calendar invitation showing a meeting with Mr. Hirsh on November 4th.  Does that --

A.  Okay, then, yeah.

Q.  -- refresh your recollection you met with him on the 4th?

Page 218

JAIN-HIGHLY CONFIDENTIAL-AEO
text about finding your conversation
energizing and him texting you that he wanted
you to consider working with him?

A.    I'm sure I did, yeah.

Q.    You're positive you did?

A.    No, sorry.  I know that I have
texted Mr. Jain since November 2024, yes.

Q.    Yeah, but did you respond to
this -- these texts directly?

A.    I cannot recall with certainty.

Q.    Did you respond to them by saying,
I don't know what you're talking about, I
want to come work with you, that it's not you
who wants me to come work with you, that I
actually said that I wanted to work with you.
You didn't respond with something like that.

A.    That would be an incredibly strange
text to send.

Q.    Okay.

customer or a prospective customer?

A.    I don't know.

MR. MUFSON:  Mark as Exhibit 15 a
text exchange Bates stamped RJ_JC_414 to

Page 219

JAIN-HIGHLY CONFIDENTIAL-AEO 417.

(Exhibit 15, Document dated 11/6/24, Bates Nos. RJ_JC_00000414 through RJ_JC_00000417, marked for identification, this date.)

THE WITNESS:  Thank you.

Q.    Did you ever ask -- before I ask you about this exchange -- did you ever ask ████████ █ ███████ ████████ ██████ ██████ █ a current or a prospective customer?

A.    No.

Q.    Now, this is an exchange with Mr. Jain on November 6th, so the next day after Mr. Jain sent you the messages in Exhibit 14, right?

A.    I believe so.

And I believe that's -- when you asked what was my response to Hirsh, this was my response to Hirsh, it was "Likewise!!!"

Q.    Got it.

A.    But let me actually just read this whole conversation.  I haven't read it.

Okay.

Q.    In this exchange -- so you started

Page 220

JAIN-HIGHLY CONFIDENTIAL-AEO

with "Likewise!!!"  So you your testimony is that's your response to Exhibit 14?

A.    I believe so, yeah.

Q.    Okay.  And then seven lines down, at 5:18 and 26 seconds, you write, "I think I need a little more clarity on the GC deal mechanics and I'm also curious to hear how to convo with ▮▮▮▮ ▮▮▮▮ went."  Do you see that?

A.    Yes.

Q.    Let's start with the first part. When you said you needed a little more clarity on the GC deal mechanics, what were you referring to?

A.    I wanted to understand how -- it was called AIT Co, at the time, how AIT Co was set up with General Catalyst.

Q.    And were you asking Mr. Jain to provide you with that information?

A.    Yes.

Q.    And why did you think he had that information?

A.    He was working for AIT Co. He was setting up AIT Co.

Page 221

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.   And did you understand what his position at AIT Co would be?

A.   Yes.

Q.   What's that?

A.   CEO.

Q.   And so as CEO, did you think he had the authority to make offers, employment offers to individuals?

A.   Yes.

Q.   And the second half of the sentence, you wrote, "I'm also curious to hear about -- to convo with ███████ ███████ went."

Did "to," you mean "the" there?

A.   I assume so.

Q.   What conversation were you referring to with ███████ ███████?

A.   I actually have no idea.  I don't remember this.

Q.   Did Mr. Jain ever tell you about a conversation with ███████ ███████?

A.   I would assume so, based on what is written here, but I don't remember.

Q.   Is ███████ ███████ a General Catalyst

JAIN-HIGHLY CONFIDENTIAL-AEO
asset or a portfolio company?

A.    No.

Q.    Did you understand that Mr. Jain was having a discussion with ███████ ████████ related to the business that he was forming with General Catalyst?

A.    I don't know what the context of that conversation would be.  It could be many different things, actually.

Q.    What other things could it be?

A.    It could be learning more about ████████ ████████ and, like, what of our healthcare portfolio companies are interesting, it could be, like, almost a due diligence exercise.  It could be a number of things.  I don't know.

Q.    Could it be something that you think was -- do you think that it was something that was disconnected from the General Catalyst deal?

A.    That is connected to the General Catalyst deal.

Q.    Oh, okay.  So I'm wondering -- do you think it's anything -- that ████████ ████████

Page 223

JAIN-HIGHLY CONFIDENTIAL-AEO

discussion, you believe, was connected to the General Catalyst deal.

A.    I believe it was connected to General Catalyst.  So at the time, Hirsh was also effectively working as the AI consultant for General Catalyst itself, right, whenever they needed a technical expert.

So I genuinely have no idea how that -- what that conversation was about.

Q.    But you were at this time curious to hear about how that conversation went, right?

A.    Yes.  Again, it could be due diligencing the quality of the General Catalyst startups that we would inevitably be working with.

Q.    And you were curious because that was potentially impacting whether you were interested in joining whatever Mr. Jain was starting with General Catalyst; isn't that right?

A.    Every startup has a risk/reward profile.  The more information you can get on it, it reduces the risk.  So, yes, it is

Page 229

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Got it, okay.

Now, you had additional exchanges with Mr. Hirsh --

MR. MUFSON:  Actually, strike that.

Q.    Did you actually meet with Ms. zu Furstenberg?

A.    Yes, we talked over Zoom.

Q.    Was it shortly after this exchange of November 12th?

A.    It was whenever it was scheduled for.

Q.    Okay.  Did you have a calendar invite for that meeting?

A.    I imagine so, yeah.

Q.    We haven't seen it, so -- but do you have a recollection of how far -- how long after this exchange you spoke with her?

A.    Reading the text, it says it would have been on November 18th at 8:00 to 8:30 a.m.  This text was on November 13th, that's why I imagine it's five days after.

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Do you recall anything else?

A.    No.

Q.    Do you recall what you said to her?

A.    I remember she did most of the talking in this meeting, the vast majority of it.

Q.    During the time period that you spoke, what did you say?

A.    I don't remember.  This was a year ago.

Page 233

JAIN-HIGHLY CONFIDENTIAL-AEO

you have a different understanding.

Q.   What does the word "solicit" mean to you?

MR. FELDMAN:  Objection to the extent it calls for a legal conclusion.

A.   I'm actually not quite sure.  Does it -- I imagine it means asking someone to join a company.

Q.   Did Mr. Jain ever ask you to join Renaissance/Percepta?

A.   No.

Q.   Did Mr. Jain ever, to your knowledge, ever ask another employee to join, another Palantir employee to join Renaissance and Percepta?

A.   No.

Q.   Okay.  Did anyone at Percepta ever ask you to join Percepta?

A.   No.

Q.   Did anyone at Percepta ever ask any Palantir employees to join Percepta?

MR. FELDMAN:  Lacks foundation.

A.   No.  And, also, I'm not in every single conversation that anyone ever has.

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Now, before you joined Percepta, you spoke with -- you communicated with Mr. Jain, Thomas Matthew, Athul Jacob, Quentin Clark, Michael Rochlin, Jeannette zu Furstenberg, Pranav Singhvi, Katie Keller, Kostas Deskalakis, Candace Richardson, Gabbi Giglio, Annie Ramsett, Carolin Winzer, and Zahi Kuros (phonetic); is that right?

A.    Sounds right to me.

Q.    Did you meet with each of those people separately?

A.    No. I mean, the last three were EAs that just help schedule the email.

Q.    Okay.

A.    Sorry, you would have to go one by one.  Could we go one by one?

Q.    Sure.  So we talked about Mr. Jain.

Thomas Matthew, tell me when did you meet with -- when did you speak --

MR. MUFSON:  Strike that.

Q.    Did you speak with Mr. Matthew and/or meet with him?

A.    I met with him in person.  He was -- at the time I met with him, he had just

Page 290

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    And then Hirsh asks, "Can we get ████████ ████████"; do you see that?

A.    Yes.  I do see.

Q.    Who is ████████ ████████?

A.    I actually don't know.

Q.    Do you know if that person is at Palantir?

A.    I don't know.

Q.    And you continue a discussion about potential candidates, right?  And then at 3:56, on page 458, you say, "God thinking about poaching is so fun."  Do you see that?

A.    I do.

Q.    What did you mean about that -- what did you mean there -- what did you mean there.

A.    It is an unartful phrase, but thinking about the prospect of building the company with people we are excited about, that's what I meant by it.

Q.    What does the word "poaching" mean?

A.    In this context what I meant it to mean is thinking about working with people who we liked.  That is fun.

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    What is your definition of poaching?

A.    I understand the definition of poaching.  I did not use it well in this sentence.

Q.    What is the definition of poaching?

MR. FELDMAN:  Objection, to the extent it calls for a legal conclusion.

MR. MUFSON:  Well, there is no foundation objection because she just said she knows what it means, so it doesn't call for a legal conclusion.

Q.    I'm asking, what is the definition of poaching?

A.    Poaching is taking employees from another company.

Q.    And Mr. Hirsh laughs in response to that statement?

A.    Yes.  It was a flip statement and he treated it as was intended to be.

Q.    And then Mr. Jain says, "you understand why I saw you and immediately went into sell mode."  Do you see that?

A.    I see that.

Page 292

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.   And when he's saying that he immediately went into sell mode, what did you understand Mr. Jain to be referring to?

A.   Again, as we have talked about, Hirsh loves selling.  He loves the feeling of -- of selling, you know, doing all of that kind of stuff.  So I can see, yes, I understand what he is saying here.

Q.   Great.  What is he saying here?

A.   He's saying that when we had coffee, and I expressed interest, he kind of pounced on it, yeah.  He was excited about that.

Q.   He pounced on it when you expressed interest and he sold you on coming to join you Percepta; isn't that right?

A.   He gave me the information about Percepta that I was asking for.

Q.   So he sold you just by giving facts; that's how he sold?

A.   It's a pretty attractive fact. It's a completely new kind of entity.  You're working on a hospital that General Catalyst owns.  That is probably the most high

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.   Sorry?

A.   Yes.

Q.   And you were expected to devote your full working energies to Palantir while you were employed there, right?

MR. FELDMAN:  Objection, vague.

A.   Yes, as we talked about in the contract.

Q.   And you never told Palantir that during your employment with Palantir you were taking calls, at least one call relating to ███████ on behalf of Percepta; isn't that right?

A.   I took one call with ██████████ as an observer.  I didn't say anything.  It was for me to understand Percepta's business model better.

Q.   That call with ██████████ was not for Palantir's benefit, right?

A.   Correct.

Q.   It was for Percepta's benefit, right?

A.   It wasn't for Percepta's benefit. Percepta got no benefit from me being there.

Page 307

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    Then why did you want to join?

A.    So that I could understand, if I were to join Percepta, what our potential first customer would look like.  It was akin to a Superday, when you go for an interview where you learn a little bit more about a business.

Q.    How long was the call with ████████████?

A.    It was three hours of them presenting their business to us.

Q.    Did you attend all three hours?

A.    Yes.

Q.    Did you say anything during that call?

A.    No.

Q.    And you asked to join that call with █████████; isn't that right?

A.    I did.

Q.    And was that a Zoom or in-person meeting?

A.    Zoom.

Q.    Did you say anything during that meeting?

Page 308

JAIN-HIGHLY CONFIDENTIAL-AEO

A.   As I just said, no, I did not.

Q.   Were you introduced?

A.   No, Hirsh introduced the Percepta team and its offerees.

Q.   And its offerings?

A.   Offerees, offerees, people they had offers up to.

Q.   So who else attended that call?

A.   On the Percepta side or the ███████ side?

Q.   On the Percepta side.

A.   It was myself, Thomas Matthew, Michael Rochlin, Athul Jacob, Kostas, yeah.

Q.   And he described you all as the offerees?

A.   The Percepta team and offerees.

Q.   Who was the part of the Percepta team?

A.   Hirsh, Athul, Kostas.

Q.   And who were the offerees?

A.   I believe it was myself, Michael and Thomas.

Q.   And what time was this meeting, the Zoom call?

Page 329

JAIN-HIGHLY CONFIDENTIAL-AEO

main issue was so that you could try to figure out what the solution would be to help?

A.   No.

Q.   No?

You didn't hope that they had described what their main issue was so you could orient what data you need to better help solve their problem?

A.   Sorry, that doesn't make sense. No, no, that's not what Percepta does.  That doesn't make sense.

MR. MUFSON:  Mark as Exhibit 18 --
Exhibit 19 an exchange RJ_JC 247 to 259.

(Exhibit 19, Text messages and note, Bates Nos. RJ_JC_00000247 through RJ_JC_00000259, marked for identification, this date.)

THE WITNESS:  Thank you.

Q.   Ms. Jain, at the top of Exhibit 19, it says "Praxis."  Do you know what that means?

A.   That was the name of the company at the time.

Page 330

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.    ███████████?

A.    AIT Co, Praxis, Percepta.  We went through -- we had a lot of difficulty naming the company.

Q.    Oh, sorry, Praxis was the name of Percepta; Renaissance, Praxis, Percepta?

A.    Correct.  There's a few in between there but, yes.

Q.    So this is another exchange on November 13th.  Was this exchange, text exchange amongst the participants during the ███████ call?

A.    It looks like it, yep.

Can I read through it?

Q.    Sure.

If you look at the -- just the last page that you are on now, Bates stamp 259. What is that?

A.    It looks like those are the notes you were asking for.

Q.    These are your notes?

A.    So it looks like, from that reading that text encounter, I scribbled down notes at the bottom of that doc.  So it's a single

Page 347

JAIN-HIGHLY CONFIDENTIAL-AEO

A.    She is the CEO.

Q.    The CEO, okay.

And so he says, I have a few updates.  Team is now, 6 and he says CEO, CTO, two founding engineers, two AI researchers.  So Mr. Jain was the CEO, right?

A.    Correct.

Q.    Who is the CTO?

A.    Thomas Matthew.

Q.    Who are the two founding engineers?

A.    Yeah, that's me and Michael. That's how he would have been describing us.

Q.    Who are the two AI researchers?

A.    Athul and Kostas probably.

Q.    And who was the potentially one more by EOY?

A.    I don't know.

Q.    You've been, since you joined Percepta, you've been working with ███████, right?

A.    Well, I joined in December.  The ███████ work got kicked off I think officially in January.

Q.    January 25th?

Page 348

JAIN-HIGHLY CONFIDENTIAL-AEO

A.   Yeah, I believe so.

Q.   You worked with, primarily with ▮▮▮▮▮▮ until you stopped working a few weeks ago?

A.   Yeah, uh-huh.

Q.   Your last date of employment with Palantir was December 2nd; is that right?

A.   With Palantir?

Q.   Yes, 2024?

A.   I don't recall the exact dates.

Q.   Now, you invited Joanna Cohen to a meeting with ▮▮▮▮▮▮; isn't that right?

A.   When?

Q.   When she was still employed at Palantir?

A.   I don't recall that at all.

Q.   Isn't it true that Ms. Cohen attended a meeting with ▮▮▮▮▮▮ while she was employed at Palantir?

A.   I don't recall that at all.  Can I see something?

Q.   So is it possible that that happened, or it didn't happen?

A.   I literally do not know what you

JAIN-HIGHLY CONFIDENTIAL-AEO

February 3rd.

Q.   Is it possible that you in fact had an in-person meeting where Ms. Cohen at ██████████ ████████ in Brooklyn as set forth in Exhibit 22?

A.   Oh, I know what this is.  Okay. We, Percepta, were working out of the ██████████ ████████ before we had an office, right.  So this is before we signed the WeWork.  They had a huge office so they were like just come up from there with us.  And so this, I think, was the day where we had Joanna come in for on sites, on site interviews and I think I took her out for lunch.  That's what this was, I think.

Q.   And you were looking to hire a -- someone with healthcare experience; isn't that right?

A.   No.  We were just looking for an engineer.  It's a nice to have if they have healthcare experience.  It isn't always true, but no, that wasn't the primary requisite.

Q.   Well, that was important, right, to hire someone with healthcare experience,

Page 360

JAIN-HIGHLY CONFIDENTIAL-AEO

A.    I don't -- I couldn't give you a date.

MR. FELDMAN:  Can I get one more time update?

THE VIDEOGRAPHER:  Sure.  6:40.

MR. FELDMAN:  Is there Chinese food coming?

Q.    And Mr. McLellan told you when he resigned from Palantir, he told you that he resigned to Ankit and that he really wanted to know who I'm joining but that he just told him he didn't want to say; is that right?

A.    Okay.  Can I see a document?

Q.    Do you have any reason to doubt that?  That he wrote that to you?

A.    I don't recall it off the top of my head.

Q.    Sure.

A.    Can you give me a document?

Q.    The fact is you never disclosed to anybody that you were going to Percepta; isn't that right?

A.    No, that's not right.

Q.    Who did you tell?

JAIN-HIGHLY CONFIDENTIAL-AEO

A.   I sent a good-bye email saying I'm joining an AI startup, founding an AI startup with other ex-Palantirians.  I sent that to over 100 people, including to all the directors of Palantir.  Furthermore, I had conversations with each of my team members,  team members in New York.  There was maybe 6 people there.  All of these conversations, I had talked about the General Catalyst.  I said I was joining Hirsh.  I described the research lab model.  I described this in as much detail as I knew it to be true at the time.

Q.   And so you told them, did you tell them anything else about what you were doing?

A.   Yes.  And nasty then also got drinks with Ankit 6 months later, in June. We had a couple Martinis.  And we went back to his house to watch sports with his wife. I told him exactly what we were doing.  I talked about the way that we were leveraging startups.  I talked about the reinforcement

JAIN-HIGHLY CONFIDENTIAL-AEO
learnings, the LMM works that we were doing. I told him about our customers. I told him who we had hired. He was impressed that we had hired some -- like some of the people ██████ ██ ████ ████ ████ ███████ █████ ██ had worked at a bank in between. He was very impressed with them. He knew everything, right.

Yes. So both before and I left, I had all of those conversations with everyone from my team. I put it in my good-bye email. I called Ankit actually immediately after I gave notice. He asked me to call him. We talked about it then. We sent me a machine learning course, because he thought it would be relevant and because we were talking about that. I was like, oh, man, I'm going to have to really up to the speed on reinforcement learning. And he was like, listen to this course.

And then further I had the email exchanges with Dean, which you all receive essentially being like, yeah, this is -- well, we didn't talk about anything

Page 363

JAIN-HIGHLY CONFIDENTIAL-AEO
substantive there.  But, you know, we talked about like starting a company and what that experience was like.  And then had drinks with Ankit where we went really in depth in ██████ ████ █ █ ████ ████ █ ██ ██ █ ██

So, no, I don't agree with the premise that I did not tell anyone.  In fact I don't think I could have been more obvious about this.  I said it over Slack messages. █ █ ██ ████ ████ ███ █ ██ █████ General Catalyst.  I told other Palantirians that I had -- I wanted to a copy of my last day, I told them all about it.

I think it's absolute nonsense to say that this was private in any way.  It was only private to the extent that we did not know exactly what we would be doing at the time.  It was the start of a company.  We had all of these raw ingredients.  We knew we wanted to do something with AI.  We didn't know exactly what.  So to that extent, -- that was purely out of just like it did not exist yet.

Page 364

JAIN-HIGHLY CONFIDENTIAL-AEO

Q.   Okay.   And it didn't exist publicly, right, because you were still trying to figure out what the business would be and there was no announcement of what the company was until General Catalyst publicly announced it; isn't that right?

A.   Until we publicly announced it, and there was no announcement, because there was nothing to announce.  We didn't have the full concept of the business yet.  Many feel we still don't, but we launched.



Q.   So you didn't update your LinkedIn or any public-facing material to discuss your potential -- or your position at Percepta?

A.   In fact I did.  I updated my LinkedIn title to be on the team at Stealth, that was the most we can could say with

Page 365

JAIN-HIGHLY CONFIDENTIAL-AEO

Stealth, ███████ ██ ██ ███████ ████████ ███

██ ██████ █ ██████ ████ ███████████ ██ ████ ████

Also, because we had not announced every text, the vast majority of text to go through the stealth period while they were figuring out exactly what they want their brand and launch to be, their press strategy to be.

Q.   And did you sign any agreement with General Catalyst, a nondisclosure agreement or confidentiality agreement?

A.   About what?

Q.   About not disclosing what you were building?

A.   I don't know.

Q.   When you joined General Catalyst, you signed an offer letter with them, right?

A.   Correct.

Q.   And that offer letter also has a nonsolicitation in it; is that right?

A.   I believe so, yeah.

Q.   You read that offer letter before you signed it?

A.   Actually I'm not sure I did, not fully.



Page 374

JAIN-HIGHLY CONFIDENTIAL-AEO
management?

A.    No.

Q.    Anything with inaccurate
reimbursements?

A.    No.

Q.    Or achieving better reimbursement
rates?

A.    No.

Page 378

JAIN-HIGHLY CONFIDENTIAL-AEO



Q.    And is that something in terms of your duties and responsibilities?  Are you, in part, creating code for clients?

A.    Like I said at the very beginning of my time, yes, I was writing some code in ▇▇▇▇▇▇▇'s environment for specific things that they now own.  I don't -- I haven't really done that.  I haven't had the time to do that in the last few months.

Q.    What have you been focused in the last few months?

A.    Managing the team.  My job is not a coder.  I am essentially a consultant.  I manage the management of the ▇▇▇▇▇▇▇.  I am liaise with our customer.  I talk to them about plans.  I sit in on meetings.  I demo the work that we have done.  I'm essentially

Page 379

JAIN-HIGHLY CONFIDENTIAL-AEO

the engagement leader for ███████████.  I am not a coder at Percepta.

MR. MUFSON:  We're going to cease the deposition now.  I have no further questions at this time.  Again, I know that we had colloquy at the beginning about -- there's a disagreement about holding the deposition open.  We have serious concerns about deficiencies in the document production that we received, missing attachments, missing metadata, missing information.  And so we -- our perspective is that we have the right to reopen this deposition once those significant deficiencies are cured.  I understand there is a dispute about that and we may have to address it with the court at the appropriate time.

MR. FELDMAN:  Okay.  Obviously, you know, we disagree with those assertions, but we'll agree to disagree.

I just have a few questions and we should all be able to get home.

Are you ready?  Okay.