**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PALANTIR TECHNOLOGIES INC.,

               Plaintiff,

    v.

HIRSH JAIN, RADHA JAIN, and JOANNA
COHEN

               Defendants.

Civil Action No. 25-cv-08985-JPO

Hon. J. Paul Oetken

---

**PLAINTIFF PALANTIR TECHNOLOGIES INC.'S REPLY**
**IN SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION**

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Attorneys for Plaintiff

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...........................................................................................................................4

I.    Palantir Is Likely to Succeed in Proving Radha and Joanna Breached Their Non-Competition Obligations. .................................................................................................4

    A.  Radha and Joanna's Non-Competition Obligations Are Enforceable. ........................4

        1.  New York Law Does Not Automatically Invalidate Non-competes that Prohibit Work for "Similar" Businesses. ............................................................4

        2.  Palantir's Non-Competes Are Supported by Legitimate Interests. .......................7

    B.  Radha and Joanna Breached Their Non-Competition Obligations. ...........................8

II.   Palantir Is Likely to Succeed in Proving Hirsh and Radha Breached Their Employee Non-Solicitation Obligations. ....................................................................................................10

    A.  Hirsh and Radha's Employee Non-Solicitation Obligations Are Enforceable. ..........10

    B.  Radha and Hirsh Breached Their Employee Non-Solicitation Obligations Through "Pillaging" and "Poaching." ....................................................................................12

III.  Palantir Is Likely to Succeed in Proving Joanna Breached Her Customer Non-Servicing Obligations. .........................................................................................................................14

    A.  Joanna's Customer Non-Servicing Obligations Are Enforceable .............................14

    B.  Joanna Breached Her Customer Non-Servicing Obligations. ...................................16

IV.  Palantir Is Likely to Succeed in Proving Joanna Breached Her Confidentiality and Return-of-Property Obligations. ...................................................................................................17

V.   Palantir Is Likely to Succeed in Proving Hirsh Tortiously Interfered with Radha's Contract with Palantir. ..................................................................................................................19

VI.  Palantir Will Suffer Irreparable Harm Absent Injunctive Relief. ....................................20

VII. The Balance of Hardships and Public Interest Strongly Favor Palantir...........................22

VIII.The Court Has Substantial Discretion to Impose Extracontractual Relief Based on Defendants' Egregious Misconduct. ..............................................................................23

CONCLUSION.....................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Adecco USA, Inc. v. Staffworks, Inc.*,
2020 WL 7028872 (N.D.N.Y. Sept. 15, 2020)...................................................16

*Adecco USA, Inc. v. Staffworks, Inc.*,
2021 WL 2593304 (N.D.N.Y. June 23, 2021) ...................................................5

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999)...................................................................................8

*Bessemer Trust Co., N.A. v. Branin*,
949 N.E.2d 462 (N.Y. 2011) ........................................................................14

*Bijan Designer for Men, Inc. v. Katzman*,
1997 WL 65717 (S.D.N.Y. Feb. 7, 1997).......................................................15

*Bulman v. 2BKCO, Inc.*,
882 F.Supp.2d 551 (S.D.N.Y. 2012) ..............................................................20

*Bus. Intel. Servs., Inc. v. Hudson*,
580 F.Supp. 1068 (S.D.N.Y. 1984) .................................................................7

*Capstone Logistics Holdings, Inc. v. Navarette*,
2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018)....................................................7

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
369 N.E.2d 4 (N.Y. 1977)..............................................................................6

*Cyre Precision LLC v. Duro Textiles, LLC*,
2016 WL 1629343 (S.D.N.Y. Apr. 22, 2016) ...................................................6

*Devos, Ltd. v. Record*,
2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015)...................................................16

*Disability Rts. New York v. N. Rivers Fam. Servs., Inc.*,
2016 WL 11979118 (N.D.N.Y. June 2, 2016) ...................................................1

*Equibal, Inc. v. 365 Sun LLC*,
2024 WL 1526178 (S.D.N.Y. Apr. 9, 2024).....................................................21

*Flatiron Health, Inc. v. Carson*,
2020 WL 1320867 (S.D.N.Y. March 20, 2020)..................................................5

*Howmedica Osteonics Corp. v. Howard*,
2022 WL 16362464 (D.N.J. Oct. 28, 2022) .....................................................14

*Iannucci v. Segal Co., Inc.*,
2006 WL 8407380 (S.D.N.Y. June 27, 2006)...................................................20

*Ikon Off. Sols., Inc. v. Usherwood Off. Tech., Inc.*,
  21 Misc. 3d 1144(A), (Sup. Ct. 2008) ............................................................. 11

*Int'l Bus. Machines Corp. v. Lima*,
  2020 WL 5261336 ................................................................................................ 20

*Int'l Bus. Machines Corp. v. Papermaster*,
  2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) .......................................... 20, 21

*Inv. Access Corp. v. Doremus & Co., Inc.*,
  588 N.Y.S. 2d 842 (1st Dep't 1992) .................................................................. 15

*John Hancock Mut. Life Ins. Co. v. Austin*,
  916 F.Supp. 158 (S.D.N.Y. 1996) ...................................................................... 7

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F.Supp.2d 525 (S.D.N.Y. 2004) ................................................................. 6

*Lumex, Inc. v. Highsmith*,
  919 F.Supp. 624 (E.D.N.Y. 1996) ...................................................................... 5

*Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*,
  2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) ..................................................... 15

*MasterCard Int'l Inc. v. Nike, Inc.*,
  164 F.Supp.3d 592 (S.D.N.Y. 2016) ................................................................. 11

*Mountain West Series of Lockton Companies, LLC v. Alliant Ins. Servs. Inc.*,
  2019 WL 2536104 (Del. Ch. June 20, 2019) ................................................... 23

*N.Y. Real Est. Inst., Inc. v. Edelman*,
  42 A.D.3d 321 (2007) ......................................................................................... 21

*Oliver Wyman, Inc. v. Eielson*,
  282 F.Supp.3d 684 (S.D.N.Y. 2017) ................................................................. 11

*Owens v. W. & S. Life Ins. Co.*,
  717 Fed. Appx. 412 (5th Cir. 2018) .................................................................... 8

*Payment Alliance Int'l, Inc. v. Ferreira*,
  530 F.Supp.2d 477 (S.D.N.Y. 2007) ............................................................. 7, 21

*Permanens Capital L.P. v. Bruce*,
  2022 WL 3442270 (S.D.N.Y. July 22, 2022) ................................................... 11

*Pinkhasov v. Vernikov*,
  2024 WL 2188356 (E.D.N.Y. May 15, 2024) .................................................. 19

*QBE Americas, Inc. v. Allen*,
  2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) ................................................... 11

*Silipos, Inc. v. Bickel*,
  2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ..................................................... 5

*Slomin's Inc. v. Gray*,
    575 N.Y.S. 2d 545 (2nd Dep't 1991) ...................................................................................... 15

*Springs Mills, Inc. v. Ultracashmere House, Ltd.*,
    724 F.2d 352 (2d Cir. 1983) .............................................................................................. 23

*United Pool Distrib., Inc. v. Customer Courier Sols., Inc.*,
    2024 WL 3163432 (W.D.N.Y. June 25, 2024) ................................................................. 14

*USI Ins. Services v. Miner*,
    801 F.Supp.2d 175 (S.D.N.Y. 2011) ................................................................................ 16

*WebMD Health Corp. v. Martin*,
    824 N.Y.S.2d 767 (Sup. Ct. 2006) ...................................................................................... 8

*Willis Re Inc. v. Herriott*,
    550 F.Supp.3d 68 (S.D.N.Y. 2021) ......................................................................... 4, 8, 15

## Other Authorities

Inquire, MERRIAM-WEBSTER, https://www.merriam-
    webster.com/dictionary/inquire ........................................................................................ 16

## PRELIMINARY STATEMENT

"At Percepta, it's business as usual" [1]—which is exactly why this Court must grant immediate injunctive relief. Defendants' self-serving testimonies and post-hoc excuses flatly contradict the contemporaneous documents unearthed through limited expedited discovery. This Court's power in that posture is clear: "the question of how much weight an affidavit will be given [on a motion for a preliminary injunction] is left to the trial court's discretion." *Disability Rts. New York v. N. Rivers Fam. Servs., Inc.*, 2016 WL 11979118, at *14 n.21 (N.D.N.Y. June 2, 2016). Defendants' pattern of evasion and contradiction guts their credibility and eliminates any basis for believing Defendants' assurances about their conduct, their intentions, or their ongoing and unlawful competitive activities. That obfuscation continues in Defendants' opposition brief and their new declarations.

The record tells the true story. Defendants are engaged in an ongoing campaign of unfair and unlawful competition, customer poaching, employee raiding, and misappropriation of Palantir's confidential information. They bragged about it amongst one another until they were caught. Hirsh and Radha orchestrated an unlawful campaign to "pillage" Palantir's talent using their insider knowledge of Palantir's recruitment and hiring strategies. ECF 44 ("MOL") at 13-17, 19-20. Defendants succeeded—and continue to profit from their pillaging. *Id.* Joanna misappropriated and retained *over a hundred* of Palantir's confidential documents. *Id.* at 21-23. And Joanna has been providing a Palantir prospective customer (███████) with the same services at Percepta that she pitched while at Palantir. *Id.* at 8, 12, 20. In fact, Hirsh, Radha, and Joanna are performing the same work for a business that provides the *same* AI-based solutions for the *same* customers as Palantir. *Id.* at 5-8, 10-13, 18-20. If that is not working for a competitor, then nothing is.

---

[1] Hirsh Jain (@hirshjain), X (Dec. 15, 2025, at 12:30 ET), https://x.com/hirshjain/status/2000619365364855032.

Palantir's likelihood of success on the merits is clear. Defendants knowingly agreed to narrowly tailored obligations designed to protect Palantir's confidential information and customer relationships—each of which is enforceable under New York law—and then violated each of them in precisely the ways those agreements were intended to prevent.

Facing incontrovertible proof of their wrongdoing, Defendants astoundingly cast this story as a "David versus Goliath" narrative by weaponizing Palantir's decision to seek limited and tailored injunctive relief against key ex-employees with demonstrated wrongdoing. Yet Percepta is a wholly-owned subsidiary of General Catalyst, a "mega fund" who in 2024 (along with Andreessen Horowitz) "accounted for 20% of all committed LP capital in the U.S."[2] So it is little wonder that when founding Percepta, Defendants *signed and required others to sign* restrictive covenants containing *nearly identical* non-compete, non-solicit, and confidentiality restrictions to the ones at issue in this lawsuit. *Compare* ECF 33-1, 33-2, 33-3 (together, "PIIA"), *with* Exs. 17, 71.[3]

The record brims with similar duplicity, *e.g.*:

| Defendants' Current Claim | The Truth |
|---|---|
| **"Hirsh did not recruit or solicit me to join Percepta." Radha Decl. ¶19.** | "I want you to consider working w me." Ex. 11 (Hirsh to Radha). |
| **"We have no plans to somehow take Palantir down by stealing its people." Hirsh Decl. ¶28.** | "Yeah I'm down to pillage the best devs at palantir." Ex. 1 (Hirsh to Radha). |
| **"Of the several individuals we discussed, I reached out to just one, via text, *to ask if we might catch up*." Hirsh Decl. ¶29.** | "*We could 100% poach Mark* I ride or die for that guy that is such a good idea. *I just texted him*." Ex. 1 (Hirsh to Radha). |

---

[2] Marissa Plescia, Digital Health Funding Drops in 2024, Investors Shift Focus to Early-Stage Startups, DEALBREAKER (Jan. 14, 2025), https://dealbreaker.com/2025/01/digital-health-funding-drops-in-2024-investors-shift-focus-to-early-stage-startups.

[3] "Ex.__" refers to exhibits attached to the Declaration of Harris Mufson (ECF 42) or the accompanying Supplemental Declaration of Harris Mufson.

| | |
|---|---|
| **"I did not have to be enticed away from Palantir because I was already on my way out the door."  Radha Decl. ¶19.** | "I actually decided I'm going to stay [at Palantir] for the foreseeable" future.  Ex. 9 (Radha to Palantir colleague during Hirsh's recruitment). |
| **"I have no idea what 'confidential recruiting strategies' Palantir is referring to."  Radha Decl. ¶25.** | "I spent basically 3 months [at Palantir] talking about how to attract / retain / identify talent."  Ex. 1 (Radha Text to Hirsh). |
| **"We [at Percepta] don't have a platform."  Radha Tr. 20:11.** | ████████████████████████ Ex. 83. |
| **"My position [on AIP Logic] was a junior front-end engineer."  Radha Decl. ¶9.** | Radha "***currently leads the development of Palantir's flagship AI product (AIP Logic)***."  Ex. 13 (Hirsh to General Catalyst). |
| **"I took these screenshots as part of the transition efforts described above, so that I could more easily reference relevant information while I was in transit."  Joanna Decl. ¶23.** | "Q: Why did you take photographs of these items on February 25th as opposed to emailing them or downloading them?  A: Again, I don't remember specifics."  ***  "Q: How did [the photographs] relate to the transition of your work?  A: Again, I don't remember specifics."  Joanna Tr. 264:25-265:06; 304:2-304:6. |
| **"Palantir's lawsuit has been disruptive to Percepta."  Hirsh Decl. ¶35.** | "At Percepta, it's business as usual." (December 15, 2025 Tweet by Hirsh after Palantir filed PI brief), *ante* n.1. |

Defendants' conduct—and their retroactive justifications—underscore why Palantir faces an *ongoing* risk of irreparable harm that cannot be remedied by damages alone.  Defendants acknowledged that risk when they signed their contracts with Palantir.  PIIA §6.4.  They went on to hold trusted Palantir positions that gave them deep access to confidential information and valuable customer relationships.  They broke that trust, boasted about their "pillaging," and now try to shirk the

consequences.  The threat they pose to Palantir is neither hypothetical nor speculative given Defendants' targeting of Palantir's customers, employees, and confidential information.

The balance of hardships and the public interest also weigh decisively in Palantir's favor. Absent injunctive relief, Palantir will continue to suffer irreparable harm to its confidential information and customer relationships as Defendants persist in the very conduct they contractually agreed to avoid. By contrast, any hardship Defendants claim is minimal and entirely self-inflicted.  Palantir seeks to enforce reasonable, time-limited covenants that Defendants knowingly accepted in exchange for millions of dollars in compensation.  Defendants remain free to work in the applied AI industry so long as they honor their contractual obligations to Palantir.  Enforcing bargained-for restrictions serves the public interest by promoting fair competition, protecting innovation, and holding sophisticated parties to the contracts they freely signed.

## ARGUMENT[4]

I.    **Palantir Is Likely to Succeed in Proving Radha and Joanna Breached Their Non-Competition Obligations.**

A.    **Radha and Joanna's Non-Competition Obligations Are Enforceable.**

Radha and Joanna agreed that, for 12 months following employment, they would not "perform the job functions that [they] performed during [their] employment with [Palantir] for an entity engaged in the same or similar business as [Palantir]."  PIIA §6.3.[5]  Instead, Defendants misstate New York law to assert meritless arguments.

1.    *New York Law Does Not Automatically Invalidate Non-Competes that Prohibit Work for "Similar" Businesses.*

Defendants argue Palantir's non-competes are overbroad and should be invalidated

---

[4] Except where noted, internal citations and quotations are omitted for clarity, and all emphases have been added.

[5] Defendants "forfeit" any challenge to the duration and geographic scope of their non-competes.  *Willis Re Inc. v. Herriott*, 550 F.Supp.3d 68, 85-86 (S.D.N.Y. 2021).

because they use the word "similar." Opp. 25-28. But New York courts have repeatedly enforced non-competes that use "similar" in the same way as the covenant at issue here. *See Adecco USA, Inc. v. Staffworks, Inc.*, 2021 WL 2593304, at *7-8 (N.D.N.Y. June 23, 2021) (finding enforceable covenants barring employees from working for "any business which competes with, or is ***similar*** to, Company's business"); *Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 626, 636 (E.D.N.Y. 1996) (enforcing non-compete prohibiting sale of "product which is ***similar to*** or competitive with a product manufactured and/or sold by the Employer").

The few cases Defendants cite in opposition do not hold that the word "similar" renders a non-compete unenforceable. Those cases simply instruct courts to read the entirety of a non-compete to determine its reasonableness, not one word or phrase in isolation. For example, in *Flatiron Health, Inc. v. Carson*, the court did not declare unenforceable every non-compete using the word "similar," but instead held the non-compete at issue was unenforceable only for purposes of "***the circumstances presented by this case***." 2020 WL 1320867, at *19 (S.D.N.Y. March 20, 2020). That non-compete prohibited working in non-competitive business lines and even in roles "unrelated to what [defendant] did for" the plaintiff. *Id*. at *6, 21, 24. The non-compete in *Silipos, Inc. v. Bickel* similarly prohibited the defendant "from performing ***any*** function for ***any*** employer in the industry." 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006).

Palantir's non-compete is significantly narrower. It does not prohibit work in non-competitive businesses, and its application in competitive firms is expressly limited to "the job functions that [Defendants] performed during [their] employment with [Palantir]." PIIA §6.3. Such narrow prohibitions are enforceable. *See Adecco USA*, 2021 WL 2593304, at *7-8 (enforcing

non-compete that prohibits employee from "performing functions similar to those performed or managed by [employee] while employed by Company").[6]

Defendants err again by asserting Palantir's non-competes "sweep in every company" using AI to enhance operational efficiencies.  Opp. 25-27.  *First*, the circumstances of this case show Percepta is a Palantir copycat that enhances operational efficiencies by assisting similar customers in developing similar AI solutions for similar use cases.  MOL 10-13.

*Second*, there is no record evidence that any of the (hypothetical) employers Defendants reference assist similar customers in developing similar AI solutions for similar use cases.  Opp. 26.  Even if they did, the covenant must be read in its entirety—without myopic focus on one word divorced from surrounding context.  *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F.Supp.2d 525, 539-40 (S.D.N.Y. 2004).  Palantir's non-compete only precludes Defendants from performing analogous duties to their job at Palantir—not from working at competitive companies entirely.  That is lawful and reasonable.

*Third*, Defendants inequitably argue the meaning of "similar" is unknowable while using the exact same language in their own restrictive covenants.  *Compare* PIIA §6.3 (prohibiting work for "similar business" to Palantir), *with* Exs. 17, 71 (prohibiting solicitation of "business similar" to General Catalyst).  Defendants require Percepta employees to agree to the same language they now challenge as incomprehensible and unenforceable.  They cannot have it both ways.

---

[6] Defendants' other cases are similarly inapposite.  *Cyre Precision LLC v. Duro Textiles, LLC* involved a non-compete with "no limits on its…temporal duration."  2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016).  Defendants' non-competes are limited to 12 months after leaving Palantir.  And the non-compete in *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.* made no mention of a prohibition on selling goods "similar" to those sold by the company, and thus, provides no support for Defendants' position.  369 N.E.2d 4 (N.Y. 1977).

### 2. *Palantir's Non-Competes Are Supported by Legitimate Interests.*

Defendants argue the non-competes are unsupported by legitimate interests. This is wrong on two scores: the covenants are supported by Palantir's legitimate interests in protecting both its confidential information ***and*** its customer relationships.

Defendants first incorrectly argue Palantir has not specified the confidential information protected by its non-compete. Opp. 28-29. Not so. Palantir has described in detail the confidential information Defendants accessed and used at Palantir and how such information could be exploited in their work for Percepta. Shankar Decl. ¶¶11-12; Greenspan Decl. ¶7; Parikh Decl. ¶9 (explaining Palantir's source code, internal workspace of demonstrations, deployed customer workflows, and proprietary customer engagement strategies). Courts have long recognized that such information is a protectible interest supporting lawful non-competes. *Bus. Intel. Servs., Inc. v. Hudson*, 580 F.Supp. 1068, 1072 (S.D.N.Y. 1984) ("information concerning the source codes"); *Capstone Logistics Holdings, Inc. v. Navarette*, 2018 WL 6786338, at *3 n.4, *27 (S.D.N.Y. Oct. 25, 2018) ("presentations on upcoming initiatives," noting there is "no conflict between Delaware and New York law regarding enforceability of restrictive covenants"); *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F.Supp.2d 477, 482-83 (S.D.N.Y. 2007) ("marketing strategies").[7]

The record also belies any argument that Palantir has not established protectible customer relationships. Opp. 29. Joanna served as the primary point of contact for customers, communicating with engineers and c-suite executives alike, while translating user needs into workflow and technical requirements. MOL 7-8. She worked hand-in-hand with customers to design and implement AI workflows, navigate complex systems, and deliver solutions that

---

[7] Defendants' cases concerning the requirements for establishing a "trade secret," Opp. 28-29, are inapposite because Palantir has not asserted trade secret claims, and "confidential information" constitutes a legitimate interest supporting enforcement of a non-compete. *See John Hancock Mut. Life Ins. Co. v. Austin*, 916 F.Supp. 158, 165 (S.D.N.Y. 1996).

transform clinical and operational processes. MOL 8. Radha did all that, too, while attending on-site bootcamps with customers to refine solutions and gain insight into product use and needs. MOL 7. These are exactly the relationships courts deem protectible—especially when Defendants work with customers in the same sectors. *Willis*, 550 F.Supp.3d at 103.[8]

### B.    Radha and Joanna Breached Their Non-Competition Obligations.

Defendants fail to rebut the evidence of breach: Percepta is engaged in the same or similar business as Palantir, and their job functions at Percepta mirror the ones they held at Palantir.

***Percepta and Palantir engage in the same or similar business.*** Defendants do not dispute that Percepta and Palantir assist similar customers in developing similar AI-driven enterprise workflow solutions for similar use cases across the same industries. That makes them competitors engaged in the "same or similar business." *WebMD Health Corp. v. Martin*, 824 N.Y.S.2d 767 (Sup. Ct. 2006); *Owens v. W. & S. Life Ins. Co.*, 717 Fed. Appx. 412 (5th Cir. 2018). Because they cannot dispute this basic and dispositive fact, Defendants nit-pick to try to create daylight between Palantir's and Percepta's businesses. These efforts fail.

Defendants argue that "Percepta has not developed, and thus does not sell, a commercial product or platform." Opp. 32. Whether Percepta has a "commercial product or platform" is irrelevant since Defendants concede the companies help similar customers develop similar AI solutions for similar use cases.

In any event, these allegations are demonstrably false. Percepta's own records show it is laser-focused on creating competitive AI products and platforms. ███████████████████

---

[8] *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999) does ***not*** establish that "to be protectible, the employee must have had a 'long-standing client relationship' and her services [to the customer] 'must have been a significant part of the total transaction.'" Opp. 29. *BDO* merely held that "[t]he risk to the employer ***reaches a maximum*** in situations in which the employee must work closely with the client or customer over a long period of time, ***especially*** when his services are a significant part of the total transaction." 93 N.Y.2d at 391-92.



Percepta would have this Court believe it is merely an "AI-focused consultancy" business.

107.  Even if Percepta were a pure consulting business, it would still be competitive with Palantir because Palantir does AI consulting work as well.  Jungck Tr. 56:7-13, 102:10-16 (detailing Palantir's "consulting agreements" where the customer does not purchase Palantir's products); Radha Tr. 108:19-109:22 (discussing Palantir's "consulting side of the house").

**Radha and Joanna perform the same job functions at Percepta and Palantir.**  As a Forward Deployed Engineer at Palantir, Joanna engaged directly with healthcare customers to

understand their business problems and design AI solutions.  Exs. 5, 94.  As an Applied AI Engineer at Percepta, she "embed[s] directly with customers [like ███████] on developing applied AI workflows."  Ex. 80.  This is the same job.

Radha concedes that she likewise did identical work as a Forward Deployed Engineer for Palantir.  *See, e.g.*, Radha Tr. 54:16-20.  Then, as an AI (Front-End) Product Engineer for Palantir, she designed and built AIP Logic; led brainstorming, coding, and prioritization of features; and attended on-the-ground bootcamps with healthcare customers (including hospitals) to drive adoption and tailor workflows.  *Id.* 67:20-70:12.  As a Founder at Percepta, she similarly designs and implements AI workflows for healthcare customers, including ███████; writes code; participates in strategic meetings and product development; and otherwise leverages her Palantir experience to architect solutions.  *Id.* 139:10-140:18; 378:18-25.  These are the same functions.

## II. Palantir Is Likely to Succeed in Proving Hirsh and Radha Breached Their Employee Non-Solicitation Obligations.

### A. Hirsh and Radha's Employee Non-Solicitation Obligations Are Enforceable.

Defendants agreed that for 12 (Hirsh) or 24 (Radha) months following the termination of their employment, they would not "directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of [Palantir] to leave their employment with [Palantir]."  PIIA §6.2.  These obligations are tailored to stop raids on Palantir employees with access to Palantir's confidential information and customer relationships.  Defendants respond that the covenants are overbroad because they apply to "every" Palantir employee "without regard to role, skill, or value to the Company."  Opp. 35-36.  Defendants misstate New York law and the facts of Palantir's business.

Courts routinely enforce employee non-solicitation covenants virtually identical to Palantir's.  *See Oliver Wyman, Inc. v. Eielson*, 282 F.Supp.3d 684, 692-93 (S.D.N.Y. 2017) (no "solicit[ing] or endeavor[ing] to cause any employee of the Company…to separate from

employment by the Company"); *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F.Supp.3d 592, 599, 602 (S.D.N.Y. 2016) (no "soliciting MasterCard employees"); *Ikon Off. Sols., Inc. v. Usherwood Off. Tech., Inc.*, 21 Misc. 3d 1144(A), at *8 (Sup. Ct. 2008) (similar).

The pair of cases Defendants cite in rebuttal do not endorse a blanket prohibition on non-solicitation provisions that reach "any employee of the Company"—but rather turned on unique and distinguishable facts. Opp. 35-36. In *Permanens Capital L.P. v. Bruce*, the plaintiff failed to establish the solicited employees had access to confidential information or customer relationships, and as a result, the non-solicit did "not protect a legitimate interest of the employer." 2022 WL 3442270, at *9 (S.D.N.Y. July 22, 2022). Similarly, in *QBE Americas, Inc. v. Allen*, the plaintiff did "not articulate any special investments that it has made in [the solicited] employees' skills" such as to find that the non-solicit protected a legitimate interest of the plaintiff. 2022 WL 889838, at *11 (S.D.N.Y. Mar. 25, 2022).

Unlike the plaintiffs in those cases, Palantir has demonstrated in detail how it invests in and entrusts its relatively small workforce:

- **Confidential information.** When asked if she had access to Palantir's confidential information, Radha responded "*[a]long with every other Palantir employee, yes*." Radha Tr. 46:25-47:5. When asked if she had access to Palantir's source code, Radha again responded "[a]long with every other Palantir engineer, yes." *Id.* 47:6-8.

- **Customer relationships.** All Forward Deployed Engineers "work side by side with [Palantir's] customers, rapidly understanding their toughest issues [and] architecting and building solutions that leverage business-critical data and the latest advancements in AI to solve them." Ex. 5. As Radha explained, "[i]f you are directly working with a customer as a forward-deployed engineer on their team, yes [you have weekly interaction]." Radha

Tr. 66:5-10.  And all Front-End Software Engineers "interview[] users to better understand their needs and identify[] product gaps to improve" as well as "consider[] that customer context along with signal gathered from other customers in different industries [to] brainstorm[] approaches."  Ex. 6.  Because Palantir's "primary source of revenue" is its "contracts with customers," Jungck Tr. 72:19-73:2, Palantir's legitimate interest in protecting customer relationships certainly extends to ***all*** the employees in whom Palantir has invested, and who are integrated into, its customer relationships.

Palantir has established precisely the sort of "legitimate interests" and "special investments" absent in *Permanens* and *QBE*.

Furthermore, this argument in insincere since Radha and Joanna's General Catalyst employment agreements contain the same employee non-solicit obligation.  *Compare* PIIA §6.2, *with* Exs. 17, 71.  Hirsh and Radha require all of their employees to agree to this obligation and acknowledge that it is "required for the adequate protection of Company's business and [is] reasonable under all circumstances."  Exs. 17, 71.  Defendants cannot legitimately contend that language they deem enforceable and "required" in General Catalyst's agreements is unenforceable when used in Palantir's agreements.

## B.  Radha and Hirsh Breached Their Employee Non-Solicitation Obligations Through "Pillaging" and "Poaching."

Hirsh knew he and other recently-departed Palantir employees were prohibited from soliciting former colleagues.  Ex. 39 (Hirsh admitting to Radha, "I just am not allowed to have 'solicited' you"); Radha Tr. 44:8-22 (Palantir employees were all generally aware of non-solicitation obligations); Mathew Tr. 320:9-321:22 (Hirsh discussed employee non-solicitation obligations with General Catalyst's attorneys).  And yet, immediately after leaving Palantir, Hirsh recruited Radha through repeated texts, meetings, and promises of lucrative compensation and

equity. *See, e.g.*, Ex. 11 (Hirsh texting Radha, "I want you to consider working with me"); Radha Tr. 214:18-216:10; 237:12-238:20 (Hirsh negotiated Radha's compensation).

Radha knew the same thing. Radha Tr. 44:8-10. But while still on Palantir's payroll, she celebrated "poaching" Palantir employees while conspiring with Hirsh to "pillage the best devs at palantir" by identifying them, sharing LinkedIn profiles, discussing recruitment strategies, proposing tailored inducements for specific employees, and contacting employees. Ex. 1.

Together, they successfully solicited Joanna through in-person meetings, calls, and introductions to Percepta stakeholders, with Hirsh negotiating her compensation and Radha reinforcing the pitch. *See, e.g.*, Exs. 43, 49, 54-57, 62. Their coordinated efforts extended to other Palantir employees as well, including Bryan McLellan, demonstrating a deliberate, sustained recruitment scheme. Exs. 2, 14, 42, 60, 75-77. This is textbook "solicitation."

Defendants do not dispute any of these facts or even attempt to distinguish the on-point legal authority in Palantir's moving brief. Instead, they claim they are not in breach because Radha, Joanna, and McLellan allegedly "instigated their own departures" from Palantir. Opp. 36.

The record squarely contradicts this assertion. Days before meeting with Hirsh to discuss Percepta, Radha told a colleague she "actually decided I'm going to stay [at Palantir] for the foreseeable" future. Ex. 9. And since Percepta was entirely in "stealth" mode during their recruitment, neither Joanna nor McLellan would have known about Percepta were it not for Hirsh and Radha's solicitation activities.[9] Regardless, whether an individual has engaged in unlawful solicitation does not turn on who initiates first contact. *Bessemer Trust Co., N.A. v. Branin*, 949

---

[9] The cases cited by Defendants are readily distinguishable. Opp. 36-37. In each case, the plaintiff presented no evidence that the defendant's actions resulted in employee departures. The opposite is true here because the record is clear that Radha, Joanna, and McLellan would ***not*** be Percepta employees today were it not for Hirsh and Radha's solicitation.

N.E.2d 462, 469 (N.Y. 2011) (a party subject to non-solicit "is not free to tout his new business venture simply because a former client has fortuitously communicated with him first").

Defendants' hit-and-miss results recruiting ***certain*** candidates similarly does not excuse their breach.  Opp. 37.  For one, Defendants ***were*** successful in recruiting Radha, Joanna, and McLellan.  Regardless, Defendants' non-solicitation obligations prohibit them from "attempt[ing] to solicit" former colleagues.  The covenants and New York law do not require that the solicitation be successful for a breach.  *See United Pool Distrib., Inc. v. Customer Courier Sols., Inc.*, 2024 WL 3163432, at *7 (W.D.N.Y. June 25, 2024) (defendant breached non-solicit simply by "sending this direct solicitation email"); *Howmedica Osteonics Corp. v. Howard*, 2022 WL 16362464, at *12 (D.N.J. Oct. 28, 2022) (solicitation does not "require that the request or petition be successful").

## III.    Palantir Is Likely to Succeed in Proving Joanna Breached Her Customer Non-Servicing Obligations.[10]

### A.    Joanna's Customer Non-Servicing Obligations Are Enforceable

Joanna does not dispute that during her career with Palantir, she was closely embedded with Palantir's customers and gained access to highly confidential information regarding those customers' businesses.  For example, Joanna admits that she "served as a point of contact for customers" and her "primary focus was managing customer relationships."  Joanna Decl. ¶¶5, 8. In light of Joanna's extensive access to Palantir's customer relationships, her agreement not to

---

[10] Percepta's effort to defeat the claims against Joanna using semantics fails.  It is true Palantir used the catch-all term "Customer Solicitation" to label its claim.  MOL 29.  But the substance of the claim is unambiguous: Joanna "is now providing precisely the same services to ▮▮▮▮ for Percepta that she pitched to provide to ▮▮▮▮ while at Palantir...constitut[ing] a breach of her obligation not to 'conduct[] business' with ▮▮▮▮ 'that is competitive or similar to' Palantir." MOL 30. This is interchangeable with the language used in customer non-servicing cases, *see Willis*, 550 F.Supp.3d at 84 ("alleged solicitation and servicing"), so Palantir has adopted that more specific label here for clarity.

"contact…any Customer for the purposes of conducting business that is competitive or similar to that of [Palantir]" is enforceable.  PIIA §6.1(a); *see Willis*, 550 F.Supp.3d at 103.[11]

Joanna parrots the same failed argument she asserts to challenge the enforceability of her non-compete by parsing the words "competitive or similar" without considering the broader context of the restrictions (i.e., requiring her to perform the same job functions at a competitor). These arguments fail for the same reasons.  *Ante* §I.B.

She also misstates New York law in arguing that customer non-servicing obligations are *per se* unenforceable if a customer independently seeks out the employee's services.  Opp. 37-38.  Courts routinely enforce customer non-servicing obligations regardless of whether the customer seeks out the employee's services.  *See Willis*, 550 F.Supp.3d at 103 (enforceable "even if they would prohibit the employee from accepting business from former clients who voluntarily and without any solicitation chose to continue to do business with the employee"); *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500, at *9 (S.D.N.Y. Jan. 27, 2025) ("numerous courts that have considered restrictive covenants prohibiting the servicing of an employee's former clients have found them to be enforceable, so long as they are otherwise reasonable in scope").[12]

---

[11] Defendants' reliance on *Bijan Designer for Men, Inc. v. Katzman* is entirely misplaced because that case concerned customer non-solicitation restrictions, not customer non-servicing restrictions.  1997 WL 65717, at *2 (S.D.N.Y. Feb. 7, 1997).  Defendants' reliance on *Slomin's Inc. v. Gray* is similarly misplaced because the court found the non-servicing provision at issue unreasonable since it applied "in perpetuity."  575 N.Y.S. 2d 545, 546-47 (2nd Dep't 1991).  Joanna's obligation lasts for only 24 months.  PIIA §6.1(a).

[12] Defendants' citation of *Inv. Access Corp. v. Doremus & Co., Inc.*, 588 N.Y.S. 2d 842 (1st Dep't 1992) is irrelevant. Opp. 38. Defendants contend that a non-servicing covenant should not be enforced "where plaintiff's customer sought out the former employee." *Id.* But *Inv. Access Corp.* held that such circumstances were "not dispositive" to its analysis. Regardless, ████ did not seek out Joanna. To the contrary, Defendants contend ████ engaged Percepta before Joanna joined. Opp. 39.

Joanna also argues that customer non-servicing provisions can only apply to actual customers rather than prospective ones. Opp. 38. Again, this is not the law. *See USI Ins. Services v. Miner*, 801 F.Supp.2d 175 (S.D.N.Y. 2011) (deeming enforceable restriction as applied to "active prospective clients"); *Adecco USA, Inc. v. Staffworks, Inc.*, 2020 WL 7028872, at *12 (N.D.N.Y. Sept. 15, 2020) (enforcing restriction as applied to "prospective customers"); *Devos, Ltd. v. Record*, 2015 WL 9593616, at *19 (E.D.N.Y. Dec. 24, 2015) (enjoining defendant from "communicating with any…prospective customer of the Plaintiff").

### B. Joanna Breached Her Customer Non-Servicing Obligations.

Joanna does not meaningfully challenge the record evidence showing she ran roughshod over her non-servicing obligations with respect to ███████. By providing the same services to ███████ for Percepta that she worked to provide ███████ on behalf of Palantir, Joanna's admissions alone establish a clear breach of her obligation.

In opposition, and without any authority, Joanna argues she is not in breach because Palantir purportedly made an initial outreach to ███████. Opp. 38. Such a narrow reading of her non-servicing covenant would gut the purpose of protecting Palantir's customer relationships. It also fails to comport with common sense or the record evidence. Indeed, the definition of "inquire" simply means "to ask about." [13] The record reflects that ███████ certainly "ask[ed] about" Palantir's services regardless of who made initial contact. Exs. 36-38. Thus, ███████ certainly "inquired of" Palantir's services.

Joanna also argues that Palantir cannot show it lost the ███████ account to Percepta because of Joanna. Opp. 39. This argument misses the point. Palantir does not bring a claim against Joanna for unlawfully soliciting ███████, but rather, for unlawfully servicing ███████

---

[13] Inquire, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/inquire.

in a competitive capacity. It makes no difference whether Joanna played a role in Percepta's

original solicitation of ███████. And Percepta's engagement with ███████ has become

significantly more lucrative since Joanna joined, undoubtedly due to her contractual breach.

Mathew Tr. 76:19-22.

## IV. Palantir Is Likely to Succeed in Proving Joanna Breached Her Confidentiality and Return-of-Property Obligations.

Joanna does not challenge the enforceability of her confidentiality and return-of-property

obligations. Instead, she asks the Court to ignore or excuse what is obvious and undisputed—that

in her final days of employment with Palantir, Joanna accessed an unusually large volume of

documents in sensitive internal repositories, sent herself multiple confidential documents through

Slack, downloaded them onto her personal iPhone, and tried to delete the evidence. Wendt Decl.

¶¶8-16; Exs. 101-102. She also took dozens of photographs of her computer screen displaying

proprietary diagrams, workflows, and technical materials. Joanna Tr. 261:7-262:4; Supp. Jungck

Decl. ¶¶4-6.

Joanna self-servingly claims she engaged in all this conduct "as part of legitimate transition

activities." Opp. 40. But she fails to explain how any of the highly sensitive materials had any

relation to any work she was doing for Palantir in her final days of employment. Greenspan Decl.

¶10; Joanna Tr. 269:22-270:11. Nor could she recall in her deposition how *any* of this inexplicable

forensic activity was part of her transition efforts—or what work she was transitioning. *See, e.g.*,

Joanna Tr. 304:2-304:6. Each of her assertions are directly contradicted. Greenspan Tr. 117:21-

127:17. Incredibly, to explain why she still had these documents on her phone months after her

departure, Joanna asserts she "forgot" she had taken and retained over 100 photos of her Palantir

laptop screen. Joanna Tr. 261:20-262:17.

Joanna also self-servingly claims the documents she stole were "not nearly as sensitive as Palantir suggests." Opp. 40. But Joanna concedes that the documents she accessed to retain post-employment are in fact "**confidential** Palantir materials." Joanna Decl. ¶21. These include a healthcare revenue cycle management diagram, an internal demonstration planning framework, a draft statement of work for a major healthcare customer, and an AI use case tracker. Wendt Decl. ¶12; Greenspan Decl. ¶9; Ex. 101. She also photographed slides showing Palantir's end-to-end healthcare AI workflows, model design strategies, and confidential sales materials across multiple industries. Joanna Tr. 280:8-18; 286:19-288:20; 294:12-295:25; 299:24-301:10; 305:5-13; 318:13-320:11; 322:23-323:2. Painting those highly-sensitive documents as exceptions, Joanna testifies that much of the material she misappropriated is available on Palantir's website. Joanna Decl. ¶22. This is, of course, an incomplete defense at best. Regardless, her explanation collapses under scrutiny. Most of these documents are available only through internal, secure repositories that only users with appropriate credentials can access. Supp. Jungck Decl. ¶6. They are maintained as confidential and may be accessed only by individuals with a legitimate business reason to do so. *Id.* The materials Joanna stole represent years of research and millions of dollars in investment, providing insight into Palantir's most effective deployment strategies, technical architecture, and customer engagement playbooks. *See* Jungck Tr. 240:25-241:9; 244:2-245:19; 263:10-21. In the hands of a competitor like Percepta, they would allow rapid replication of Palantir's solutions, shortcutting product development, targeting high-value use cases, and eroding Palantir's competitive advantage. Shankar Decl. ¶12; Greenspan Decl. ¶11; Supp. Jungck Decl. ¶¶5-7.

Nor should the Court credit Joanna's argument that her breach is "moot" after she purportedly deleted the confidential information she stole after Palantir caught her. Joanna Decl.

¶21.  Even if certain files were deleted from her iPhone, that does not eliminate her breach or eliminate the risk of ongoing harm.  Joanna fails to address whether such materials exist on other devices or in cloud backups.  And despite repeated requests, Defendants have refused to detail the supposed investigation they made into the dissemination of Palantir's confidential information.  Ex. 110 (Jan. 8, 2025 Letter from Latham & Watkins).  Courts considering requests for injunctions have rejected similar post-hoc and self-serving assurances.  *Pinkhasov v. Vernikov*, 2024 WL 2188356, at *7 (E.D.N.Y. May 15, 2024) (rejecting mootness where defendant's assurances in her declaration were "sparse," "illusory," and lacked "detailed and binding" qualities of a stipulation or judicially enforceable covenant).  Joanna also fails to explain how an injunction prohibiting her from using and retaining Palantir's confidential information could harm her in any way—because it simply would not.  If her promises are sincere, an injunction would merely effectuate them.

## V.    Palantir Is Likely to Succeed in Proving Hirsh Tortiously Interfered with Radha's Contract with Palantir.

Hirsh does not meaningfully contest what his own contemporaneous writings demonstrate—he knew about Radha's restrictive covenants and tortiously interfered with them.

His half-hearted feigned ignorance of Radha's obligations is easily discounted.  Opp. 41. He and Radha discussed their obligations, and each owed the same loyalty, employee non-solicitation, and confidentiality obligations to Palantir.  *Compare* ECF 33-1, *with* ECF 33-2; *see also* Ex. 39; Radha Tr. 231:22-232:8; Mathew Tr. 320:9-321:22.  Radha also testified that employee non-solicitation obligations are "widely discussed" among Palantir's employees.  Radha Tr. 232:4-8.

The scarce opposition is expected, as there is perhaps no clearer articulation of tortious interference than a plan to enlist Radha to "pillage" Palantir's employees and customers in violation of her obligations to Palantir and then execute on that plan.  Hirsh encouraged Radha to

participate in recruiting and competitive customer meetings before she resigned—causing her to violate her contracts and her duty of loyalty.  *See* Radha Tr. 41:23-42:6; Ex. 1.  The record is clear, and Hirsh should be held accountable for his tortious conduct.

## VI.    Palantir Will Suffer Irreparable Harm Absent Injunctive Relief.

Palantir has established that absent a preliminary injunction, it will suffer immediate and irreparable harm due to the risk of disclosure of its confidential information and interference with its customer relationships.  Defendants argue that Palantir must prove misappropriation of confidential information or actual loss of customers.  That is not the law.  A plaintiff need not wait for the harm to fully materialize before seeking injunctive relief.  Irreparable harm can be established by a substantial risk or threat of disclosure of confidential information or interference with customer relationships.[14] *See Int'l Bus. Machines Corp. v. Papermaster*, 2008 WL 4974508, at *7-8 (S.D.N.Y. Nov. 21, 2008).

The question, therefore, is not whether Palantir **has** lost any customers, Opp. 17-20, but whether Palantir faces an imminent **risk** of losing customers or goodwill.  *Bulman v. 2BKCO, Inc.*, 882 F.Supp.2d 551 (S.D.N.Y. 2012) ("prospective loss of…goodwill alone is sufficient").  Palantir faces such risk based on the clear overlap between Percepta's and Palantir's businesses, *ante* §I.B.; Defendants' contractual violations; *ante* §§I.B; II.B., III.B., IV, and Defendants' continued contradictions of contemporary evidence, *ante* Preliminary Statement. This risk is far from speculative.  Opp. 16-20.  Percepta has successfully targeted potential Palantir customers like ███████.  *Ante* §§III.B.  And Percepta is actively targeting Palantir's major healthcare customers. ███████ is a "Target Customer[]" with which Percepta is in "advanced conversations," Ex. 79, and ███████ is in Percepta's "current commercial pipeline."  Ex. 81.

---

[14] Indeed, Defendants acknowledged their breaches would cause irreparable harm, PIIA §6.4, which further supports a finding of irreparable harm in the absence of an injunction.  *See Iannucci v. Segal Co., Inc.*, 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006) (showing of irreparable harm "strengthened significantly" by contractual acknowledgment); *Int'l Bus. Machines Corp. v. Lima*, 2020 WL 5261336, at *14 (similar).

Palantir also faces an imminent risk of disclosure of its confidential information. For one, Defendants' self-serving testimony casts serious doubt on their assurance no Palantir confidential information has *already* been used. These risks are particularly acute with respect to Joanna, who went digging for Palantir's confidential information and stole dozens of Palantir confidential documents upon her departure. *Ante* §IV. Even so, Defendants' representations of non-use are irrelevant to the outcome. Defendants neither dispute that they accessed Palantir's confidential information while employed nor that both Percepta and Palantir offer AI-driven enterprise workflow solutions for customers in overlapping industries. Given these facts, Defendants will ***inescapably*** leverage Palantir confidential information to benefit Percepta unless they are held to the terms of their contracts and responsible for their torts. *See Int'l Bus. Machines Corp.*, 2008 WL 4974508, at *7-8 ("likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm."); *Payment All. Int'l*, 530 F.Supp.2d at 485 (risk of inevitable disclosure "support[s] enforcement of an express restrictive covenant").

Because they have no answer on the merits, Defendants focus on the timeline. But Palantir did not unreasonably delay in seeking relief. As Defendants concede, "delay is measured from the time the plaintiff originally learned of the alleged violation or is put on notice thereof, not when the irreparable injury allegedly begins." Opp. 22 (quoting *Equibal, Inc. v. 365 Sun LLC*, 2024 WL 1526178, at *9 (S.D.N.Y. Apr. 9, 2024)).[15] Defendants hid the nature of Percepta's business until October 2025. MOL 10. As soon as Defendants revealed the nature of their new competitive business—which had been clandestinely operating for months while it leveraged Palantir's employees and confidential information—Palantir immediately launched an investigation and then filed suit within days of uncovering Defendants' misconduct. *N.Y. Real Est. Inst., Inc. v. Edelman*, 42 A.D.3d

---

[15] Joanna's unusual Slack activities in the final weeks of her employment gave rise to a standard IT alert but did not put Palantir on notice she was stealing its confidential information to use at a competitor. *See* Wendt Tr. 34:6-14.

321, 322 (2007) ("Mere delay…does not preclude the grant of an injunction" when "defendant[s] hid their misconduct).

## VII.    The Balance of Hardships and Public Interest Strongly Favor Palantir.

Any hardship to Defendants from honoring the contracts they knowingly signed—in exchange for millions of dollars—is minimal, self-inflicted, and far outweighed by Palantir's legitimate interest in avoiding irreparable harm.

Defendants portray themselves as "young professionals" forced to accept onerous, take-it-or-leave-it restrictions that may ***temporarily*** prevent them from working in their preferred roles.  Opp. 41-42.  But Defendants are highly sophisticated individuals with elite educations, extensive experience at global technology companies like Google and Microsoft, and their own multi-million-dollar startup backed by one of the largest venture capital firms in the world.   No record evidence suggests Defendants lacked meaningful choice (or bargaining power) when they signed their agreements with Palantir.

Nor does the requested injunction unreasonably restrict Defendants' ability to work—even in the short term, and even in the applied AI industry.  They simply must avoid misusing confidential information or (temporarily) doing analogous work for competitors and/or soliciting Palantir employees or customers.

Enforcing narrowly tailored covenants like Palantir's advances the public interest by promoting fair competition and upholding bargained-for contracts.  Defendants agreed to reasonable restrictions for substantial compensation.  Palantir seeks prospective relief to enforce its end of the bargain now and in the future.

**VIII.  The Court Has Substantial Discretion to Impose Extracontractual Relief Based on Defendants' Egregious Misconduct.**

The Opposition routinely discusses non-defendant Percepta's conduct—and rightly so. Percepta's future ability to compete fairly is "tainted" by Hirsh's calculated interference with Radha's contractual obligations and his creation of a copycat business built by unlawfully raiding employees and customers and misusing confidential information.

Courts have broad equitable authority to craft injunctions. *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983). Given the severity and deliberate nature of Hirsh's violations, as in *Mountain West Series of Lockton Companies, LLC v. Alliant Ins. Servs. Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019), the Court should enjoin Hirsh from working for Percepta for 12 months. His ongoing role poses an unacceptable risk of continued violations and irreparable harm.

Defendants do not even mention *Mountain West*. Instead, they argue New York has a public policy against *implying* post-employment covenants. Opp. 43. Palantir is not asking this Court to "imply" a post-employment covenant—but rather to exercise its substantial discretion to impose one to remedy the ongoing irreparable harm created by Hirsh's tortious conduct and contractual violations.

Defendants also argue that injunctive relief must be tailored to fit specific legal violations. Opp. 44. Palantir agrees. As in *Mountain West*, Percepta had "little chance" of succeeding absent Hirsh's tortious interference and "pillaging" violating his non-solicit. Given the egregiousness of misconduct, this Court should temporarily enjoin Hirsh from working for Percepta. Hirsh has built his Palantir imitator almost entirely through unlawful and unfair competition and fostered a culture of transgression instead of transparency. He cannot be trusted to honor his legal obligations if permitted to continue "business as usual."

## CONCLUSION

Palantir respectfully requests that the Court enter its proposed preliminary injunction.


Dated: January 20, 2026                              **GIBSON, DUNN & CRUTCHER LLP**

                                                     By: */s/ Harris M. Mufson*

                                                     Harris M. Mufson
                                                     Ilissa Samplin
                                                     Justin M. DiGennaro
                                                     Zachary A. Schreiber

                                                     GIBSON, DUNN & CRUTCHER LLP
                                                     200 Park Avenue
                                                     New York, New York 10166-0193
                                                     Telephone: 212-351-4000
                                                     hmufson@gibsondunn.com
                                                     jdigennaro@gibsondunn.com
                                                     zschreiber@gibsondunn.com

                                                     GIBSON, DUNN & CRUTCHER LLP
                                                     333 South Grand Avenue
                                                     Los Angeles, CA 90071-3197
                                                     Telephone: 213-229-7000
                                                     isamplin@gibsondunn.com

                                                     *Attorneys for Palantir Technologies, Inc.*

## <u>WORD COUNT CERTIFICATION</u>

I, Harris M. Mufson, an attorney duly admitted to practice law before this Court, hereby certify that this memorandum of law complies with the word limit set forth in the Court's January 6, 2026 Order because it contains no more than 6,977 words, excluding the parts of the motion exempted from the word limit by Local Civil Rule 7.1.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: January 20, 2026                    By: <u>*/s/ Harris M. Mufson*</u>

Harris M. Mufson