UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PALANTIR TECHNOLOGIES, INC.,
                                            Plaintiff,

                        -v-

RADHA JAIN, *et al.*,
                                            Defendants.

25-CV-8985 (JPO)

**REDACTED**
OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Before the Court is a motion for a preliminary injunction filed by Plaintiff Palantir

Technologies, Inc. ("Palantir") against Defendants Radha Jain, Joanna Cohen, and Hirsh Jain

(collectively, "Defendants").  For the reasons that follow, the Court grants the motion for

preliminary injunction as to Palantir's claims against Radha Jain and Hirsh Jain for breach of

their employee non-solicitation obligations and against Cohen for breach of her confidentiality

obligations.  The Court denies all other relief.

I.    **Findings of Fact**

The Court makes the following findings of fact based on the parties' submissions and the

testimony and exhibits in the record.

A.    **Defendants' Work at Palantir**

Palantir is a global software company offering products and services that, among other

things, enable its customers to integrate artificial intelligence ("AI") directly into their business

operations.  (ECF No. 9 ("Shankar Decl.") ¶¶ 2, 6.)  One such product, Artificial Intelligence

Platform ("AIP"), is designed to integrate directly into a customer's existing data infrastructure

and deploy AI-powered applications that process large volumes of data, synchronize the data for

analysis, generate tailored outputs that automate repetitive processes, make AI-driven

recommendations, and execute specific actions within a customer's existing workflow.  (*Id.* ¶¶ 3-4.)  Palantir has AIP customers across several industries, including supply chain management, financial services, and healthcare.  (*Id.* ¶ 5.)

Hirsh Jain joined Palantir in 2017, shortly after graduating from college.  (ECF No. 67 "Hirsh Jain Decl.") ¶¶ 2-3.)  He started as a "forward deployed engineer," a term Palantir uses to describe software engineers who work directly with customers or embed in their operations, within the company's U.S. government division ("USG").  (*Id.* ¶ 3.)  After holding various roles within the division, Hirsh Jain was named Head of Public Health and Senior Vice President, Federal, in 2022.  (*Id.* ¶ 5; ECF No. 40 ("Parikh Decl.") ¶ 4.)  In this role, Hirsh Jain had oversight, strategy, and execution responsibilities across Palantir's federal government health business and held management responsibilities, including setting compensation, contributing to compensation review, and serving as a hiring manager.  (Parikh Decl. ¶¶ 5-6.)

Radha Jain joined Palantir in January 2020, shortly after graduating from college.  (ECF No. 65 ("Radha Jain Decl.") ¶¶ 2, 4.)  Soon after starting, Radha Jain began working within Palantir's USG division as a data engineer, where her role involved building data pipelines and configuring charts and dashboards within Foundry, Palantir's data analytics platform product.  (*Id.* ¶¶ 4-5.)  About a year and a half later, she transitioned to a new role as a sales engineer within USG, where she helped pitch Palantir to potential federal government customers by building demos to illustrate Foundry's potential applications and use cases.  (*Id.* ¶ 6.)  In late 2022, Radha transitioned to another role in Palantir on an internal engineering team.  (*Id.* ¶ 8.)  In April 2023, Radha Jain joined a team within Foundry to leverage large language models ("LLMs").  (*Id.* ¶ 9.)  The project, which became AIP Logic, allows users to query LLMs in a no-code interface using their existing data in Foundry.  (*Id.*)  Radha Jain was a junior front-end

engineer on the AIP Logic project and spent most of her time coding features of AIP Logic related to user interface. (*Id.* ¶¶ 9-11.) In her role, she did not regularly interact with AIP Logic customers. (*Id.* ¶ 12.)

Joanna Cohen joined Palantir in 2020, shortly after graduating from college. (ECF No. 69 ("Cohen Decl.") ¶¶ 2-3.) Cohen began as a forward deployed engineer in Palantir's healthcare division, spending much of her time cleaning and organizing customer data and configuring Foundry so that clients could run analytics. (*Id.* ¶¶ 3-4.) She did not spend much time writing software. (*Id.*) In November 2021, Cohen transitioned to Technical Lead such that, alongside her data organization work, she also served as a point of contact for customers. (*Id.* ¶ 5.) In February 2023, she became Enterprise Lead and Healthcare Lead within Palantir's "Helix" Pod, a group that focused on the company's non-hospital healthcare clients. (*Id.* ¶ 6.) In that role, Cohen provided sales demos of Foundry, participated in sales calls, and managed six Palantir employees, most of whom were not on healthcare projects. (*Id.* ¶¶ 6, 9.) In April 2023, Cohen gave a demo to ▮▮▮▮▮, a then-prospective Palantir healthcare customer. (ECF No. 41-27 at 2.) In October 2024, one of Cohen's colleagues reached out to ▮▮▮▮▮ and had early-stage conversations with ▮▮▮▮▮ executives. (ECF No. 41-25 at 2; Cohen Decl. ¶ 7.) Cohen spoke with a ▮▮▮▮▮ employee around that time about that employee's interest in potentially working for Palantir. (Cohen Decl. ¶ 7.)

In their time at Palantir, Hirsh Jain, Radha Jain, and Cohen all had access to Palantir's confidential information, including: Palantir's GitHub repository containing the core source code for its flagship software platforms; Palantir's internal demonstrative workspace; live, customer-deployed workflows; and proprietary customer engagement strategies. (Parikh Decl. ¶ 9; Shankar Decl. ¶ 11; ECF No. 11 ("Greenspan Decl.") ¶ 7.)

Hirsh Jain, Radha Jain, and Cohen all also signed a Proprietary Information and Inventions Agreement (the "Agreement") with Palantir before beginning their employment. (ECF No. 33-1 ("Hirsh Jain Agmt."); ECF No. 33-2 ("Radha Jain Agmt."); ECF No. 33-3 ("Cohen Agmt.").)  In relevant part, Hirsh Jain's Agreement requires that he "not directly or indirectly solicit, or recruit, or attempt to solicit, or recruit, any employee of [Palantir] to leave their employment with [Palantir]," and that he not "contact any employee of [Palantir], or cause an employee of [Palantir] to be contacted, for the purpose of leaving employment with [Palantir]" for twelve months following his termination from Palantir.  (Hirsh Jain Agmt. § 6.2.) The provision requires tolling of the restricted period in the event of breach.  (*Id*.)

Radha Jain's and Cohen's Agreements contain similar employee non-solicitation provisions, except that their Agreements extend the restricted period to twenty-four months following termination of employment and expand the scope of solicitation to not just Palantir but also any of its subsidiaries worldwide.  (Radha Jain Agmt. § 6.2; Cohen Agmt. § 6.2.)  Their Agreements also require that they "not contact, or cause to be contacted, directly or indirectly, or engage in any form of . . . communication with any Customer for the purposes of conducting business that is competitive or similar to that of [Palantir] or for the purpose of disadvantaging [Palantir's] business in any way" for a period of twenty-four months immediately following their termination from Palantir.  (Radha Jain Agmt. § 6.1(a); Cohen Agmt. § 6.1(a).)  "Customer" is defined in the Agreement to "mean all persons or entities that have used or inquired of [Palantir's] services at any time during the two-year period preceding the termination of [their] employment with [Palantir]."  (Radha Jain Agmt. § 6.1(a); Cohen Agmt. § 6.1(a).)

Both Radha Jain's and Cohen's Agreements also contain prohibitions on competition during and after employment.  The Agreements provide that, during the course of Radha Jain's

and Cohen's employment with Palantir, they would not, "in the same or materially similar capacity" as they work for Palantir, serve as a partner, employee, consultant, director for, organize or take preparatory steps for the organization of, or participate in or affiliate themselves with any business that is in any respect competitive with the business of Palantir or its subsidiaries.  (Radha Jain Agmt. § 5; Cohen Agmt. § 5.)

Radha Jain's and Cohen's Agreements further provide that, for the twelve months immediately following the termination of their employment with Palantir, they "will not engage in any Prohibited Activity," which is defined as an activity in which they "perform the job functions that [they] performed during [their] employment with [Palantir], directly or indirectly, in whole or part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, intern or any other similar capacity for an entity engaged in the same or similar business as [Palantir or its subsidiaries], including those engaged in the business of developing and selling analytical software, whether existing or planned." (Radha Jain Agmt. § 6.3; Cohen Agmt. § 6.3.)  The non-solicitation and post-termination non-compete provisions in Radha Jain's and Cohen's Agreements are subject to tolling.  (Radha Jain Agmt. § 6.4; Cohen Agmt. § 6.4.)

The Agreements also contain a confidentiality provision requiring that Defendants not disclose or use any "Proprietary Information" except within the scope of their employment, where "Proprietary Information" is defined to include "all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae or research activities) [they] develop, learn or obtain during [their] employment that relate to [Palantir and its subsidiaries], or the

business or demonstrably anticipated business of [Palantir and its subsidiaries] or that are received by or for [Palantir and its subsidiaries] in confidence." (Hirsh Jain Agmt. § 4; Radha Jain Agmt. § 4; Cohen Agmt. § 4.) The Agreements require Defendants to promptly return to Palantir all items containing Proprietary Information upon termination of employment. (*Id.*)

### B.    Defendants' Departures from Palantir

In June 2024, Hirsh Jain began to speak with investors at General Catalyst ("GC"), a venture capital firm that invests in "AI-first" companies. (Hirsh Jain Decl. ¶ 10; ECF No. 41-56 at 2.) He learned that GC was creating an "AI Transformation Company," or "AITCo," that would offer AI transformation services to customers including GC's other portfolio companies and investments. (Hirsh Jain Decl. ¶¶ 10-11.) AITCo, which iterated through a few names, eventually became Percepta AI LLC ("Percepta"). (*Id.* ¶ 21.) In July 2024, Hirsh Jain accepted an offer from GC to become Chief Executive Officer of AITCo. (*Id.* ¶ 14.) He informed numerous colleagues at Palantir that he was resigning to become the CEO of a new AI initiative within GC—and specifically that the startup would be working on delivery of value-based care—and worked his last day at Palantir on August 2, 2024. (*Id.* ¶¶ 15-17.) Hirsh estimates that, since his departure from Palantir, he has told over 250 people at Palantir of his plans and current work. (*Id.* ¶ 18.) He began working at Percepta, then AITCo, in September 2024. (*Id.* ¶ 21.)

Near the end of August 2024, Hirsh Jain texted Radha Jain offering to catch up and to introduce her to a future colleague of his at GC. (ECF No. 42-7 at 2.) The two met for coffee on November 4, 2024. (ECF No. 42-10 at 2.) At that meeting, Radha Jain learned about what Hirsh Jain was working on at Percepta, which was then named Renaissance. (Hirsh Jain Decl. ¶¶ 23, 26; Radha Jain Decl. ¶ 17.) The next day, Hirsh Jain messaged Radha Jain that he found their conversation "very energizing and was reminded of how much [he'd] love to come to work

every day and see [her]." (ECF No. 42-11 at 2.) Hirsh Jain then texted, "I say that both [because] I want you to consider working w[ith] me, but also [because] I am def riding the excitement high off of seeing you!" (*Id.*) Radha Jain asked follow-up questions about how money and equity work at Percepta (ECF No. 41-4 at 3-4), and a few days later, Hirsh Jain introduced Radha Jain to a managing director at GC, explaining that the two had "chatted a bunch about Renaissance." (ECF No. 42-13 at 2.)

On November 13, 2024, Radha Jain told Hirsh Jain that she felt "pretty certain" about joining Percepta. (ECF No. 41-11 at 2.) She then joined a call between Percepta employees and ████████, a Percepta customer. (ECF No. 41-13 at 2; Radha Jain Decl. ¶ 20.) Radha Jain did not speak in the meeting (Radha Jain Decl. ¶ 20), but she was introduced as a member of then-Renaissance, participated in a contemporaneous message thread with the other Percepta team members in the meeting, took notes, and contributed her thoughts on how Percepta could achieve "a fairly easy win" or take next steps. (ECF No. 41-13 at 2, 6, 8, 12.)

On November 14, 2024, Hirsh Jain messaged Radha Jain about getting her an offer with Percepta. (ECF No. 42-15 at 6.) The next day, Hirsh Jain and Radha Jain messaged about her start date. (ECF No. 41-1 at 2.) In the same conversation, the two discussed the possibility of hiring several then-current Palantir employees. After Radha Jain mentioned a person at Palantir with whom she enjoyed working, Hirsh Jain said, "[h]ire him," to which Radha Jain replied that "the real star combo here" would be that person in tandem with another Palantir employee. (*Id.* at 5.) Hirsh Jain then said, "I am, fundamentally, a recruiter," and Radha Jain added, "I actually think there would be a play there." (*Id.*) In the next message, Radha Jain said that she "also made friends with a lot of the pipeline builder guys who are also excellent and grind," and that she thought "there is a world where [they] can get some stellar eng talent." (*Id.* at 5-6.) Hirsh

Jain responded, "Yeah I'm down to pillage the best devs at [P]alantir when they're at their maximum richness." (*Id.* at 6.) Radha Jain then noted that she thought the GC-backed structure of Percepta would make it more attractive to developers than "deltas," another category of Palantir employees, before linking to the LinkedIn page of a delta at Palantir who she noted was very good. (*Id.* at 6-7.) In response, Hirsh Jain said, "that is such a good idea" and they "could 100% poach [him]," adding that he just texted him. (*Id.* at 7-8.) Radha Jain responded, "Oh fuck yes," and "Palantir is making him feel special [right now] so we just gotta make him feel more special." (*Id.* at 8.) The two continued to talk about other Palantir employees, noting that one "is probably poachable," and that another "is the best all around everything . . . but is unattainable." (*Id.* at 9-11.) Hirsh Jain then said to Radha Jain, "You understand why I saw you and immediately went into sell mode." (*Id.* at 12.) Radha Jain then offered strategies on hiring, noting that Palantir "crushed" its strategies and that she "think[s] [they] have an opp[ortunity] to do something similar." (*Id.*) She noted that she did "a brief stint building the recruiting machine," and that she and Palantir's head of recruiting "spent basically 3 months talking about how to attract / retain / identify talent," adding that a strategy she offered earlier in the conversation "was a key key part of it." (*Id.* at 13.)

On November 19, 2024, Radha Jain formally accepted an offer to join GC. (ECF No 41-6.) She gave notice of her resignation to her supervisor at Palantir on November 21, 2024, and on November 27, 2024, she emailed approximately 100 people at Palantir informing them that she would be joining an AI startup with former Palantir employees. (Radha Jain Decl. ¶ 26.) She told others over calls that she had an offer in hand from GC and told her supervisor about Percepta's connections to GC and to Hirsh Jain. (*Id.*) She worked her last day at Palantir on December 5, 2024, and started at Percepta a few days later, on December 9, 2024. (*Id.* ¶ 28.)

On November 5, 2024, Cohen and a Palantir colleague met with Hirsh Jain.  (Cohen Decl. ¶ 11; ECF No. 42-45.)  Afterwards, Cohen texted a third party that they planned to meet with Hirsh Jain again to figure out where she and the colleague "would fit in," noting that "right now he's hiring engineers," mostly ex-Palantir.  (ECF No. 41-32 at 6.)  Later that month, Hirsh Jain introduced Cohen to Thomas Mathew, Percepta's Chief Technology Officer.  (ECF No. 41-34 at 2.)  In January 2025, Hirsh Jain again emailed both Mathew and Cohen, saying, "you already know each other but you guys should catch up again to talk all things Renaissance!" (ECF No. 41-37.)  Around that time, he also introduced Cohen to other Percepta members to talk about a new company.  (ECF No. 41-38 at 3; ECF No. 41-39.)  In one such email, Hirsh Jain introduced Cohen to "a critical partner of AITCO" who then invited Cohen to a Zoom meeting titled "AITCo Role."  (ECF No. 41-40; ECF No. 41-41.)  Hirsh Jain also introduced Cohen to Radha Jain and the two met for lunch following Cohen's onsite interview with Percepta, after which Radha Jain called Cohen's Palantir supervisor for a reference.  (Radha Jain Dep. at 350-52, 357; Cohen Dep. at 179.[1])

In early February, Hirsh Jain messaged Cohen and asked, "If we were to move forward would you be comfy w[ith] close to asap."  (ECF No. 42-62.)  He then discussed making her an offer with other GC members (ECF No. 41-44) and negotiated her compensation (*see* ECF No. 41-46; ECF No. 41-47).  Cohen accepted an offer on February 17, 2025, and signed an agreement with GC on February 21, 2025.  (ECF No. 41-49; ECF No. 41-53.)

On the day that she resigned from Palantir, February 24, 2025, Cohen sent herself multiple Palantir documents on Slack and downloaded those documents to her personal

---

[1] The parties have submitted deposition excerpts in a number of filings.  For ease of reference, the Court cites each deposition with reference to the internal page number.

cellphone, in violation of Palantir's policy against transferring company documents to personal devices.  (ECF No. 10 ("Wendt Decl.") ¶ 10.)  She then deleted the documents from her laptop. (ECF No. 41-76 at 3.)  Those documents included a healthcare revenue cycle management diagram, an internal healthcare demonstration planning framework, and a draft statement of work.  (Wendt Decl. ¶ 12.)  The Slack activity triggered an IT alert.  (Wendt Dep. at 33-35.) Around the time of her departure from Palantir, Cohen also accessed and reviewed information in Palantir's GitHub repository, including the names and contact information for Palantir's healthcare customers.  (Wendt Decl. ¶ 16.)  In the three-day window surrounding Cohen's notice of resignation, she viewed sixty-two documents in Highspot, Palantir's repository of confidential marketing content, workflow diagrams, and sales intelligence.  (Wendt Decl. ¶¶ 14-15; Greenspan Decl. ¶ 10.)  The documents she reviewed included those related to industries in which she had never worked and amounted to more documents than she had viewed in the preceding four months combined.  (Wendt Decl. ¶¶ 14-15.)  Cohen took a number of photos of some of these materials and other Palantir work product using her personal cellphone.  (Cohen Dep. 261-65.)  The images she took included descriptions of Palantir offerings and workflow designs, staffing solutions for hospital systems, customer-specific information, presentations and diagrams for active and prospective customer engagement, and other sales documents and customer presentations.  (*Id.* at 280, 286-88, 291, 299-301, 303-05, 318-320, 322-23; *see also* Cohen Decl. ¶ 22.)  Cohen worked her last day at Palantir on March 4, 2025, and she began at Percepta on March 17, 2025.  (Cohen Decl. ¶¶ 25-26.)

Bryan McLellan, who is not a party in this case, is another former Palantir employee who made the move to Percepta.  He became interested in leaving Palantir in early 2025 and spoke with Mathew about Percepta in February 2025.  (ECF No. 63 ¶¶ 4-6.)  After meeting other

members of the Percepta team, including Hirsh Jain and Radha Jain, McLellan accepted an offer and resigned from Palantir in March 2025. (*Id.* ¶¶ 7-10.) Radha Jain, Cohen, and McClellan are the only three individuals Percepta has hired directly from Palantir. (Hirsh Jain Decl. ¶ 33.)

### C.    Defendants' Work at Percepta

Percepta partners with customer organizations to identify where AI can transform the business, deploys an onsite team to shadow the customer's operators, develops a plan for how to apply AI solutions, creates a comprehensive AI platform for the company, and rolls out solutions. (ECF No. 41-56 at 5.) Some of these customers, like ███████, are GC portfolio companies. (Hirsh Jain Decl. ¶ 24.) To build its solutions, Percepta stitches together products offered by other AI companies, including those in GC's portfolio, into a customized "bespoke solution[]" for each customer. (Mathew Dep. at 172-75, 179.) The company made its official public launch on October 2, 2025. (ECF No. 42-78.)

Four days after Hirsh Jain left Palantir, Palantir's Chief Technology Officer connected him with investors at a venture capital firm who were interested in learning more about the work he would be doing; this happened again in January 2025. (Hirsh Jain Decl. ¶ 20; ECF No. 66-1; ECF No. 66-2.) At the end of 2024, Eric Menser, an enterprise lead for startups at Palantir who worked in the Office of the CEO, emailed Hirsh Jain to learn more about Percepta's work and how Palantir might engage startups like Percepta to use its AIP and Foundry offerings. (Hirsh Jain Decl. ¶ 23; ECF No. 66-3.) Hirsh Jain, Mathew, and Menser met in early January. (Hirsh Jain Decl. ¶ 23; ECF No. 66-3 at 2-3.) Mathew testified that they told Menser that Percepta was doing AI consulting work for customers within the GC ecosystem and helping them undertake an AI transformation. (Mathew Dep. at 74-75.) After the meeting, Menser emailed again indicating that he was still interested in working together. (ECF No. 66-3 at 4.) In February 2025, Menser

11

connected Hirsh Jain and Mathew with a PhD candidate who was interested in the healthcare space.  (ECF No. 66-4.)

In May 2025, Radha Jain met with her former supervisor at Palantir, Ankit Shankar. (Radha Jain Decl. ¶ 30.)  According to Radha Jain, she told him about her work at Percepta, including with ████████, their efforts to grow the team, and who from Palantir had joined Percepta.  (*Id.*)  Shankar testified that Radha Jain gave a vague description of Percepta's work and named former Palantir employees with whom she was working, but he does not recall learning about Percepta's customers or any other relevant details about the conversation. (Shankar Dep. 180-83.)

Radha Jain serves as co-founder at Percepta.  (Radha Jain Decl. ¶ 1.)  She leads engagement with ████████, managing a team of engineers that relies on AI start-ups to provide LLM infrastructure and uses reinforcement learning and advanced modeling, techniques that Palantir does not use, to build bespoke solutions.  (*Id.* ¶ 32.)  She meets regularly with ████████'s leadership team to discuss the solutions her team is building.  (*Id.* ¶ 35.)  She also worked on the process of launching Percepta's engagement with another healthcare company. (*Id.* ¶ 36.)  As co-founder, Radha Jain is involved in hiring, overseeing embedded project managers, and mapping the strategic direction of the company.  (*Id.* ¶ 37.)  Her role does not entail much coding, and she does not run or oversee Mosaic, which is the bundle of AI start-ups and open-source software that Percepta uses in some of its customer engagements.  (*Id.* ¶ 38.)

Cohen is a junior software engineer at Percepta.  (Cohen Decl. ¶ 27.)  She spends most of her time writing code for Percepta's customers in their codebases, and one of the customers she works with is ████████.  (*Id.* ¶ 27.)  At Percepta, Cohen does not join sales calls and has no team leadership responsibilities.  (*Id.* ¶ 28.)

### D.      Procedural Background

Palantir commenced this case against Radha Jain and Cohen on October 30, 2025 and sought emergency relief.  (ECF No. 1; ECF No. 6.)  On November 3, 2025, and on consent of the parties, the Court entered a temporary restraining order (the "Stipulated TRO") that required Radha Jain and Cohen to not use or disclose any documents or information created by them or other Palantir employees in relation to their work for Palantir or obtained in their course of employment with Palantir.  (ECF No. 22 at 1-2.)  The Stipulated TRO also required Radha Jain and Cohen to forensically image personal devices and data storage accounts and locations that contain or contained Palantir property and to return to Palantir all items containing or embodying Palantir property.  (*Id.* at 2-3.)  Radha Jain and Cohen also agreed to not perform any work for Percepta pending the Court's resolution of Palantir's motion for preliminary injunction and to not solicit any Palantir customers or employees.  (*Id.* at 3-4.)

On December 11, 2025, Palantir filed a first amended complaint that added Hirsh Jain as a defendant in the case.  (ECF No. 33.)  Pursuant to the expedited discovery and briefing schedule set out in the Stipulated TRO, Palantir filed its motion for a preliminary injunction on December 12, 2025 (ECF No. 38), along with a memorandum of law in support (ECF No. 43 ("Mem.")).  Defendants filed their opposition to the motion on January 12, 2026.  (ECF No. 71 ("Opp.").)  Palantir filed a reply in further support on January 20, 2026.  (ECF No. 79 ("Reply").)  The Court held a hearing on the motion for a preliminary injunction on January 27, 2026.

## II.      Conclusions of Law

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).  Palantir is a citizen of Delaware and Colorado; Defendants are citizens of New York; and the amount in controversy exceeds $75,000, exclusive of interest and costs.  (ECF No. 33 ¶¶ 36-40.)

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quotation marks omitted).

### A.    Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted). "Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted). "The movant is required to establish not a mere *possibility* of irreparable harm, but that it is '*likely* to suffer irreparable harm if equitable relief is denied.'" *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (emphasis in original) (quoting *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

Palantir argues that it will suffer two forms of irreparable harm absent a preliminary injunction: harm resulting from the risk of disclosure of its confidential information to a competitor seeking to replicate its business from documents or employees freshly removed from the company, and harm to its relationships with its customers. (Mem. at 38.) Palantir also

argues that there is irreparable harm because Defendants' Agreements acknowledged such harm would result from a breach of the Agreements.  (*Id.*)

"Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987).  "Such is the case even where, as here, the restrictive covenant agreement to which a defendant is a party states that any violation thereto will constitute irreparable harm." *Accenture LLP v. Trautman*, No. 21-CV-2409, 2021 WL 6619331, at *8 (S.D.N.Y. June 8, 2021).

A showing of substantial risk of harm to a plaintiff's customer relationships typically establishes irreparable harm, as it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).  Here, Palantir has established that Radha Jain met with ████████, which Palantir had previously courted, in a Percepta capacity while still employed at Palantir (ECF No. 41-13; ECF No. 41-11 at 5); that Percepta has had advanced conversations with a Palantir customer, ████ ████ (ECF No. 41-56 at 7); that another Palantir customer, ██████████, is in Percepta's commercial pipeline (ECF No. 41-58 at 9); and that Cohen sent herself confidential Palantir documents in advance of her transition to Percepta (Wendt Decl. ¶ 10; Cohen Dep. at 260-65). The totality of these facts establishes a risk of irreparable harm to Palantir's customer relationships.  *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) (finding risk of irreparable harm where Defendants, among other things, "met with [a competitor's] representatives repeatedly over a period of months while still employed

with [plaintiff]," "emailed [plaintiff's] confidential [] documents to their personal email accounts during the same period," and "sought and held meetings with several [of plaintiff's] clients after joining [competitor]").

Defendants contend that Percepta has not actually done business with either of the two Palantir customers in its commercial pipeline, and that ██████ was never a Palantir customer. (Opp. at 24-25.) But Palantir need not wait until it has actually lost business to seek preliminary injunctive relief, because "prospective loss of goodwill alone is sufficient to support a finding of irreparable harm." *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 564 (S.D.N.Y. 2012) (Sullivan, J.) (cleaned up). In contrast to the cases on which Defendants rely, this is not a case where Palantir has failed to allege any solicitation of its clients—instead, Palantir has demonstrated that Percepta has successfully won over a client that Palantir had sought and is in medium and advanced conversations with two current Palantir customers. *Cf., e.g., Impax Media Inc. v. Ne. Advert. Corp.*, No. 17-CV-8272, 2018 WL 358284, at *4 (S.D.N.Y. Jan. 10, 2018) ("Plaintiff has not put forward evidence of potential clients with whom Plaintiff is currently contracted, in talks with, or even planning to negotiate[.]"); *Fid. Info. Servs., Inc. v. Katz*, No. 09-CV-766, 2009 WL 10721269, at *3 (N.D.N.Y. Aug. 4, 2009) (finding no risk of irreparable harm where the allegedly competing product is non-operational and has no customers).

The Court also concludes that Palantir has established a risk of irreparable harm with respect to the disclosure of its confidential information. "The disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (quotation marks omitted). "However, the mere exposure of an employee to the trade secrets or confidential information of a former employer does not, without more, create a threat

of irreparable harm.  The operative question is whether there is a risk that such information will be used or disclosed in a way to cause harm." *Accenture*, 2021 WL 6619331, at *15.

Defendants had access to Palantir's confidential information over the course of their employment, including source code for the company's software platforms, the company's internal demonstrative workspace, live customer workflows, and proprietary customer engagement strategies.  (Parikh Decl. ¶ 9; Shankar Decl. ¶ 11; Greenspan Decl. ¶ 7.)  That said, there is no evidence that either Percepta or GC is in possession of any Palantir materials.  (ECF No. 61-15 at 8; ECF No. 61-16 at 7.)  As a result, Defendants argue that Palantir is relying on the "inevitable disclosure" doctrine (Opp. at 23 n.4), which dictates that risk of irreparable harm results from a situation in which a defendant possesses trade secret information and disclosure of those secrets is inevitable. *See Int'l Bus. Machines Corp. v. Papermaster*, No. 08-CV-9078, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008).

The inevitable disclosure doctrine would be hard for Palantir satisfy, as it requires showing that "the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer." *Id.* (quotation marks omitted).  But "[a] plaintiff need not necessarily satisfy each of the elements of the doctrine of inevitable disclosure of trade secrets to establish a likelihood of irreparable harm from disclosure of trade secrets or confidential information." *Accenture*, 2021 WL 6619331, at *14.  Instead, "[a] past employer may still be exposed to a likelihood of irreparable harm . . . if the former employee . . . has shown such a disregard for her legal and contractual obligations in the past that there is a risk she will disregard those obligations in the future." *Id.*

Here, Cohen sent herself Palantir documents, downloaded them onto her personal phone, and then deleted those documents from her laptop.  Although she testified that she sent herself these documents for work purposes and that having documents on her phone helped her work in transit, she was unable to offer any specific explanation for why she sent herself these documents in particular, how they related to her role, how she used those documents in her role, or if she had a pre-existing practice of taking photographs of her work laptop screen.  (*See* Cohen Dep. at 261-70.)  This explanation is too vague to overcome the risk of irreparable harm evident from the facts in the record, which demonstrate that Cohen, on the precipice of joining a new company, sent herself a number of Palantir documents without any legitimate purpose that she can articulate with specificity and then deleted those documents from her laptop.  *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 330 (E.D.N.Y. 2020) (finding irreparable harm where defendants returned their laptops with certain information erased and emailed confidential information to their personal address while still employed by plaintiff).  The documents were also not related to maintaining a record of personal performance but instead "appear to have been . . . downloaded for their competitive value to the new employer."  *Accenture*, 2021 WL 6619331, at *15.  And on the current record, the Court credits testimony offered by Palantir indicating that these documents contain at least some confidential information.  (*See, e.g.*, Jungck Decl. ¶¶ 5-8 (discussing an AI Use Case Tracker Cohen sent to herself which ranks the highest value uses for a customer and which is subject to a non-disclosure agreement).)

Additionally, although acknowledgement of irreparable harm in the Agreements themselves is not dispositive of whether preliminary injunctive relief is appropriate, such language is still a factor that weighs in favor of finding irreparable harm.  *See, e.g.*, *N. Atl.*

*Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying in part on acknowledgment of irreparable harm in employment agreement to determine that there would be irreparable harm absent preliminary injunctive relief).

Defendants argue that any showing of irreparable harm is undercut by Palantir's delay in bringing this case, relying on a combination of Defendants' resignations, their farewell emails and chats, the IT alert triggered by Cohen's Slack message to herself in February 2025, and conversations that Defendants had with various high-ranking employees at Palantir in late 2024 and throughout 2025.  These facts, Defendants contend, show that Palantir knew or should have known about Percepta and Defendants' work there since, at latest, May 2025.  (Opp. at 28-29.)

An unexplained delay typically militates against the granting of a preliminary injunction.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  However, the "delay" that Defendants identify here is not unexplained or unwarranted.  Percepta publicly announced its launch only in early October 2025, the same month that Palantir filed this case.  (ECF No. 42-78.)  Although Palantir may have had *some* sense of what Percepta was working on prior to that launch, its knowledge was patchwork and vague, hardly the kind of constructive or actual notice that was present in the cases on which Defendants rely.  *Cf. Fid. Info. Servs., Inc.*, 2009 WL 10721269, at *3-4 (concerning an eight-month delay after the competitor issued a press release announcing its launch of a competing product); *Equibal, Inc. v. 365 Sun LLC*, No. 21-CV-6254, 2024 WL 1526178, at *10 (S.D.N.Y. Apr. 9, 2024) (concerning four-month delay after a trademark application put plaintiff on notice of the allegedly infringing mark, and even then noting that such delay may be explained by a good-faith investigation of the infringement); *TomGal LLC v. Castano*, No. 22-CV-9516, 2022 WL 17822717, at *5 (S.D.N.Y. Dec. 19, 2022)

(concerning a five-month delay between an unsuccessful cease-and-desist against defendants and the commencement of a case).

Accordingly, Palantir has sufficiently demonstrated that Defendants' conduct is likely to cause imminent harm to its goodwill, customer relationships, and confidential information and that it will likely suffer irreparable harm absent a preliminary injunction.

### B.    Likelihood of Success on the Merits

#### 1.    Breach of Contract

Palantir contends that it is likely to succeed on the merits of its claims that Defendants breached the non-compete, non-solicitation, and confidentiality provisions of their Agreements. The Court applies New York law as required under the terms of the Agreements.  (Hirsh Jain Agmt. ¶ 9; Radha Jain Agmt. ¶ 9; Cohen Agmt. ¶ 9.)  Under New York law, a plaintiff asserting a breach of contract claim must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).

#### a.    Radha Jain's and Cohen's Non-Compete Provisions

Radha Jain's and Cohen's Agreements provide that, for the twelve months immediately following the termination of their employment with Palantir, neither will engage in an activity in which they "perform the job functions that [they] performed during [their] employment with [Palantir], directly or indirectly, in whole or part, as an employee . . . or any other similar capacity for an entity engaged in the same or similar business as [Palantir or its subsidiaries], including those engaged in the business of developing and selling analytical software, whether existing or planned."  (Radha Jain Agmt. § 6.3; Cohen Agmt. § 6.3.)

To grant a motion for a preliminary injunction on an employee restrictive covenant claim, a district court must determine if the covenant is likely to be enforceable. *JLM Couture, Inc. v.*

*Gutman*, 91 F.4th 91, 105 (2d Cir. 2024). "In New York, the prevailing standard of reasonableness for employee non-compete agreements applies a three-pronged test." *Frantic, LLC v. Konfino*, No. 13-CV-4516, 2013 WL 5870211, at *2 (S.D.N.Y. Oct. 30, 2013). "A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public[.]" *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (N.Y. 1999) (emphases omitted). "A violation of any prong renders the covenant invalid." *Id.* at 389.

"[A]n employer's 'legitimate' interests include: (1) the protection of trade secrets; (2) where the employer is exposed to 'special harm' due to the 'unique' nature of an employee's services; or (3) the goodwill of an employer's business." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 215 (S.D.N.Y. 2013) (quoting *Ken J. Pezrow Corp. v. Seifert*, 197 A.D.2d 856, 856 (4th Dep't 1993)). Palantir argues that it has a legitimate interest in protecting confidential information and in protecting customer relationships that Radha Jain and Cohen developed at its expense. (Mem. at 30.) It is likely to succeed on that argument. Both Radha Jain and Cohen had access to confidential information throughout the course of their employment at Palantir, including proprietary source code and customer and prospective customer information. (Shankar Decl. ¶ 11; Greenspan Decl. ¶ 7.) As discussed above, there is risk that such confidential information may be disclosed. *See supra* Section II.A; *see also Int'l Bus. Machines Corp. v. De Freitas Lima*, No. 20-CV-04573, 2020 WL 5261336, at *9 (S.D.N.Y. Sept. 3, 2020) (finding employer had legitimate interest in protecting confidential information where employee knew of "customer and prospective customer information" and "information regarding the development

status of specific IBM products" (cleaned up)), *aff'd sub nom. Int'l Bus. Machines Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021).[2]

Even where a non-compete clause protects a legitimate interest, "reasonableness will not be found where restrictive covenants act to unreasonably limit trade and burden an individual's livelihood." *Poller*, 974 F. Supp. 2d at 220. Two such measures of reasonableness are temporal and geographic limitations. *Id.* Because the non-compete at issue here is in effect for only one year post-termination, it is temporally reasonable. *See BDO Seidman*, 93 N.Y.2d at 393 (finding eighteen-month non-compete temporally reasonable). And even though the non-compete has no geographic limitation, that is permissible where, as here, "an employer's business is conducted worldwide to a global customer base." *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13-CV-8739, 2014 WL 97317, at *7 (S.D.N.Y. Jan. 9, 2014) (quoting *Evolution Mkts., Inc. v. Penny*, No. 7823/09, 2009 N.Y. Misc. LEXIS 1276, at *44 (N.Y. Sup. Ct. 2009)).

Temporal and geographic limitations are not the only relevant factors for determining if a non-compete is "no greater than required for the protection of the employer's legitimate interests." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999, 2020 WL 1320867, at *19 (S.D.N.Y. Mar. 20, 2020) (cleaned up). "Since there are powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood, . . . restrictive covenants

---

[2] Palantir is also likely to succeed in showing that it had a legitimate interest in protecting customer relationships. At Palantir, Cohen served as the main point of contact for a healthcare client, played a role in sales and implementation services, and led implementation strategy while directly interacting with customer points of contact. (Cohen Dep. at 40-44, 65-67.) The record does not as strongly suggest that Radha Jain built strong customer relationships at Palantir, but it does indicate that, in her role as a forward deployed engineer, she met with customers on a weekly basis. (Radha Jain Dep. at 65-66.) *See BDO Seidman*, 93 N.Y.2d at 391-92 ("The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." (quotation marks omitted)).

which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law." *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (N.Y. 1977) (quotation marks and citations omitted); *see also Univ. Sports Publ'ns Co. v. Arena Media Networks, LLC*, No. 109436/06, 2007 WL 7130745 (N.Y. Sup. Ct. Feb. 9, 2007) (noting that a non-compete is unreasonably broad when it "impermissibly prevent[s] employees from pursuing their chosen careers and impose[s] an unfair burden").

Palantir's non-compete limits the kinds of companies Defendants can work for and the kinds of roles they can take—Defendants cannot work at companies that are "similar" to Palantir or its subsidiaries in roles where they "perform the job functions that [they] performed during [their] employment with [Palantir]." (Radha Jain Agmt. § 6.3; Cohen Agmt. § 6.3.) The Agreement does not clarify what would make a business "similar" to Palantir. And given Palantir's wide-ranging work and clientele, it is unclear what AI company would *not* be similar to the company. Palantir is "both [a] software and consulting" company, as well as "an analytics and AI company." (Jungck Dep. at 73.) It "harness[es] AI," "build[s] data integration software," "sell[s] software," "do[es] services for [its] customers," and "build[s] models." (*Id.* at 50-52, 73.) It has 711 customers as of December 31, 2024 (ECF No. 61-3 at 9), in so many industries that its corporate representative could not think of a single one in which it did not have a client (Jungck Dep. at 79).

The little guidance available in the text of the non-compete comes from the clause immediately following the "similar" clause—"including those engaged in the business of developing and selling analytical software, whether existing or planned." (Radha Jain Agmt. § 6.3; Cohen Agmt. § 6.3.) Even that clause sweeps in any number of companies, including those that offer traditional data analytical software rather than AI software. (*See* Jungck Dep. at

46-47 (describing analytical software broadly).) But that clause is also non-exclusive. Indeed, Palantir seeks to read "similar" to sweep in companies that do not develop or sell analytical software. In response to Defendants' argument that Percepta does not plan to develop and sell software, Palantir urges that the factual dispute "is irrelevant since Defendants concede the companies help similar customers develop similar AI solutions for similar use cases." (Reply at 13.) In other words, a company is similar to Palantir if it helps "similar" customers develop "similar" AI solutions for "similar" use cases.

But what does it mean for a company to have customers "similar" to Palantir's? Palantir has customers in virtually every industry. (Jungck Dep. at 79.) Palantir has also stated that it views its competitors as including "large enterprise software companies, government contractors, [] system integrators," and even the company's own potential customers who seek to internally develop their software. (ECF No. 61-3 at 13.) If nearly every company that uses AI could be considered either a client or a competitor, the non-compete may be triggered if Radha Jain or Cohen went to work for any company that creates AI solutions or seeks to develop them for internal use.

Likewise, it is unclear what it means for a company to offer AI solutions "similar" to those offered by Palantir in use cases "similar" to those of Palantir's customers. Palantir emphasizes that Percepta and Palantir offer similar solutions because both companies integrate AI-driven software "into enterprise workflows to enhance operational efficiency." (*See, e.g.*, Mem. at 31.) But the focus on Palantir's "workflow" solutions obfuscates the much broader scope of Palantir's offered solutions. Palantir markets a wide range of AI and analytical services beyond operationalizing workplace efficiency. Palantir's platforms include Gotham, an intelligence platform that "surface[s] insights for global defense agencies, the intelligence

24

community, disaster relief organizations and beyond" and "enables users to identify patterns . . . ranging from signals intelligence sources to reports from confidential informants," and which "help[s] operators plan and execute real-world responses to threats that have been identified within the platform." (ECF No. 61-3 at 7-8.) The company's own job postings indicate that its software engineers help clients on diverse use cases that include "develop[ing] lifesaving drugs, forecast[ing] supply chain disruptions, locat[ing] missing children, and more." (ECF No. 42-5.) It is not even clear that all of Palantir's products implement AI to deliver customer solutions. (*See* ECF No. 61-3 at 8-9 (identifying AIP as an AI-driven product, but not any of Palantir's other products as such).)

In context, it becomes clear that Palantir's diverse analytic and AI offerings across virtually every industry render most AI or analytical companies "similar" to Palantir in at least some sense of the word. Palantir presents a narrowly scoped explanation for why Percepta is similar to Palantir, but there is no evidence that the scope of the non-compete is actually so limited when "the ['similar to'] clause contains no criteria to provide notice of which similarities are and are not relevant." *Flatiron Health*, 2020 WL 1320867, at *20. In a case concerning a non-compete that prohibited "participat[ing] in [] any business that is similar" to that of a health technology company, Judge Marrero held that the "similar to" clause impermissibly "operates as a broad and amorphous restraint." *Id.* Even in the context of a licensing agreement—where restrictive covenants are far more permissible under New York law—Judge Cote nonetheless found that a non-compete prohibiting the defendant from producing patterns "similar" to the plaintiff's was "impermissibly broad in scope and unduly burdensome" because it "provides no criteria to provide notice of what [the plaintiff] considers to be similar." *Crye Precision LLC v.*

*Duro Textiles, LLC*, No. 15-CV-1681, 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir. 2017).

The same is true here, where Radha Jain, Cohen, and all of Palantir's other employees who signed an Agreement upon accepting an offer of employment have no notice of where they may work after leaving Palantir. The notice problem is further exacerbated when the employer is a company that does not work just in one sector but on all sorts of AI and analytical services across all industries, including law enforcement analytics, cryptography, and workflow optimization. (ECF No. 61-3 at 12.) Prohibiting its employees from going to work in *any* of these contexts is not narrowly tailored to protecting Palantir's legitimate interests. The non-compete as written would prohibit Radha Jain and Cohen from joining any business similar to that of Palantir or its worldwide subsidiaries, regardless of whether they actually worked in that area for Palantir. To put it another way, a Palantir developer who worked only with law enforcement clients would nonetheless be prohibited, under the terms of the non-compete, from joining a healthcare-focused tech company like Percepta.

Palantir relies heavily on that part of the non-compete limiting its application to only those jobs in which Defendants would perform analogous duties to their job at Palantir. (Reply at 11.) It urges that this limitation distinguishes the non-compete here from that in *Flatiron Health*. (*Id.* at 10-11.) It is true that a non-compete that prohibits an employee from working for another company only in an analogous role is more likely to be enforceable. *Cf., e.g.*, *GFI Brokers, LLC v. Santana*, No. 06-CV-3988, 2008 WL 3166972, at *10 (S.D.N.Y. Aug. 6, 2008) (Lynch, J.). But there are no magic words that automatically validate a non-compete; instead, the Court must "focus[] on the particular facts and circumstances giving context to the agreement." *BDO Seidman*, 93 N.Y.2d at 390.

Here, the non-compete prohibits an employee from "perform[ing] the job functions that [they] performed" at Palantir for a similar business, whether performance of such job functions is done "directly or indirectly, in whole or part." (Radha Jain Agmt. § 6.3; Cohen Agmt. § 6.3.) Palantir employees are therefore prohibited from working any job that involves, in any part or even indirectly, a job function that they performed while at Palantir, no matter how ancillary a role that function plays in their new job and no matter how ancillary a role that function played in their job at Palantir. The non-compete also applies to any job function, regardless of whether that function implicates a legitimate interest in protecting confidential information or customer relationships. Cohen, for example, managed a number of Palantir employees in her final role at Palantir; under the terms of the non-compete, she would be unable to take on a management role at any AI company that delivers solutions to clients, even if she were managing people who worked in industries different than the ones in which she or her Palantir supervisees worked.

Palantir also asserts that the non-compete bars performance of *all* of Defendants' previous job functions, including those they had only when they first started at Palantir. (Hearing Tr. at 14.) But at a place like Palantir, with a "unique" and "flatter" structure (*id.* at 8), where employees may change roles without receiving formal promotions or changes in compensation (Cohen Dep. at 36-37), it is possible for an employee to shift through job functions quite often. Indeed, in their few years at Palantir, both Radha Jain and Cohen changed job titles and job responsibilities a number of times. (*See* Radha Jain Decl. ¶¶ 4-11; Cohen Decl. ¶¶ 3-9.) Under the terms of the non-compete, someone who only coded in their first year at Palantir, and then spent many more years doing entirely unrelated work for Palantir, such as marketing or operations, would still be prohibited from taking a software developer job if it were at a company "similar" to Palantir or any of its subsidiaries. *Cf. Papermaster*, 2008 WL 4974508, at *12-13

27

(holding non-compete was reasonable where it applies only when the defendant leaves to work at an entity that engages in competition with divisions of the company in which the defendant worked during the last two-year period prior to his termination).

This is not to say that a non-compete necessarily needs to time-limit a job functions requirement to be enforceable under New York law.  But given that Palantir's non-compete has such sweeping breadth, the relatively anemic cabining done by the "job functions" limitation does not cure the fact that Radha Jain and Cohen would be effectively barred from pursuing the careers for which they are trained for the duration of the non-compete.  Indeed, when pressed on whether there was *any* role that Cohen or Radha Jain could have at Percepta, Palantir could offer only janitor and Chief Operating Officer, neither of which is a realistic position for Defendants to take given their education and professional experience.  (Hearing Tr. at 15, 131-32.)

In light of the facts and circumstances particular to Palantir's non-compete, the Court concludes that Palantir is unlikely to succeed in proving that the terms of the provision are reasonably tailored to protect its legitimate business interest.  In reaching this holding, the Court does not conclude that a non-compete can never be enforceable when it prohibits working for a business "similar to" that of the employer.  Indeed, a non-compete with analogous language may be enforceable when imposed by employers operating in discrete industries and on employees who can find work in their chosen profession outside of that clearly defined sphere of "similar" businesses.  But in examining the facts specific to this case, as it is required to do, the Court concludes that the non-compete would prohibit Radha Jain and Cohen from working for virtually any AI or data analytics company in virtually any role for which they are trained.

Palantir does not ask this Court to partially enforce the non-compete.  In any event, the Court declines to do so at this juncture and on this record, where Palantir imposed the non-

compete as a condition of Radha Jain's and Cohen's initial employment and there is little

evidence in the record as to overreach or bad faith. *See BDO Seidman*, 93 N.Y.2d at 394-95;

*Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 780 N.Y.S.2d 675, 677-78 (3rd Dep't 2004)

(noting that "imposition of the covenant in connection with hiring or continued employment"

weighs against partial enforcement); *see also Brown & Brown, Inc. v. Johnson*, 980 N.Y.S.2d

631, 641 (4th Dep't 2014) (reversed on other grounds) (holding that a restrictive covenant that

included a narrowing provision was evidence of employer's bad faith).

### b.    Hirsh Jain's and Radha Jain's Employee Non-Solicitation Provisions

Hirsh Jain's and Radha Jain's Agreements require that they "not directly or indirectly

solicit, or recruit, or attempt to solicit, or recruit, any employee of [Palantir] to leave their

employment with [Palantir]," and that they not "contact any employee of [Palantir], or cause an

employee of [Palantir] to be contacted, for the purpose of leaving employment with [Palantir]."

(Hirsh Jain Agmt. § 6.2; Radha Jain Agmt. § 6.2.)

The analysis set forth in *BDO Seidman* applies to employee non-solicitation provisions.

*See MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 600 (S.D.N.Y. 2016); *Perella*

*Weinberg Partners LLC v. Kramer*, 230 A.D.3d 451, 451 (2024). For the reasons articulated

above, Palantir has a legitimate interest in protecting against the disclosure of its confidential

information and in protecting its customer relationships. *See MasterCard*, 164 F. Supp. 3d at

602 ("[P]laintiff's assertion that the Non-[Solicitation] Provision is designed to prevent

competitors from poaching employees from [Plaintiff's] highly developed [information security]

department as well as protect against the misappropriation of [Plaintiff's] proprietary

[information security] network coincides with the legitimate interests recognized by courts in

New York.").

Similarly, for the reasons articulated above, the geographic and temporal scope of the non-solicitation provision is likely reasonable.  *See id.* at 599, 601-602 (holding that twelve-month and twenty-four-month non-solicitation restrictions were enforceable); *Marsh USA Inc. v. Karasaki,* No. 08-CV-4195, 2008 WL 4778239, at *16 (S.D.N.Y. Oct. 31, 2008) (upholding worldwide non-solicitation agreement).  Indeed, courts have repeatedly enforced employee non-solicitation provisions markedly similar to the one at issue here.  *See, e.g.*, *MasterCard*, 164 F. Supp. 3d at 599-602 (upholding agreement that prohibited the defendants from "directly or indirectly, solicit[ing], induc[ing], recruit[ing], or encourag[ing] any other employee, agent, consultant or representative to leave the service of [MasterCard] for any reason"); *Ikon Off. Sols., Inc. v. Usherwood Off. Tech., Inc.*, No. 9202-08, 2008 WL 5206291 at *16-17 (N.Y. Sup. Ct. Dec. 12, 2008) (finding enforceable a non-solicitation agreement that prohibited employees from soliciting, enticing, or encouraging the plaintiff's employees to leave the company for two years post-employment); *Perella Weinberg Partners LLC v. Kramer*, 188 N.Y.S.3d 915, at *6, *10 (N.Y. Sup. Ct. 2023) (holding that agreement prohibiting limited partners from "directly or indirectly in any capacity . . . hir[ing] or solicit[ing], recruit[ing], induc[ing], entic[ing], influenc[ing], or encourag[ing] any Firm employee" to leave the Firm is enforceable), *aff'd in relevant part*, 230 A.D.3d 451, 451-52 (2024).

Defendants argue that the provision is unenforceable because it prohibits solicitation of every person employed by Palantir, without regard to their position.  (Opp. at 42.)  But there is no categorical rule that such a provision is per se unenforceable.  Indeed, the cases cited above favorably treated employee non-solicitation provisions that used language nearly identical to the language used here.  Instead, as with all restrictive covenants under New York law, the Court's obligation is to consider "whether the clause at issue protects cognizable employer interests."

*QBE Americas, Inc. v. Allen*, No. 22-CV-756, 2022 WL 889838, at *11 (S.D.N.Y. Mar. 25, 2022). Here, like in *MasterCard*, Palantir has sufficiently demonstrated at this juncture that its legitimate interest in protecting its confidential information justifies the scope of the employee non-solicitation provision. Indeed, Radha Jain herself acknowledged in depositions that she, "[a]long with every other Palantir employee," had access to Palantir's confidential information. (Radha Jain Dep. at 46-47.) *See Mastercard*, 164 F. Supp. 3d at 599, 602 (concluding that a provision prohibiting employees from "solicit[ing], induc[ing], recruit[ing], or encourag[ing] *any other employee*, agent, consultant or representative to leave the service of [MasterCard] for any reason" was supported by a legitimate interest (emphasis added)).

Defendants make no arguments on the two remaining *BDO Seidman* factors, undue hardship or injury to the public. *See BDO Seidman*, 93 N.Y.2d at 388-89. And given the limited time frame of the non-solicitation provision and the legitimate interests that it protects, the Court cannot conclude at this juncture that the provision is unenforceable on either ground. *See MasterCard*, 164 F. Supp. 3d at 602.

Having determined that the employee non-solicitation provision is likely enforceable, the Court also concludes that Palantir is likely to succeed in showing that Hirsh Jain and Radha Jain breached that provision. Hirsh Jain asked to meet up with Radha Jain and, after the meeting, told her that he "was reminded of how much [he'd] love to come to work every day and see [her]," and that he "want[s] [her] to consider working w[ith] [him]." (ECF No. 42-7 at 2; ECF No. 42-11 at 2.) In a later conversation, Hirsh Jain acknowledged that he "went into sell mode." (ECF No. 41-1 at 12.) He then connected her with a managing director at GC. (ECF No. 42-13 at 2.) Likewise, Hirsh Jain met with Cohen and then introduced her to a number of Percepta employees for the express purpose of discussing Percepta. (Cohen Decl. ¶ 11; ECF No. 41-34; ECF No. 41-

37; ECF No. 41-38 at 3; ECF No. 41-39.)  One of those Percepta employees was Radha Jain, who then "took [Cohen] out for lunch" as part of her interviews.  (Radha Jain Dep. at 350.)

Hirsh Jain and Radha Jain also brainstormed together about potential Palantir employees to solicit.  (ECF No. 41-1.)  In that conversation, Radha Jain offered names and LinkedIn profiles of then-current Palantir employees to Hirsh Jain, the two discussed hiring them and the best recruitment strategies, and Hirsh Jain messaged a person whose LinkedIn page Radha Jain sent, opining to Radha Jain that they "could 100% poach [him]."  (*Id.* at 5-8.)

These facts establish that Hirsh Jain and Radha Jain likely "solicit[ed], or recruit[ed], or attempt[ed] to solicit, or recruit," Palantir employees to join Percepta, and that the two "contact[ed] an[] employee of [Palantir], or cause[d] an employee of [Palantir] to be contacted, for the purpose of leaving employment with [Palantir]."  (Hirsh Jain Agmt. § 6.2; Radha Jain Agmt. § 6.2.)  Hirsh Jain solicited Radha Jain, as evidenced by his message asking her to consider joining Percepta and his later acknowledgment that he was in "sell mode."  (ECF No. 41-1 at 12; ECF No. 42-11 at 2.)  He also recruited Cohen, as evidenced by their meeting, his introduction of her to other Percepta members, and his discussions with her about making an offer and negotiating terms.  (ECF No. 42-45; ECF No. 41-37; ECF No. 41-38 at 3; ECF No. 41-39; ECF No. 41-45; ECF No. 41-46; ECF No. 41-47.)  He introduced Cohen to Radha Jain, who then also participated in hiring and recruiting Cohen.  (Radha Jain Dep. at 350-54.)  Radha Jain also attempted to recruit Palantir employees, at least indirectly, by feeding names to Hirsh Jain, who then attempted to recruit Palantir employees by contacting at least one person Radha Jain suggested with the goal of poaching him.  (ECF No. 41-1.)

Defendants, in the face of an unfavorable evidentiary record, emphasize that none of the employees Radha Jain and Hirsh Jain discussed in their text thread joined Percepta, and that the

Palantir employees who did join Percepta instigated their own departures.  (Opp. at 43-44.)

Neither argument is persuasive.  The first overlooks the fact that the non-solicitation provision

also prohibits attempted solicitation.  (Hirsh Jain Agmt. § 6.2; Radha Jain Agmt. § 6.2.)  The

second is not clear on the record and also places too much weight on a strained interpretation of

"solicit."  Defendants cite a New York Supreme Court case that defined the word "solicit" to

require initiation of contact, but the contract in that case prohibited only "solicit[ing], or sell[ing]

directly."  *Bajan Grp., Inc. v. Consumers Interstate Corp.*, 958 N.Y.S.2d 59, at *1, *6 (N.Y. Sup.

Ct. 2010).  In contrast, the Agreements here also prohibit "recruiting," a word that encompasses

actions taken "to secure the services of" someone.  *See Hongxia Wang v. Enlander*, No. 17-CV-

4932, 2018 WL 1276854, at *6 (S.D.N.Y. Mar. 6, 2018) (quotation marks omitted).  In any

event, this is not a case where the only evidence of solicitation or attempted solicitation is

"speculation" based on pre-existing relationships and temporal proximity.  *Cf. FTI Consulting,*

*Inc. v. Graves*, No. 05-CV-6719, 2007 WL 2192200, at *8 (S.D.N.Y. July 31, 2007).  Instead,

Hirsh Jain was deeply involved in the process of introducing both Radha Jain and Cohen to

Percepta, facilitating their recruiting, enlisting Radha Jain to participate in the interviewing and

hiring of Cohen, and staying involved in the offer process.  The record also establishes that both

Hirsh Jain and Radha Jain explicitly sought to recruit Palantir employees and messaged at least

one person with that purpose.  *See Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-

4819, 2018 WL 6786338, at *28 (S.D.N.Y. Oct. 25, 2018) (finding breach of employee non-

solicitation provision where the defendants asked the plaintiff's employee if he wanted to join

the defendants' company and directed another employee to speak with the recruiting company's

personnel about joining), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020).

Accordingly, the Court concludes that Palantir is likely to succeed in showing that Hirsh Jain and Radha Jain breached their employee non-solicitation agreements.

### c.    Cohen's Customer Non-Solicitation Provision

Palantir argues that Cohen, by working with ████████, is in breach of the customer non-solicitation provision in her Agreement.  That provision requires that she "not contact, or cause to be contacted, directly or indirectly, or engage in any form of . . . communication with any Customer for the purposes of conducting business that is competitive or similar to that of [Palantir] or for the purpose of disadvantaging [Palantir's] business in any way" for a period of twenty-four months following her termination from Palantir.  (Cohen Agmt. § 6.1(a).) "Customer" is defined in the Agreement to "mean all persons or entities that have used or inquired of [Palantir's] services at any time during the two-year period preceding the termination of [Cohen's] employment with [Palantir]."  (*Id.*)

Both New York courts and courts in this district have routinely held that a customer non-solicitation or non-servicing agreement is unenforceable if it restricts the employee from servicing clients with whom she did not personally work.  *Frantic, LLC v. Konfino*, No. 13-CV-4516, 2013 WL 5870211, at *3 (S.D.N.Y. Oct. 30, 2013); *see also BDO Seidman*, 93 N.Y.2d at 393.  "[S]uch provisions will be 'considered overbroad if the former employee had not personally served those customers before and if the individual had never represented the firm's goodwill to those customers.'"  *Poller*, 974 F. Supp. 2d at 221 (quoting Employment Law, Practitioner Treatise Series, § 8.10).  Additionally, some courts have held customer non-solicitation agreements to be overbroad if they apply to potential customers.  *See Mercer Health & Benefits*, 307 F. Supp. 3d at 350; *Frantic, LLC*, 2013 WL 5870211, at *3.

The customer non-solicitation provision at issue bars Palantir employees from soliciting any entity that has "used or inquired of [Palantir's] services at any time during the two-year period preceding the termination of [their] employment with [Palantir]." (Cohen Agmt. § 6.1(a).) This definition prevents former Palantir employees from soliciting or servicing Palantir customers whom they never personally served while at Palantir, as well as entities who never actually used Palantir's services but only "inquired of" such services. Palantir offers no argument for why this case should be distinguished from the many cases in which courts have held similar provisions to be unreasonably broad.

"A covenant will be rejected as overly broad . . . if it seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment." *Scott, Stackrow & Co.*, 780 N.Y.S.2d at 677. Because the agreement here does exactly that, the Court concludes that Palantir is unlikely to succeed in showing that it is enforceable under New York law. And as with the non-compete provision, Palantir has not shown at this juncture that partial enforcement is warranted. *See id.* at 678 (declining to partially enforce provision where "plaintiff, from a superior bargaining position, required defendant to sign the employment agreement upon hiring her," where defendant did not enjoy "any other significant benefit beyond continued employment" in exchange for her agreement, and where the agreement was signed long after the issuance of *BDO Seidman*).

> **d.    Cohen's Confidentiality and Return-of-Property Provision**

Palantir's final breach of contract claim is against Cohen for purported violations of the confidentiality provision in her Agreement. That provision requires her not to disclose or use outside the scope of her employment any "Proprietary Information," which encompasses "all Inventions and all other business, technical and financial information," "including, without

limitation, the identity of and information relating to customers or employees, price lists, pricing

structures, marketing and sales information, business plans or dealings, designs, formulae or

research activities" that she obtains during her employment and "that relate to [Palantir and its

subsidiaries], or the business or demonstrably anticipated business of [Palantir and its

subsidiaries] or that are received by or for [Palantir and its subsidiaries] in confidence." (Cohen

Agmt. § 4.)  The Agreement further requires Cohen to promptly return to Palantir all items

containing Proprietary Information upon termination of employment.  (*Id.*)

Cohen accessed and downloaded a number of Palantir documents onto her personal

device in the days surrounding her resignation.  (Wendt Decl. ¶¶ 10, 12.)  After sending herself

multiple documents on Slack, Cohen downloaded the documents onto her personal phone and

then deleted those files from her work laptop.  (ECF No. 41-76 at 3.)  She also used her phone to

take photographs of her work laptop screen.  (Cohen Dep. at 261-65; Cohen Decl. ¶ 22.)  As

discussed above, Cohen could offer only a vague and imprecise explanation for why she took

these actions, and could not explain how she actually used the documents that she sent herself or

photographed.  Cohen's explanation does not sufficiently overcome this surreptitious and

anomalous behavior, establishing a likelihood that the information she sent herself or

photographed has been used or disclosed or is at risk of being used or disclosed.

Defendants do not dispute that Cohen sent herself these documents.  Instead, they argue

that the claims are moot now that Cohen has returned the materials pursuant to the Stipulated

TRO and that there is no evidence any materials were shared with Percepta or GC.  (Opp. at 46-

47.)  They elsewhere dispute whether the materials Cohen sent to herself were in fact

confidential.  (*Id.* at 27-28.)

Cohen may be right that not all the information she sent herself is confidential.  (*See* Cohen Decl. ¶ 22.)  But that does not mean *none* of the information she sent herself is confidential.  At this juncture, the Court concludes that at least some of the information Cohen took into her possession is likely confidential, including an AI use case roadmap prepared for one of Palantir's major healthcare customers that was subject to a non-disclosure agreement (Jungck Decl. ¶¶ 4-7), internal strategies for the sales team on how to pitch Palantir products to potential customers (ECF No. 78 ¶ 6), and an internal team planning document for future features (*id.* ¶ 5).

Because the record demonstrates that Cohen "surreptitiously" sent herself confidential materials that she retained after her termination of employment with Palantir, "an injunction is needed to assure that [she] do[es] not use any confidential information covered by the Confidentiality Agreement[]."  *Mercer Health & Benefits*, 307 F. Supp. 3d at 353.  Defendants argue that the Stipulated TRO has mooted any confidentiality claim, but that argument fails.  The Stipulated TRO required Cohen to forensically image her devices and data storage accounts and locations that contain or contained Palantir's property and to delete all such property from those devices and accounts (ECF No. 22 at 2-3), but given the limited expedited discovery that has been conducted thus far, it is possible that subsequent investigations may reveal that Palantir property exists on additional devices or has in fact been disseminated to Percepta or others.

### 2.    Tortious Interference

Palantir also brings a tortious interference claim against Hirsh Jain, alleging that he induced Radha Jain to breach her confidentiality, non-compete, and employee non-solicitation obligations.  (Mem. at 37-38.)  "To state a contract-interference claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting

damages to the plaintiff." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 124-25 (2d Cir. 2008) (Sotomayor, J.). "Plaintiff must also establish proximate causation." *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05-CV-9478, 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009) (Lynch, J.).

On this record, Palantir has not demonstrated that it is likely to succeed in showing that Hirsh Jain knew of Radha Jain's contractual obligations, let alone that he intentionally procured a breach of those obligations. Hirsh Jain has not been deposed and no evidence in the record shows that he knew of Radha Jain's contractual obligations. Palantir relies on the fact that Hirsh knew of his own employee non-solicitation obligations and that his Agreement also prohibited disclosing confidential information and engaging in competitive work during his employment with Palantir. But Hirsh Jain's Agreement also differs from Radha Jain's in other ways, and the record does not offer any evidence that Hirsh Jain knew that Radha Jain's Agreement looked similar to his, let alone that it included the same provisions relevant here. (*Compare* Hirsh Jain Agmt. *with* Radha Jain Agmt.; *see also* Radha Jain Dep. at 231 (testifying that she does not recall ever discussing her contractual restrictions with Hirsh Jain).) Further discovery may bear out Palantir's allegations of knowledge and intentional procurement, but the absence of evidence at this juncture counsels against the granting of a preliminary injunction. *See Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018) ("[N]ew York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract.").

## C.     Remaining Factors

For those claims on which Palantir has shown a likelihood of success, it has also shown that the balance of equities and public interest favor granting the motion for a preliminary injunction. Defendants are minimally harmed by an injunction preventing them from soliciting

or recruiting Palantir employees and from not disclosing or using any of Palantir's confidential information.  In contrast, Palantir has a strong interest in protecting its legitimate business interests.  Likewise, "the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, No. 1:24-CV-9914, 2025 WL 304500, at *9 (S.D.N.Y. Jan. 27, 2025) (quotation marks omitted).

### D.    Extracontractual Relief

Lastly, Palantir urges this Court to impose an extracontractual obligation on Hirsh Jain enjoining him from working for Percepta and on Hirsh Jain and Radha Jain enjoining them from participating in any hiring.  (Mem. at 43-44; ECF No. 45 at 4.)  The Court declines to take such extraordinary measures.  First, having concluded that the non-compete provision in Radha Jain's and Cohen's Agreements is likely unenforceable, the Court declines to impose that obligation on Hirsh Jain, who had no such provision in his Agreement.  Second, Palantir overstates the nature of Hirsh Jain's conduct.  Admittedly, Hirsh Jain has likely violated his employee non-solicitation obligation.  Nonetheless, this is not a case in which Palantir employees left "en masse" to Percepta or a case in which egregious theft of trade secrets has tainted the competing business wholesale.  *Cf. Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226, 2019 WL 2536104, at *7, *22-23 (Del. Ch. June 20, 2019).  Absent evidence of the type of conduct that was at issue in *Mountain West*, an extracontractual injunction enjoining Hirsh Jain from working at Percepta is disproportionate to the relief necessary to protect Palantir from irreparable harm and unsupported by New York's disfavor of employee non-competes.

## III.    Sealing

The parties have moved to seal or redact certain portions of their briefing and certain exhibits filed contemporaneously therewith.  (ECF No. 37; ECF No. 58; ECF No. 60; ECF No.

74; ECF No. 82; ECF No. 83; ECF No. 87.) Judicial documents are protected by both a common law and First Amendment right of access. *United States v. Greenwood*, 145 F.4th 248, 254 (2d Cir. 2025). A court record may be sealed only if closure is essential to protect higher values including privacy interests, financial records, and confidential business information. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20, 124 (2d Cir. 2006); *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995).

The Court has reviewed the redacted and sealed materials in this case and concludes that the redactions and sealing are narrowly tailored to protect personally identifying information of individuals, personal information related to non-parties, the names of customers or clients that are not publicly disclosed, and other proprietary business information. These interests warrant the narrow sealing and redaction that the parties propose. *See, e.g.*, *W.J. Deutsch & Sons Ltd. v. Diego Zamora, S.A.*, No. 1:21-CV-11003, 2022 WL 890184, at *2-3 (S.D.N.Y. Mar. 25, 2022).

## IV.    Conclusion

For the foregoing reasons, Palantir's motion for a preliminary injunction is GRANTED in part and DENIED in part. Pending final judgment in this case or further order of this Court, it is hereby ORDERED that:

(1) Hirsh Jain and Radha Jain are enjoined from soliciting, recruiting, attempting to solicit, or attempting to recruit Palantir employees. Hirsh Jain is enjoined for twelve months from the date of entry of the Stipulated TRO, November 3, 2025, and Radha Jain is enjoined for twenty-four months from that same date.

(2) Joanna Cohen is enjoined from using or disclosing any confidential information obtained from Palantir. Within fourteen days of the date of this Order, Palantir and Cohen shall meet and confer to determine a method of identifying, returning, and deleting or sequestering all confidential Palantir information within Cohen's possession.

40

(3) Palantir's motion is denied in all other respects.

The parties are directed to confer and submit jointly proposed redactions to this opinion and order within fourteen days of the date of this Order.

The Clerk of Court is directed to close the motions at Docket Numbers 37, 38, 58, 60, 74, 82, 83, and 87.

~~The Clerk of Court is also directed to file this opinion and order UNDER SEAL PARTY VIEW ONLY.~~

SO ORDERED.

~~Dated: February 18, 2026~~
~~New York, New York~~

*Redactions approved and so*
*ordered: March 5, 2026.*

J. PAUL OETKEN
United States District Judge